N1BCzilC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          19 Cr. 802 (GBD)

MENDEL ZILBERBERG,

            Defendant.

------------------------------x

                                 New York, N.Y.
                                 January 11, 2023
                                 10:00 a.m.

Before:

                HON. GEORGE B. DANIELS,

                               District Judge

                    APPEARANCES

DAMIAN WILLIAMS,
      United States Attorney for the
      Southern District of New York
BY:  DINA McLEOD
      DANIEL NESSIM
      KIMBERLY RAVENER
      Assistant United States Attorneys

BRAFMAN & ASSOCIATES PC
      Attorneys for Defendant
BY:  BENJAMIN BRAFMAN
      JACOB KAPLAN

1          (Case called)

2          MS. McLEOD:  Good morning, your Honor.  Dina McLeod,

3    Daniel Nessim, and Kimberly Ravener on behalf of the

4    government.

5          THE COURT:  Good morning.

6          MR. BRAFMAN:  Good morning, your Honor.  Benjamin

7    Brafman and Jacob Kaplan on behalf of Mr. Zilberberg, who is

8    present, your Honor.

9          THE COURT:  Let me start with the government.  What's

10   the status from the government's perspective?

11         MS. McLEOD:  Your Honor, while I won't bury the lead,

12   the basic status is that we understand from defense counsel

13   that they are likely to seek an adjournment of the trial.  The

14   government produced a number of documents that were produced to

15   us from the FDIC earlier in the case, which weren't central in

16   the government's case, but out of an abundance of caution, we

17   produced.  Defense counsel, due to their trial schedule, is

18   going to be available starting in around May.  So that's sort

19   of the main status right now.  There's obviously other sort of

20   substantive issues about the case, but in terms of sort of the

21   top line issue for your Honor in terms of scheduling and dates,

22   that is an application that we understand to be coming from the

23   defense today.

24         THE COURT:  Mr. Brafman, what's your situation?

25         MR. BRAFMAN:  Your Honor, we or all, I think, on both

1   sides are diligently preparing for trial beginning on the 23rd.

2   Yesterday, we received 20,000 documents, 20,000 pages of

3   documents that sensibly are related to the FDIC, and the FDIC

4   had a central role in the investigation in this case.  The

5   charge was bank fraud and this began with substantial testimony

6   before the FDIC.

7          The week before or two weeks before, we received

8   11,000 documents, and getting 20,000 documents yesterday makes

9   it literally impossible for us to be able to carefully review

10  them.  And whether or not the government deems them to be

11  relevant or not, we have an obligation, I think, to review them

12  carefully because the FDIC is not taking a side position here.

13  They have been central to the preparation of the case.  So, in

14  an abundance of caution, I think we have no choice, subject to

15  your Honor's approval, to seek an adjournment.

16         The difficulty with adjourning the trial is we have

17  another trial beginning in late February before Judge Irizarry,

18  and that's been pending for three years.  So that, I think,

19  trial date is firmly set.  We were going to go to the Eastern

20  District to request a short adjournment of that date because of

21  this trial running back to back, but if we get this trial

22  adjourned, that trial won't have to be moved.

23         But the principal request, your Honor, is for this

24  trial to be adjourned.  We've conferred with the government and

25  we believe, again, if you are available, sir, that the May date

1   would be acceptable.  The government also asked us whether we

2   would be available in July and the answer is yes as to both May

3   and July.  I think your Honor knows it's rare that I ask for an

4   adjournment of a trial date.  It's just what I do.  And we

5   prepared diligently, but to get 20,000 documents -- and we're

6   not faulting the government.  These documents were, I think,

7   accumulated by the FDIC, but they are a central player in this

8   case, and not to have a chance to review them, if there were a

9   conviction in this case, it would make it difficult for it to

10  be sustained if we didn't have a chance to review those

11  documents.

12          So, respectfully, your Honor, we are asking for an

13  adjournment.  Subject to your Honor's availability, we would be

14  available in May or in July, which I think would be, both

15  dates, acceptable to at least some members of the government

16  team.

17          THE COURT:  I already started lightening the calendar

18  for the 23rd of January for this trial.  My understanding,

19  we're talking about approximately a three-week trial.  Are we

20  definitely or very likely going to go to trial on the next

21  date?

22          MR. BRAFMAN:  Well, Judge, my request is that it not

23  be a starting date because we will not have had a chance to

24  review these materials, even if we worked around the clock,

25  20,000 documents, and god only knows what they refer to and who

1    they relate to.  There are a number of FDIC witnesses who will

2    testify in this trial.  Many of the interviews were done with

3    members of the FDIC present when witnesses were reviewed as

4    opposed to most cases where we get FDI 302s, we were getting

5    FDIC reports of the interviews.  There are also a wealth of

6    testimony that was taken by the FDIC, and many of the principal

7    witnesses in this case testified under oath before the FDIC.

8    Now, we have had that testimony for a considerable period of

9    time, but getting 11,000 documents and now 20,000 documents, I

10   think it makes it impossible for us to provide effective

11   assistance of counsel if we had to ignore what was in those

12   materials and proceed to trial on the 23rd.

13          I apologize for this request, Judge, but I think you

14   should recognize, respectfully, that we are in an untenable

15   position because going to trial without reviewing those

16   materials would introduce an ineffective assistance of counsel

17   issue in the event that the defendant were convicted, and I

18   don't want that issue in any case I diligently prepare for.

19   But I think, Judge, it's an unfortunate development.  I'm not

20   faulting anyone for this development, but I certainly don't

21   want us to be faulted for raising this issue on the eve of

22   trial.

23          THE COURT:  At this point, there's no possibility or

24   likelihood of a disposition in this?

25          MR. BRAFMAN:  I don't think so, your Honor.  We have

1    had that discussion numerous times.  The defendant maintains

2    that he is not guilty.  We have, I think, a reasonable, triable

3    case from our perspective.  I think he's entitled to a trial,

4    obviously.

5         THE COURT:  What week were you looking at either in

6    May or July?

7         MR. BRAFMAN:  We had the opportunity to confer with

8    your courtroom deputy and we were looking for either mid May,

9    and then very recently before your Honor got on the bench, the

10   government asked whether we would be available in July, and I

11   think both dates would be acceptable.

12        THE COURT:  And there's no other month or weeks that

13   are possible?

14        MR. BRAFMAN:  Well, what we may do is, your Honor, if

15   your Honor would agree, we would later today look at our

16   respective calendars, confer with the government, and then send

17   a note to the Court as to what other dates might be acceptable.

18   I don't believe April is available because of the trial in the

19   Eastern District, and also the Passover holiday comes out right

20   in between.

21        THE COURT:  I'd like to give you an earlier date

22   rather than a later date.  May, I can just tell you right now,

23   I think I have a trial scheduled for May 15th already.  Also,

24   last year, and I don't know if there's going to be a

25   possibility this year, I sat for a week on the Ninth Circuit,

1  so I wasn't here for a week and I was in California.  So I

2  don't know whether or not whether I'm going to be asked to come

3  back out there.

4  MR. BRAFMAN:  Your Honor, may I suggest that if the

5  January 23rd date is adjourned by the Court, we can confer with

6  the government either later today or tomorrow, send your

7  Honor's deputy or your Honor a list of dates that we would be

8  available, we would waive speedy trial obviously because it's

9  our request, and then the Court could look at those dates and

10  give us another day at your Honor's convenience.

11  THE COURT:  Why don't we do this, let me pick a date

12  that's convenient for the parties for a pretrial conference in

13  about 60 days.  Between now and then, you can propose some

14  specific dates, as many as you can for two or three months in

15  those months, and I can check my schedule and see what makes

16  sense.

17  So we'll adjourn the trial.  I would say maybe a

18  March 21st pretrial conference.  We can see whether or not we

19  can firm up a trial date between now and then or on that date.

20  MR. BRAFMAN:  I think March 21st is available to

21  defendant, your Honor.

22  THE COURT:  At 10 o'clock.

23  MS. McLEOD:  That's fine for the government.

24  THE COURT:  Let's have a pretrial conference on that

25  date.

1          In the next few weeks, give me some proposed dates for

2     trial.  If I can respond quickly to you and make those dates

3     available, then I'll get back to you even before the March 21st

4     pretrial conference and we can either have that or adjourn that

5     if we don't need to meet at that time.

6          I know there's an outstanding motion.  I was going to

7     be prepared to at least discuss that today.  Did you want to

8     address that today or did you want to put that off until --

9          MS. McLEOD:  I think the parties both wanted to

10    address it today.

11         THE COURT:  My understanding, it was short circuited,

12    but my understanding with regard to the issues is that the

13    government has some evidence that they say is possibly 404(b)

14    evidence.  My recollection of the papers is that the government

15    has three or four incidents that they wanted to use and the

16    defense has objected to one of those.

17         MR. BRAFMAN:  That's correct, your Honor.

18         THE COURT:  And I think the one that the defense

19    objected to is the financial transactions with the niece?

20         MR. BRAFMAN:  Yes, sir.

21         THE COURT:  I guess my direct question to the

22    government in reviewing the papers is that I understand --

23    well, two things.  The government has at least two or three

24    incidents besides that that they want to offer, and those

25    incidents are more akin to, I'll say, the MO that the

1   government contends is the pattern in this case.  It seems to

2   me that, in one sense, this niece issue is cumulative of that

3   and that the niece issue is not the same MO as the other

4   instances that the government wants to offer at trial.  I'm

5   trying to figure out if the government is going to offer two or

6   three other instances that they say is the same MO as they say

7   is the evidence in this case.  What is the need for the niece

8   situation in addition, and why is that relevant if it's not the

9   same MO as the government contends is its case here and as it

10  contends is the situation in the other instances?

11          MS. McLEOD:  So a couple things.  So there is the

12  charged loan, which I think we defined as loan 1, and then

13  there are three other extensions of credit, there are various

14  types of extensions of credit, one of which is the niece.  So,

15  in total, the government is seeking to introduce three in

16  addition to the charged loan.

17          THE COURT:  I'm sorry.  You just confused me because

18  you just gave me four.  You said that there is one --

19          MS. McLEOD:  There is the charged loan, which is 1.

20          THE COURT:  When you say the charged loan --

21          MS. McLEOD:  That is the one that is the subject of

22  the indictment.

23          THE COURT:  The charges in this case?

24          MS. McLEOD:  Yes.

25          THE COURT:  And then three others.

1        MS. McLEOD:  And then three others, including the

2    niece.

3        THE COURT:  So if you get two out of the three, why do

4    you need the niece and why is the niece's pattern and MO more

5    relevant or as relevant as the pattern and MO in the other two?

6        MS. McLEOD:  So, first, as to the pattern, the MO is

7    very similar in all three in the sense that --

8        THE COURT:  I didn't understand that the MO with the

9    niece was the same kind of structured transaction as the other

10    two and as is charged in this case.

11        MS. McLEOD:  Well, they are all straw loans that the

12    defendant steered to Park Avenue Bank.  He then facilitated and

13    controlled much of the transaction in the sense that he was the

14    person sort of mainly corresponding with the bank and sort of

15    pushing the loan through.  In all of these transactions, he

16    failed to disclose his personal financial interest in the

17    proceeds of the loan.  There were similar misstatements in all

18    three of the loans.

19        So, for example, in both loan 2, which is the niece

20    loan, they say that the purpose of the loan is working capital

21    for a business, which is false.  Then, in another loan, I think

22    it's loan 3, they also state working capital for a business.

23    So the misstatements among the loan applications are almost

24    identical in terms of the false purpose of the loan.

25        THE COURT:  But I thought that the other two loans

1    were more -- the activity of the other two loans was similar to

2    the activity that you claim occurred in this case and that of

3    the three instances that the personal loan to the niece was not

4    structured in the same way as those other two loans and as the

5    charged loan.

6         MS. McLEOD:  Well, they all have slightly different

7    structures to them, they're different types of loans.  I mean

8    even --

9         THE COURT:  I mean, you know more than I, but do you

10   not think that the other two loans are, as you've laid them out

11   in your papers, structured in a more similar way than the niece

12   loan?

13        MS. McLEOD:  I wouldn't say they're structured in a

14   more similar way.  I would say that they are more alike in

15   terms of time period --

16        THE COURT:  Well, aren't they more alike in terms

17   of -- I mean, your theory of this case is what, that he got

18   together with a codefendant outside of the bank, they

19   structured false loans that would go to a company, and I don't

20   know if I have the facts as you claim them, and that paperwork

21   was done to transact that loan with this company and the loan

22   was approved.  Mr. Zilberberg, being the bank officer, received

23   part of those proceeds.  My understanding is that's what you

24   say similarly happened in these other two transactions, but

25   that's not exactly the way that you say the transaction with

1    the niece took place.

2          MS. McLEOD:  They have very similar relevant

3    characteristics.  The key characteristics --

4          THE COURT:  I'm talking more about the differences.

5          MS. McLEOD:  Well, again, they all have slight

6    differences from each other.

7          THE COURT:  Why do you need the niece transaction?  If

8    you have two other transactions that you say are structured in

9    a way that, as I say, the same MO, structured in a way where

10   there's a phoney company, as you say, that's set up, that false

11   information is provided to the bank for this loan, the loan is

12   approved, and the defendant allegedly receives a portion of

13   those proceeds, that's not exactly what happened in the niece

14   loan.  What I just said is not what happened in the niece loan,

15   is it?

16         MS. McLEOD:  What happened in the niece loan is

17   that --

18         THE COURT:  Answer that first.  That's not the way the

19   niece loan was structured.

20         MS. McLEOD:  In the sense that there weren't other

21   coconspirators involved.

22         THE COURT:  In any sense, tell me in what way -- did I

23   mischaracterize the way this case and the other two loans were

24   structured?  I mean, that's my understanding, what you

25   presented me.

1      MS. McLEOD:  I don't think so.  I also think that --

2      THE COURT:  But that's not the way the niece loan was

3  structured.  First of all, did the niece loan involve setting

4  up a phoney company?

5      MS. McLEOD:  So I don't think any of the loans involve

6  setting up a phoney company.  The companies all existed and

7  they were legitimate.  Actually, in some ways, that makes the

8  niece loan the most probative --

9      THE COURT:  Why?

10     MS. McLEOD:  Because in that case, in all of the other

11 cases, there were actual companies involved that were being

12 described as the companies that would receive the loan.

13     THE COURT:  But the niece loan didn't involve a

14 company.

15     MS. McLEOD:  But the representation to the bank was

16 that she had a business.  So it's actually the most --

17     THE COURT:  But it wasn't a business loan to the

18 company.

19     MS. McLEOD:  No, but none of these were business

20 loans, they were all personal loans.

21     THE COURT:  Okay.

22     MS. McLEOD:  So they were all for working capital,

23 that was the purpose, but these were personal loans.  So, for

24 example, loan 3 was a personal line of credit to the borrower

25 there.  So the business versus personal distinction does not

1     make --

2              THE COURT:  So tell me what happened in the niece

3     loan.

4              MS. McLEOD:  So with the niece loan, she --

5     essentially, the defendant told her, you know, there's a good

6     business opportunity for you, you can make some money, you just

7     open an account at Park Avenue Bank and I'll take care of it.

8     And she then signed a bunch of paperwork, which she didn't read

9     and didn't know really what was in it.  As it turns out, it was

10    a loan which used her savings as the collateral for the loan,

11    which was a little over $100,000.  Those proceeds went to the

12    defendant.  The misrepresentations in that loan paperwork were

13    frankly very clearcut.  The niece is a --

14             THE COURT:  Representations made by whom?

15             MS. McLEOD:  The government would allege the defendant

16    because he prepared the paperwork.

17             THE COURT:  Okay.  That's what I'm trying to

18    understand.

19             So is it your position that the niece is a

20    coconspirator in a criminal transaction?

21             MS. McLEOD:  No, because she did not know about the

22    representations.  She didn't know false representations were

23    being made.

24             THE COURT:  But in all other cases, that's not true?

25             MS. McLEOD:  So in the charged loan, in that case, as

1    well, that straw borrower also did not read the loan paperwork

2    and did not know --

3            THE COURT:  What was Mr. Fried's role?

4            MS. McLEOD:  Mr. Fried -- so one of the other straw

5    borrowers was Mr. Fried's father-in-law, so he was involved in

6    that loan.  Actually, in that loan, as well, that straw

7    borrower didn't know either.  So most of the loans, actually

8    out of the four, three of them involve straw borrowers that

9    didn't understand.

10           THE COURT:  How many of those involved Mr. Fried?

11           MS. McLEOD:  Two.

12           THE COURT:  Okay.  The other two, other than the

13   niece's transaction?

14           MS. McLEOD:  No, that includes the charged loan.  Out

15   of the three -- I'll call them three 404(b) loans versus the

16   charged loan.  The charged loan involved Mr. Fried and one of

17   the three 404(b) loans involved Mr. --

18           THE COURT:  So you have the charged loan which

19   involves Mr. Fried, you have the other loan, one of these other

20   three loans that involve Mr. Fried, and you have a loan

21   transaction that doesn't involve Mr. Fried.  Why do you need

22   the niece?

23           MS. McLEOD:  Two of them.  So a couple of reasons.

24   One is that the representations on the niece loan are far more

25   probative because they are so clearcut in terms of the falsity.

N1BCzilC

1    So this is going back to my point about the companies and the

2    working capital.

3            THE COURT:  How is it more clearcut?  I'm not sure

4    either the information was true or it was false.  Either bank

5    fraud was committed or it was --

6            MS. McLEOD:  I agree, but some things are much

7    clearer, and let me explain why.  So the other three loans, the

8    claim was this is for working capital for companies.  In most

9    of those cases, the companies existed, these were real

10   companies.  In the niece's case, the claim was this was working

11   capital for a business.  The niece is a special ed teacher, she

12   has no business, and what's another sort of really key point

13   that makes this loan incredibly probative is that Zilberberg

14   has a clear personal relationship with the niece.  So there's

15   no question that he would have known that she did not have a

16   business.  And she would testify, I trusted him and he took

17   care of all the paperwork.  So in some ways, that makes it much

18   more probative of the other loans --

19           THE COURT:  Probative of what?

20           MS. McLEOD:  Of his state of mind and of his

21   knowledge --

22           THE COURT:  You don't think you have sufficient

23   evidence in this case and in combination with two other

24   transactions that demonstrate, sufficiently, his state of mind?

25           MS. McLEOD:  No, and part of it is because I expect

1    that the defense is going to argue this is all Aaron Fried.

2    They're going to say Fried did all of this, he was involved in

3    these loans, he's the mastermind --

4            THE COURT:  And your response would be Mr. Fried was

5    involved in the charged offense, Mr. Fried was also involved in

6    a second offense, and here's another third offense that

7    Mr. Fried had nothing to do with that we can demonstrate.

8            MS. McLEOD:  Exactly, so --

9            THE COURT:  Okay.  All of that is without the niece.

10           MS. McLEOD:  Well, the niece is the first one that the

11   defendant --

12           THE COURT:  I'm saying if you don't use the niece, you

13   still have Mr. Fried involved in this transaction, you say you

14   have Mr. Fried involved in a second transaction, and you say

15   that if you can put it all on Fried, you have a third incident

16   where Mr. Fried is not even involved that you can demonstrate

17   that this defendant's criminal --

18           MS. McLEOD:  Right.  The fact we have an extra one,

19   another one doesn't make the niece cumulative.

20           THE COURT:  The question still is whether or not -- I

21   mean, if you tell me you have three things to prove the same

22   issue, I'm not sure it's not cumulative, and I'm not sure that

23   the personal relationship between interjecting the personal

24   relationship between the defendant and the niece is not more

25   prejudicial or confusing than it is probative.  You have all

N1BCzilC

1    sorts of other probative evidence.

2              MS. McLEOD:  So I'm happy to respond to the

3    prejudicial point, but if I could respond to the relevance

4    point first.

5              I just want to take a 30,000-foot view here.  So the

6    government's allegations are going to be that the defendant had

7    a calculated plan.  He needed money, he was on the board of his

8    bank and he knew the way the bank worked, and over a course of,

9    frankly, a very short period of time, about a year, he steered

10   four straw loans to the bank that he knew he was going to be a

11   beneficiary of, but did not disclose that to the board, despite

12   there being regulations about that.  Those loans had very

13   similar misstatements about what they were going to be used

14   for, the purpose of the loan.  We expect that the defense is

15   going to, in part, say, you know what, look, he may have

16   received some of this money, but that was because he was being

17   paid for legal fees and Fried was the one who was handling all

18   of the representations.  So all of this, you can't pin this on

19   him, he just didn't know.

20             THE COURT:  And your response is, he did it at least

21   two times before?

22             MS. McLEOD:  Yes.

23             THE COURT:  But you want to say he did it at least

24   three times before.

25             MS. McLEOD:  Twice, the niece puts the lie to that.

1    The niece puts the lie to that because --

2              THE COURT:  So does the other instances you're talking

3    about, don't they?

4              MS. McLEOD:  Well, there's one other that doesn't --

5    there's one that involves Fried, Fried's father-in-law, and

6    then there's the charged loan, which also involves Fried.

7              THE COURT:  And the one that doesn't involve Fried,

8    why is that not just as probative, if not more probative than

9    the niece's?

10             MS. McLEOD:  Because that involves a client of the

11   defendant who was seeking a line of credit, a personal line of

12   credit for his own business.  That business existed and he

13   received some of the funds, and some of the funds from this

14   line of credit went to his business and some went to the

15   defendant.  So the question of what working capital is in terms

16   of legal fees is murkier, a little bit murkier on that

17   question, right.

18             So I think the government's argument would be you

19   received money from this loan and you knew that these

20   misstatements were false.  But that was my point about the

21   niece being more clearcut.  When you have a business and some

22   of the money is going to the business and some is going to pay

23   legal fees for your attorney, that's not as clear as a case

24   where you'd have a niece that the niece will say he did all of

25   this, he takes all of the money from this loan, which the niece

 1    doesn't even really realize that was what was happening.  The

 2    statements are about things that the defendant, I think the

 3    jury can reasonably infer, would have known, I think this niece

 4    can testify, he knew I didn't have a business, I'm a special

 5    needs teacher.  So the intent and the knowledge are much

 6    clearer than the third case.  So that's one of the reasons

 7    they're not cumulative.

 8         THE COURT:  I'm not sure, I just don't have enough of

 9    the facts.  I'm not sure why you say it's much clearer than the

10    others.

11         MS. McLEOD:  So I think what might be helpful, I

12    think, and I think it's helpful to have this conversation

13    because I have a sense of what you're attuned to in terms of

14    the factual nature of it.  I think because it's so specific,

15    maybe it would make sense for us to put in a letter where we

16    describe in much more detail the differences between the loans,

17    because it sounds like that is understandably an important

18    point for you, and if that's not crystal clear, then I want to

19    make sure that it is.

20         THE COURT:  My concern is this, if you have evidence

21    in this case, you have evidence of another transaction that you

22    say is similarly criminal that Mr. Fried was a coconspirator

23    and you have another transaction where Mr. Fried's not even

24    involved, I don't know why the niece is a critical part of your

25    case here.  And there's a basic old rule that used to be

N1BCzilC

1    followed that, as they say, if you can't win this case without

2    that, then maybe you shouldn't have brought this case.  If the

3    niece's evidence is the critical piece of this case, what you

4    just described is if you do present it the way you presented

5    it, the jury is going to be faced with proof beyond a

6    reasonable doubt that the defendant was involved in this

7    transaction with Mr. Fried, proof that he was involved in a

8    previous transaction, similar transaction with Mr. Fried if he

9    claims no criminal intent.  Then if he claims, well, I didn't

10   do it, Mr. Fried did it all, you say you have another case

11   where Mr. Fried is not even involved that you can show to rebut

12   that evidence.  And I'm not sure that the jury needs to spend

13   their time trying to figure out whether the -- I assume that

14   you don't have any conviction of anyone with regard to the

15   niece's transaction?

16            MS. McLEOD:  Correct.

17            THE COURT:  So I'm not sure why it's worth the jury's

18   time and attention, and it's not more prejudicial for them, on

19   top of the evidence that you have in this case, on top of the

20   similar evidence that you have involving Mr. Fried, in light of

21   the similar evidence you have that doesn't involve Mr. Fried,

22   that they should spend their time making a determination of

23   whether or not he and the niece defrauded the bank and whether

24   or not that is significantly probative of whether he committed

25   this crime.

N1BCzilC

1      MS. McLEOD:  So, first of all, to the point about the

2   jury's time, this will be a relatively short trial and this

3   will be one witness, right, it's just the niece, she's maybe

4   30 minutes, she's got two documents.  This is not going to be a

5   circus around this one person.

6      THE COURT:  You're going to guarantee me that?

7      MS. McLEOD:  Look, I don't know what Mr. Brafman is

8   going to do.

9      THE COURT:  You're not even sure what you're going to

10  be compelled to do, that's the question.

11     MS. McLEOD:  Look, I think, again, to sort of take a

12  step back, as you mentioned, the government has the burden of

13  proof here and this is a case where the intent and knowledge

14  are the key issues in the case.  What did the defendant know,

15  what did he intend to do.  And it's a fraud case, so a lot of

16  the argument is going to be circumstantial.  So these are cases

17  where every piece of evidence that the government can bring to

18  bear, especially -- and again, I'm happy to put in a letter to

19  sort of explain, but exactly why the niece in particular is so

20  probative, but to have an example of a case where the defendant

21  and the defendant alone was the person who knew what was

22  happening and was in charge of it.

23     THE COURT:  But you have that case without the niece.

24     MS. McLEOD:  So, respectfully, I don't think we do,

25  and that's why --

1        THE COURT:  Because you just said to me that Mr. Fried

2   is not involved in one of these prior instances that you want

3   to put in evidence --

4        MS. McLEOD:  I guess what I'm suggesting to you is

5   that the involvement of Mr. Fried is just one of the important

6   points about the loans.

7        THE COURT:  But on that point, that point seems to be

8   that you already have evidence to rebut that argument.

9        MS. McLEOD:  Perhaps as to that point.  But again, in

10  the case with the niece, there is really no question that he --

11  frankly, the argument is extremely compelling, that he knew

12  what the misrepresentation was because this is his niece and he

13  knows that she doesn't have a business, she's a special ed

14  teacher.  His client, he has a business, he's going to say,

15  look, of course he had a business, I thought it was for the

16  business, it wasn't my business what he was doing paying me

17  with the money, I didn't tell him to do that.  That's very

18  different from the niece where he was the controlling person

19  behind it and he -- the evidence, again, the argument is, I

20  think, very compelling that there's no way he didn't know.

21       THE COURT:  You don't think the argument is very

22  compelling with the evidence you have of this case independent

23  of that, the evidence that comes with the extra Fried

24  transaction and the evidence that comes with the non-Fried

25  transaction?

1    MS. McLEOD:  Well, I mean, of course, as the

2  government, you hope your evidence is compelling.  We got to

3  put --

4    THE COURT:  That's why I'm trying to understand why

5  you need this additional transaction and what is it that you

6  cannot -- you think you might not sufficiently be able to

7  demonstrate by having the evidence in this case, the evidence

8  of a prior transaction between these two coconspirators, and

9  the evidence of a prior transaction without Mr. Fried.

10    MS. McLEOD:  I mean, if the Court's concern is the

11  number of transactions, and then that's a question of

12  choosing -- if it's sort of the Court would only like us to put

13  on only two 404(b) loans, then we can pick one or the other,

14  then we're happy to --

15    THE COURT:  No, that's not my concern.  My concern is

16  that you want to put on three, they've objected to one.  My

17  concern is that the personal nature of the third transaction is

18  significantly different than the nature of the other

19  transaction.  I'm not sure, again, other than, as they say, the

20  MO, I'm not sure what else that you want to argue additionally

21  and demonstrate additionally with the niece's transaction that

22  you don't have sufficient evidence and don't intend to offer

23  sufficient evidence without the niece's transaction.  The way

24  you tell me as so, there's not a significant difference, I

25  understand the compelling part of your argument about the

1  nature of her position and the relationship, but I am coupling

2  that with my assessment of whether or not this personal

3  relationship with the niece raises other issues for the jury

4  and may have some prejudice in this case that the other

5  independent transactions, if they are powerful evidence of MO,

6  then I assume your position is that you could probably, I

7  assume, I hope that the government's position is that you could

8  probably prove this case even without any of these prior

9  situations because you have sufficient evidence that indicates

10  that the defendant has committed this crime, the sufficient

11  involvement and knowledge to commit this crime.  This isn't a

12  case where the government says that I need some similar act

13  evidence and, Judge, if you don't give us this, we won't have

14  any similar act evidence.

15        MS. McLEOD:  So a couple points.  One, I think your

16  Honor is right about sort of the -- I think you're attuned to

17  the issue sort of about personal nature.  The personal nature

18  of the relationship is part of what makes it so probative.  So

19  the fact that this is somebody who he knew so well is part of

20  what makes it probative.  Part of it is not just the fact that

21  he would have had knowledge of her profession and the fact that

22  she didn't have a business and pushed the loan through knowing

23  she didn't have a business and that that was false, right, but

24  it's also the fact that the defendant, in doing this, had to

25  take advantage of trust relationships with lots of people.

1       THE COURT:  Right.

2       MS. McLEOD:  And that's a big part of, you know, I

3  think what's going to be the narrative of the government's case

4  that --

5       THE COURT:  I'm not sure the nature of the trust

6  relationship is significantly different for the charged offense

7  and the other two similar acts --

8       MS. McLEOD:  And that's exactly why it's not more

9  inflammatory.  So if the trust relationship isn't more

10  different than the charged loan, then certainly that --

11       THE COURT:  My statement was about the other two, it

12  wasn't about the niece loan.

13       MS. McLEOD:  Right.  Maybe I just misunderstood.

14       THE COURT:  I'm saying that the nature of the charge

15  here and the nature of the evidence with regard to the two

16  instances that they're not objecting to addresses that issue.

17       MS. McLEOD:  In at least one of those loans, there was

18  taking advantage of a family member, it was just the

19  defendant's coconspirator who did it.  These aren't sort of

20  situations where it's so far afield from what this is about.

21       And the other thing I would sort of note is the

22  general allegations.  I mean, it's a criminal trial, so the

23  allegations are going to be the defendant did bad things,

24  right.  The question is whether it's unfairly prejudicial to

25  him.  So the government's case is going to be about this is

1    somebody who was on the board of directors of a bank, had a

2    fiduciary duty to the bank, betrayed the trust of the bank and

3    bilked it out of a lot of money while the bank was at its

4    lowest point right before the bank went under, he was getting

5    money out the door just as the bank was about to fail.

6         THE COURT:  And the question is you want to prove that

7    by the direct evidence in this case and evidence of three

8    different transactions as opposed to prove that by the evidence

9    in this case and the evidence of two transactions.

10        MS. McLEOD:  My point about the narrative of the case

11   was more to the 403 point, that the allegations in this case

12   are alleging things that the defendant did that are bad because

13   that is what a criminal trial is about.  However, the question

14   is, is that unfairly prejudicial to him and is it worse than

15   anything that is going to be before the jury for direct

16   evidence.  What I'm saying is the evidence is going to be that

17   he did very, very bad things.  And the fact that --

18        THE COURT:  Well, it is prejudicial to the defendant.

19   If it wasn't prejudicial to the defendant, you wouldn't be

20   offering it.

21        MS. McLEOD:  Exactly.

22        THE COURT:  The question is, is a third transaction

23   unduly prejudicial to the defendant as opposed to a second

24   transaction, as opposed to a fifth transaction, as opposed to a

25   tenth transaction.  I will give you an opportunity to submit a

1    further letter on this understanding what my concerns are, but

2    it seems to me that my reaction at this point and not

3    necessarily my ruling at this point, but my reaction is that it

4    seems to me that it would be, in fairness, appropriate for the

5    government to put in its evidence on this case and put in two

6    separate, different transactions that they say that would rebut

7    any claim of mistake or lack of knowledge or lack of intent and

8    wait and see if the defendant testifies in this case to see

9    whether or not it is appropriate in response to whatever his

10   claim of defense is to make a further application, that in

11   response to that testimony, to put on the evidence of the

12   niece.

13           MS. McLEOD:  Your point is well taken.  I think we

14   will put in an additional letter just to make sure that we sort

15   of highlighted any key facts that we think are relevant.

16           I'll just leave you with one final point, because I

17   think we've discussed --

18           THE COURT:  And then I'll hear briefly from

19   Mr. Brafman.

20           MS. McLEOD:  But the final point I would make is that

21   I think it's important for the government and I think it would

22   be part of our case, all of these are of a piece with each

23   other, it's a pattern of conduct.  So sort of slicing and

24   dicing them is well, pick one, pick one, pick one, pick two.

25   The point is that this is a course of conduct throughout which

N1BCzilC

1   we can show the defendant's knowledge.

2           THE COURT:  Two separate transactions aside from this

3   transaction, in the abstract, can do that.  Three transactions,

4   other than the charged transaction, can also do that.  So the

5   question is, why do you need three instead of two?  That's

6   really my issue.

7           MS. McLEOD:  We will put in something on that, but

8   hopefully address some of your Honor's concerns.

9           THE COURT:  Mr. Brafman, did you want to be heard?

10          MR. BRAFMAN:  Just briefly, your Honor.  I think the

11  Court is correct, sir, in focusing on the prejudice that comes

12  into the case that the government really doesn't need.

13          And in terms of the lack of probative value of the

14  niece's loan, it happens before any of the other transactions

15  are undertaken.  I think it's six months or a year before.  It

16  doesn't involve any of the other two coconspirators, Mr. Fried

17  or Mr. Khan, and it's a passbook loan.  So the bank would

18  testify that on a passbook loan, because the bank doesn't have

19  any risk, that they would approve this loan whereas the other

20  loans presented somewhat of a risk.

21          I think the overriding concern we have is that in

22  addition to its lack of probative value, it's a 403 issue where

23  the overwhelming prejudice of a defendant, as the government

24  argues, taking advantage of his relatively young niece is

25  really the major concern we have.  And I think, Judge, they

1    really don't need it.  Your Honor is correct with respect to

2    the charged transaction in the indictment that involves Fried

3    and Khan with respect to a loan involving Mr. Fried's

4    father-in-law, that obviously involves Mr. Fried.  And the

5    third transaction without the niece involves both Fried and

6    Mr. Khan.

7          So I think, Judge, there are a total of three

8    transactions that the government could argue shows intent,

9    shows lack of mistake, and shows everything that they need if

10   the jury believes their witnesses.

11         So they'll write a letter, we'll obviously respond to

12   it, but I think your Honor's initial reaction and initial

13   concern is consistent with the defendant's concern.

14         THE COURT:  Why don't you give me a further letter in

15   the next two weeks, and within 10 days after that, you can

16   respond.  I'll review that and we can discuss it further on the

17   21st and finally, hopefully by that time, be able to set a firm

18   trial date and be able to, at least on this issue, let me know

19   what the extent of the admissibility of similar act evidence is

20   going to be.

21         Is there anything else then we need to address today?

22         MR. BRAFMAN:  No, your Honor.

23         MS. McLEOD:  Your Honor, the government would move to

24   exclude time until the conference date of March 21st to allow

25   the parties to continue to prepare for trial.

N1BCzilC

1          THE COURT:  The defense has consented to the exclusion

2     of time.

3          MR. BRAFMAN:  That's correct.

4          THE COURT:  So I will exclude time between now and the

5     trial date.  We'll either address this further issue and any

6     other issues that might make this trial move more efficiently

7     on the 21st or sometime in advance of whatever trial date that

8     we pick if the 21st is not the appropriate time to do that.

9     I'll see everyone on the 21st at 10 o'clock and I'll wait to

10    hear from you with regard to the proposed trial date.

11                              * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25