```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                                      :
   UNITED STATES OF AMERICA,                          :
                                                      :
           - v. -                                     :     19 Cr. 802 (GBD)
                                                      :
   ARON FRIED,                                        :
                                                      :
                         Defendant.                   :
------------------------------------------------------x
```

## GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Dina McLeod
Daniel G. Nessim
Assistant United States Attorneys
    - Of Counsel

In 2009, the defendant Aron Fried and his co-conspirators, obtained a fraudulent bank loan for $1.4 million. In order to commit the crime, the defendant and his co-conspirators recruited a straw borrower, concocted false premises for the loan application, and partnered with Mendel Zilberberg—a director at the bank—who facilitated the loan's approval.

To reflect the seriousness of the defendant's conduct, to promote just punishment and respect for the law, and to deter this defendant and others like him, the Government respectfully requests that the Court impose a Guidelines sentence between 30 and 37 months' imprisonment.

## I. OFFENSE CONDUCT

In approximately June 2009, Aron Fried and another co-conspirator ("CC-1"), who had been previously convicted of federal health care fraud, began planning to obtain a loan to fund CC-1's investment into Fried's home health care business, Emanuel Services, Inc. ("Emanuel"). Since Fried and CC-1 knew that CC-1's felony conviction and lack of creditworthiness prevented him from obtaining the loan in his own name, CC-1 enlisted an acquaintance to sign for the loan and serve as a straw borrower (the "Straw Borrower"). Fried and CC-1 partnered with the defendant, Mendel Zilberberg, then a director at a Manhattan-based bank insured by the Federal Deposit Insurance Corporation (the "Bank"), to effectuate the scheme using Zilberberg's connections at the Bank. Together, Zilberberg, Fried, and CC-1 concocted a false premise for the loan, supported the application with false and misleading representations, and set up pass-through bank accounts to funnel the proceeds of the loan to themselves. Based on the false representations made to the Bank and Zilberberg's involvement in the loan approval process, the Bank issued a $1.4 million loan ("Loan-1") to the Straw Borrower. Fried was primarily responsible for funneling the fraud proceeds to Zilberberg and CC-1.

On November 15, 2022, Fried pleaded guilty to conspiracy to commit bank fraud, as set forth in a Superseding Information.

A. **The Bank Fraud Scheme**

In advance of the loan submission, Fried informed CC-1 that he had a "friend" at the Bank, that is, Zilberberg, who could get a loan approved quickly for CC-1. In addition to serving as a director at the Bank, Zilberberg was an attorney who had consulted with CC-1 regarding the consequences of CC-1's prior felony conviction to CC-1's plans to go into business with Fried. Fried told CC-1 that Zilberberg would receive a portion of the Loan-1 proceeds, consisting of approximately one-third, or $466,000, as a favor for helping to obtain Loan-1.

At CC-1's behest, on or about August 31, 2009, the Straw Borrower and his wife applied for Loan-1, an approximately $1.4 million unsecured line of credit, from the Bank. That same day, Zilberberg emailed the loan officer handling the Loan-1 application at the Bank ("Employee-1"), stating that Zilberberg's office would be sending documents relating to Loan-1 shortly, and asking Employee-1 to "process asap."

Zilberberg continued to send many emails to the Bank to facilitate Loan-1 getting approved, including providing false financial information for the Straw Borrower and providing a false purpose for Loan-1, even though Zilberberg was aware that the Loan-1 proceeds were going to be sent to CC-1 and Fried, as well as himself. For example, on the day of the Loan-1 application, August 31, 2019, Zilberberg emailed a net worth statement for the Straw Borrower to Employee-1 that contained various false statements, including the misleading representation that the Straw Borrower owned CC-1's $2.5 million home.[1] Later that same day, Employee-1 emailed

---

[1] In reality, CC-1's home had been temporarily fraudulently conveyed to the Straw Borrower in order to inflate his assets to support Loan-1 and to induce the Straw Borrower to apply for Loan-1.

Zilberberg, asking, "what should I put down as the purpose of the loan?" Zilberberg replied: "To be able to take advantage of business opportunities?" At the time, Zilberberg knew – but hid from the Bank – the true purpose of Loan-1. Indeed, Zilberberg represented an entity formed by Fried and another business partner to purchase Emanuel, and facilitated the purchase of Emanuel using proceeds from Loan-1. To maintain the lies on the Loan-1 application, Fried told CC-1 that, if asked, the Straw Borrower needed to tell Bank personnel that Loan-1 was for an investment in the Straw Borrower's own business.

The Bank's internal review of Loan-1 was summarized in a presentation intended for internal bank review (the "Presentation"). The Presentation falsely listed Straw Borrower as a "client" of Zilberberg, a Bank board member who also maintained his own law firm and other businesses. The Presentation falsely stated that the purpose of Loan-1 was "[t]o be used for working capital for business investments," citing the Straw Borrower's company. The Presentation falsely noted that the Straw Borrower "stated that he needs funds to make additional investments, such as down payments on properties, etc. The flexibility of a line of credit will make these investments possible." The Loan-1 documents did not mention CC-1, Fried, or Emanuel, nor did they disclose Zilberberg's financial interest in Loan-1.

On or about September 8, 2019, Zilberberg emailed Employee-1 that Employee-1 should prioritize Loan-1 over others because it "is the important one." On or about September 10, 2009, Zilberberg again emailed Employee-1 regarding Loan-1, asking, in substance and in part, "Are we on track. When will this fund." In a further email exchange the same day, Employee-1 informed Zilberberg that Employee-1 needed information on additional income for the Straw Borrower because the debt-service coverage ratio was too low. On or about September 11, 2009, an assistant to Zilberberg supplied Employee-1 with documents purporting to show additional income for the

Straw Borrower to support Loan-1, and stated, in substance and in part: "Mr. Zilberberg sends the following documents and asks if you would return reply with a funding date please." On or about September 13, 2009, Zilberberg emailed one of his employees ("Employee-2") to follow up on Loan-1 and indicated that it involved both the Straw Borrower and Fried. On or about September 14, 2009, Employee-2 emailed Zilberberg stating, in substance and in part, that Employee-1 said Loan-1 was out of Employee-1's hands and that Zilberberg "can get it moved along etc." Zilberberg responded "OK."

### B. The Disbursement of the Fraud Proceeds

On or about September 18, 2009, the Bank funded Loan-1, depositing approximately $1.4 million into an account held in the Straw Borrower's name. Bank records reflect that Loan-1 proceeds were promptly distributed into accounts controlled by Zilberberg, Fried, and CC-1. Fried's accounts received a majority of the funds and Fried then disbursed the proceeds to his co-conspirators. Among other transfers, Fried transferred $466,000 from the Loan-1 funds to One World United, Inc. ("One World"), a business owned by Zilberberg.

Within approximately one year, Loan-1 fell into default. The Bank itself was closed by the New York State Banking Department in or about March 2010, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as the receiver of the bank. Loan-1 and other Bank obligations were assumed by a successor ("Bank-2"). Loan-1 was never fully repaid, and Bank-2 and the FDIC suffered a combined loss of over $1 million on Loan-1.

In or about 2011, Bank-2 sued the Straw Borrower to collect on Loan-1, and CC-1 and Fried arranged for settlement discussions on behalf of the Straw Borrower through an attorney referred by Fried's nephew. In connection with those settlement discussions, false representations continued to be made to Bank-2 to maintain the false impression that the Straw Borrower was the

4

actual borrower on Loan-1. The FDIC commenced an investigation into Loan-1. During the FDIC investigation, Fried asked CC-1 not to mention to the FDIC that $466,000 went to Zilberberg. Fried told CC-1 that, if asked, Fried planned to lie and claim the funds were "legal fees."

## II. DISCUSSION

### A. Applicable Law and Guidelines Range

The United States Sentencing Guidelines continue to provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

5

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In the Presentence Investigation Report, the United States Probation Office calculated an applicable Guidelines range of 30 to 37 months' imprisonment. (PSR ¶ 92). That determination is in accord with the calculation in the parties' plea agreement.

### B. The Nature and Circumstances of the Offenses and the Need for Punishment Weigh In Favor of a Significant Sentence

The defendant's crime was very serious. The defendant conspired with others, including a bank insider and fiduciary to obtain a $1.4 million loan under false pretenses. This fraud harmed the Bank, which lost money as a result of the defendant's crime. Even more troubling, the defendant's crime—by using a straw borrower, by exploiting an insider connection—undermines the integrity of the banking system.

Nor does the offense represent an isolated decision. Fried was at the genesis of the fraudulent scheme and made calculated decisions many times to continue to perpetrate the scheme, including each decision to transfer the fraudulent proceeds to his co-conspirators.

The defendant's crime was motivated by greed—the purpose of the fraudulent loan was to help fund Fried's acquisition of a home health business. He personally received approximately $900,000 in proceeds from the fraudulent loan and retained approximately $430,000 of that sum.

The defendant's crime involved deception, false statements, planning, and sophistication. The defendant's victim was a bank that was teetering on the edge of insolvency, and ultimately failed. The severity of the conduct warrants a Guidelines sentence.

### C. A Sentence Within the Stipulated Guidelines Range Is Necessary to Promote Respect for the Law and Afford Adequate Deterrence to Criminal Conduct

The need to afford adequate deterrence to both the defendant and the public generally also weighs strongly in favor of a significant term of imprisonment.

As described above, the defendant's crime was motivated by greed. Although, as reported by the PSR, the defendant owns substantial assets, he chose to engage in this criminal conspiracy to help his acquisition of Emanuel. Accordingly, a significant sentence is necessary to discourage the defendant from committing further crimes and to impress upon him the serious consequences of his criminal conduct.

General deterrence and the need to promote respect for the law are also significant concerns motivating the Government's sentencing position. Serious, incarceratory, sentences for the defendants who defrauded and made false statements to the Bank is essential to convey that these costly fraud schemes carry a serious cost and will be harshly dealt with.

The U.S. Court of Appeals for the Second Circuit recently emphasized, in a case involving fraud and money laundering, that general deterrence is particularly important in such cases: "We have said. . . that consideration of general deterrence is especially important in the crimes of the sort that this case involves." *Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023), (citing *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of . . . deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime . . .") (internal citation omitted); *United States v. Park*, 758 F.3d 193, 201 (citing the example of tax fraud)).

7

As is clear from this case, it is all too easy to do what the defendants did, all too attractive, and all too difficult to detect until the fraud has been completed. This means that a meaningful sentence is warranted. *See, e.g.*, *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (alteration in original)); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

### III. Conclusion

For all the reasons set forth above, the Government respectfully submits that a Guidelines sentence, is sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney

By: *Dina McLeod*
   Dina McLeod
   Daniel G. Nessim
   Assistant United States Attorneys
   (212) 637-1040