1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            19 CR 802 (GBD)

5    ARON FRIED,

6                    Defendant.              Sentence
     ------------------------------x
7
                                            New York, N.Y.
8                                           April 18, 2023
                                            10:30 a.m.
9

10   Before:

11
                         HON. GEORGE B. DANIELS,
12
                                            District Judge
13
                              APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DINA McLEOD
          DANIEL G. NESSIM
17        Assistant United States Attorneys

18   CLAYMAN ROSENBERG KIRSHNER & LINDER LLP
          Attorneys for Defendant
19   BY:  ISABELLE A. KIRSHNER
          BRIAN D. LINDER
20        ELIEL A. TALO

21

22

23

24

25

 1                    (Case called)

 2                    MS. McLEOD:  Good morning, your Honor, Dina McLeod and

 3      Daniel Nessim for the government.

 4                    THE COURT:  Good morning.

 5                    MS. KIRSHNER:  Good morning, your Honor, Isabelle

 6      Kirshner, Brian Linder, and Eliel Talo for Mr. Fried, and

 7      Mr. Fried is next to me.

 8                    THE COURT:  Good morning.

 9                    Ms. Kirshner, did you receive a copy of the

10      presentence report and have an opportunity to review it with

11      your client?

12                    MS. KIRSHNER:  Yes, your Honor.

13                    THE COURT:  Do you have any objections or corrections

14      to make to the report itself?

15                    MS. KIRSHNER:  We submitted our objections to the

16      report, and I believe those objections are contained in the

17      addendum to the report.

18                    THE COURT:  Let me first start with the government.

19      Does the government wish to be heard further on sentence?

20                    MS. McLEOD:  Just briefly, your Honor.

21                    And I think, given that there is a plea agreement

22      here, I am going to mainly be focusing on the 35 --

23                    THE COURT:  I'm sorry.  You have to speak louder and

24      slower.

25                    MS. McLEOD:  I am going to focus on the section

1    3553(a) factors that we consider relevant here.

2         First, the offense conduct, which I think at this

3    point your Honor is relatively familiar with, given your

4    involvement in this case and other briefing.  The offense

5    conduct here was serious.  This was a crime against a bank.  It

6    undermined the integrity, essentially, of a financial

7    institution by submitting -- the defendant was part of a

8    calculated scheme.  He was one of the sort of people who

9    concocted this scheme to recruit a straw borrower to submit

10   false statements in a loan application to a bank and to use an

11   insider at the bank to sort of exploit that person's insider

12   status at the bank to get this loan approved, and the loan

13   ultimately was approved for $1.4 million.

14        The defendant then received a fair amount of the money

15   into his own accounts.  Some of that money -- a fair portion of

16   the money he then passed on to his coconspirators.  Some of the

17   money remained in his possession.  So he was involved as well

18   with those additional transactions on the back end where the

19   money was being disbursed because, as your Honor is aware, the

20   money first went into the straw borrower's bank account because

21   the bank thought that the money was going to go to that person.

22   It was then distributed from the straw borrower primarily to

23   the defendant, who then was largely in charge of distributing

24   it out.

25        An important sort of part of this is the fact that

1  this was not an isolated case of one bad choice.  This was a

2  series of many decisions made over a period of time to engage

3  in this fraud against the bank.  And so every time the

4  defendant was speaking with a coconspirator, was agreeing to

5  statements to be in the loan applications, every transfer of

6  money to a coconspirator, those are all decisions that the

7  defendant made to continue playing a part in this conspiracy to

8  defraud the bank.  I think that's the primary gist of what we

9  want to leave with you.  We have a sentencing submission.

10        Defense counsel, of course, put in their own lengthy

11 submission which deals quite a bit with the defendant's

12 personal history and characteristics, and I know that your

13 Honor will consider those as well.

14        But in the government's view, the offense conduct is

15 extremely serious and warrants a guidelines sentence of 30 to

16 37 months.  Thank you, your Honor.

17        THE COURT:  Thank you.

18        Ms. Kirshner.

19        MS. KIRSHNER:  Thank you, your Honor.

20        Let me first introduce to the Court Mr. Fried's wife,

21 adult children, and their spouses and his brother.  As you

22 know, I trust your Honor has read all the letters that have

23 been submitted here, and I'm hoping that putting a face to

24 their words make them a little bit more impactful.

25        Your Honor, the conduct in question in this case took

1   place almost 14 years ago.  That, along with Aron's personal

2   circumstances, somewhat complicated our ability to sort of

3   actually reconstruct what happened here.

4           But, regardless, since so many years have passed, any

5   argument that Mr. Fried -- that he should go to jail now, that

6   it serves at a deterrence somehow, rings hollow.

7           Since the inception of this case, the government has

8   sought to exaggerate Aron's role, and they did so in the

9   drafting of the indictment and they did so in their sentencing

10  submission.  While it was true that this loan was secured in

11  part to meet Aron's financial needs so that he can open a new

12  business, he was one of four people who participated in this

13  crime, and he was the only one who actually made any effort to

14  repay the bank and the person from whom he borrowed the money.

15          As we indicated in our submission, Aron retained

16  Mendel Zilberberg, an attorney, to represent him in a

17  litigation with Renaissance Health Care, his former health care

18  company.  Zilberberg also, at the same time, counseled Aron,

19  who was seeking finance for a new business, and discussed with

20  him other options other than taking a loan from the bank.

21          Eventually, Mr. Zilberberg, Aron's lawyer who was on

22  the loan committee at the bank, proposed assisting him in

23  obtaining a loan from Park Avenue Bank.

24          Aron had also spoken to Abraham Kahan, the

25  government's informant in this case, who I'm sure you will see

1  more of in July, and Kahan introduced Aron and the straw

2  borrower -- Kahan introduced the straw borrower into this

3  equation.  Aron essentially followed the instructions of his

4  lawyer, Zilberberg, on how this was to be carried out.

5          Again, nothing I am saying is intended to minimize

6  Aron's acceptance of responsibility, but he was not the

7  criminal mastermind here.

8          The government's claim in their submission that he was

9  primarily responsible for funneling the proceeds is frankly

10  ridiculous.  He opened an account to receive the proceeds at

11  Mr. Zilberberg's direction, signed blank checks that were

12  provided to Mr. Kahan, who then filled out the checks, and

13  signed off on two to three wires for large amounts of money.

14  Again, this was done at the direction of both Mr. Kahan and Mr.

15  Zilberberg.

16          And we have, if the Court wishes to see, the checks

17  that were signed by Aron, but ultimately the payee was written

18  in by Mr. Kahan.  And we have a schedule of payments that were

19  made at Mr. Kahan's direction for repayment of Aron's loan from

20  Kahan.  Those payments directly benefited Mr. Kahan or entities

21  associated with him.

22          Besides the funds that the Kahan used for his own

23  benefit, Aron repaid the bank $400,000 directly.  That was

24  after he had learned that the loan had defaulted.  Remember, he

25  made $500,000 in payments to Kahan or to third parties on

1  Kahan's part.  So Aron fully paid back that portion of the loan

2  that he personally received.  In fact, he paid back far more

3  than what he invested in his new company, Emanuel.

4         The government's characterization of Aron Fried as

5  greedy is gross and misplaced.  Admittedly he used the funds to

6  start a new business, but unlike his coconspirators, one of

7  whom is the cornerstone of the government's case, he can

8  account for the spending.  There are no personal luxury items,

9  there are no fancy vacations, there are no entities through

10  which funds were being funneled.  He borrowed money and he paid

11  back the amount that he borrowed.

12         As your Honor knows, our submission focused very much

13  on Aron Fried the man.  I hope we have painted, and I hope we

14  have succeeded in painting a more accurate portrait of who Aron

15  Fried is, the man, the husband, the father, the brother, the

16  citizen of his community.

17         Aron is a man who was doing good deeds before he had

18  any contact with law enforcement.  He is a man who has done

19  good deeds his entire life.  You have read letters from his

20  friends, his employees, and his family members who describe the

21  man that we, his lawyers, have come to know over the last few

22  years.  He is a genuinely kind, generous, and decent man.  And

23  as noted, he opens his home to troubled youth, and he helps

24  people out without regard to recognition.

25         He is a man who is haunted by the effects by this

1   matter that has had on his family, and a man who generally

2   feels pain and responsible for the pain that he has caused his

3   family.

4         The trauma that this arrest caused his family is

5   simply excruciating and it was also completely avoidable, as I

6   had specifically offered the government the opportunity to

7   surrender should they choose to charge him.

8         As we have detailed carefully in our submission, Aron

9   was diagnosed with dedifferentiated chondrosarcoma in 2017.  He

10  has endured surgeries and horrible cancer treatment, but he has

11  fought to survive and so far he has won the battle against this

12  very aggressive, very serious form of cancer.

13        I know that we have provided the Court or buried the

14  Court with volumes of medical information, but, more

15  importantly, with a letter from Dr. Jonathan St. George, which

16  explains Aron's condition from more of a lay person's

17  perspective.

18        What is clear is that to date Aron's survival can be

19  attributed not only to his personal tenacity but to the

20  incredible and outstanding medical care that he has received

21  from outstanding medical institutions.

22        Aron is currently monitored with imaging and scanning

23  every three months.  He is scheduled and likely to have one

24  next week, pending insurance approval.  Close active monitoring

25  is critical because of the aggressive nature of this cancer and

1   its resistance to chemotherapy.  We know that it has recurred

2   at least once and as Dr. St. George noted, early surgical

3   intervention is what likely made the difference for him.

4           I know, and you know, that the BOP will represent to

5   this Court that they can respond to any medical condition.  And

6   I know, and you know, just based on what the BOP has done for

7   the last few years, they cannot or will not meet the most basic

8   medical needs of the people that they are responsible for.

9           They are certainly in no position to deal with Aron

10  Fried's condition.  Any sentence that includes incarceration

11  increases a risk and a recurrence may be missed and that Aron's

12  life expectancy will be cut short.

13          Your Honor, we have both been doing this for a very

14  long time.  I represented many defendants in this courtroom and

15  in this courthouse, and you've sentenced many.  What we know is

16  that there are good people who do bad things and there are bad

17  people who do bad things, and justice requires that we

18  differentiate between how we treat them.

19          Aron Fried is a good man who almost 14 years ago did a

20  bad thing, and the time that followed he has done so much good.

21  He has also endured so much pain, as has his family.  There is

22  simply no need to impose a sentence of incarceration in this

23  matter.  We are looking at you, and you are looking back at us

24  and at the people who Mr. Fried love and who love him back, the

25  people who suffer for him and suffer with him.  He would never

1    do anything that would cause them to suffer for this again.

2         We beg that the Court sentence Mr. Fried to a sentence

3    that does not include jail.  Let him do what he does best, be a

4    good man who has always done and will continue to do good for

5    others.  Thank you.

6         THE COURT:  Ms. Kirshner, you seem to characterize the

7    nature of the criminal conduct significantly different than the

8    government.  My understanding is that the nature of this scheme

9    was to submit false documentation through the lawyer at the

10   bank on behalf of individuals who submitted false information

11   and divided up the profits of that loan and that loan was

12   defaulted on.  I am not sure in what way you are disputing

13   those facts.

14        MS. KIRSHNER:  That is true.  What happened here was

15   that Abraham Kahan found a straw borrower.  Kahan, Zilberberg,

16   and Mr. Fried entered into a document which I think we have

17   explained in our papers called a heter iska, that allows

18   Orthodox Jews to charge each other interest.  The loan proceeds

19   were intended to go to Mr. Kahan and the intention was that

20   those proceeds were to be given to Mr. Fried and Mr. Fried was

21   to give them to Mr. Zilberberg and Mr. Kahan.  It was done in

22   that way because Mr. Kahan had a prior conviction and no one

23   believed he would be able to obtain a loan from the bank.  But

24   it was Aron's intention and he believed it was everyone's

25   intention to pay this back, and he is the one who paid it back.

1          THE COURT:  Paid the loan?

2          MS. KIRSHNER:  He paid his portion, what he received

3     from the loan proceeds, which was about $900,000, he paid that

4     portion back.  He paid that portion back by paying the bank

5     directly $400,000, and he paid Kahan $500,000 because Kahan was

6     the person from whom he borrowed the money.  And he made those

7     payments in the form of paying for Mr. Kahan's rental car,

8     making payments to entities that Mr. Kahan controlled, paying

9     for Mr. Kahan's insurance.

10         THE COURT:  I am not sure why he should get the

11    benefit of what he paid a coconspirator.

12         MS. KIRSHNER:  All I'm saying is that his intention

13    was always to pay back -- to have the loan paid back.  His

14    intention was not for the bank to suffer a loss.

15         THE COURT:  But I don't understand what the purpose of

16    the scheme was other than to pocket hundreds of thousands of

17    dollars for each of the participants.

18         MS. KIRSHNER:  But he didn't.

19         THE COURT:  He did until he got caught.

20         MS. KIRSHNER:  He paid back $400,000 directly to the

21    bank, and he paid back the money he borrowed from Mr. Kahan to

22    Mr. Kahan in ways that Mr. Kahan directed.  The crime here is a

23    false statement to the bank.

24         THE COURT:  Right.  In support of a $1.4 million loan.

25         MS. KIRSHNER:  Exactly.

1            THE COURT:  Which was submitted on false information

2   about the purpose of that loan.

3            MS. KIRSHNER:  The deal at the beginning of this --

4   and again, I am not trying to undermine acceptance of

5   responsibility here.  But the agreement was that the Kahan was

6   supposed to pay Mr. Sauber, the straw borrower, back the money

7   so that Mr. Sauber could make the bank whole.

8            THE COURT:  What was the criminal agreement?

9            MS. KIRSHNER:  To have Mr. Sauber take out the loan.

10           THE COURT:  That's not a crime.

11           MS. KIRSHNER:  Because Mr. Sauber -- everyone was

12  aware that Mr. Sauber was going to have to make statements to

13  the bank that were false in order to obtain the loan.

14           THE COURT:  Right.  He obtained the loan.  But the

15  loan was not for the purpose for which it was taken out.

16           MS. KIRSHNER:  Right.

17           THE COURT:  And the purpose or consequence of taking

18  out that loan would be for at least three individuals to walk

19  away with those proceeds.

20           MS. KIRSHNER:  Well, Mr. Fried's understanding was

21  that he was going to take a certain portion of those proceeds,

22  his portion of the proceeds that he got from Mr. Kahan, open a

23  business, and then the loan was to be paid back by Kahan and

24  Zilberberg, who did not hold up their end of the bargain.

25           THE COURT:  But it wasn't Kahan or Zilberberg's money?

1          MS. KIRSHNER:  They got loan proceeds.  They

2     unlawfully got loan proceeds.  But he paid back that portion of

3     the loan that he received.

4          THE COURT:  When you say he paid it back, my

5     understanding is that he received over $400,000 of this -- of

6     these illegal proceeds.

7          MS. KIRSHNER:  He received approximately $900,000.  He

8     paid $400,000 back to the bank directly.

9          THE COURT:  When?

10         MS. KIRSHNER:  After he learned that the loan had

11    defaulted, because he was of the belief that his coconspirators

12    were also paying back the loan.  And the rest -- remember, he

13    borrowed the money, in his mind, from Mr. Kahan, and Mr. Kahan

14    directed him on how to make payments back to him.  And those

15    directions were in the form of payments for rental cars to

16    entities that Mr. Kahan owned and controlled, for Mr. Kahan's

17    life insurance, his health insurance.  So he paid Mr. Kahan

18    back $500,000, expecting that Mr. Kahan would take other funds

19    and pay the loan back, pay the loan to Mr. Sauber so that

20    Mr. Sauber would not be on the hook for the loan.  But that did

21    not happen.

22         THE COURT:  And you say he paid another $400,000 back

23    to the bank?

24         MS. KIRSHNER:  Yes.

25         THE COURT:  When?

1          MS. KIRSHNER:  2011, '12.

2          THE COURT:  As a result of what?

3          MS. KIRSHNER:  As a result of learning that there was

4    a default on the loan.

5          THE COURT:  And learning that by the criminal charges

6    here?

7          MS. KIRSHNER:  No.  The criminal charges in this case

8    didn't happen until 2019, well before the criminal charges.  He

9    did it because Mr. Kahan came knocking and said, Sauber is now

10   on the hook, and they are coming after him for the loan.  So he

11   paid back that portion of the loan that he was -- that he

12   believed he was responsible for.

13         THE COURT:  My understanding of the nature of the

14   agreement was that Mr. Fried was to receive approximately

15   $400,000 of the loan proceeds.

16         MS. KIRSHNER:  Yes.

17         THE COURT:  And that those loan proceeds were the

18   result of fraudulent documentation that was submitted to the

19   bank.

20         MS. KIRSHNER:  Yes.

21         THE COURT:  And you say he was going to do what with

22   the $400,000 other than pocket it?

23         MS. KIRSHNER:  Start a new business.

24         THE COURT:  What right does he have to start a new

25   business with the $400,000 proceeds of a crime?

1          MS. KIRSHNER:  He doesn't have the right.  But what he

2   did do in order to make it right was to pay that money back to

3   the bank.

4          THE COURT:  Does the government want to be heard

5   further on this?

6          MS. McLEOD:  Sure, just briefly.

7          I don't think that there is a dispute between the

8   parties on the basics of the scheme that your Honor was

9   outlining.  I do think there is a bit of minimizing of the

10  defendant's role here in the sense that there is a lot of

11  emphasis being placed on what Kahan did, which is warranted,

12  because he was a coconspirator, but a little bit of a

13  minimizing of the fact that the whole point of this was that

14  Kahan and Fried were going to start -- Kahan was going to

15  invest in one of Fried's businesses and Fried wanted to start

16  this business.  The whole impetus of this was Fried's business.

17  That was the point of this loan in the outset.

18         And then eventually Zilberberg gets involved as the

19  straw borrower gets involved, but Kahan and Fried were the

20  entry point.  They were the ones who came up with this idea to

21  get the loan.  Eventually it becomes this thing, the 1.4

22  million with the straw borrower and Zilberberg attached.  I

23  don't think that that was clearly sort of embraced by the

24  defendant, understandably.

25         So in terms of the payments, the initial 1.4 million

1   comes into the straw borrower's account, most of it then

2   goes -- is sent from the straw borrower to Fried's account,

3   which he opened for this.  I will say, I don't think it's a

4   huge -- it's really much of a defense to say that -- to say

5   that he was told to do this.  It's in the nature of a

6   conspiracy.  Sometimes people are telling you what to do.  You

7   don't have to do it.  It's a choice.  So I think part of

8   accountability is saying, yes, I made the choice to do what my

9   coconspirator told me to do, which was open up this bank

10  account and then funnel money to the coconspirators, which is

11  part of it.

12          After the scheme sort of falls apart, in the sense

13  that the loan goes into default and the bank also goes into

14  receivership, so there is these two sort of things happening at

15  the same time.

16          One of the victims in this case is Valley National

17  Bank, so they have assumed the loan portfolio, and they have to

18  write off the loan, and they obtain a judgment against the

19  straw borrower.  After that judgment, the defendant pays a

20  series of $100,000 payments to, I believe it's Valley National.

21          There is no dispute about that.  I think it's sort of

22  up to your Honor the weight to put on the fact that the

23  defendant says he never intended a loss.  This is not my first

24  bank fraud case and, in my experience, almost every bank fraud

25  defendant says they never intended a loss because typically the

1   whole point of a bank fraud is that usually people think or

2   often people think that they will be able to make the payments

3   on the loan, so they hope that they will just make the payments

4   and no one will ever find out.  That didn't happen here,

5   obviously.  There was a loss.

6           Whether or not the defendant intended to cause a loss

7   in the beginning, A, is not really relevant to the nature of

8   bank fraud itself, which is about lying to the bank and, B, is

9   something that's somewhat foreseeable when you commit a fraud

10  on the bank because part of what you are doing when you submit

11  a false loan application to the bank is, you are depriving the

12  bank of the ability to actually judge credit worthiness.  When

13  you deprive the bank of the ability to judge credit worthiness,

14  it means in some instances you might have some less

15  creditworthy people taking on a loan, and it's more likely that

16  you will have these defaults, which is why Congress cares so

17  much about bank fraud.

18          To sort of get to the bottom line of it, I don't think

19  that there is a significant sort of difference between the

20  parties' view of the case.  I think there is a difference in

21  the gloss that we are putting on it, which is part of the

22  advocacy.

23          But I think your Honor is correct to note that at no

24  point did the defendant have a right to this money, even if he

25  were -- even if he was using it for his own business.  If you

1   want to start a business, you have to get the money for that

2   business in a legitimate way, and he didn't do that here.

3           I hope that adds a little bit of context for your

4   Honor's question, questions to defense counsel.  If you have

5   any other specific questions, I'm ready to answer them.

6           THE COURT:  How do you characterize his relative role

7   vis-a-vis the other defendant?  I have one defendant who is

8   getting ready to go to trial.  I have another alleged

9   coconspirator.  What do you say his actual role was?

10          MS. McLEOD:  I think -- in terms of culpability, I

11  think in some ways he is slightly less culpable than Zilberberg

12  because Zilberberg exploited a position of trust at the bank,

13  which makes his crime worse.  In some ways what Fried did was

14  worse than what Zilberberg did because Fried was the impetus

15  for it.  The reason for the loan was because Fried needed money

16  or wanted money for this business.  So Zilberberg didn't come

17  up with the idea.  He was brought in sort of after the idea for

18  the loan came into play.

19          THE COURT:  What was Fried's relationship to the

20  actual loan?

21          MS. McLEOD:  Fried's relationship to the actual loan

22  was that he was to receive a portion of the straw loan.

23          THE COURT:  Did he participate --

24          THE DEFENDANT:  In the actual submission.

25          THE COURT:  Execution of the loan?

1          THE DEFENDANT:  I don't think that he -- that he

2    himself filled out the fake loan application and submitted it.

3    I think that was primarily done through Kahan and through

4    Zilberberg, although Fried would have known that it was a straw

5    borrower who was doing it, and thus the fact that it's a straw

6    borrower is in and of itself a false statement to the bank

7    because it's a false statement of the identity of the borrower.

8          But to answer your question directly, I don't think he

9    was the one who filled out the form, the application and

10   submitted it, although I think he knew --

11         THE COURT:  How do you characterize about what has

12   been the successful execution of the crime?

13         MS. McLEOD:  How would I characterize the crime or his

14   part in it?

15         THE COURT:  Yes.  Exactly what would have been

16   accomplished had the crime not been discovered.

17         MS. McLEOD:  I think if this hadn't unraveled, I think

18   the idea was that Zilberberg takes his cut, he is happy over

19   there, and Fried and Kahan would have this investment in this

20   home health care business.  That was the hope.  That was the

21   hope that the defendants had.

22         THE COURT:  That's what I'm trying to understand.  The

23   home health care business was related in what way to this loan?

24         MS. McLEOD:  It wasn't in the bank's eyes, right,

25   because the home health care business was hidden to the bank,

1  so the bank knows nothing about that business, because they

2  don't know the true purpose of the loan.  They think the straw

3  borrower has his own reasons.

4           THE COURT:  What is Mr. Fried's relationship to the --

5           MS. McLEOD:  Mr. Fried wants to own and run this

6  business.  So the proceeds of the loan are, in theory, to help

7  him get this business off the ground and put capital

8  investments into this home health care business, along with

9  Kahan, and the idea being that Kahan is a coinvestor in the

10 business.  So that was the initial sort of thought of what was

11 going to happen with the loan proceeds.  It's just that --

12          THE COURT:  Who was making payments on the loan?

13          MS. McLEOD:  I don't think really -- I don't think the

14 payments were really being made.  That's why it went into

15 default.

16          THE COURT:  You mean right away the payments were

17 not -- on the loan were not being made.

18          MS. McLEOD:  Right.  It went into default fairly

19 quickly, and I think -- and I think Fried, although he didn't

20 make payments during the sort of early life of the loan, once

21 it went into judgment, he then made that series of payments,

22 $100,000 payments totaling $400,000.

23          I think no other payments were made on the loan at

24 all.

25          THE COURT:  What's the date of the loan was taken out

1   and what was the date of the payment?

2              MS. McLEOD:  The date of the loan is September 2009

3   and the date of the payments are October 2011, November 2011,

4   December 2011, and February 2012.  So the first payment by

5   Fried is about two years after the loan is taken out.

6              THE COURT:  Do you have any indication that anyone

7   else made any payment on this loan, initial payment on this

8   loan?

9              MS. McLEOD:  I believe that no one else made any

10  payment on the loan.

11             MS. KIRSHNER:  Actually, your Honor, Mr. Fried made

12  payments early on on the loan directly to the bank, because at

13  that time it was an interest-only portion of the payments.  So

14  early on, directly, when the first payments were due, Mr. Fried

15  made payments.  I don't know that anyone else did.  We have a

16  schedule of payments that were made in April -- in April of

17  2010, there was an interest payment made.  In April of 2010,

18  there is another interest payment made that Mr. Fried makes

19  directly to the bank.

20             THE COURT:  But Mr. Fried was not a signatory on this

21  loan.

22             MS. KIRSHNER:  No.  Just to clarify what you said, he

23  had nothing to do with the application for the loan.  He had no

24  input into it.  He never saw it.  He didn't sign it.  He had

25  nothing to do with it.

1           THE COURT:  Thank you.

2           MS. KIRSHNER:  Yes.  But he knew -- he obviously knew

3    that the borrower was not the borrower, the actual borrower,

4    and he knew that false statements had to have it included in

5    the application in order to obtain a loan.

6           THE COURT:  But I don't understand why Mr. Fried began

7    making payments on the loan.

8           MS. KIRSHNER:  Because he thought it was appropriate.

9    Because he believed he had an obligation to both Mr. Sauber,

10   the straw borrower, and Mr. Kahan to make those payments.

11          THE COURT:  That's what I don't understand.  How is it

12   that he had the obligation to make those payments?

13          MS. KIRSHNER:  Because that was part of their heter

14   iska that they brought out.  This was the deal and how it was

15   going to work.

16          THE COURT:  That Mr. Fried was going to make all of

17   these payments on this loan.

18          MS. KIRSHNER:  His view was that he borrowed money

19   from Mr. Kahan and in order to fulfill his obligations for

20   Mr. Kahan, he would make these payments because that was part

21   of what he agreed with.  These payments, these early payments

22   to the bank in 2010 were made at Mr. Kahan's direction.  So

23   that was in part to satisfy his loan to -- from Mr. Kahan.  But

24   as far as we know, he is the only one who actually made the

25   payments to the bank.

1          THE COURT:  You say he made how many payments to the

2    bank before he made the $100,000 payment?

3          MS. KIRSHNER:  I believe that he made -- I see on our

4    spreadsheet, in April of 2010, he made two payments to the bank

5    for interest in total of $8,000.  It was an interest-only loan

6    at that point.

7          THE COURT:  Why did he have the sole responsibility to

8    make those payments?

9          MS. KIRSHNER:  He didn't.  But he had a responsibility

10   to Mr. Kahan.

11         THE COURT:  To make how much of those payments?

12         MS. KIRSHNER:  To make payments on behalf of Mr. Kahan

13   or to Mr. Kahan to satisfy his loan that he received from

14   Mr. Kahan.  So if Mr. Kahan said, instead of paying me back

15   this month, make an interest payment to the bank, that's what

16   he did.  Instead of paying me back this month, pay for my car,

17   that's what he did.  Instead of making a payment to the bank,

18   instead of paying me, Abraham Kahan, back directly, make an

19   interest payment to this entity and that's what he did.  And it

20   was his belief that, by virtue of those payments, he was

21   satisfying his loan that he took from Mr. Kahan.

22         THE COURT:  What was the anticipated role and profit

23   for Mr. Zilberberg?

24         MS. KIRSHNER:  For Mr. Zilberberg?

25         THE COURT:  Yes.

1              MS. KIRSHNER:  Well, that's another very long story

2    that I am sure you will hear.  But Mr. Zilberberg asked for

3    funds to have -- to receive a portion of the $1.4 million loan.

4    And Mr. Zilberberg's obligation was to pay back Aron because

5    the funds -- the loan proceeds went into an account that's

6    under Mr. Fried's name, that Mr. Zilberberg directed him to

7    open up.  I am not saying he is not responsible for it.

8              THE COURT:  I was going to say, that's clearly a

9    crime.  There is no innocent reason for Mr. Zilberberg to

10   personally profit if he is the loan officer.

11             MS. KIRSHNER:  Right.  There is no reason for him to

12   have done any of this.  The point --

13             THE COURT:  I am trying to think of it from

14   Mr. Fried's perspective.  Mr. Fried knew that Mr. Zilberberg

15   was defrauding the bank.

16             MS. KIRSHNER:  I don't know that Mr. Fried understood

17   that Mr. Zilberberg was a loan officer on a loan committee.

18             THE COURT:  You don't think he believed that he knew

19   that he was a bank employee?

20             MS. KIRSHNER:  He knew that he had some influence at

21   the bank.  That he knew.

22             THE COURT:  I thought he was the one who structured

23   the loan.

24             MS. KIRSHNER:  He is also not a bank employee.  He was

25   his lawyer.  Mr. Zilberberg was his lawyer who was retained

1    before --

2              THE COURT:  To do what?

3              MS. KIRSHNER:  He was in a dispute with his prior

4    employer, Renaissance Health Care.

5              THE COURT:  But not as a lawyer in relationship to

6    this transaction?

7              MS. KIRSHNER:  Yes.  He was his lawyer.  He was

8    representing Aron in connection with a separate and unrelated

9    litigation, and Aron was talking to him about, I need financing

10   to open up a new business called Emanuel.  Let me just say,

11   Emanuel today is still owned and operated by Aron Fried.

12             THE COURT:  To do that, he would have to illegally

13   give Zilberberg a profit, personal property.

14             MS. KIRSHNER:  It wasn't intended to be a profit.

15             THE COURT:  That's what I'm trying to understand.

16   Either Zilberberg -- Zilberberg is charged as a coconspirator

17   here and Zilberberg was supposed to make money that he was not

18   entitled to by structuring this loan.  Is it Mr. Fried's

19   position that he was totally unaware of this?

20             MS. KIRSHNER:  No.  Judge, again, that's why I said,

21   the intention here is not to avoid responsibility for his

22   conduct.  Obviously, he was aware of all these steps.  But

23   Zilberberg was his lawyer.  Zilberberg said, I have an in at

24   the bank.  Let's get the loan.

25             THE COURT:  Zilberberg said more than that.  He says,

1  basically:  I will help you get the loan if you bribe me.

2  Basically, right, that's what he said.  He wasn't entitled to a

3  commission.

4          MS. KIRSHNER:  It was intended to be a loan that Aron

5  believed that Zilberg would pay back to Aron.

6          THE COURT:  I know.  But Zilberg's involvement in

7  wanting to profit off of this bank transaction was an illegal

8  agreement.

9          MS. KIRSHNER:  OK.

10          THE COURT:  I am just trying to understand who knew

11  what, who agreed to what --

12          MS. KIRSHNER:  I just want the Court to be aware that

13  initially the funds that went to Zilberg were funds that was

14  a loan that Aron extended to Zilberg, expecting that

15  Zilberg would pay him back, and then Aron would pay that

16  back to Kahan.

17          THE COURT:  But that's not the theory of the

18  government's case that I understood.  I thought the theory of

19  the government's case was that Zilberg was to profit off of

20  this bank fraud by knowingly facilitating this bank fraud in

21  exchange for a payment by Fried and others.  Is that not true?

22          MS. KIRSHNER:  What his intention was was to extend a

23  loan to Mr. Zilberg.

24          THE COURT:  No.  I don't understand that.  His

25  intention was, pursuant to this conspiracy, was to help

1   facilitate bank fraud, and part of facilitating the bank fraud

2   involved paying Zilberberg a portion of those proceeds.

3              MS. KIRSHNER:  In the form of a loan.

4              THE COURT:  It doesn't matter what the form is.

5              MS. KIRSHNER:  Ultimately, Mr. Zilberberg changed the

6   agreement between him and Aron and said, those are going to

7   represent prepaid legal costs for the litigation.  And this is

8   another whole story.  It's neither here nor there.

9              THE COURT:  That doesn't transfer his knowledge of the

10  conspiracy of the fraud of the bank.

11             MS. KIRSHNER:  I'm not suggesting it does.  All I'm

12  suggesting to you is that you asked the right questions.  In

13  terms of the loan application that went to the bank, Aron had

14  no participation in that process.

15             But clearly there was an agreement prior to receiving

16  the loan as to how the loan will be effectuated.  That's why he

17  has pleaded guilty.  That's why we are here.  If he had no

18  knowledge of what the structure of the loan was going to look

19  like, we wouldn't be here today.

20             THE COURT:  What I thought was more important is that

21  Mr. Fried participated in submitting -- was a knowing

22  participant in a conspiracy to submit false documentation to

23  the bank to get this loan.  And as part of this conspiracy, he

24  had to make a payment to Mr. Zilberberg.

25             MS. KIRSHNER:  But listen.  What doesn't make sense is

1    to pay $450,000 to Mr. Zilberberg to obtain a $400,000 loan.

2                THE COURT:  That's what I am trying to understand.  It

3    makes sense if you are never going to pay the loan back.

4                MS. KIRSHNER:  Aron believed that Zilberberg would pay

5    him back, and that was the deal --

6                THE COURT:  What proceeds?

7                MS. KIRSHNER:  Whatever proceeds people use to pay

8    back loans.

9                THE COURT:  Zilberberg was going to pay Aron?

10               MS. KIRSHNER:  The money that went from Aron to

11   Zilberberg was intended to be a loan, as memorialized in the

12   heter iska.

13               THE COURT:  Your contention is that it was not -- the

14   money that went to Zilberberg was not money that was paid to

15   him in order to facilitate the bank fraud.

16               MS. KIRSHNER:  That is my contention.  And if you look

17   at the numbers, it does not make sense that you would pay

18   $450,000 in order to obtain a $400,000 loan.

19               THE COURT:  It's a $1.4 million dollar loan.

20               MS. KIRSHNER:  Right.  But his portion that he

21   received is $400,000.

22               THE COURT:  Again, I am trying to understand the total

23   scheme, and what you just said makes sense only to the extent

24   that I have to accept the premise that they intended to pay

25   back the loan instead of walking away with the money after they

1    have defaulted on the loan.

2         MS. KIRSHNER:  It was certainly Aron's intention to

3    fulfill his obligations.  I cannot speak to what the other two

4    people intended to do with it.  But in Aron's mind, this

5    fraudulently obtained loan was what he paid back and that loan

6    that he got, the money that he got he borrowed from Kahan

7    because the loan proceeds went into an account that Aron

8    controlled.  Aron gave loan proceeds to Zilberberg that he

9    believed was a loan, and Aron gave loan proceeds to Kahan that

10   he believed was a loan.  But Aron's take from this was

11   $400,000, and he paid it back and it was always his intention

12   to pay it back.

13        THE COURT:  I don't understand the position that he

14   intended to pay this back if at the same time he is

15   representing that the only payments that he made initially on

16   these loans were interest payments at the direction of the

17   other individual.

18        MS. KIRSHNER:  He believed that Kahan was going to

19   make payments to satisfy the loan to the bank, but his

20   obligation was to Kahan.

21        THE COURT:  When was that going to take place?

22   Because that never took place, and he is the only one who paid

23   anything.

24        MS. KIRSHNER:  The obligation to the bank was interest

25   only for the first year.

1          THE COURT:  Right.  But Kahan never paid any interest,

2     did he?

3          MS. KIRSHNER:  But he didn't know that.  His view was,

4     my obligation, Aron Fried's obligation, was to Kahan.

5          THE COURT:  He did know that because Kahan told him to

6     pay the interest.

7          MS. KIRSHNER:  That month.

8          THE COURT:  Kahan didn't pay the interest.

9          MS. KIRSHNER:  That month.

10         THE COURT:  Is it your position that Kahan made any

11    payment on this loan?

12         MS. KIRSHNER:  I don't know what Kahan did.  But in

13    order to satisfy his obligation to Kahan, he followed Kahan's

14    direction and made payments to Kahan in order to satisfy his

15    obligation to Kahan.

16         THE COURT:  Mr. Fried.

17         MS. KIRSHNER:  By the way, the interest was fully paid

18    on the loan.

19         THE COURT:  I'm sorry?

20         MS. KIRSHNER:  The interest was fully paid on the

21    loan.

22         THE COURT:  By whom?

23         MS. KIRSHNER:  For the first year.

24         THE COURT:  For the what?

25         MS. KIRSHNER:  The first year the interest was fully

1    paid on the loan.

2              THE COURT:  By whom?

3              MS. KIRSHNER:  I think Mr. Sauber, who was the straw

4    borrower.

5              THE COURT:  Mr. Fried, is there anything you want to

6    say before I impose sentence?

7              THE DEFENDANT:  Yes, your Honor.

8              Your Honor, I know that this is the only

9    opportunity --

10             THE COURT:  You are going to have to speak up and be

11   by the mic.

12             THE DEFENDANT:  Sorry.

13             Your Honor, I know that this is the only opportunity

14   that I will have to speak directly to you and it's important to

15   me that I have the chance to show who really I am.

16             I am not the criminal mastermind that the prosecutors

17   may have you believe.  I made some internal decisions, relied

18   on bad people, and certainly should have known better, but I

19   never intended them.  I never intended any harm.

20             I stand before you this morning humbled and remorseful

21   for the actions that brought me here today.  Growing up in a

22   very large family, I was taught by my parents to help people

23   and give back to my community and other communities.  I have

24   always tried to and continue to strive to set an example to my

25   family.  I have spent many years doing good in my community,

1   helping kids, raising money for needy families.

2          I recognize that although it was not intentional, my

3   actions caused the bank financial harm and doing so has great

4   consequences to the financial community.  This loan was over

5   ten years ago and so much has happened in my life and in the

6   world since then.

7          My actions caused my family serious repercussions and

8   harm.  My wife and children are deeply affected, both

9   emotionally and physically.  Please let me take this

10  opportunity to apologize to them for what I've put them

11  through, in particular my wife, who has stood by my side

12  through so many difficult times.

13         As you know, prior to my arrest I was diagnosed with

14  bone cancer, and the battle continues.  This has also had an

15  impact on my family life and me.  For over a year during my

16  treatment I have been having severe pain and weakness, not

17  knowing if each day would be my last.  My wife and kids endured

18  this horrible journey along with me, which makes this case even

19  worse.  Every day my whole family wanted -- every day, every

20  twinge, every headache means that the case -- that the cancer

21  has returned.  It has been a great stress of all of us.  I am

22  fortunate to have received the wonderful care, and I'm

23  terrified of recurrence of the cancer should I go to jail.

24         In this great country we believe in second chances.

25  Your Honor, I stand before you and plead for leniency on behalf

1    of my family and myself.  Your Honor, no one knows what the

2    future will hold, but I would like the opportunity to correct

3    my misdeeds and set forth the proper example for my family and

4    community.

5         I started going for therapy after this incident and

6    still go weekly for therapy.  In my community this is not a

7    common thing, but I have found it useful.

8         Your Honor, my family needs me.  I have lost many

9    precious years due to my illness and my wife's illness and all

10   that has transpired in the past years.  Your Honor, I am asking

11   the opportunity to rectify my misdeeds and correct them for

12   giving back to the community, a lifetime of honesty and doing

13   good things.

14        Your Honor, I appreciate your consideration and mercy

15   in this matter.

16        THE COURT:  I reviewed the presentence report and

17   accept the factual recitations in the presentence report.  The

18   guideline range as calculated is a total offense level 19,

19   criminal history category I.  I reviewed the submissions by the

20   parties and considered the arguments made today and considered

21   all the factors in 18 U.S.C. for the imposition of a reasonable

22   sentence, 3553(a).

23        In this case I believe that the arguments made from

24   the defense warrant a sentence below the guideline range, and I

25   am going to impose a sentence even below the recommended

1    sentence of 18 months.  But I believe in this case that the --

2    I don't accept what has been characterized as some sort of

3    innocent mistakes made by the defendant.  I think his conduct,

4    as he admitted it in his allocution, was deliberate criminal

5    conduct in which he attempted to defraud the bank with the

6    participation of others, and the characterization of his

7    minimal role in this I don't think is appropriate.

8            In this case, given all of his health and his family

9    circumstances, I am going to impose a sentence of a year and a

10   day.  I am going to impose a period of three years' supervised

11   release.  I also have to impose the mandatory $100 special

12   assessment.

13           The defendant can surrender to a facility designated

14   by the Bureau of Prisons no later than 2 p.m. on September 1 or

15   any time before then.  I will impose three years of supervised

16   release.

17           The mandatory conditions of supervised release are

18   imposed.  Defendant shall not commit another federal, state, or

19   local crime.  Defendant shall not unlawfully possess a

20   controlled substance.  Defendant shall refrain from any

21   unlawful use of a controlled substance and submit to at least

22   one drug test within 15 days of his release from custody and

23   two unscheduled drug tests thereafter.  Defendant must also

24   cooperate in the collection of any DNA as directed by the

25   probation officer.

1          The standard conditions of supervision 1 through 12 as

2   recommended by the presentence report are also imposed with the

3   special condition that the defendant shall submit his person,

4   residence, vehicle, electronic devices to a search on the basis

5   that the probation officer has reasonable belief that there has

6   been a violation of supervised release or unlawful conduct.

7          Is the government seeking restitution?

8          MS. McLEOD:  Yes, your Honor.  It's agreed upon

9   between the parties.  I'll hand up the order.

10         THE COURT:  I will order restitution.  What amount is

11  the restitution?

12         MS. McLEOD:  It is in the amount $1,066,853.

13         THE COURT:  That's the amount of restitution, not

14  forfeiture?

15         MS. McLEOD:  Correct.

16         As to forfeiture, the parties would propose the

17  following.  We are still in some discussion about the amount.

18  So the parties would propose that your Honor order forfeiture

19  today with the parties to come back to your Honor with an order

20  with an amount.

21         THE COURT:  I will give the parties 60 days to submit

22  a request with regard to forfeiture.

23         MS. KIRSHNER:  Your Honor, can you direct -- I

24  understand it's a recommendation.  But as you know, Mr. Fried

25  is an orthodox Jew.  Otisville has a kosher facility there.  It

1    allows him access to his family.  If you could recommend that.

2              THE COURT:  Recommend which?

3              MS. KIRSHNER:  Otisville.

4              THE COURT:  I will make that recommendation.

5    Obviously, subject to the availability of space.

6              MS. KIRSHNER:  Your Honor, is there any possibility

7    that you would consider house arrest in this case?

8              THE COURT:  No, not at this time.  I think that it's

9    appropriate.  I think this is an appropriate sentence.  If

10   anything significantly develops with regard to his health, I am

11   willing to reconsider between now and when he surrenders, a

12   further application.  But it would have to be based on

13   significant new information that's not before the Court at this

14   time.

15             MS. KIRSHNER:  Thank you.

16             THE COURT:  That's the sentence of the Court.

17             Mr. Fried, you have the right to appeal this

18   conviction and sentence.  To the extent that you have not

19   waived such right at the time of your plea, if you wish to

20   appeal any portions of this conviction and sentence, you should

21   discuss it immediately with your attorney.  In order to

22   preserve your right to appeal, a notice of appeal must be filed

23   on your behalf within 14 days of entry of today's judgment.

24             That's the sentence of the Court.

25             MS. McLEOD:  Your Honor, just one other thing.  The

1  government would move to dismiss any open counts as to this

2  defendant.

3            THE COURT:  That application is granted.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25