1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          19 Cr. 802 (GBD)

5  MENDEL ZILBERBERG,

6                                      Trial
              Defendant.
7  ------------------------------x

8                                      New York, N.Y.
9                                      July 5, 2023
                                       10:00 a.m.
10

11 Before:

12              HON. GEORGE B. DANIELS,

13                                      District Judge
                                        -and a Jury-
14
                        APPEARANCES
15
   DAMIAN WILLIAMS
16      United States Attorney for the
        Southern District of New York
17 DINA McLEOD
   DANIEL G. NESSIM
18      Assistant United States Attorneys

19 BRAFMAN & ASSOCIATES, P.C.
        Attorneys for Defendant
20 BY:  BENJAMIN BRAFMAN
        JACOB KAPLAN
21
   Also Present:
22
   Robert Stout, Special Agent FBI
23 Nicholas Tranchitella, Special Agent FDIC
   Joseph Carbone, Paralegal Specialist, USAO
24 Lia Newman, Paralegal Specialist, Brafman & Associates, P.C.

25

1      (Case called)

2      MS. McLEOD:  Good morning, your Honor.  Dina McLeod

3  and Daniel Nessim for the government, and with us at counsel

4  table is Special Agent Robert Stout of the FBI.

5      THE COURT:  Good morning.

6      MR. BRAFMAN:  Good morning, your Honor.  Benjamin

7  Brafman, Jacob Kaplan, and Lia Newman, who is a paralegal with

8  our office.  And seated here is Mr. Mendel Zilberberg, the

9  defendant in this case.

10      THE COURT:  Good morning.

11      Is the government ready to proceed?

12      MS. McLEOD:  Yes, your Honor.

13      THE COURT:  Mr. Brafman, defense ready to proceed?

14      MR. BRAFMAN:  Yes, your Honor.

15      THE COURT:  Are there any issues that we need to

16  address before we bring up the jury?

17      MR. BRAFMAN:  I don't believe so, your Honor.

18      MS. McLEOD:  No, your Honor.

19      THE COURT:  All right.  Let me make sure I know — I

20  have a correct list of all of the folks who are at the table.

21  I have Mr. Brafman, Mr. Kaplan, and Ms. Newman.

22      MR. BRAFMAN:  That's correct, sir.

23      THE COURT:  And at the government's table, I have

24  Ms. McLeod and Mr. Nessim and Nicholas — how do you

25  pronounce —

1              MS. McLEOD:  Nicholas Tranchitella.

2              THE COURT:  ⸺ Tranchitella?

3              MS. McLEOD:  Tranchitella.

4              THE COURT:  That's who?

5              MS. McLEOD:  He is right there.

6              THE COURT:  Is he going to be at counsel table?

7              MS. McLEOD:  He may be.  He's one of the case agents.

8              THE COURT:  All right.  Who else do we have at counsel

9    table?

10             MS. McLEOD:  We also have our paralegal Joseph

11   Carbone.

12             THE COURT:  All right.  Am I missing somebody?

13             MS. McLEOD:  I think that's everybody who might be at

14   the government's table.

15             THE COURT:  Who's Carbone?  OK.

16             MR. STOUT:  Special Agent Robert Stout.

17             THE COURT:  I don't think I have you.  OK.  That's

18   what I was missing.  Robert Stout, S-t-o- ⸺

19             A VOICE:  U-t.

20             THE COURT:  U-t.

21             Now, at this point approximately how many witnesses

22   does the government have and how long do you think it will take

23   to present those witnesses?

24             MS. McLEOD:  The government has eight witnesses.  I

25   think it's possible that the government could rest Monday or

1    Tuesday.

2              THE COURT:  Of next week?

3              MS. McLEOD:  Of next week, yes.

4              THE COURT:  So you think you can put in your case in a

5    week?

6              MS. McLEOD:  Yes.

7              THE COURT:  And I have a witness list.  I have eight

8    names on that witness list.  Are those the people, or do we

9    have additional people or substitutes?

10             MS. McLEOD:  Those should be the list, yes.

11             THE COURT:  Mr. Brafman, obviously, other than

12   discussing with your client whether he's going to testify, do

13   you anticipate at this point calling additional witnesses?

14             MR. BRAFMAN:  No, I don't, your Honor.  We've managed

15   to stipulate to a lot of things, so we're OK.

16             THE COURT:  All right.  So we should be able to get

17   the witnesses in before the end of next week.

18             MR. BRAFMAN:  Yes.

19             THE COURT:  Today being Wednesday.

20             So I think that I was told that the jury would be

21   ready in about ten minutes.  So we can —— as soon as they're

22   ready, we can bring them up, and we can start.

23             (Jury selection commenced)

24             (Continued next page)

25

N75DZILF

|    |                                                                       |
|----|-----------------------------------------------------------------------|
| 1  | AFTERNOON SESSION                                                      |
| 2  | 2:35 p.m.                                                              |
| 3  | (In open court; jury not present)                                     |
| 4  | THE COURT:  I think all our jurors are here.  We're                   |
| 5  | ready to begin.  I'll bring them in.                                   |
| 6  | (Jury present)                                                         |
| 7  | THE COURT:  OK.  You can be seated.                                   |
| 8  | Could we swear in the jurors.                                          |
| 9  | (A jury of 12 and 2 alternates was impaneled and                      |
| 10 | sworn)                                                                 |
| 11 | THE COURT:  Members of the jury, at this point I'm                    |
| 12 | required by the law to instruct you generally concerning your         |
| 13 | basic functions, duties, and certain rules which apply to every       |
| 14 | jury so that you will better be able to assess and weigh the          |
| 15 | evidence as it's presented and reach a proper verdict.                |
| 16 | Now, the trial has commenced with the selection of the               |
| 17 | jury.  The next step in the trial will be an opening statement        |
| 18 | by the government to outline for you what the prosecution             |
| 19 | intends to prove by way of evidence in the case.                      |
| 20 | Now, after counsel for the government makes their                     |
| 21 | opening statement, counsel for the defendant, if they desire,         |
| 22 | may also, but are not required to, make an opening statement.         |
| 23 | Now, what counsel for either side says in an opening                  |
| 24 | statement is not evidence.  You may consider the opening              |
| 25 | statement as a preview of what each side intends to prove by          |

1  way of evidence in the case.

2      Now, after the opening statement, or statements, the

3  Assistant United States Attorneys will present one or more

4  witnesses who will be questioned by them.  Now, this is called

5  direct examination.  And after the Assistant U.S. Attorney

6  completes their questioning of the witness, defense counsel

7  will be given an opportunity to question that witness.  This is

8  called cross-examination.  And after the government has

9  concluded the calling of its witnesses and the introduction of

10  any exhibits which are admissible into evidence, the defendant

11  may, but is not required to, offer evidence in his own defense.

12  And after both sides rest, the government's attorney may make a

13  closing argument, followed by the closing argument of the

14  defendant's attorneys, and the government attorney will then

15  make a rebuttal in response, and then I will instruct you on

16  the law, and you will retire to deliberate for the purpose of

17  reaching a verdict.

18      Now, this is a general outline of the trial procedure.

19  Now, I'm hopeful again, now that I've spoken to the lawyers,

20  hopefully we'll be done with the witnesses in a week or so, a

21  little less time than I thought, if we move efficiently.  And

22  I'm going to ask that you listen carefully to the testimony.

23  You can take notes if you want, but you don't have to.  If you

24  want any testimony read back to you, the court reporter is

25  taking down every word that's being said and can read the

1    testimony back to you of any witness word for word.

2         Now, the evidence in this case consists of testimony

3    of witnesses under oath and exhibits which are admitted into

4    evidence plus any stipulations agreed upon by the attorneys.

5         Now, questions in and of themselves are not evidence.

6    Therefore, you cannot infer any fact from the mere asking of a

7    question.  It is the answer coupled with the question that

8    constitutes evidence.  For example, if a witness was asked a

9    question, "Don't you own an automobile?" and the witness

10   answers "No," you may not infer from the mere asking of the

11   question that the witness does own an automobile.

12        Now, during the course of the trial, the Assistant

13   United States Attorney or defense counsel may object to a

14   question or an answer on the ground that it somehow is legally

15   improper or inadmissible.  Now, if I sustain the objection,

16   this means that the question or the answer was in some way

17   improper, and if an answer's already been given, I will

18   instruct you to disregard it.  Therefore, the answer is no

19   longer evidence in the case.  If I overrule the objection, then

20   it means that the question is proper, and I will permit it to

21   be answered or, if already answered, I will permit the answer

22   to remain as evidence in the case.

23        Now, please do not resent the fact that an attorney

24   makes objections.  This is their duty.  And do not hold it

25   against them, against either side, if I rule against them.

1   Now, as I will explain in detail in my instructions at the end

2   of the case, as jurors in this case, you are the sole judges of

3   the facts, and I am the sole judge of the law, and you must

4   accept the law as I give it to you without hesitation or

5   reservation, even if you privately disagree with me.  Now, you

6   must keep an open mind throughout the trial.  You must not

7   converse amongst yourselves or with anyone else upon any

8   subject connected with the trial.

9           You must neither offer nor express an opinion about

10  the guilt or innocence of the defendant or reach any conclusion

11  about what the verdict should be until I finally give the case

12  to you.  You must not read or listen to any accounts or any

13  discussions of the case in the event that it's reported by

14  newspapers or other news media, and you must not visit or view

15  any premises or place where the offense charged was allegedly

16  committed or any other place or premises involved in the case.

17  And you must not do any research or investigation about the

18  case on your own.

19          You must decide this case solely on the evidence

20  presented at this trial, and you must speak to no one about the

21  case until the trial has completely ended.  And you must

22  promptly report to the Court any incident within your knowledge

23  involving an attempt by any person to speak with any member of

24  the jury about the case.

25          Now, during the trial, again, you should not speak

1    with any of the parties in this case nor any individuals

2    associated with them.  As I instructed you, they are instructed

3    not to speak with you.  So don't consider it rude if they see

4    you outside of this courtroom and they don't acknowledge your

5    presence.  Obviously, if someone were to see you speaking to

6    one of the parties involved in the case, they might draw an

7    improper inference even though it may be a perfectly innocent

8    conversation unrelated to the case.

9            Now, we're right on schedule, and I want to move right

10   along.  So we'll next start — proceed with the next step in

11   the trial, which would be an opening statement by the

12   government.

13           MS. McLEOD:  This is a case about greed and lies.  The

14   greed of this man, the defendant, Mendel Zilberberg, and the

15   lies that he and his partners in crime told to trick a bank

16   into giving them a loan for $1.4 million.

17           Mendel Zilberberg is a lawyer, and in 2009 he was also

18   on the board of directors at a bank here in New York City.  A

19   director at a bank is supposed to look out for the interests of

20   the bank first.  He's supposed to put what is good for the bank

21   over what is good for him.  But the defendant did the opposite.

22   He and his coconspirators partnered up to get a $1.4 million

23   loan using a sham borrower, someone who applies for a loan and

24   claims to be the person seeking the loan but in reality is just

25   a front man for the real borrower.  The defendant and his

1    partners in crime were the real borrowers, and they lied to the

2    bank about that and a lot of other things to make sure that

3    they got their money.

4        The defendant used his position at the bank as a

5    director of the bank to get the loan processed and approved.

6    And when the $1.4 million was issued by the bank, the defendant

7    took his cut, over $450,000, a third of the loan money, and he

8    never paid it back.  That's why we're here today, because when

9    the defendant defrauded his own bank to get a $1.4 million

10   loan, he committed multiple federal crimes.

11       Ladies and gentlemen, this is the government's opening

12   statement.  This is an opportunity to give you an overview of

13   what the evidence will show and how we will prove it to you.

14       So what will the evidence show?  The evidence is going

15   to show that the defendant, along with his coconspirators, lied

16   to a bank in order to get a loan for $1.4 million that the

17   defendant never repaid.

18       About 15 years ago, in 2009, the defendant was a

19   practicing attorney.  He was also a director on the board of a

20   bank called Park Avenue Bank, and the defendant had a client

21   who was trying to get a business off the ground.  His client

22   needed investors.  He needed money to get his business going,

23   but the defendant's client didn't have good enough credit to

24   get a loan for the business.  So the defendant's client brought

25   a potential investor on board, but that investor needed a loan

 1   to make his investment, and the investor also had bad credit.

 2          So we have three people:  The defendant, the

 3   defendant's client, and the potential investor.  They all want

 4   money, but they can't get it through a legitimate loan.  So to

 5   solve their problem, they all agree to use a sham borrower, one

 6   of the investor's friends, to apply for a loan from the bank.

 7   The investor would get the money to make his investment,

 8   defendant's client would get the money he needed for his

 9   business, but there was one catch.  The defendant wanted them

10   to apply for an even bigger loan than originally planned

11   because the defendant wanted to take a cut of the money for

12   himself.  The defendant and his coconspirators agreed that the

13   defendant would get one-third of the money, and in return, the

14   defendant would help get the loan processed and approved.  And

15   the defendant held up his end of the bargain.  He used what he

16   knew as a director of the bank and his position at the bank to

17   get the loan approved.

18          First, the defendant and his coconspirators told the

19   bank a series of lies.  The identity of the borrower was a lie.

20   The defendant also told the bank that the purpose of the loan

21   was for the sham borrower to take advantage of business

22   opportunities.  That was also a lie.  The loan application

23   stated that the sham borrower was a client of the defendant's.

24   Also a lie.  And the defendant never told the bank that he was

25   actually getting a big cut of the loan.  And you will hear that

1   these lies mattered to the bank because when a bank is trying

2   to decide whether to give someone a loan, the bank is looking

3   at whether that person will pay the loan back.  So it's crucial

4   for the bank to know the true borrower on the loan.  But the

5   defendant and his coconspirators lied about that exact fact to

6   the bank because they knew they couldn't get the money fair and

7   square.

8           And make no mistake, the defendant planned this fraud

9   carefully.  He made sure that this loan would be pushed through

10  with as little scrutiny as possible.  He used a sham borrower

11  to apply for the loan, concealing his own stake in the loan,

12  because he knew that a bank regulation required that a bank

13  insider like himself had to get the approval of the full board

14  of directors when seeking a loan.

15          And what about the amount of the loan, $1.4 million?

16  The defendant chose that number purposely.  He knew that a loan

17  of over $1.5 million would need to go to the bank's credit

18  committee and would be looked at more closely.  And the

19  defendant's preparation and lies worked.  The bank approved the

20  loan, and the money was deposited into the sham borrower's bank

21  account, and then the coconspirators started moving the money

22  out into bank accounts that they controlled.

23          And who was the very first person who got a cut of the

24  money?  The defendant.  On the very same day that the loan was

25  funded by the bank, the defendant received over $450,000 of the

1    loan money.  And when the loan defaulted, the defendant was

2    nowhere to be found.  He never repaid the money that he took

3    from the loan, and the bank, which the defendant knew was in

4    bad financial shape, was left holding the bag.

5           So that's what the evidence is going to show.  How

6    will we prove it to you?  What types of evidence are you going

7    to see at this trial?  First, you'll see different types of

8    documents.  You will see the loan presentation containing the

9    lies about the loan.  You will see emails between the defendant

10   and the loan officer about the loan, emails where the defendant

11   is repeatedly pushing the loan officer to get the loan

12   approved.  You will see bank records showing that, based on the

13   lies that the defendant and his coconspirators told, the bank

14   sent the sham borrower $1.4 million and that hundreds of

15   thousands of dollars of that money flowed to the defendant.

16          You'll also hear from witnesses.  You'll hear from the

17   sham borrower himself.  He will tell you that he agreed to do a

18   favor for the investor by helping him apply for this loan.  He

19   will tell you that he was just the borrower on paper.  In

20   reality, he didn't take any part of the loan money.  The sham

21   borrower will tell you that he did not fill out the loan

22   paperwork and that the statements relied on by the bank in

23   approving the loan were lies.

24          You will hear from the loan officer who reviewed the

25   loan.  He'll tell you about the bank's loan policy and what the

1    bank considered when evaluating whether to issue a loan.  He

2    will also tell you that he passed along the loan to his

3    supervisors, but he did not recommend approving it because he

4    thought it was a risky loan.

5            You are also going to hear from the investor who was

6    one of the defendant's coconspirators.  The investor will tell

7    you specifically what they did to make the scheme work.  He

8    will tell you that they committed fraud and explain how and why

9    they did it.  And ladies and gentlemen, you'll hear that the

10   investor has committed and pled guilty to serious crimes,

11   including the crimes he committed with the defendant.  And he

12   entered into an agreement with the government to cooperate and

13   testify about the crimes he committed in the hopes of receiving

14   less jail time.

15           The sham borrower I told you about is testifying

16   pursuant to what's called a non-prosecution agreement, which

17   means that in exchange for the government not prosecuting him

18   for his involvement in the defendant's crime, he has agreed to

19   tell the government about what he did and to testify in court.

20           So listen carefully when the sham borrower and the

21   investor testify and scrutinize what they tell you, and if you

22   do, you will see that their testimony is consistent with the

23   other evidence in this case —— the emails, the bank records,

24   and the other witnesses.

25           Ladies and gentlemen, the evidence you're going to see

1   and hear isn't necessarily going to come in in chronological

2   order.  The evidence will come in in bits and pieces, but after

3   you've seen and heard all of the evidence in this case, you

4   will know exactly what happened here.  The defendant took

5   advantage of his trusted position at a bank and worked with

6   others to lie to get the bank to issue him a loan that he never

7   should have gotten and which he never paid back.

8           Now, I'm about to sit down, but before I do, I'd ask

9   you to do three things:  First, pay close attention to the

10  evidence; second, follow the judge's instructions on the law;

11  and third, use your common sense, the same common sense that

12  guides you in your daily lives.  If you do those three things,

13  the defendant will get a fair trial, the government will get a

14  fair trial, and you will reach the only verdict that is

15  consistent with the evidence and the law:  The defendant is

16  guilty.

17          THE COURT:  Mr. Brafman, would you like to make an

18  opening statement on behalf of the defense?

19          MR. BRAFMAN:  Yes, your Honor.

20          Good afternoon, ladies and gentlemen.  My name is

21  Benjamin Brafman.  This is Jacob Kaplan.  We are going to

22  defend Mr. Zilberg.  And this young lady is a paralegal at

23  our firm, and this man is Mendel Zilberberg, who is on trial

24  here.

25          I've listened carefully to the government's opening

1    statement, and I hope you did as well.  There was one thing

2    missing from her statement.  She identified an investor, but

3    she didn't mention his name.  His name is Abraham Kahan.  And I

4    submit to you, with great respect, that the case relies on the

5    credibility of Mr. Kahan.  And when you hear his testimony, you

6    will conclude that he is just not credible; that his testimony,

7    I submit with great respect for your individual integrity, you

8    will conclude that his testimony is essentially worthless.

9         So let me tell you what is not in dispute in this

10   case.  What is not in dispute, Mr. Zilberberg got money.  They

11   don't have to prove that.  I'm conceding that he got money, but

12   he got money out of the loan not through fraud.  It was because

13   he was a lawyer for one of the people who Ms. -- I only know

14   her first name — Ms. McLeod tells you was a coconspirator.

15   That's not true.

16        And I want to tell you our opening statement because

17   the voyage she took you through is not consistent with what

18   happened in this case.  Many of you have listened to coming

19   attractions for a movie or reviews of a play, and then when you

20   went to see it, it was nothing like the coming attractions.

21   The coming attractions basically boil down little vignettes

22   where they try to explain to you what the film's going to be

23   about.  And many times you come into the theater, you watch the

24   whole movie, and you are disappointed.  I think you're going to

25   be very disappointed at the end of this trial.

1       So Mr. Zilberg got money, and he was a lawyer.  And

2   one of the people in this case, Mr. Fried, who is not the

3   investor, he was scrambling to get money for his business, a

4   health care business.  And Mr. Zilberg had represented him

5   through years of litigation, and he owed Mr. Zilberg

6   substantial legal fees.  And Mr. Zilberg got him the loan

7   not by lying to the bank but by inquiring as to the status of

8   the loan.  And you will hear the bank person, Mr. Rosenwasser,

9   and he will testify that it is not unusual for the person who

10  refers the client or the loan applicant to the bank to make

11  inquiry every so often as to when the loan will close.

12      And you will find that both Mr. Fried and Mr. Kahan

13  were unscrupulous people, and Kahan took very real advantage of

14  Mr. Sauber, who you will conclude he used as a dupe.  And he

15  took his wife, Toby, and had her sign the deed to her house to

16  Mr. Sauber so that his financial statement to the bank would

17  look like he was worth millions of dollars more, and that deed

18  was transferred to Mr. Sauber for $10.  Obviously a sham

19  transaction that Mr. Zilberg had nothing whatsoever to do

20  with and had no knowledge of whatsoever.

21      Indeed, when Mr. Kahan concocted this stupid scheme,

22  they went to another bank first, and the loan was applied to a

23  different bank, and the different bank refused the loan.  And

24  it was a different kind of a loan.  It was a credit line.  And

25  Mr. Sauber went to that bank with Mr. Kahan, and that was

 1   months before they came to the Park Avenue Bank.  So you will

 2   find zero evidence that Mr. Zilberberg was aware of the sham

 3   transaction involving the home, and it was —— he was unaware of

 4   the loan application where the government says Mr. Sauber was a

 5   straw borrower.  Indeed, Mr. Kahan, who I will tell you a

 6   little bit more about in a minute, Mr. Kahan, who was meeting

 7   with the government agents again and again and again in an

 8   effort to gain a cooperation told them repeatedly that he never

 9   discussed the loan with Mr. Zilberberg.  He never discussed the

10   loan with Mr. Zilberberg.  So they may tell you that the

11   evidence in this case is going to allow you to conclude that

12   Mr. Zilberberg was aware of the scheme.  There is no evidence

13   whatsoever to get you to conclude that Mr. Zilberberg was aware

14   of it.

15        So there are some things which are not in dispute.

16   This is not a case about whether a person was or was not a good

17   director of a bank.  This is not a civil lawsuit.  This is a

18   criminal case, and they are going to ask you to rely on flawed

19   evidence and a flawed theory to get you to make a very

20   important decision in your life, a very important decision,

21   obviously, in the life of Mr. Zilberberg.  And I submit to you

22   that at the end of the case, you're going to conclude that they

23   haven't provided you with credible evidence.

24        The only person who is going to testify about this

25   scheme is Mr. Kahan, and he will admit on the witness stand

 1   that he never discussed the sham transaction that he and his

 2   wife engaged in when they gave their house to Mr. Sauber.  And

 3   Mr. Sauber will tell you that Mr. Kahan owed him money from

 4   before and that he promised Mr. Sauber, if you help me get this

 5   loan, I'm going to be able to pay you back for the $70,000 that

 6   you gave me a long time ago.

 7           So let me repeat — and sometimes repeating something

 8   makes an impression, I hope — that Mr. Sauber was picked by

 9   Mr. Kahan without Mr. Zilberg's knowledge.  That Mr. Sauber

10   was picked by Mr. Kahan because Mr. Kahan had ripped him off in

11   the past.  He had convinced him to lend him money which he

12   never paid back.  So the actual borrower, according to the bank

13   that appeared on the documents, was Mr. Kahan and Mr. Sauber

14   because Mr. Kahan monitored these transactions very carefully

15   to make sure that Sauber was at the bank and that Sauber was

16   doing what he needed to do to fool the bank.

17           And the bank person who comes to testify,

18   Mr. Rosenwasser, is not going to tell you that he approved the

19   loan.  He knew that Mendel Zilberberg was the person who was

20   bringing this client to the bank.  He believed that Mendel

21   Zilberberg was the lawyer representing Mr. Sauber.  So to

22   suggest that they didn't know that he was a client of

23   Mr. Zilberg is inconsistent with the evidence that the

24   government's own witnesses will tell you.

25           The fact that Mr. Zilberberg got money from the loan

1    does not mean he committed a bank fraud.  The fact that

2    Mr. Zilberberg got money from the loan does not mean that he

3    was responsible for defrauding the bank.  And when this case

4    ends, I think you will conclude that the government has not

5    proved their case beyond a reasonable doubt.

6            So let me tell you who their important witness in this

7    case is going to be, a witness whose name did not come up at

8    all in the government's opening statement, and I understand why

9    and you will understand why.  They are not the government.  You

10   are the government.  They get to call themselves the government

11   in a trial because that's how it works.  The government will

12   offer this witness.  The government will offer this witness.

13   The government will introduce this exhibit.  They're not the

14   government.  You're the government.  I'm part of the

15   government.  Judge Daniels is, obviously, part of the

16   government.  And even Mr. Zilberberg is part of the government.

17           So they get to wear that title in a criminal trial,

18   but they don't get to take advantage of that title.  They're

19   one of the advocates, and they do a very good job, you'll see,

20   but they are not the government.  You are the government.  And

21   the reason you are the government is because the only thing

22   that stands between the government and a person accused of a

23   trial is private citizens like yourselves who agree to serve on

24   a jury.  And thank God for people like you, because when you

25   serve on a jury, you will see how important that is.

1          So let me tell you just a little bit about Abraham

2     Kahan, a person who has lied throughout his adult life.  He

3     lied to a judge 20 years ago when she sentenced him to

4     probation and promised that he will never do a crime again.  He

5     lied to this government when he met with them in order to try

6     and get a cooperation agreement when they asked him again and

7     again and again and again, who owns this health care company?

8     Who owns Crown of Life?  And every time they asked him, on four

9     occasions when he promised to tell them the truth, he said my

10    wife Toby owns it, because he is a convicted felon, and you

11    can't get a license to run a health care agency if you have a

12    conviction.

13         So when they finally confronted him with the lie and

14    they figured this out, he said to them, I was in denial.  You

15    know why he lied to them?  Because he didn't want to admit the

16    fraud.  And you know what the fraud was in that health care

17    company?  They cheated nursing aids, people who do God's work

18    at minimum wages, and he admitted to that.  And what they did

19    when they found out that he lied, they had him plead to another

20    three counts: lying to government agents, committing health

21    care fraud, and also committing money laundering.

22         So after he committed to the crimes in this case that

23    he made up and he conspired to do, the punishment, if you will,

24    was he had to plead guilty to another three crimes.  And you

25    know why that's, like, offensive?  Because for the four crimes

1    he already pleaded guilty to or agreed to plead guilty to, he

2    was looking at 95 years in prison if the judge sentenced him to

3    the maximum crime.  So the new charges that he pled guilty to

4    gave him another 50 years.  So he'd have to be 180 if he was

5    going to live through all of those sentences, assuming the

6    judge gave the maximum sentence.

7          So at the end of the day, ladies and gentlemen, you

8    cannot even consider thinking about convicting Mendel

9    Zilberberg unless you find Abraham Kahan to be credible.   In

10   the United States of America, before the jury can come to a

11   jury of private citizens and say we have given you enough

12   evidence that you should conclude beyond a reasonable doubt

13   that this man is guilty, they have to provide you, I submit,

14   with honest testimony, credible testimony, consistent

15   testimony.  So what they're going to do is they're going to put

16   on Abraham Kahan, and Abraham Kahan is not going to say that I

17   know that Mendel Zilberberg is involved.  He's going to say I

18   heard that he was involved.  That's what he's going to say, and

19   that's the only evidence in this case that will point at Mendel

20   Zilberberg as being a conspirator, someone who has

21   intentionally tried to defraud the bank.

22         Ladies and gentlemen, here's how it works, and that's

23   what you're going to see in this case.  If a person is caught

24   having committed serious crimes, they can do one of two things:

25   They can plead guilty or they can go to trial or they can try

1    and cooperate with the United States of America and become, if

2    you will, after the fact a government witness, and if they do,

3    they have to tell the truth.  And if they tell the truth and if

4    the government concludes that they've been honest, they can get

5    a 5K letter, and a 5K letter is the golden letter Mr. Kahan was

6    trying to get.

7            But you have to always tell the government the truth.

8    If they catch you lying, you don't get your cooperation

9    agreement, except in this case.  In this case they caught him

10   lying again and again and again and again to agents of the

11   United States Attorney's Office, sitting in a room, looking

12   them in the face and lying to their face, and yet they gave him

13   the cooperation agreement.  And the cooperation agreement

14   allows them to tell the judge to please don't sentence me to a

15   lot of time in jail because I cooperated with the United States

16   Attorney's Office.  And to suggest that he is worthy of belief

17   by the government, if they suggest that to you, I think that's

18   going to be offensive, you will conclude, because he committed

19   one scam after another after another.  And when you ask

20   Mr. Kahan how many times did you violate the law in the last 20

21   years, I'm going to wait with bated breath to see what he says,

22   because throughout his life he's been a thief and a liar and a

23   fraudster, as that term is going to be used in this case.

24           So I ask you to keep an open mind, and I ask you to be

25   fair to Mr. Zilberberg.  And as Judge Daniels —— Judge Daniels

1    instructs you and he has already told you, a defendant is

2    presumed innocent.  When the government files charges against

3    anyone on any crime, he or she is presumed innocent, and in

4    order to get the presumption of innocence off your —— they have

5    to come to you with credible evidence, consistent evidence,

6    evidence that suggests that they have proved every element of

7    the crimes charged beyond a reasonable doubt.  And in this case

8    they're not going to be able to do that.  In this case there is

9    a flawed theory.

10          So keep in mind that this man is not charged with

11   being a good director or a bad director.  This is not a civil

12   lawsuit.  This is not a civil lawsuit.  This is a criminal

13   case.  And you have to understand the seriousness of what's

14   going on here, and you have to treat his life as you would make

15   an important decision in your own life.  And I suggest that

16   when you evaluate Mr. Kahan at the end of the case, you would

17   never rely on him to make an important decision in your own

18   life.  That's the test you will have to conclude, not whether

19   you like him or you dislike him, whether or not in an important

20   decision in your life, would you rely on him?  And I suggest,

21   with great respect, that no one in this room will take the

22   position that you —— that he could be relied on.

23          So this is the opening statement.  It's at the

24   beginning of the trial.  So far you haven't heard any evidence.

25   You've heard opening statements by a young prosecutor and

1    you've heard opening statements from me.  I suggest that at the

2    end of the case, you will conclude that my opening statement

3    will ring true, and nothing they can say to you, no document

4    they can show to you will overcome the baggage that they come

5    into this case with, because the baggage they come into the

6    case with is Abraham Kahan.  And Abraham Kahan sat in their own

7    office, looked them in the eye, and lied again and again and

8    again until they caught him.  And when they caught him, they

9    still gave him a cooperation agreement.

10            And he has not yet been sentenced.  He's on bail.  He

11   will come into this courtroom.  He will swear to tell the

12   truth, the whole truth, nothing but the truth.  I ask you to

13   wait, not just his direct examination.  I ask you to keep an

14   open mind through the cross-examination because what you're

15   going to see is that to suggest that he is someone who is

16   credible is offensive, and to suggest to you that you should

17   rely on him to convict a private citizen of a serious crime, I

18   suggest that you will hesitate to even think about doing that.

19            So when you go back into the jury room, I want you to

20   think about what I have said, I want you to listen to the

21   Court's instructions, and I want you to think about the lies

22   that Mr. Kahan will have admitted to over and over and over

23   again.  And I suggest that the only one verdict that will be

24   fair, if you apply the law and you listen to the evidence and

25   you evaluate it, if you evaluate it very carefully, I submit

1    the verdict will be, Mr. Zilberberg, you're not guilty of this

2    crime.  The government has failed to prove you guilty.  And

3    accordingly, I suggest that you will come back into this

4    courtroom after deliberating and your foreperson, whoever that

5    might be, will rise to deliver the verdict, and in a strong,

6    confident voice will announce the verdict:  Mr. Zilberberg,

7    you're not guilty.

8            Thank you very much, ladies and gentlemen.

9            THE COURT:  Will the government call its first

10   witness.

11           MS. McLEOD:  Yes, your Honor.  Give us one second to

12   move the podium.

13           THE COURT:  Yes, sure.

14           MS. McLEOD:  Your Honor, before we call the first

15   witness, we have a couple stipulations to read.

16           THE COURT:  Sure.  A stipulation, ladies and

17   gentlemen, I'll give you further instructions later on, it's

18   just an agreement by the parties that certain facts are true

19   or, if a certain witness would come in, that witness would give

20   certain testimony.  It saves us time from calling all of those

21   individual witnesses.

22           MS. McLEOD:  It is hereby stipulated and agreed

23   between the parties that Government Exhibits 301 through 309,

24   including sub-exhibits, are true and correct account files

25   maintained by Citibank.  These account files contain records

1    made at or near the time of the acts they record, by or from

2    information transmitted by a person with knowledge of the

3    matter set forth in the records or kept in the course of

4    regularly conducted business activity, and it was the regular

5    practice of that business to make the records.

6         Government Exhibits 310 and 311, including

7    sub-exhibits, are true and correct account files maintained by

8    HSBC.  These — and there's similar language in the second

9    paragraph as in the first paragraph about business records.

10        Third paragraph reads:  Government Exhibits 214, 216,

11   and 217 are true and correct records of Valley National Bank,

12   and there's similar language as well about business records in

13   that paragraph which I will not read.

14        Government Exhibit 215 is a true and accurate copy of

15   a loan forbearance agreement dated October 2011.  Government

16   Exhibits 219, 221, and Defense Exhibit 204 are true and

17   accurate copies of property deeds.  And it is further

18   stipulated and agreed that this stipulation which is marked as

19   Government Exhibit 1001 may be received in evidence as a

20   government exhibit at trial.

21        So the government offers Government Exhibit 1001.

22        THE COURT:  Are you just offering 1001?

23        MS. McLEOD:  Just the stipulation for now.

24        THE COURT:  All right.  Any objection?

25        MR. KAPLAN:  No, your Honor.

1          THE COURT:  It will be admitted into evidence.

2          (Government's Exhibit 1001 received in evidence)

3          MS. McLEOD:  And the second stipulation:  It is hereby

4    stipulated and agreed between the parties that Government

5    Exhibits 201 to 213 and 220, including sub-exhibits, are true

6    and correct business records used and maintained by Park Avenue

7    Bank in connection with assessing and issuing loans and lines

8    of credit.  And this paragraph contains similar language

9    regarding business records as in the last stipulation.

10          Government Exhibits 801 to 816 are true and correct

11   copies of minute entries relating to meetings of Park Avenue

12   Bank's board of directors and subcommittees of Park Avenue

13   Bank's board of directors.

14          Government Exhibits 51, 52, and 312 to 319, including

15   sub-exhibits, are true and correct Park Avenue Bank business

16   records.

17          It is further agreed that this stipulation, which is

18   marked as Government Exhibit 1002, may be received in evidence

19   as a government exhibit.

20          The government offers Government Exhibit 1002.

21          THE COURT:  Any objection?

22          MR. KAPLAN:  No, your Honor.

23          THE COURT:  It will be admitted into evidence as 1002.

24          (Government's Exhibit 1002 received in evidence)

25          MS. McLEOD:  The government calls Herschel Sauber.

1          THE COURT:  Would you step up into the witness box.

2     Just remain standing for a minute.

3     HERSCHEL SAUBER,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6          THE COURT:  You can be seated, sir.  Just pull that

7     microphone to your mouth.  Keep your voice up.

8          You can inquire, Ms. McLeod.

9     DIRECT EXAMINATION

10    BY MS. McLEOD:

11    Q.  Mr. Sauber, how old are you ——

12         THE COURT:  Sorry.  Have him state his name and spell

13    it for the court reporter.

14    Q.  Could you please state and spell your last name for the

15    record.

16    A.  My name is Herschel Sauber, H-e-r-s-c-h-e-l; last name,

17    S-a-u-b-e-r.

18    Q.  How old are you?

19    A.  I'm 51 years old.

20    Q.  What city do you live in?

21    A.  In Brooklyn, New York.

22    Q.  What's your educational background?

23    A.  After I finished high school and went to college to get my

24    prerequisites, I did an apprenticeship for 1,900 hours to get

25    my certification as an orthotist.

1   Q.  What do you do for work?

2   A.  I'm an orthotist and a prosthetist.  I make artificial

3   limbs and orthotic devices, which are braces or —

4   Q.  Do you work for a particular company?

5   A.  Yes.  I work for Orthocraft Inc.

6   Q.  What's your position there?

7   A.  I'm the owner of the company.

8   Q.  And how long have you worked at Orthocraft?

9   A.  I think it's 20 — 29 years.

10  Q.  Directing your attention to 2009, did you take out a loan

11  from Park Avenue Bank?

12  A.  Yes, I did.

13  Q.  Were you ever interviewed by law enforcement regarding that

14  loan?

15  A.  I have been, yes.

16  Q.  Did you have an attorney when you met with law enforcement?

17  A.  I did.

18  Q.  Did you have additional meetings with the prosecutors in

19  this case?

20  A.  Yes.

21  Q.  And after those discussions, did you, your lawyer, and the

22  prosecutor come to an agreement?

23  A.  Yes, we did.

24  Q.  What was that agreement?

25  A.  The agreement was that the prosecution wasn't going to

1    prosecute me, and I had to just tell the truth and agreed not

2    to commit any crimes.

3              MS. McLEOD:  Mr. Carbone, if you could show just for

4    the witness and counsel what's been marked as 3507-016.

5    Q.  I just want you to take a look at this silently.

6              Mr. Carbone, if you could scroll through it slowly so

7    the witness can see the document.

8    A.  It just went blank.

9    Q.  Mine, too.

10             Mr. Sauber, do you recognize this document?

11   A.  Yes.

12   Q.  What is it?

13   A.  This is the agreement that I have with the prosecution.

14             MS. McLEOD:  The government offers 3507-16.

15             THE COURT:  Any objection?

16             MR. KAPLAN:  No objection.

17             THE COURT:  It will be admitted into evidence.

18             (Government's Exhibit 3507-16 received in evidence)

19             MS. McLEOD:  If we could just go to the second page,

20   Mr. Carbone.

21   BY MS. McLEOD:

22   Q.  Just want to draw your attention to a couple points here.

23   In the first paragraph, it states the U.S. Attorney's Office

24   will not criminally prosecute you for any crimes related to (1)

25   participation in a bank fraud involving the acquisition by

1    false and fraudulent pretenses of a $1.4 million business loan

2    from Park Avenue Bank in 2009 and false representations that

3    you made directly to Valley National Bank representatives.  Do

4    you see that?

5    A.  Yes, I do.

6          THE COURT:  Did you want this on the screen for the

7    jury?

8          MS. McLEOD:  Oh, I'm sorry.  Mr. Carbone, if you could

9    publish.

10         Thank you, your Honor.

11   Q.  Is that consistent with your understanding of your

12   agreement?

13   A.  Yes, it is.

14         MS. McLEOD:  If we could look at paragraph 3,

15   Mr. Carbone, paragraph 3 on page 1.  Thank you, Mr. Carbone.

16   Q.  Is this what we're looking at, the requirements that you

17   are required to do as part of the agreement?

18   A.  Yeah, that's my understanding.

19   Q.  And is the very first thing you're required to do is to

20   truthfully disclose all information about your activities to

21   the government?

22   A.  Yes.

23         MS. McLEOD:  Thank you, Mr. Carbone.

24   Q.  Do you know someone named Abraham Kahan?

25   A.  Yes, I do.

1    Q.   And how do you know him?

2    A.   I was introduced to him through my brother-in-law who went

3    to school with him many, many years ago.  I think it was at a

4    Purim party.

5    Q.   What sort of relationship did you have with Mr. Kahan?

6    A.   When he introduced him to me, he told me that he was in the

7    medical supply business, which involved, like, wheelchairs or

8    walkers, hospital beds.  And we exchanged information, and we

9    kind of kept in touch because I had patients that — that

10   sometimes needed some wheelchairs, and I would refer them to

11   him, and if he had a patient that was an amputee or needed a

12   device, he would refer them to me.

13   Q.   Did Mr. Kahan ever discuss his financial situation with

14   you?

15   A.   Yes.

16   Q.   What did he say about it?

17   A.   Like, at the beginning, it was how well his business was

18   doing, but over the years he ran into some difficulty, and he

19   asked me for some help.

20   Q.   What sort of help did he ask you for?

21   A.   Initially asked me to give him a short-term personal loan,

22   and then eventually to help him obtain a loan through the bank.

23   Q.   Just focusing on the personal loans, did you end up lending

24   him money?

25   A.   Yes, I did.

1    Q.  About how much did you lend him?

2    A.  I think it was about $70,000 over the years.

3    Q.  Did you charge him any interest?

4    A.  I did not.

5    Q.  Why not?

6    A.  Because according to Jewish law, if you give a person a

7    loan, to a friend or a fellow Jew, it's not proper to charge

8    them any interest.

9    Q.  Did Kahan ever pay you back for those loans?

10   A.  He did partially.

11   Q.  You mentioned that he also eventually asked you to help him

12   get a loan.  What was the specific request that he made to you?

13   A.  Well, he came to me one day, and he told me that he had

14   sold his medical supply business and he was getting payments

15   every month.  But I don't remember the details, but he was ——

16   the person he had sold it to stopped giving him payments.  And

17   he had the opportunity to go into a new business, and he told

18   me he was also making a wedding at that time, and he needed

19   help getting a loan to be able to start over, I guess.

20   Q.  And what did he want you to do to help him get the loan?

21   A.  So he wanted me to help him —— well, I'm not 100 percent

22   clear how I understood it, but it was something to the effect

23   of helping him cosign —— of me cosigning on a loan to guarantee

24   it with the bank.

25   Q.  Did he tell you why he needed your help getting a loan?

1   A.  Yeah.  He told me he was investing in a home health care

2   company.

3   Q.  Did he tell you why he couldn't get a loan by himself?

4   A.  Yeah.  He told —— he told me he had some tax —— tax issues.

5   That he was still straightening out some tax payments.

6   Q.  When he first asked you —— approximately when, if you

7   remember, did this conversation occurred?

8   A.  It's close to 15 years ago.  I think it was in —— sometime

9   either late '08 or beginning of '09, somewhere around that

10  time.

11  Q.  And when Mr. Kahan asked you for help getting a loan, how

12  did you initially respond to him?

13  A.  I was very uncomfortable.  I tried brushing him aside.  By

14  nature I have a difficult time telling people no, but I just

15  didn't feel comfortable doing it and kept on making excuses why

16  I couldn't, and he just kept on coming back.

17  Q.  And eventually what happened?

18  A.  Eventually, I felt really bad for him.  He was in a

19  difficult situation, and I agreed to do it.

20  Q.  Do you remember what the initial amount of the loan was to

21  be?

22  A.  Yeah.  Initially, he had told me he needed $700,000.

23  Q.  And did that, the amount of that loan, ever change?

24  A.  Yeah.

25  Q.  How did it change?

1    A.  I'm not sure what you mean, how.

2    Q.  What did the amount change to?

3    A.  Oh, it changed to 1.4 million at the end, yeah.

4    Q.  Was any part of the loan money meant to go to you?

5    A.  No.

6    Q.  Who did you believe the loan money was for?

7    A.  For Abraham Kahan.

8    Q.  What did you believe the loan money was for?

9    A.  It was to invest in this — in this home health care

10   agency.  He told me he was also using part of the money because

11   he was making a wedding at that time.  That's all I know.

12   Q.  Who did you believe was going to repay the loan?

13   A.  It was either Abraham Kahan personally or he might have

14   said that the business that he was investing in was going to

15   make payments on it.

16   Q.  Now, did Mr. Kahan — why did you agree to help Mr. Kahan

17   with the loan?

18   A.  I considered him a friend, also viewed him as a successful

19   businessperson in the community.  He had a — as far as I knew,

20   people looked up to him.  I had confidence that he was able to

21   do it.  I felt really bad.  I saw a person who was able to

22   support his family and he — he had a difficult time, and he

23   made it sound like it wasn't of his doing.  It was that his

24   business deal went sour when he sold it and he wasn't getting

25   repaid, and he had a great opportunity to start over again.

1   Q.  Did Kahan do anything to give you reassurance that he would

2   pay the loan back?

3   A.  Yes, he did.

4   Q.  What did he do?

5   A.  He agreed to put his house in my name as collateral.

6   Q.  And whose idea was that?

7   A.  Don't remember exactly, but I remember at some point he's,

8   like, I'll give you the house.  I said, I don't know.  Let me

9   think about it.  And I think that ultimately gave me the

10  reassurance that, you know, if he was that committed to put his

11  house on the line to ⸺ to repay the loan.

12  Q.  And were you in fact eventually put on the deed to

13  Mr. Kahan's house?

14  A.  Yes, I was.

15  Q.  After you were added to the deed of that house, did you

16  consider that house to be your house?

17  A.  I did not.

18  Q.  Did you plan to keep that house?

19  A.  No.

20  Q.  What was the plan?

21  A.  The plan was, as soon as the loan was repaid, to transfer

22  the home back to him.

23          MS. McLEOD:  Mr. Carbone, if you could pull up just

24  for the witness and counsel what's marked as Government

25  Exhibit 219, and you can scroll through.  I think it's about

1  three pages, the first three pages, for Mr. Sauber.

2  Q.  Mr. Sauber, do you recognize this document?

3          Mr. Carbone, you can go to the first page.

4  A.  I guess this is the paper that transferred the house into

5  my name, I guess.

6  Q.  If we look at — if we just go to the third page, is that

7  your wife's signature?

8  A.  No.

9  Q.  Is the deed between your wife — I'm sorry, is that

10 Mr. Kahan's wife's signature?

11 A.  I don't know her signature.

12 Q.  Is it signed by someone in the signature block Ms. Toby

13 Kahan?

14 A.  Yes, it is.

15         MS. McLEOD:  This exhibit was part of the stipulation.

16 The government offers Government Exhibit 219.

17         THE COURT:  Any objection?

18         MR. KAPLAN:  No objection, your Honor.

19         THE COURT:  It will be admitted into evidence as 219,

20 Government Exhibit.

21         (Government's Exhibit 219 received in evidence)

22         MS. McLEOD:  Mr. Carbone, if you could turn to page 1.

23 BY MS. McLEOD:

24 Q.  I'll just highlight a couple of things in the document,

25 Mr. Sauber.  If we look at the very top portion of the page, do

1   you see it says document date 6/5/2009?

2   A.   Yes.

3   Q.   And document type, deed?

4   A.   Yes, I do.

5        MS. McLEOD:   Then if you go down, Mr. Carbone, to the

6   middle of the page, yeah, the sort of the whole middle of the

7   page.

8   Q.   Under address it says "1264 57th Street," and what address

9   is that?

10  A.   That is the residence of Abraham Kahan, as I understood.

11  Q.   I think we touched on this, but who is Toby Kahan?

12  A.   It's Abraham Kahan's wife.

13  Q.   And as grantor/seller, is that right?

14  A.   Yes.

15  Q.   And then the grantee/buyer is who?

16  A.   Myself.

17       MS. McLEOD:   And Mr. Carbone, if we could turn to

18  page 3.

19  Q.   And if we just look at the top of the document, do you see

20  that it says this indenture was made between Toby Kahan and

21  you, and then towards the bottom it says in consideration of

22  $10?

23  A.   I do see that, yes.

24       MS. McLEOD:   Thank you, Mr. Carbone.

25  Q.   After the house was signed over to you or you were added to

1    the deed, did anything change in terms of who was living in the

2    house?

3    A.  No, not as far as I know.

4    Q.  Are you still on the deed of that house today?

5    A.  I am not.

6    Q.  What happened?

7    A.  Well, this is moving ahead, but after the loan hadn't been

8    repaid, he kept on reassuring me that he is going to get the

9    loan paid, he's going to get his taxes straightened out, and

10   he's going to be able to pay the loan off.  He came to me one

11   day, and he said he's driving from my house straight upstate to

12   either his accountant or attorney, I don't really remember

13   exactly, but if I could sign over the house to him, we'll be

14   taken care of right away and the loan will get paid off.  And I

15   believed him.

16   Q.  OK.

17   A.  So I signed the papers to transfer the home back to him.

18            MS. McLEOD:  Mr. Carbone, if you could pull up for the

19   witness and counsel what's marked as Government Exhibit 221.

20   You can just scroll a little bit.  This document was also part

21   of one of the stipulations, the government offers Government

22   Exhibit 221.

23            THE COURT:  Any objection?

24            MR. KAPLAN:  No objection.

25            THE COURT:  It will be admitted into evidence as

1    Government Exhibit 221.

2              (Government's Exhibit 221 received in evidence)

3              MS. McLEOD:  If we just look at the first page,

4    Mr. Carbone.

5    Q.  And towards the top, just drawing your attention, it says

6    document date February 17, 2010.  Do you see that?

7    A.  Yeah.

8              MS. McLEOD:  If we can go to the middle of the page,

9    Mr. Carbone.

10   Q.  All right.  Here, grantor/seller is you, and grantee/buyer

11   is Toby Kahan, correct?

12   A.  Yes.

13             MS. McLEOD:   Thank you, Mr. Carbone.

14   Q.  All right.  So going back to the Park Avenue Bank loan, did

15   you have to do anything to help get the loan processed?

16   A.  Yes.

17   Q.  What did you have to do?

18   A.  I know that Mr. Kahan came to my house several times.  He

19   told me he's going to make it very convenient for me.  I'm not

20   going to have to do anything.  Any papers that they need, he'll

21   come to me.  So he picked up tax returns and I'm not sure what

22   else, but anytime they needed documents, he came to pick it up.

23   Q.  Did you sign documents for the loan?

24   A.  Yes, I did.

25   Q.  Did you read the documents before you signed them?

1    A.  I did not.

2    Q.  Why not?

3    A.  I wish I knew.  I trusted him, I really did.

4              MS. McLEOD:  Mr. Carbone, if you could pull up for the

5    witness and counsel what's been marked as Government

6    Exhibit 211 for identification, and if you can scroll down a

7    little bit just to allow Mr. Sauber to look.  If you could

8    scroll down to the signatures.  And if you could continue

9    scrolling a little bit more, Mr. Carbone, just to show the rest

10   of it, and down to the signatures.

11   Q.  Do you recognize these documents, Mr. Sauber?

12   A.  I think these are the loan documents.  I don't remember

13   reading it, but yeah.

14   Q.  Are these your —— is your signature on the documents?

15   A.  Yes, it is.

16             MS. McLEOD:  Your Honor, the government offers

17   Government Exhibit 211.

18             MR. KAPLAN:  No objection.

19             THE COURT:  It will be admitted into evidence as 211.

20             (Government's Exhibit 211 received in evidence)

21             MS. McLEOD:  Mr. Carbone, if you could publish to the

22   jury and go to the first page.  And if we could expand the top

23   portion.

24   BY MS. McLEOD:

25   Q.  It says "Promissory Note."  Borrower, Herschel Sauber and

1    Pauline Sauber.  And who is Pauline Sauber?

2    A.   She's my wife.

3    Q.   And on the right it says lender, Park Avenue Bank.

4    A.   Yes.

5    Q.   Principal amount, $1.4 million?

6    A.   Correct.

7    Q.   And date of the notice, September 15, 2009, is that right?

8    A.   Yes, it is.

9         MS. McLEOD:  If we could go to the third page,

10   Mr. Carbone.

11   Q.   Is this your signature, Mr. Sauber?

12   A.   Yes, it is.

13   Q.   Did you read this document before you signed it?

14   A.   I did not.

15        MS. McLEOD:  All right.  Mr. Carbone, if you could

16   please go to page 4, and if you could just expand the top

17   portion.

18   Q.   So this document says "Business Loan Agreement" at the top.

19   Do you see that?

20   A.   Yes, I do.

21        MS. McLEOD:  If you could go to page 9, Mr. Carbone.

22   Q.   Is this your signature on the document?

23   A.   Yes, it is.

24   Q.   Did you read this document before you signed it?

25   A.   I did not.

1          MS. McLEOD:  OK.  Let's go back to page 4,

2    Mr. Carbone.  In about the middle of the page, it says

3    "Representations and Warranties."  A little further down.

4    Maybe the bottom half of the page.

5    Q.  Do you see that there are representations and warranties

6    between the borrower and the lender made in this agreement?

7    A.  Yes, I do.

8    Q.  And under business activities, who are the people making

9    the representations about business activities?

10   A.  Myself.

11   Q.  And who else in the paragraph below?

12   A.  My wife.

13         MS. McLEOD:  And if we go to page 5 and if we look in

14   the middle of the page, Mr. Carbone, you can do from

15   affirmative covenants to the bottom.  OK.

16   Q.  It says at the top of this section:  "Borrower covenants

17   and agrees with lender that so long as this agreement remains

18   in effect, borrower will."  And then about second or third from

19   the bottom, it says "loan proceeds."  Do you see that?

20   A.  Yes, I do.

21   Q.  It says the borrower covenants with the lender to use all

22   loan proceeds solely for borrower's business operations unless

23   specifically consented to the contrary by lender in writing.

24   Do you see that?

25   A.  Yes, I do.

1    Q.  Was that an accurate representation?

2    A.  No, I never — the money never came to my business.

3              MS. McLEOD:  All right.  Mr. Carbone, if you could

4    please go to page 11.

5    Q.  And at the top it says "Disbursement Request and

6    Authorization."  Do you see that?

7    A.  Yes, I do.

8              MS. McLEOD:  And Mr. Carbone, if you could show the

9    main part of this page, the middle half.

10   Q.  OK.  Do you see it says the primary purpose of the loan is

11   business?

12   A.  Yes.

13   Q.  And then it says specific purpose:  "The specific purpose

14   of this loan is working capital."  Was that true?

15   A.  Not for my business, no.

16   Q.  Now, did you yourself — thank you, Mr. Carbone.

17             Did you yourself directly provide any information

18   about the loan to Park Avenue Bank?

19   A.  No.  It was always through Abraham Kahan.

20             MS. McLEOD:  If we can pull up for witness and counsel

21   what's been marked for identification as Government

22   Exhibit 220.  I'll just scroll down.

23             MR. BRAFMAN:  Excuse me, your Honor.  Can I step out?

24   Mr. Kaplan is going to remain here.  Can I step out for a

25   moment?

1          THE COURT:  Sure.

2          MR. BRAFMAN:  Thank you.

3          MS. McLEOD:  Mr. Carbone, if you can just scroll down

4    so that counsel can see the document and the witness can see

5    the document.

6          This exhibit was part of one of the stipulations.  The

7    government offers Government Exhibit 220.

8          MR. KAPLAN:  No objection.

9          THE COURT:  It will be admitted into evidence as

10   Government Exhibit 220.

11         (Government's Exhibit 220 received in evidence)

12         MS. McLEOD:  If we can go to the first page,

13   Mr. Carbone.

14   BY MS. McLEOD:

15   Q.  Mr. Sauber —— if we go to the second page, actually, sorry,

16   Mr. Carbone.

17         Is that your signature, Mr. Sauber?

18   A.  Yes, it is.  That's not my handwriting.

19   Q.  OK.  And if we can go back up to the first page, did you

20   prepare this document, Mr. Sauber?

21   A.  No.  It has my name spelled wrong, and I never filled this

22   out.

23   Q.  It says at the top "Statement of Personal Net Worth as of

24   June 30, 2009," and then it has your name misspelled.  At the

25   bottom of the page, it lists real estate, and it says

1  1477 East 27th Street, Brooklyn.  And do you recognize that

2  address?

3  A.  Yes, I do.

4  Q.  What address is that?

5  A.  That's my private — primary residence.

6  Q.  And then the second property listed is 1264 57th Street,

7  Brooklyn, and do you recognize that address?

8  A.  Yes, I do.

9  Q.  What address is that?

10  A.  That's Abraham Kahan's address.

11  Q.  Is that the property that you were added to the deed for?

12  A.  Yes.

13  Q.  At the time of this statement of personal net worth, did

14  you consider the property at 57th Street to be part of your own

15  net worth?

16  A.  I did not.

17          MS. McLEOD:  Thank you, Mr. Carbone.  And if we can

18  pull up just for witness and counsel what's been marked for

19  identification as Government Exhibit 208, and we'll just scroll

20  so counsel can see the document.

21          Government Exhibit 208 was subject to one of the

22  stipulations.  The government would offer Government

23  Exhibit 208.

24          MR. KAPLAN:  No objection.

25          THE COURT:  It will be admitted into evidence as

1    Government Exhibit 208.

2              (Government's Exhibit 208 received in evidence)

3    BY MS. McLEOD:

4    Q.  So, Mr. Sauber, at the very top it says the "Park Avenue

5    Bank Loan Presentation."  Date, August 31, 2009.  Do you see

6    that?

7    A.  Yes, I do.

8              MS. McLEOD:  And if you could go to the signature

9    blocks, Mr. Carbone.

10   Q.  Did you sign this document?

11   A.  I did not.

12   Q.  Do you know or remember whether you saw this document in

13   2009?

14   A.  I don't remember.

15             MS. McLEOD:  Let's go back to the first page.

16   Q.  All right.  It says borrower, Herschel Sauber, Pauline

17   Sauber.  Is that right?

18   A.  Yes.

19   Q.  And under line amount it says "$1.4 million unsecured line

20   of credit available for direct debt.  Purpose:  To be used for

21   working capital for business investments.  (See background

22   section)."

23             If we look at the very bottom of the first page where

24   it says "existing relationship," says "Mr. Sauber is a client

25   of Mendy Zilberberg, PAB board member."  Is that statement

1   accurate?

2   A.   No, I don't think I've ever met him or had dealings with

3   him.

4   Q.   Have you ever been a client of Mendy Zilberberg?

5   A.   Not to my knowledge, no.

6   Q.   Did you ever tell anyone that you were a client of Mendy

7   Zilberberg?

8   A.   No.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2    Q.   What's your -- do you know Mendy Zilberberg?

3    A.   I do not.

4    Q.   Do you have any knowledge of whether Mr. Zilberberg was

5    involved with this loan?

6    A.   I have no knowledge at all.

7    Q.   Okay.  If we can go to page 2.

8              And just looking at the bottom, where it says "debt

9    service," one of the things it says is, K-1 income, SSSZ, LLC.

10   Are you familiar with what that is?

11   A.   Yes, I am.

12   Q.   What is that?

13   A.   It was an investment I made along with three other friends.

14   I don't remember what year, but it was in -- like a real estate

15   investment.  And we would get returns on it some years, some

16   years we wouldn't, but --

17   Q.   Was $70,000 the accurate representation of your portion of

18   the K-1 income?

19   A.   No.

20   Q.   Was it higher or lower?

21   A.   Lower, I would assume.  We were four partners.

22             MS. MCLEOD:  Mr. Carbone, if you could go to the top

23   part of page 2, where it says "business description."

24   Q.   All right.  So it says, "Mr. Sauber owns Orthocraft, Inc.

25   which produces artificial limbs, braces, and other orthopedic

products." It continues on to say, "he owns two smaller

companies."

          Were these statements correct?

A.  Yes, it is.

Q.  And then I want to go to -- if we could just draw your

attention to the third paragraph.  It says, "Mr. Sauber stated

that he needs funds to make additional investments, such as

down payments on properties, et cetera.  The flexibility of a

line of credit will make these investment possible."

          Was this statement accurate?

A.  No.

Q.  Did that information come from you?

A.  No, not to my recollection.  I didn't have any dealings

with the bank.

          MS. MCLEOD:  Thank you, Mr. Carbone.

Q.  Mr. Sauber, are you familiar with a document called a heter

iska?

A.  Yes, I am.

Q.  What is it?

A.  I'm not well versed in it, but my understanding is, as we

discussed before, in Jewish law you don't charge interest on

loans.  I mean, there is kind of a way around it if you

structure the loan as a business deal, and so people are able

to borrow money and invest in businesses or -- and collect

interest.

1    Q.  And is the heter iska the document memorializing the

2    business deal?

3    A.  Yeah.

4    Q.  Did you sign a heter iska to allow you to participate in

5    this loan?

6    A.  I have some sort of recollection about it, yes.

7    Q.  Do you remember who the heter iska would have been between?

8    A.  It would have only been with Abraham Kahan.

9    Q.  Mr. Sauber, did you attend the loan closing?

10   A.  Yes, I did.

11   Q.  And to the best of your recollection, who else attended the

12   closing?

13   A.  Abraham Kahan.

14   Q.  Anyone else?

15   A.  Oh, at the closing?

16   Q.  At the closing.

17   A.  Well, we sat at a desk, and there was a gentleman in a suit

18   I assumed worked at the bank, and there was another Hasidic

19   individual hovering around, checking things out, walking away,

20   coming back.

21   Q.  Did you keep any of the closing documents?

22   A.  No.  I wasn't given anything at the bank.

23   Q.  Other than signing the closing documents, did you sign

24   anything else?

25   A.  Yes.

1    Q.   What did you sign?

2    A.   So the bank officer brought out a checkbook, and he handed

3    it over.  I don't remember if he left at that point or he was

4    there.  I remember something about him leaving in the middle.

5    But they asked me to sign two checks, blank checks, and

6    afterwards they told me, "okay, you can go, and we'll finish

7    everything up."

8    Q.   Did the bank ultimately approve the loan?

9    A.   To my understanding, yes.

10   Q.   And what happened when the money was disbursed by the bank?

11   A.   I have no idea.

12   Q.   After the loan closed, what happened -- as far as your

13   understanding, happened with the loan?

14   A.   My understanding is it went to Abraham Kahan to go into the

15   business he was investing in, but he was the only person I know

16   of --

17   Q.   Did you ever receive any communications with the bank after

18   the loan had closed?

19   A.   Yes, I did.

20   Q.   What were those communications?

21   A.   The only communications I received, I don't know how many

22   months later, or I don't remember how long, but I got a phone

23   call when they could expect the next payment.

24   Q.   Sorry.  The bank asked you when they could expect the next

25   payment?

1    A.   Yes.

2    Q.   And what did you say to them?

3    A.   I said, I don't know.  Let me find out through the guy

4    that's dealing with it.

5    Q.   And what did you do after?

6    A.   I called Abraham Kahan right away, and said, what's going

7    on.  I wasn't receiving any of the bank -- like the payment --

8    I got no mail from the bank, so I was totally unaware of it.

9    It wasn't coming to me.

10   Q.   And what did Mr. Kahan say?

11   A.   It's been years.  I don't remember exactly what he said,

12   but he was like, don't worry.  I'm going to take care of it.

13   I'm going to speak to my -- I don't have an exact recollection,

14   but he kind of reassured me he was going to get to the bottom

15   of it.

16   Q.   Did you hear from the bank again about the loan?

17   A.   Yes, I did.

18   Q.   What happened?

19   A.   Well, it came to my house.  I had my office in the house at

20   that time, so they walked in one day.  I think it was two

21   representatives from the bank.

22   Q.   And what did they say?

23   A.   I don't remember exactly what they said, but something like

24   "when can we expect to get paid."

25   Q.   And what did you tell them?

A.  I mean, I freaked out.  I was like, I've just got to get

them out of here.  I'm like, let me get back to you.  Let me

try to figure out what's going on.

        I didn't know what to say at that time.  I think it

really hit me like something's really off.

Q.  At that point, did you tell the bank you weren't really the

borrower on the loan?

A.  No, I didn't really volunteer any information to them.

Whatever they asked me, I kind of nodded and said, sure.  I

mean, just to get them out.

Q.  And what happened -- what ultimately happened with the

loan?

A.  What happened?  They defaulted.

Q.  And what did you do once it defaulted, or what happened

after it defaulted?

A.  Oh, what happened was that, you know, Mr. Kahan is like,

don't worry.  I'm going to take care of this.  We can negotiate

with the bank.  I'm going to hire an attorney.  It's not going

to cost you anything.  I'm going to take care of everything,

and we're going to get it paid off.

        Okay.  Because this is not what I signed up for.  I

only did this to help you.  I don't deserve this.

        And, I mean, he was very remorseful.  He felt bad

about it, and he said he was going to handle it.

Q.  Did you end up coming to an agreement with the bank?

1    A.  Yes.

2    Q.  And what was your involvement in negotiating that

3    agreement?

4    A.  I had no involvement at all.

5         MS. MCLEOD:  Okay.  Mr. Carbone, if you can pull up

6    for the witness and counsel what's been marked as Government

7    Exhibit 215.  And if we can scroll to the signature blocks.

8    Q.  Okay.  Is that your signature, Mr. Sauber?

9    A.  Yes, it is.

10        MS. MCLEOD:  Your Honor, the government offers

11   Government Exhibit 215.

12        THE COURT:  Any objection?

13        MR. KAPLAN:  No objection.

14        THE COURT:  It will be admitted into evidence as

15   Government Exhibit 215.

16        (Government Exhibit 215 received in evidence)

17        MS. MCLEOD:  Let's go back to the top, Mr. Carbone.

18   Q.  Mr. Sauber, it says "forbearance agreement" at the top.

19        Do you see that?

20   A.  Yes, I do.

21   Q.  What's the date?

22   A.  October 5, 2011.

23   Q.  And it says it's being entered into between plaintiff, VNB

24   New York, and yourself, and your wife.

25        Why was it being entered into by VNB, rather than Park

1   Avenue Bank?

2   A.  Well, my understanding is the bank failed, and the loan was

3   bought by VNB.

4            MS. MCLEOD:  And if we go to page 3, Mr. Carbone, and

5   if we can look at 2A.

6   Q.  It says, "judgment debtors shall pay judgment creditor a

7   total of $800,000, the settlement amount."

8            What does this settlement amount represent?

9   A.  It represents the amount the bank was willing to accept in

10  lieu of the loan going into default.

11  Q.  In lieu of the full amount being paid?

12  A.  Yeah.

13  Q.  Have you paid back that amount?

14  A.  Personally, no.

15  Q.  Do you still have an obligation to repay $800,000 to the

16  bank?

17  A.  I have a judgment that's still going on.  I'm not sure if

18  -- I don't know what the total amount is.

19  Q.  Did you receive any of the proceeds of the $1.4 million

20  loan?

21  A.  I did not.

22  Q.  Did you receive any financial benefit from the Park Avenue

23  Bank loan?

24  A.  No.

25            MS. MCLEOD:  One moment, your Honor.

1            MS. MCLEOD:  No further questions, your Honor.

2            THE COURT:  Why don't I give the jury a ten-minute

3    break before we go into cross-examination.

4            Ladies and gentlemen, we'll take ten minutes.  Don't

5    discuss the case.  Keep an open mind.  I'll see you in ten

6    minutes.

7            You don't have to stay in the jury room, but just be

8    back in ten minutes.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (In open court; jury not present)

2             THE COURT:  You can step down.

3             We'll continue in ten minutes.

4             MS. MCLEOD:  Thank you, your Honor.

5             (Recess taken)

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court; jury present)

2                THE COURT:  You can be seated.  Thank you.

3                Mr. Kaplan, cross-examination.

4                MR. KAPLAN:  Yes.  Thank you, your Honor.

5                THE WITNESS:  May I sit down?

6                THE COURT:  Yes.  Thank you.

7                MR. KAPLAN:  Judge?

8                THE COURT:  Yes.  Go ahead.

9    CROSS-EXAMINATION

10   BY MR. KAPLAN:

11   Q.  Good afternoon, Mr. Sauber.

12   A.  Good afternoon.

13   Q.  My name is Jacob Kaplan, and I'm one of the attorneys of

14   the Mendel Zilberberg Law Firm.

15                I'm going to ask you some questions.  If I talk too

16   fast or you don't understand my question, please let me know,

17   and I'll try to reword it.  Okay?

18   A.  Sure.

19   Q.  You testified on direct you first met Abraham Kahan in the

20   mid '90s, correct?

21   A.  I don't remember the exact year.  I know it was more than

22   20 years ago.

23   Q.  So it's the late '90s, maybe 2000's?

24   A.  Possibly.

25   Q.  But at the time of the 2009 loan, about how many years did

1  you know him?

2  A.  A long time.  A long time.

3  Q.  It's fair to say that you trusted him when he asked you to

4  take out the loan for him, didn't you?

5  A.  Yes, I did.

6  Q.  In fact, you trusted him years earlier when you lent him

7  you said around $70,000?

8  A.  Yes.

9  Q.  Did he ever pay back that money?

10  A.  Part of it.

11  Q.  About how much did he pay back?

12  A.  I think he paid back about half.

13  Q.  And what about the other half?  He just ignored you or just

14  never paid you back?

15  A.  He didn't ignore me.  He came for this loan.

16  Q.  So let's talk about this loan.  When he approached you in

17  2009 to take out a loan, didn't he tell you that the reason why

18  he couldn't take out the loan for himself was because he had

19  tax issues?

20  A.  Yes.

21  Q.  He never told you that the reason why he would have trouble

22  taking out a loan was because he was a convicted felon, did he?

23  A.  No, he did not.

24  Q.  In fact, he never told you that he was a convicted felon

25  when you loaned him the $70,000 either, did he?

1    A.  He did not.

2    Q.  You only found out years later that he was a convicted

3    felon, correct?

4    A.  Correct.

5    Q.  Before going to Park Avenue Bank to get this loan, do you

6    recall Abraham Kahan asking you to take out a home equity line

7    of credit from a different bank and give him the proceeds?

8    A.  I don't remember exactly, but I'm not sure.

9    Q.  Well, do you recall a banker or broker named Sarah Hoffman?

10   A.  Yes, I do.

11   Q.  Okay.  Do you recall ever trying to get a home equity line

12   of credit on your house from Sarah Hoffman?

13   A.  I think so.  I don't know if she did a mortgage for us or a

14   refinance.  I don't know if it went through.  Yeah, I think he

15   recommended her one time.

16   Q.  But do you remember going to her with Abraham Kahan?

17   A.  Not particularly, no.

18   Q.  Now, you said on direct that when you went to go take out

19   the loan from Park Avenue Bank, before doing so, Mr. Kahan had

20   given you the deed to his house; is that correct?

21   A.  Yes, it is.

22   Q.  You didn't ask him to give you the deed, did you?

23   A.  I don't remember.  I don't know which way it went, but I

24   know that when he gave it to me, he gave it to me as a

25   reassurance.

1  Q.  As a reassurance that you would get repaid somehow,

2  correct?

3  A.  The loan would get repaid, yes.

4  Q.  When he gave you the title to his house, you understood

5  that he was still living there with his family, correct?

6  A.  Correct.

7  Q.  And you understood you were not, in fact, the owner of the

8  house?

9  A.  That is correct.

10 Q.  Is it fair to say that when Abraham Kahan gave you the deed

11 to his house, he didn't say to you "I'm giving you this deed,

12 so you can have more assets when we go borrow money from a

13 bank," did he?

14 A.  I don't remember him telling me that.

15 Q.  He just told you it was a way to protect you, that this way

16 you would be confident that the loan would be repaid?

17 A.  Yes.

18 Q.  And you trusted him?

19 A.  I did.

20         MR. KAPLAN:  Ms. Newman, if we can pull up GX 220,

21 which is already in evidence.

22 Q.  Mr. Sauber, can you see GX 220?

23 A.  Yes, I do.

24 Q.  Now, you testified on direct that you never read this

25 document, correct?

1    A.  Correct.

2    Q.  In fact, I think, as they pointed out in direct, your name

3    is even misspelled, correct?

4    A.  Yes, it is.

5    Q.  Is this a document that Abraham Kahan just gave you to

6    sign?

7    A.  Well, it doesn't have my signature on it, so I didn't sign

8    it.

9    Q.  Second page?

10   A.  Oh, yes, if I signed it, he brought it over to my house.

11   Q.  Because Abraham Kahan was the only one you were dealing

12   with on this loan, correct?

13   A.  Yes, that's correct.

14   Q.  And you trusted him so much that you didn't actually read

15   the document before signing it?

16   A.  Correct.

17   Q.  And, again, even though the property is listed as 1477 East

18   27th Street -- I'm sorry.  That's your house.  The 57th Street

19   in Brooklyn, that was Mr. Kahan's house, correct?

20   A.  As far as I knew, yes.

21   Q.  You also see a third property that says 73 Lower Court in

22   Connecticut?

23   A.  Yes.

24   Q.  Is that a property that you own?

25   A.  It was me and two other friends that invested in that

1  property.

2  Q.  Did you tell Mr. Kahan that you had invested in that

3  property?

4  A.  I think so, yeah.

5  Q.  Is that how he was able to put that on this form?

6  A.  As far as I understand.

7          MS. MCLEOD:  Objection.

8          THE COURT:  Overruled.  You can answer.

9  A.  I don't have a particular memory of it, but I don't want to

10  assume why it's there.  But it's possible I might have told

11  him.

12  Q.  Did you also tell Mr. Kahan about your K-1 with SSSZ?

13  A.  I do not remember telling him that.

14          MR. KAPLAN:  Ms. Newman, if you can pull up GX 208,

15  already in evidence.  If you can scroll down to the second

16  page.

17  Q.  Do you see on the bottom it says, "K-1 income, SSSZ, LLC?

18  A.  Yes, I do.

19  Q.  Do you know how the bank got that information?

20  A.  I have no idea.

21  Q.  But you didn't give that information to the bank?

22  A.  I'm not sure.  It's been almost 15 years, so --

23  Q.  Well, do you recall interacting with the bankers at Park

24  Avenue Bank?

25  A.  No.

1   Q.  As far as you can recall, you didn't give them this

2   information?

3   A.  To the bank?  No.

4   Q.  Let's talk about the loan itself for a second.

5           Did Abraham Kahan tell you he needed the money to

6   invest in a home care agency?

7   A.  Yes, he did.

8   Q.  Did he tell you that home care agency was going to be

9   invested with Aron Fried?

10  A.  I remember the name Fried.  I didn't really pay -- I don't

11  remember the exact name, but I do remember the name Fried.

12  Q.  Being that you're also in kind of the health care industry,

13  did you follow up and ask him what type of business he was

14  going into?

15  A.  He told me it was a home care agency.  That's either

16  nurses, or something along those lines, to patients' homes, but

17  it was totally unrelated to my field, so --

18  Q.  It was your understanding that you were taking out that

19  money to give to him to invest in that company, correct?

20  A.  I'm not sure exactly what you mean by that.

21  Q.  Well, Mr. Kahan told you that he needed the loan to invest

22  in the company, correct?

23  A.  Yes.

24  Q.  And you believe he's investing in a home health care

25  company, correct?

1    A.  Correct.

2    Q.  You just testified that you don't recall speaking with the

3    bank about the loan.  Do you remember that?  Do you remember

4    testifying to that?

5    A.  Yes, I do.

6    Q.  Let me ask you a couple side questions.

7            Do you own or have you owned in the past a wine

8    business?

9    A.  Yes.

10   Q.  Okay.  And do you recall ever discussing that wine business

11   with the banker at Park Avenue Bank?

12   A.  No.

13   Q.  And we established before that you own a property in

14   Bridgeport, Connecticut, correct?

15   A.  Correct -- I don't know if it's Bridgeport.  I'm not sure.

16   Q.  Well, it's Laurel, but it's technically Bridgeport?

17   A.  All right.

18   Q.  Do you know if it's technically Bridgeport?

19   A.  I have no idea.

20   Q.  Do you recall discussing that property with the banker at

21   Park Avenue Bank?

22   A.  I do not recall that.

23   Q.  Do you recall ever telling the man at the bank why you

24   needed to take out the loan?

25   A.  No.

1   Q.  So, in front of you I think you still have GX I think it's

2   208.

3           Do you see the top, I think it's business description?

4   A.  Yes.

5   Q.  Do you know who gave that information to the bank?

6   A.  No.

7   Q.  Do you see the last sentence of the first paragraph that

8   talks about Long Island Winery?

9   A.  Yes.

10  Q.  Is that the wine company that you owned?

11  A.  Yes.

12  Q.  Do you know how the bank got that information about the

13  wine company?

14  A.  I don't know for sure.  I mean, I might have discussed it

15  with Abraham Kahan, but I don't know specifically.

16  Q.  And as far as you know, Kahan was the only one interacting

17  with the bank on your behalf?

18  A.  Yes, that was my understanding.

19  Q.  So then in the last paragraph in that subsection where it

20  says, "Mr. Sauber stated he needs funds to make additional

21  investments," that sentence, as far as you know, you didn't

22  make that statement to the bank, correct?

23  A.  Correct.

24  Q.  If anyone, it would be perhaps Fried that made -- sorry,

25  Kahan that made it?

1          MS. COLSON:  Objection.

2          THE COURT:  Overruled.  You can answer.

3     A.  I have no idea.  I wasn't there when it was discussed.

4     Q.  But as far as you know, Kahan was the only person there who

5     interacted with the bank on your behalf?

6     A.  Yes.

7     Q.  Do you recall ever telling anyone at the bank that you were

8     taking out the loan and giving the money to Abraham Kahan?

9     A.  No.  When we were at the closing, they had me sign checks,

10    and they gave it to him.  It was handed over to him at the

11    bank.

12    Q.  But do you recall telling the bank itself that you were

13    taking out the loan and giving it to him?

14    A.  No.

15    Q.  Let me direct your attention to August of 2013.

16         Do you recall giving a sworn statement before the FDIC

17    about this loan?

18    A.  Yeah.  I don't remember the date, but I remember appearing

19    there, yes.

20    Q.  And do you recall that you swore under oath to tell the

21    truth when you gave that statement?

22    A.  Yes.

23    Q.  Just like you did today in court?

24    A.  Yes.

25    Q.  And there was a court reporter taking down notes, just like

1    today?

2    A.  I think so.

3    Q.  And you had your attorney there at the time?

4    A.  Yes, I did.

5    Q.  And August 2013 was about four years from the loan,

6    correct?

7    A.  Yes.

8    Q.  It was a lot closer than now, which is about 14 years from

9    the loan, right?

10   A.  I would assume so, yeah.

11   Q.  Do you recall telling the FDIC in August of 2013 that you

12   had made it very clear to the bank that you were taking out the

13   loan, and you were giving the loan to Kahan?

14   A.  I do not recall that, no.

15   Q.  All right.  Would seeing your FDIC testimony refresh your

16   recollection?

17   A.  I don't know.  I could take a look at it.

18         MR. KAPLAN:  Ms. Newman, if you can pull up 3507-008

19   just for the Court, counsel, and the witness.  And at page 32,

20   please.

21   Q.  Mr. Sauber, if you can just read to yourself the top

22   answer, and let me know when you're done.  Okay?

23   A.  Okay.  I mean, I don't have a recollection of this

24   discussion with FDIC.

25         MS. MCLEOD:  Objection, your Honor.

1           If you could take the document down before you inquire

2     further.

3           MR. KAPLAN:  Okay.

4     A.  Yeah, I mean, I don't have an exact recollection of

5     actually talking with them.  It was many, many years ago.  I

6     think what I was referring to over there was at the closing,

7     when they asked me to sign the checks and hand it over to them,

8     but I'm not sure.

9     Q.  That's fine.

10          On direct examination, you were asked some questions

11    about your relationship with Mendel Zilberberg.  Do you

12    remember?

13    A.  Yes.

14    Q.  Now, you've never met Mendel Zilberberg, have you?

15    A.  Not to my knowledge.

16    Q.  And it's fair to say you've never met Mendel Zilberberg

17    about this loan, correct?

18    A.  Yes.

19    Q.  Because, again, it was Kahan you dealt with?

20    A.  Correct.

21    Q.  And like you said earlier, it was Kahan who came to your

22    house with the loan documents?

23    A.  Yes.

24    Q.  Now, you were asked some questions on direct about whether

25    you were ever a client of Mendel Zilberberg.

1          Do you remember that?

2   A.  Yes.

3   Q.  Do you recall who represented you when you bought your

4   house at 1477 East 27 Street in Brooklyn in 2000?

5   A.  I can't tell you for sure, but it could have been Joseph

6   Berger, who's a friend of mine.

7   Q.  And were you aware whether Mr. Berger worked for

8   Mr. Zilberberg at the time?

9   A.  No, but I do know he had the closing in his office.  I do

10  remember that.

11  Q.  But you don't recall that he actually worked at Mendel

12  Zilberberg's office?

13  A.  I have no clue who he worked for.

14          MR. KAPLAN:  Ms. Newman, if you can pull up again

15  3507-08?

16          MS. MCLEOD:  Your Honor, to the extent this is

17  attempting to refresh the recollection of the witness --

18          THE COURT:  Well, I don't know what the question is.

19          MS. MCLEOD:  As to --

20          THE COURT:  Do you have an objection?

21          MS. MCLEOD:  Can we be heard at sidebar?

22          THE COURT:  Come up.

23          (Continued on next page)

24

25

1              (At sidebar; jury not present)

2              THE COURT:  I'm sorry.  I'm not sure what you're

3       objecting to.

4              MS. MCLEOD:  It wasn't an objection.  I was trying to

5       understand, before we got into it, what Mr. Kaplan's purpose

6       was with the transcript.

7              THE COURT:  Okay.  To save you some time, do you

8       understand it now?

9              MR. KAPLAN:  Let's discuss the issue, because we're

10      going to come back here in five seconds.

11             THE COURT:  Is there something to fight about?

12             MS. MCLEOD:  It might be worth talking about now.

13             MR. KAPLAN:  He's testifying now he was never a client

14      of Mendel Zilberberg.  In front of the FDIC, he was asked a

15      question, were you ever a client of Mendel Zilberberg.  He

16      said, yes.  So I want to impeach him on that.

17             In addition, he said, I don't believe Joseph Berger

18      worked for Mendel Zilberberg.  At the FDIC, he said he worked

19      at Mendel Zilberberg.

20             Another thing that's going to come up is we have a

21      proposed exhibit.  So this exhibit is the deed to his house.

22             THE COURT:  Okay.  Is it in evidence yet?

23             MR. KAPLAN:  Well, it's part of the stipulation.

24             THE COURT:  All right.

25             MR. KAPLAN:  But I think we're going to probably

1   likely argue about it.  So the relevance of this deed is, at

2   the time, the intention is for Joseph Berger, who he said was

3   his attorney -- Mendel Zilberberg & Associates.

4               THE COURT:  Okay.

5               MR. KAPLAN:  So I want to use this to establish to him

6   that Joseph Berger was working for Mendel Zilberberg &

7   Associates at the time.

8               THE COURT:  Okay.  Well, how does he verify this

9   document from the information he's got, and --

10              MR. KAPLAN:  So, I mean, the information is the deed

11  to his house.

12              THE COURT:  Oh, okay.

13              MR. KAPLAN:  So to the extent that --

14              THE COURT:  He can identify the deed.

15              MR. KAPLAN:  It's a public document.

16              THE COURT:  Is it in evidence?

17              MS. MCLEOD:  It's not yet.

18              THE COURT:  Do you intend to stipulate?

19              MR. KAPLAN:  We stipulated as part of the stipulations

20  through -- an authentic copy of the deed.

21              MS. MCLEOD:  Authentic --

22              THE COURT:  Are you going to object to its

23  admissibility?

24              MS. MCLEOD:  I am, your Honor.

25              And just to close out the three issues Mr. Kaplan was

raising, I think to the extent you want to impeach him, I think

you can go ahead.  I'll object if I think it's improper

impeachment.  But now that I understand what you're doing, it's

helpful.

THE COURT:  Okay.

MS. MCLEOD:  As to this exhibit, the issue we have is

this.  So one is that this document does not say that

Mr. Sauber is a client of Mr. Zilberberg.  It just has a mail

to address, and it says Brookwood Title, which is another one

of Mr. Zilberberg's businesses.  It's not clear from this who

represents Mr. Sauber, or that Mr. Zilberberg represents him.

THE COURT:  So what is it that you don't want him to

ask this witness about this document?

MS. MCLEOD:  So the asking is not a problem.  It's the

putting it into evidence, is I think misleading and confusing

to the jury, because, frankly, as an attorney myself, I cannot

tell from this document that Mr. Sauber is represented by

Mr. Zilberberg.  It just has a bunch of stamps on it with

addresses of things to be mailed to.  And so the idea that the

jury should now infer from this that a representation occurred

I think is misleading and confusing, and should be excluded on

403 grounds.

THE COURT:  Well, is this document -- are you going to

object to this document being admitted into evidence, or did

you guys stipulate to this document?

1          MS. MCLEOD:  We did not stipulate it's admissibility,

2     and I will object to it coming into the evidence.

3          THE COURT:  Okay.

4          MR. KAPLAN:  One thing in response to that, he's

5     already testified Joseph Berger is his lawyer, so it's not a

6     question of this having to prove that Joe Berger is his lawyer.

7          THE COURT:  What are you trying to prove?

8          MS. ZAPATA:  That Joe Berger at this point was

9     associated with Mendel Zilberberg & Associates.

10          MS. MCLEOD:  Your Honor, the issue is that --

11          THE COURT:  How are you going to prove that through

12     him?

13          MR. KAPLAN:  No.  I'm proving it through the deed

14     itself.  The deed is being sent to Mendel Zilberberg, attention

15     Joseph Berger.  And the next page, also, it's being sent to

16     Mendel Zilberberg & Associates.  So I'm not using it to

17     establish he was the lawyer.  He already established he was the

18     lawyer.

19          THE COURT:  I know, but what you're trying to

20     establish is that this person represented him through

21     Mr. Zilberberg, and that he was aware that Mr. Zilberberg was

22     his lawyer.  He said he wasn't wanted.

23          MR. KAPLAN:  I don't need him to know the fact that

24     Mr. Zilberberg was his lawyer.

25          THE COURT:  What's the relevance of the fact

1   Mr. Zilberberg and this other lawyer have a relationship, other

2   than the inference that he must have known that Zilberberg was

3   involved?

4               MR. KAPLAN:  Because one of the elements in this case,

5   one of the charges in this case is Mr. Zilberberg lied to the

6   bank when he said that he was a client of Mr. Zilberberg.

7               THE COURT:  Right.

8               MR. KAPLAN:  So this is helpful to establish that he

9   actually was a client of the firm.  Hold on.  He was a client

10  of the firm, because Joe Berger, who he already said was his

11  lawyer, was working for Mendel Zilberberg at the time.

12              THE COURT:  Well, I'm not sure -- first of all, I'm

13  not even sure, do you have the original document?

14              MR. KAPLAN:  This is -- I got this off the website,

15  off ACRIS.  This is -- it's got this seal.

16              THE COURT:  But who's going to say that these three

17  people are connected?

18              MR. KAPLAN:  Well, so I'm going to -- he already said

19  Joe Berger was connected to him, so we already have the

20  connection to the witness, to this document.  We already

21  have -- his name is on the document, right?  Herschel Sauber,

22  it's his deed.

23              THE COURT:  Right.

24              MR. KAPLAN:  So he's a connected to the document.  Joe

25  Berger is connected to the document, because he already just

1    said Joe Berger represented him to buy his house.

2                THE COURT:  Okay.

3                MR. KAPLAN:  And I think he said recently there was a

4    closing done at Zilberberg's office.

5                MS. MCLEOD:  Yes, but --

6                THE COURT:  So what do you want to ask him about this

7    document?

8                MR. KAPLAN:  What I want to ask him about the document

9    is, were you represented by Joe Berger at Joe Berger &

10   Associates -- at --

11               THE COURT:  Okay.

12               MR. KAPLAN:  You were represented by Joe Berger.

13   Based on this document, it seems to say that it was mailed to

14   --

15               THE COURT:  I know, but that's not the question you're

16   going to ask him, is it?  What is the question?

17               MR. KAPLAN:  I'm going to ask him, did you know at

18   that time that Joe Berger worked for Mendel Zilberberg?

19               MS. MCLEOD:  He already answered.

20               MR. BRAFMAN:  With this document.

21               THE COURT:  Whether he knows it is not the issue.  The

22   issue is whether it's true.  He said already he didn't know

23   that they had a relationship.  He even said further than that,

24   I think he said they didn't have a relationship.  So the

25   question is how are you establishing this relationship if he's

1    not aware of the relationship?

2              MR. KAPLAN:  I'm establishing his relationship through

3    his testimony at the FDIC, where he said he was a client.

4              THE COURT:  That's different.  If he says he was a

5    client, you can confront him with that, but I'm not sure

6    whoever filled out this document filled out this document

7    accurately.  That's what you're offering.  You're offering it

8    for the truth, that these two have a connection, and I'm not

9    sure that there's anybody that I am aware of that can testify

10   to that.

11             MR. KAPLAN:  Judge, if I want to put in a business

12   card, I wouldn't be offering the truth of the business card.

13             THE COURT:  Well, it depends.  It depends whether or

14   not the business card came out of my pocket, and if you're

15   trying to prove that there's a relationship between me and

16   Mr. Brafman, because I had the business card in my pocket,

17   because he gave it to me.

18             MR. KAPLAN:  That's a fair point.  Let's say the

19   business card is attached to his deed --

20             THE COURT:  But he's not giving you the answers that

21   you want.

22             MR. BRAFMAN:  You can use this to refresh his

23   recollection.

24             MR. KAPLAN:  Yes.

25             THE COURT:  Without giving the jury the substance, for

1    the purpose -- you're offering it for the truth.  You want the

2    jury to imply they must have had a relationship, he must be

3    lying about it, because this was written.  We don't know who

4    wrote this.  We don't know what motivated the person to write

5    this.  We don't know what the relationship was, and even if

6    there was a relationship, we don't know if he knows of the

7    relationship, because he says, no, they didn't have a

8    relationship.

9           So if you want to refresh his recollection, fine.  You

10   can do that.  If you want to ask him, were you asked these

11   questions or did you give these answers, you can ask him any of

12   that.

13          MR. KAPLAN:  I'm going to start with that, and see

14   where it goes.

15          MS. MCLEOD:  Okay.

16          MR. KAPLAN:  Okay.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Yes.

3    BY MR. KAPLAN:

4    Q.  Mr. Sauber, you just said that you were never a client of

5    Mendel Zilberberg, correct?

6    A.  Not to my knowledge.

7    Q.  Okay.  So I want to refresh your recollection.

8              Let's go back to the FDIC testimony, page 26.

9              I think it's in front of you now.

10             As we established, this statement was given under

11   oath, correct?

12   A.  Yes.

13   Q.  I'm sorry.  Page 36.

14             Mr. Sauber, do you see the middle of the page?  Were

15   you asked the question, "were you ever a client of an attorney

16   named Mendel Zilberberg?"  And the answer, "yes?"

17   A.  I do see that.

18   Q.  And this is the testimony you gave in front of the FDIC?

19   A.  Yes.

20   Q.  And if we can go to page 37.

21             Do you recall being asked the question, "so that was a

22   company you purchased, rather than funded and -- founded?"  And

23   giving the answer, "yes, that was a company I purchased?"  But

24   then, "my friend's name was Joe Berger.  He was my attorney.

25   He worked at that law office."

1   A.  I don't recall it.  I see it.  I mean, I think if you want

2   a little clarification, I'm not sure if I just assumed, because

3   the closing was in his office, that I was a client, but I never

4   knew that for a fact.  I just know that we did the closing

5   there.

6   Q.  We can go to page 39.  And, actually, if you can go to the

7   bottom of page 38, please.

8           Do you recall being asked this question:  "You just

9   know you were at his office?"  And giving the answer --

10          Next page, three -- "I know I was at his office.  I

11  think my friend Joe Berger, who was his -- worked -- I think he

12  worked at -- he worked at that office for a short time."

13  A.  You're asking me if I recall this question?

14  Q.  I'm asking if you gave that answer.

15  A.  I don't remember.  I mean, I don't remember that.  What

16  year was that?  2013?  I don't remember the interview.

17  Q.  Moving on.  At some point you said you went to the bank to

18  fill out some documents for the loan, correct?

19  A.  No, I didn't say that.

20  Q.  Well, the document close -- the loan closing, didn't you go

21  to the bank?

22  A.  Yeah.  Yeah.

23  Q.  When you went to the bank for the loan closing, didn't you

24  sign some documents?

25  A.  I think so.

1   Q.  And Abraham Kahan went with you, correct?

2   A.  Right.

3   Q.  And when you went to the bank that day, did you also open

4   up an account?

5   A.  I don't know.  I assume so, because they gave me checks to

6   sign, but I didn't come in there and ask to open up an account.

7   Q.  And at that time, did Abraham Kahan ask you to sign some

8   blank checks and give him those checks?

9   A.  Yes.

10  Q.  Do you know what Kahan did with those checks?

11  A.  I have no idea.

12  Q.  If we can pull up GX 315, which is part of the

13  stipulations.

14          MR. KAPLAN:  If there's no objection, we'd like to put

15  in GX 315.

16          THE COURT:  I believe it's already offered in

17  evidence.

18          MS. MCLEOD:  It was part of the stip, but I think both

19  parties agree that Government Exhibit 315 should be admitted.

20          THE COURT:  315, not 215?

21          MR. KAPLAN:  I'm sorry, 315.  315.

22          THE COURT:  All right.  Then I'll admit it as 315.

23          (Government Exhibit 315 received in evidence)

24          MR. KAPLAN:  Thank you, your Honor.

25          Ms. Newman, if you can pull up page 20, and display it

1   to the jury and the witness.  And if you could blow up the top

2   two checks.

3   Q.  So, Mr. Sauber, are those checks on your account?

4   A.  It has my name on it, yes, I'm going to say.

5   Q.  And is that your signature?

6   A.  Yes.

7   Q.  But the "pay to the order" section, you didn't fill that

8   out, did you?

9   A.  I did not.

10  Q.  Isn't it true that Abraham Kahan owns Ads Here?

11  A.  I don't know.  I don't know.  I know he told me he opened

12  up an ads company, but I don't know for certain that he owns

13  it.

14  Q.  Again, are these checks with your signature that are made

15  out to Toby Kahan, A. Kahan, and Toby Kahan?

16  A.  Yes, they are.

17  Q.  And, again, you didn't write out the names of the person

18  getting the check?

19  A.  No.

20  Q.  Do you know if Abraham Kahan filled them out?

21  A.  I do not.

22  Q.  If we can go to page 6.

23          Okay.  So this is a check from Aron Fried to "Hershel"

24  Sauber, with your name spelled incorrectly?

25  A.  Yes.

1   Q.  You see on the second part it's endorsed.  Did you endorse

2   it?

3   A.  No, I did not.

4   Q.  Did someone else endorse your name on a check in your

5   account?

6   A.  I didn't do it.  I mean, it's not my signature.

7   Q.  Can we go to page 10, please.

8           Again, this is another check from Aron Fried to

9   Herschel Sauber.  This time the name is spelled right.  But did

10  you endorse the check?

11  A.  No.

12  Q.  If we can go to page 25.

13          Is this another check made out to Herschel Sauber?

14  A.  Yes, it is.

15  Q.  And do you see in the memo line it says "loan interest?"

16  A.  Yes, I do.

17  Q.  If you go to the endorsing, do you know if you did that?

18  A.  It's a stamp.  I have no idea.  I don't even know what that

19  is.

20  Q.  So you don't recall ever endorsing this check?

21  A.  No.

22  Q.  Can we go to page 26?

23          This is another check made out to you?

24  A.  Yes.

25  Q.  Also says "loan interest?"

1   A.  Yes.

2   Q.  And has the same stamp for endorsing, right?

3   A.  Yes, it does.

4   Q.  But none of this is done by you?  This is done by somebody

5   else, correct?

6   A.  I have no memory of it.  No.  There's nothing.

7   Q.  Did you do anything with this account?

8   A.  I don't know what account it is.

9   Q.  Okay.  If we can go to the first page.  This is the Park

10  Avenue Bank account in your name.

11  A.  It says GPX Apex Company, LLC.  I have no idea what that

12  is.

13  Q.  That's the check.

14          If we can go to the first page of the document?

15  A.  What am I looking at, the account number?

16  Q.  The account name, and the account number.

17  A.  Yeah, I never had anything to do with that account.

18  Q.  Did Kahan have to do with that account?

19  A.  I assume so.

20  Q.  So any checks written on that account were Kahan's checks,

21  not your checks?

22          MS. MCLEOD:  Objection.

23          THE COURT:  Sustained as to the form.

24          MR. KAPLAN:  That's fine.  I'll move on.

25  Q.  Do you remember on direct being asked some questions about

1   being approached by members of the bank asking about the loan?

2   A.  Yes.

3   Q.  And do you recall they came to your house in about August

4   of 2010 to ask you some questions?

5   A.  I remember they came.  I don't remember the year or the

6   date.

7   Q.  And what do you recall telling them when they came to your

8   house?

9   A.  I don't.  I was like really taken aback and flustered, and

10  my reaction was to get them out of there.  And whatever they

11  said, I was like, sure, yes, I'll -- let me speak to my guys

12  who are handling it, and try to get it taken care of right

13  away.

14  Q.  And did you reach out to Kahan after this?

15  A.  Yeah, immediately.

16  Q.  Do you recall telling those people from the bank at the

17  time that you used the proceeds from the line of credit to

18  establish a new home health care business?

19  A.  I do not recall that.  Again, if they asked me, I probably

20  said yes.  I think like a light bulb went on then that the bank

21  doesn't know about this, when I was under the assumption that

22  the bank did know about it, and I just wanted them out of there

23  at that time.

24  Q.  Do you recall telling them your new business should be

25  profitable soon, in several months, and it was your intention

 1   to pay back the loan at that time?

 2   A.  I do not recall that.  That might have been something that

 3   Mr. Kahan had said to me.  I'm not sure.  I don't remember

 4   exactly.

 5   Q.  But this was you talking to the bankers, not Mr. Kahan,

 6   correct?

 7   A.  Again, I don't remember the exact conversation.

 8   Q.  Okay.  I'm going to try to refresh your recollection.

 9           If we can pull up DX-201 just for the witness, the

10   Court, and the attorneys.

11           Just one second.  It's not working on the computer, so

12   if you'll just bear with me a minute.  We have to use pictures.

13           THE COURT:  Sure.

14           MR. KAPLAN:  Judge, can I approach the witness?

15           THE COURT:  Yes.

16   Q.  Mr. Sauber, if you can read that document to yourself, and

17   let me know when you're done.

18           Does that document refresh your recollection as to

19   whether or not you told the bankers in August of 2010 that you

20   used the proceeds of the loan to establish a new home health

21   care business?

22   A.  It does not refresh my memory.  I mean, but, again, it is

23   possible I told them, or it's possible they asked me and I said

24   yes.  I don't have a specific recollection of the conversation.

25           MR. KAPLAN:  Okay.  Ms. Newman, if you can pull up

1  document 3507-16, which is in evidence.  You can display it if

2  you want.  And if you can just highlight the -- I shouldn't say

3  highlight.  Can you expand the first paragraph?

4  Q.  So, Mr. Sauber, this is your non-prosecution agreement; is

5  that right?

6  A.  Yes.

7  Q.  And do you see number two in that list of the crimes, which

8  says "false representations that Sauber made directly to Valley

9  National Bank representatives concerning the aforementioned

10 loan and Sauber's involvement in the loan to the extent Sauber

11 had disclosed such conduct to this office?"

12 A.  Yes, I do.

13 Q.  Do you know what false representations it's referring to?

14 A.  Not specifically.  I mean, it's what -- I'm not sure if I

15 told it to the bank, or the bank suggested it to me and I just

16 agreed with them.  But it was -- I guess at that time I was

17 trying not to look for any more trouble, and called Mr. Kahan

18 right afterwards, and I did not open up to them and just tell

19 them, hey, no, no; by the way, you guys really had a loan for

20 Mr. Kahan; it had my name on it as a guarantor.  I just wanted

21 them out of there.  I don't know if I directly told it to them,

22 or they told it to me and I agreed with it.

23            MR. KAPLAN:  Okay.  Just a few more questions.

24            THE COURT:  Sure.

25            MR. KAPLAN:  If we can pull up GX 221 that is already

1    in evidence.

2    Q.  And, Mr. Sauber, is this the deed going back to Toby Kahan?

3    A.  Yes, it is.

4    Q.  And you testified on direct that Mr. Kahan asked you to

5    give you back this deed -- to give him back this deed, right?

6    A.  Yes.

7    Q.  And he asked you to give it back so he could pay you back

8    or pay back the loan, correct?

9    A.  Yes.

10   Q.  Were you hopeful that he would pay back the loan after you

11   gave back the deed?

12   A.  Yeah, I believed him at that time.

13   Q.  So it's fair to say you trusted him, and you gave him back

14   the deed, because you believed he would pay you back?

15   A.  I don't know if I trusted him, or I was hoping that he was

16   telling me the truth, because I really wanted this off of my

17   head.  It was causing a lot of stress, and I just was looking

18   to get this thing dealt with and done with.  And when he

19   promised me he was going to take care of it, I was like, okay,

20   let's get this done.

21   Q.  But he lied to you?

22   A.  Yes.

23   Q.  So you trusted him when you lent him $70,000, correct?

24   A.  Yes.

25   Q.  You trusted him when you took out a $1.4 million loan on

1   his behalf?

2   A.   Yes.

3   Q.   You trusted him when you gave him back the deed to the

4   property?

5   A.   Yes, I did.

6   Q.   And all these times he lied to you?

7   A.   When he asked for the money, he didn't lie.  He took it.

8   Q.   Well, didn't he say he'd pay back the money?

9   A.   Yeah.

10  Q.   And after trusting him through all this, all you're left

11  with is a million dollar judgment?

12  A.   I'm not sure what the amount is, but I do have a judgment

13  on my hands, yeah.

14  Q.   I have no further questions.

15          THE COURT:  Any further questions?

16          MS. MCLEOD:  Very brief redirect.

17          THE COURT:  Okay.  Let's finish him up.

18  REDIRECT EXAMINATION

19  BY MS. MCLEOD:

20  Q.   Mr. Sauber, you were asked some questions on

21  cross-examination about Joe Berger and a closing at Mendel

22  Zilberberg's office.

23          Do you remember that?

24  A.   Yes, I do.

25  Q.   What do you remember about the closing?

1    A.  I don't know if it was a refinance or we purchased our

2    house.  I mean, Joe Berger is a close friend.  He still is.

3    And I think he was just out of law school, and he said he could

4    do the closing for us.  And he told me, meet me at the office.

5    And I do have a recollection of the building saying Mendel

6    Zilberberg on the outside in large letters.  That's why -- I

7    mean, I don't know if I assumed that he worked for him.  I have

8    no idea.

9    Q.  Was Mendel Zilberberg at the closing?

10   A.  He was not.

11   Q.  Have you ever met Mendel Zilberberg?

12   A.  Not to my knowledge, no.

13   Q.  Has he ever been your attorney?

14   A.  Not that I know of.

15           MS. MCLEOD:  No further questions, your Honor.

16           THE COURT:  Any further questions of this witness?

17           MR. KAPLAN:  No, your Honor.

18           THE COURT:  Thank you, sir.  You can step down.

19           Ladies and gentlemen, we're going to adjourn for the

20   day.  I think we're making good progress.  If we keep making

21   progress like this, I think we're ahead of schedule.  But I'll

22   let you know where we are at the end of tomorrow.

23           Don't discuss the case.  Keep an open mind.  I'll see

24   you tomorrow morning.  9:45, so we can start promptly.

25           Let's give the jury a few minutes to leave the floor.

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  All right.  Let's promptly start tomorrow

3     morning at 9:30.

4          MS. MCLEOD:  Thank you, your Honor.

5          MR. KAPLAN:  Thank you, your Honor.

6          (Adjourned to July 6, 2023, at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

HERSCHEL SAUBER

Direct By Ms. McLeod . . . . . . . . . . . . .30

Cross By Mr. Kaplan  . . . . . . . . . . . . .61

Redirect By Ms. McLeod . . . . . . . . . . . .92

GOVERNMENT EXHIBITS

Exhibit No.                              Received

1001   . . . . . . . . . . . . . . . . . . . .29

1002   . . . . . . . . . . . . . . . . . . . .29

3507-16  . . . . . . . . . . . . . . . . . . .32

219  . . . . . . . . . . . . . . . . . . . . .39

221  . . . . . . . . . . . . . . . . . . . . .42

211  . . . . . . . . . . . . . . . . . . . . .43

220  . . . . . . . . . . . . . . . . . . . . .47

208  . . . . . . . . . . . . . . . . . . . . .49

215  . . . . . . . . . . . . . . . . . . . . .57

315  . . . . . . . . . . . . . . . . . . . . .84