N76DZIL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                           19 Cr. 802 (GBD)

MENDEL ZILBERBERG,

                                   Trial
          Defendant.

------------------------------x

                                 New York, N.Y.
                                 July 6, 2023
                                 9:30 a.m.

Before:

                 HON. GEORGE B. DANIELS,

                                 District Judge
                                 -and a Jury-

                     APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
DINA McLEOD
DANIEL G. NESSIM
    Assistant United States Attorneys

BRAFMAN & ASSOCIATES, P.C.
    Attorneys for Defendant
BY:  BENJAMIN BRAFMAN
    JACOB KAPLAN

Also Present:

Robert Stout, Special Agent FBI
Nicholas Tranchitella, Special Agent FDIC
Joseph Carbone, Paralegal Specialist, USAO
Lia Newman, Paralegal Specialist, Brafman & Associates

N76DZIL1

1          (In open court; jury not present)

2          THE COURT:  Be seated.

3          I think we're waiting for one juror, and then we can

4   proceed.  Is there anything we need to address before we go

5   over the next witness?

6          MS. MCLEOD:  The government handed up a proposed

7   limiting instruction for regulation O, which both parties

8   agreed to.  The proposed instruction is in bold, and we would

9   propose that this instruction be read -- we would propose that

10  this instruction be read after the testimony of Todd Goldman.

11  He's the first government witness today.  After his direct

12  testimony.

13         THE COURT:  How long is that testimony?

14         MS. MCLEOD:  He's probably about 45 minutes on direct.

15         THE COURT:  So what's the status at this point of your

16  agreement?  Mr. Brafman?

17         MR. BRAFMAN:  We're agreeing that that should be read

18  after the testimony of Mr. Goldman.

19         THE COURT:  Okay.  So you're both requesting that this

20  be read?

21         MR. BRAFMAN:  Yes.

22         THE COURT:  Mr. Goldman, the witness is going to

23  testify with regard to that regulation?

24         MS. MCLEOD:  At a very high level.

25         THE COURT:  All right.  And you want me to do it after

1    his direct examination?

2           MR. BRAFMAN:  Yes.

3           THE COURT:  When he's finished?

4           MR. BRAFMAN:  Yes.

5           THE COURT:  All right.  Do if the parties agree I can

6    just --

7           MR. BRAFMAN:  After his direct testimony.

8           THE COURT:  Oh, after his direct testimony, before

9    cross?

10          MR. BRAFMAN:  Yes, sir.

11          THE COURT:  All right.  Is that the government's

12   position -- did you hear what he said?

13          MS. MCLEOD:  After direct testimony is fine, your

14   Honor.

15          THE COURT:  After direct testimony, before cross.

16          MR. BRAFMAN:  Yes.

17          THE COURT:  All right.  Let me ask you this:  How are

18   you going to present this and when?

19          MS. MCLEOD:  The testimony?

20          THE COURT:  Yes.  With regard to the regulation O.

21          MS. MCLEOD:  It's going to be a question -- so

22   Mr. Goldman is a bank examiner for the FDIC, and essentially

23   he'll be asked, you know, what sort of loans do you look at

24   when you do your bank examinations.  He'll say some of those

25   are insider loans.

1    And then I'll ask him, you know, at a high level, is

2    there any regulation that governs those type of loans?  Yes.

3    What's it called?  At a high level, what is the regulation?

4    He's not -- he doesn't --

5         THE COURT:  What part of the regulation is the

6    relevant portion?  Because I don't think I even have the

7    regulation.

8         MS. MCLEOD:  Oh, it's --

9         THE COURT:  Is this going to be an exhibit?

10         MS. MCLEOD:  No.  It's just going to be testimony as

11    to just the basic subject matter of what the regulation is.

12         THE COURT:  Okay.  So he's not going to quote from the

13    regulation?

14         MS. MCLEOD:  No, he's not going to quote from the

15    regulation.  He's just going to state the regulation is a -- it

16    governs -- it sets limits on loans to insiders at a bank.  So,

17    an executive or a member of the board of directors.

18         THE COURT:  All right.  So you're not -- the jury is

19    not going to -- yes, keep that door closed.

20         You're not quoting from the regulation or showing the

21    regulation to the jury?

22         MS. MCLEOD:  No.

23         THE COURT:  Is there a portion of the regulation that

24    you're going to articulate to that --

25         MS. MCLEOD:  From the regulation itself, no, just a --

N76DZIL1

1     just a high overview of the regulation.

2              THE COURT:  Well, what are you going to say the

3     regulation requires?  How are you going to --

4              MS. MCLEOD:  So we -- there is a part of the board's

5     loan policy -- sorry, the bank's loan policy, which talks about

6     regulation O, and in the specific context of the bank, it

7     requires loans to insiders be approved by the full board of

8     directors.

9              THE COURT:  Is the jury going to see that?

10             MS. MCLEOD:  Yeah.  That's the bank's loan policy, so

11    that's --

12             THE COURT:  Okay.  So the bank's loan policy quotes

13    regulation O?

14             MS. MCLEOD:  It does not quote it.  It just says the

15    bank -- in sum and substance, you know, the bank complies with

16    regulation O, and here is our policy.  Our policy is loans

17    subject to regulation O must be approved by the full board of

18    directors.

19             THE COURT:  All right.  So I'm just trying to

20    anticipate, because I'm a little concerned about the nature of

21    the language.  First of all, you don't want me to say you may

22    hear about a regulation, federal regulation, because they will

23    have already heard.

24             MS. MCLEOD:  Yes.

25             THE COURT:  Also, you say that you want to emphasize

N76DZIL1

1     that, while you may consider as a relevant factor whether the

2     defendant violated regulation O, you may not convict the

3     defendant merely because he violated a federal regulation.

4              Is there going to be any evidence through this witness

5     that the defendant violated regulation O?

6              MS. MCLEOD:  The defendant -- the witness is not going

7     to say that.

8              THE COURT:  So why am I telling the jury that it's a

9     relevant -- that at this point that it's a relevant factor

10    whether he violated regulation O?

11             MS. MCLEOD:  I think the concern from both of the

12    parties is that the -- the foundation is there to suggest that

13    he could have violated the regulation, right, because he's an

14    insider at the bank.

15             THE COURT:  Right.

16             MS. MCLEOD:  And there will be also the evidence that

17    --

18             THE COURT:  Well, not at that point, though.

19             MS. MCLEOD:  Yes, at that point.

20             THE COURT:  Well, who is going to say what is the

21    evidence at this point when you ask me to give this instruction

22    with regard to regulation O being in effect, and that he

23    disregarded the requirements of regulation O?

24             MS. MCLEOD:  Oh, sorry.  I was answering your previous

25    question, which was --

N76DZIL1

1          THE COURT:  Right.  Well, this is a new question.

2          MS. MCLEOD:  -- which was how he was an insider.

3          So the foundation is going to be there that he was an

4     insider at the bank.

5          THE COURT:  Who is going to say this?

6          MS. MCLEOD:  Mr. Goldman will say it.  This is not a

7     dispute between the parties.

8          THE COURT:  Right, but I'm trying to figure out the

9     timing of my instructing the jury.  The two of you can

10    anticipate what's going to happen next week, but the jury is

11    not.  I'm going to give them an instruction, but the

12    instruction you want me to give tells them at this point, at

13    this trial, after the direct examination of this witness, it is

14    going to be an issue for them to consider whether or not he

15    violated regulation O?

16         MS. MCLEOD:  They may consider it.

17         THE COURT:  Okay.  So is this witness going to opine

18    that he violated regulation O?

19         MS. MCLEOD:  No.  What he's going to say is the

20    defendant was -- I mean, it's already I think -- it will be in

21    evidence that the defendant -- Mr. Goldman will say the

22    defendant was a member of the board of directors, okay?

23         THE COURT:  Right.

24         MS. MCLEOD:  He is, therefore, an insider --

25         THE COURT:  Right.

N76DZIL1

1          MS. MCLEOD:  -- who falls under the regulation O, in

2     the sense that there's only a small group of people that fall

3     under regulation O.

4          THE COURT:  Right.

5          MS. MCLEOD:  People who receive loans under regulation

6     O, insiders have to follow certain rules.

7          THE COURT:  Okay.

8          MS. MCLEOD:  The loan policy --

9          THE COURT:  Which rules?  Following certain rules,

10     certain regulations and statutes, or follow the bank's internal

11     rules?

12          MS. MCLEOD:  Both.  Both.  But --

13          THE COURT:  Well, which one is relevant?

14          MS. MCLEOD:  Both are relevant.  But I'm talking here

15     about -- so regulation O is a federal regulation that is also

16     captured in the credit policy.

17          THE COURT:  It says what?

18          MS. MCLEOD:  And the credit policy says that

19     regulation O requires that if you provide loans to insiders,

20     they must be on substantially similar terms to what would be

21     given to the general public.

22          THE COURT:  Okay.

23          MS. MCLEOD:  Okay.  So this is a conflict of interest

24     problem.  And the loan policy states that loans that are

25     subject to regulation O must go through the full board of

N76DZIL1

1    directors approval.

2                THE COURT:  Which says that --

3                MS. MCLEOD:  The bank's own credit policy.

4                THE COURT:  Okay.  The bank's credit policy.

5                MS. MCLEOD:  Yes.  Says that a regulation O loan --

6    says it has to go through the board of directors.  So that's a

7    special rule governing such a loan.

8                THE COURT:  It's a bank rule?

9                MS. MCLEOD:  It's a rule under the policy, yes.

10               THE COURT:  It is not a legal requirement?

11               MS. MCLEOD:  Well, so, we -- I think we have been --

12   we are not going to be getting into the details of what

13   regulation O is, because it's -- one is -- the bank examiner is

14   not a regulation O -- he's not a subject matter expert in

15   regulation O.  He's here to just sort of give some reference at

16   a high level.

17               And we also didn't want to step too much on your

18   Honor's toes in terms of getting into the weeds of legal

19   issues.  This was -- you know, we -- I think we're doing this,

20   and I think this is in part a limiting instruction that we had

21   discussed with defense counsel, because defense counsel had

22   this concern as well.  And so that's why it's a joint proposal

23   from the parties.

24               We moved in limine on this issue on regulation O, and

25   at the time, there was no opposition to it.  So --

1          THE COURT:  Well, you moved to do what?

2          MS. MCLEOD:  To introduce evidence on regulation O.

3   We moved in limine, and it was unopposed.

4          THE COURT:  All right.

5          MR. KAPLAN:  I believe it was unopposed requesting a

6   limiting instruction.

7          THE COURT:  All right.  Well, I'm prepared to give

8   whatever limiting instruction the two of you can agree to, but

9   I have a little bit of a concern that the relevant -- the

10  relevant evidence is not whether he violated regulation O.  The

11  relevant evidence is whether or not he was aware of and

12  disregarded the bank's policy of -- with regard to insiders

13  having an interest in the transaction.  But I'm just cautioning

14  you both, without the jury knowing what the substance of

15  regulation O says, I'm not quite sure how they're supposed to

16  evaluate whether he's evaluated the language of regulation O.

17         MS. MCLEOD:  So I think your Honor is completely right

18  in the sense that, from the government's point of view, what is

19  relevant is the defendant's knowledge of the regulation, and

20  his knowledge of the policy, and the fact that he, you know, in

21  the government's view, structured a loan in the way that he

22  attempted to I think or will attempt to say, I was not -- I do

23  not have to comply with regulation O, because he did not want

24  this loan to have scrutiny on it.

25         So that's why we're not calling somebody to opine as

N76DZIL1

1    to the actual violation is, because I think your Honor's

2    correct, what's important is what the defendant understood

3    about the regulation.  And so the witness is really just to

4    give the jury just a high level understanding of what the

5    regulation is, so that they can understand some of the

6    references to regulation O in the documents, like in the loan

7    policy, and in the loan minutes.

8           THE COURT:  I guess my last question then is what is

9    the relevant language of regulation O?

10          MS. MCLEOD:  So we can, on the next break, or if we

11    have time now, if we're still waiting for a juror --

12          THE COURT:  The juror's here.

13          MS. MCLEOD:  Oh, the juror's here.  I was going to

14    stay we could print it out.  One of the reasons I was trying to

15    keep this high level, among other things, it's a pretty --

16          THE COURT:  I know, but I have to tell the jury that

17    it's relevant for them to decide whether he violated regulation

18    O.  If they don't know what the language of regulation O

19    says -- the question is not whether he violated regulation O.

20    The question is whether or not he has criminal intent and

21    knowledge with regard to the conspiracy, and the conduct that

22    the government is alleging, and if he knew he shouldn't do it.

23          MS. MCLEOD:  Yes.

24          THE COURT:  That it's a bad thing.

25          MS. MCLEOD:  Right.

1          THE COURT:  If he didn't know he was prohibited from

2     doing it, then for him that's a good thing.  But the question

3     is what is regulation O.  Maybe I'm asking too many questions

4     before I hear testimony, but I don't know what this guy is

5     going to say about regulation O, and the bank's policies, and

6     how they interrelate, and whether or not the jury's supposed to

7     be given the impression that that is an undisputed issue, that

8     he violated regulation O in the bank's policy.

9          MR. BRAFMAN:  Your Honor, having listened to your

10    Honor's discussion now, I think your Honor is right, and I

11    think we were concerned that this witness would imply that the

12    defendant violated the regulation if, in fact -- even if he

13    didn't opine on that.  And, in the course of the discussion

14    I've listened to this morning, for now, we would withdraw our

15    consent to this regulation, even though we had long discussions

16    with the government about this.

17          I understand the Court's concern, and we can revisit

18    this when Mr. Rosenwasser testifies, because he's a bank member

19    who actually knows about this loan, didn't approve it.  Now, he

20    didn't approve it for reasons having nothing to do with

21    regulation O, because he didn't know that Mr. Zilberberg was,

22    in fact, allegedly involved in pursuing this loan.  So I think

23    if your Honor's concern is that the jury will be confused, I

24    hear your Honor.  I think your Honor is right.

25          And to the extent that we've had discussions with the

1    government to consent to this language, the time of the

2    instruction is of concern to me now that I've heard your Honor

3    explain why it's of concern to the Court, so --

4              THE COURT:  Well, what do you want me to do?

5              MR. BRAFMAN:  I think --

6              THE COURT:  The government obviously intends to ask

7    him about either the bank policy that's in place, that

8    defendant should have been aware of, or the regulation that was

9    in place that he should have been aware of, and --

10             MR. BRAFMAN:  It was out --

11             THE COURT:  See, if they want to argue that being

12   fully aware of those regulations, he engaged in conduct that

13   was inconsistent with those obligations --

14             MR. BRAFMAN:  Your Honor, we don't -- we don't

15   withdraw our consent to the language of the proposed --

16             THE COURT:  I'm sorry.  Say it again.

17             MR. BRAFMAN:  We are not withdrawing our consent to

18   the language that is before the Court.

19             THE COURT:  Okay.

20             MR. BRAFMAN:  We understand and now join in the

21   Court's concern as to how this might now confuse the jury.  And

22   we can obviously revisit this after the testimony of

23   Mr. Goldman, or after the testimony of Mr. Rosenwasser, or at

24   the end of the trial in a charging conference.

25             THE COURT:  So what do you want me to do, either at

N76DZIL1

1   the time that he testifies about this, or before you

2   cross-examine him?

3          MR. BRAFMAN:  I think, your Honor, after his direct

4   testimony, we could revisit it, because to the extent that he

5   mentions regulation O, the manner in which he does that, we can

6   revisit that issue at that time before cross-examination, which

7   I understand from Mr. Kaplan may be very brief.

8          THE COURT:  Do you have an objection to that area of

9   inquiry by the government?

10         MR. BRAFMAN:  Yes.  I mean, a lot depends on how

11  they're going to do it.

12         THE COURT:  Well, I can't rule unless I know how

13  they're going to do it, and what you object to them doing.

14         MR. BRAFMAN:  It's my understanding that he's not

15  going to opine as an expert.

16         THE COURT:  Okay.

17         MR. BRAFMAN:  And he's someone who worked at the bank

18  during what they viewed as, you know, this period.  He was with

19  FDIC.  They were reviewing certain matters.  And his

20  cross-examination is going to be very brief, Mr. Kaplan assures

21  me.  So I think if we revisit the issue after his direct, we

22  take a short break for the jury and the rest of us at that

23  time, we can revisit the issue we're not withdrawing.

24         THE COURT:  We may have to withdraw the issue before

25  then if you're going to object to his testimony.

1    MR. BRAFMAN:  Let's wait and see what questions they

2  ask.

3    THE COURT:  Well, that's why I'm asking, in terms of

4  what you want me to do in anticipation, because I'm not sure

5  what he's going to say.

6    MR. BRAFMAN:  I understand.

7    MS. MCLEOD:  Can I be heard, your Honor?

8    THE COURT:  Yes.

9    Let me just ask you -- I'm not interested in the

10  question -- what is he going to say?  What is going to be his

11  answer that you say is on this issue?

12    MS. MCLEOD:  Oh, okay.  So he's going to give a high

13  level statement --

14    THE COURT:  Don't tell me what he's going to -- tell

15  me exactly what you expect him to say, word for word.

16    MS. MCLEOD:  Well, I think that puts the government in

17  a tough position, because I don't want to --

18    THE COURT:  Well, why?  You don't know what he's going

19  to say?

20    MS. MCLEOD:  I know in sum and substance what --

21    THE COURT:  I don't --

22    MS. MCLEOD:  Your Honor, people don't answer the same

23  way each time.  You said word for word.

24    THE COURT:  You prepped him?

25    MS. MCLEOD:  Yes.

1          THE COURT:  I don't want to know what your question

2    is.  I want to know what his answers are.  What do you

3    anticipate he's going to say?

4          MS. MCLEOD:  Your Honor, I just want a caveat.  This

5    is what I expect him to say.

6          THE COURT:  I know.  That's all --

7          MS. MCLEOD:  I can't say what he'll say word for word.

8          THE COURT:  You know what you want him to say.

9          MS. MCLEOD:  It's not what the government wants.  It's

10   what the answers are.

11         THE COURT:  It is what you want.  You only get what

12   you want him to say -- you're going to ask him a question, and

13   he's going to give you an answer.  Just tell me what is your

14   question, and what do you expect the answer to be?

15         MS. MCLEOD:  Well, let me just check my question,

16   although do you want the question?  You stated you didn't want

17   the question.

18         THE COURT:  I just want to know what you anticipate

19   he's going to say.

20         MS. MCLEOD:  Okay.  I anticipate that he's going to

21   say that there is a regulation that governs loans to insiders

22   called regulation O.

23         THE COURT:  Okay.

24         MS. MCLEOD:  And that he would expect loans made to a

25   director to be disclosed as part of an examination, as part of

1    a bank examination.

2                THE COURT:  Okay.

3                MS. MCLEOD:  And then I'm going to ask him in basic

4    terms what is regulation O, and I expect he'll say something

5    along the lines of regulation O requires that bank insiders who

6    get loans get loans on substantially similar terms as allowed

7    -- as given to the general public.

8                THE COURT:  Okay.

9                MS. MCLEOD:  I'm going to ask does the FDIC -- a good

10   preview, does the FDIC expect banks to have a policy in place

11   about regulation O?  Yes.

12               And then I'm going to ask about the bank's credit

13   policy, which we will move into evidence.  And the bank's

14   credit policy, which, if you like --

15               Joey, why don't you pull up Government Exhibit G-1,

16   and go to page 5.

17               THE COURT:  You're going to admit this into evidence?

18               MS. MCLEOD:  Yes.

19               THE COURT:  You're going to show it to the witness?

20               MS. MCLEOD:  Uh-huh.

21               THE COURT:  Then you're going to ask the witness what

22   about it?

23               MS. MCLEOD:  I'm going to show him paragraph 5.  This

24   is Park Avenue Bank's own policy.

25               THE COURT:  Is that in evidence by stipulation, or

1    he's going to provide the basis for it?

2              MS. MCLEOD:  If the authenticity is by stipulation --

3    it's a business record.  Sorry.

4              THE COURT:  Okay.

5              MS. MCLEOD:  So we're going to show this.  This is the

6    bank's own policy.

7              THE COURT:  This is the branch regulation O policy?

8              MS. MCLEOD:  Correct.

9              THE COURT:  Okay.

10             MS. MCLEOD:  And I'm going to ask, is this policy

11   consistent with your understanding of regulation O.

12             THE COURT:  Okay.

13             MS. MCLEOD:  Okay.  I'm going to ask him, what are --

14   you know, there's a reference to "related interests" in here.

15   I'm just going to ask him what are "related interests," just

16   for the jury's knowledge.

17             And then if you go to page 7 --

18             THE COURT:  He's going to say what?

19             MS. MCLEOD:  He's going to say that those are -- so,

20   for example, if a director had a company, that would be a

21   related interest.

22             THE COURT:  Okay.

23             MS. MCLEOD:  So a loan to your own company still

24   counts.

25             And then page 7, if you go to right below the table,

1    Joey, there's this one sentence, it just says, "the Board of

2    Directors must approve all extensions of credit subject to

3    regulation O."

4              THE COURT:  Okay.

5              MS. MCLEOD:  So that's really it.

6              THE COURT:  That's all I wanted to know.

7              So, Mr. Brafman, is there any portion of that

8    examination that you're going to object to, so we don't keep

9    going back and forth in front of the jury?

10             MR. KAPLAN:  Judge, give us one minute?

11             THE COURT:  Yes.

12             MR. BRAFMAN:  Your Honor, if the direct examination

13   proceeds according to the government's outline, then we're not

14   going to object to that testimony, and we're not going to ask

15   the Court for a limiting instruction at this time.

16             THE COURT:  Okay.

17             MR. BRAFMAN:  Your Honor, if the government's correct,

18   examination proceeds as it's been outlined, we're not going to

19   object to it.  But after the direct, we may ask the Court to

20   provide a limiting instruction.

21             THE COURT:  All right.

22             MR. BRAFMAN:  So I think making our position clear in

23   a vacuum, it is difficult, as it is for your Honor.  So we're

24   not withdrawing our consent to the language, but we can agree

25   whether it is given to the jury after we hear the actual direct

N76DZIL1

1  examination.

2          THE COURT:  All right.  So we'll proceed.  If you have

3  an objection to any particular question, you can make it.  If

4  after the direct examination, or after cross, or at any point

5  before I charge the jury you believe it's appropriate to give

6  this instruction, or a similar instruction, then I'll consider

7  it at that time.

8          MR. BRAFMAN:  Yes, sir.

9          THE COURT:  All right.  So let's go ahead forward.

10  Our jurors are here.  I don't want to make them wait any

11  longer.  We can proceed.

12          MS. MCLEOD:  Your Honor, would you like us to get the

13  witness?

14          THE COURT:  Yes.  Why don't you bring the witness in,

15  and put him in the back.  Then I'll ask you to call the

16  witness, we'll swear him.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  You can be seated.  Thank you.

3          Good morning, ladies and gentlemen.

4          JUROR:  Good morning.

5          THE COURT:  Ladies and gentlemen, we're ready to

6     proceed.  I think that we're on schedule.  We may be inching

7     toward getting head of schedule.

8          I want to emphasize to everyone we're a team.  We

9     can't start until everybody arrives.  So I'll ask you to be

10    prompt, or contact us if there's a delay.  Also, there are many

11    times we are dealing with issues outside of the presence of the

12    jury with lawyers.  For us, it saves time in the long run,

13    rather than adds time, to resolve some of these issues

14    beforehand.

15         So we're ready to proceed.  I think we're on schedule.

16    I'll ask the government to call the next witness.

17         MS. MCLEOD:  Your Honor, the government calls Todd

18    Goldman.

19         THE COURT:  Step up, sir.

20         THE DEPUTY CLERK:  Please raise your right hand.

21         (Witness sworn)

22         THE COURT:  You can be seated, sir.

23         Would you state and spell your name for the court

24    reporter, and just point the microphone to your mouth?

25         THE WITNESS:  My name is Todd Goldman, T-o-d-d,

1    G-o-l-d-m-a-n.

2              THE COURT:  You can inquire.

3              MS. MCLEOD:  Thank you, your Honor.

4     TODD GOLDMAN,

5          called as a witness by the government,

6          having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MS. MCLEOD:

9    Q.  Mr. Goldman, what do you do for work?

10   A.  I'm a bank examiner with the Federal Deposit Insurance

11   Corporation, or the FDIC.

12   Q.  And what is the FDIC?

13   A.  The FDIC is a government agency that basically protects

14   consumers.  We essentially do that in three ways.  We ensure

15   deposits, you know, your bank deposits.  We examine banks, and

16   if banks need to be closed, we handle sort of the resolution,

17   so, you know, the government gets back as much money as they

18   can after they pay off the depositors that need to be paid.

19   Q.  And what's your educational background?

20   A.  I have a bachelor's degree from Carnegie Mellon University

21   in management and economics.  And I have an MBA from Baruch

22   College, with a focus in accounting.

23   Q.  And when did you start working at the FDIC?

24   A.  June of 1990.

25   Q.  What positions have you held at the FDIC?

1    A.   I started as an assistant bank examiner, and I became a

2    bank examiner.  Then I became a first level supervisor.  And

3    now I'm a senior risk examiner is what we call it.  It's

4    basically a senior examiner.

5    Q.   What is a bank examination?

6    A.   A bank examination is basically we -- each bank that has --

7    that we examine, we go in, and we basically review six areas.

8    We call them the CAMELS components.  That's what we review

9    during a bank exam.  The C stands for capital, so we assess the

10   adequacy of the bank's capital, which is really the amount of

11   money they have, the amount of assets they have to protect

12   themselves from losses.

13        We review the asset quality, which is basically, you

14   know, how good the assets are.  Usually that's loans and

15   securities.  Those are the biggest assets that the bank has.

16   So, you know, are these good assets.

17        We review management, the quality of bank management.

18   That's extremely important, because that dictates how the --

19   really how the bank is going to do.

20        We look at the bank's earnings, you know, how much

21   they're earning, and how their expenses are.

22        We look at the bank's liquidity, you know, do they

23   have -- you know, can they meet their obligations on a

24   day-to-day basis.  So, you know, depositors come in, they want

25   to withdraw their money, the bank has enough money on hand, and

1    they manage themselves so they can deal with that.

2            And the last of the areas that we review is

3    sensitivity to market risk, which is basically, if you think

4    about it, all the bank's assets and their liabilities, they

5    have some sort of rate of interest associated with them, and we

6    look at how the banks manage these interest rates.

7            So those six areas comprise what we review at bank

8    examinations.

9    Q.  Are banks required to undergo examinations?

10   A.  Yes.  There's a statutory requirement that banks are

11   reviewed -- receive an examination either annually, or, based

12   on certain situations, they can be every 18 months.

13   Q.  And what do you do as part of a bank examination?

14   A.  Well, as part of the exam, you know, we're required to go

15   on site and review books and records.  But what it really means

16   is that we're looking at the bank's policies, you know, their

17   risk management, how they control all the risks that a bank is

18   exposed to.  So we read the board minutes; we review policies;

19   we talk to management; we review a lot of the assets; you know,

20   we review some loans, some securities, you know; and really we

21   cover those -- what I talked about before, those CAMELS

22   components, those six areas.  That's essentially an exam.

23   Q.  What's the basic purpose of the bank examination?

24   A.  The purpose of a bank exam is to assess the safety and

25   soundness of the institution.  So that's really -- you know,

1   it's really not just the condition of the bank, but is the bank

2   in compliance with rules and regulations, and that would be the

3   purpose.

4   Q.  Are bank examinations designed to detect fraud?

5   A.  They are not designed to detect fraud.  We may -- as part

6   of our exam, we may uncover fraud, but the examination itself

7   is not designed to detect fraud.

8   Q.  How long does an examination take to complete?

9   A.  Typically, four to eight weeks.

10  Q.  And what information do you review in conducting an

11  examination?

12  A.  We look at all the key policies and procedures.  We review

13  the board minutes.  We will review individual loans,

14  investments.  We will look at various examination reports about

15  how they monitor things like liquidity, how they monitor -- how

16  they're affected by changes in interest rates, how their -- how

17  their loans would do if some sort of bad event happened, you

18  know, what we call like stress tests, where you look at, you

19  know, how your portfolio would react to adverse events.

20          So there are a lot of things that, you know, we look

21  at.

22  Q.  And who provides the information to you that you review?

23  A.  The bank provides all the documents for our review during

24  the exam.

25  Q.  And you mentioned that, as part of the exam, you examine

1   some individual loans.  How do you decide which loans to

2   review?

3   A.   Sure.  So we only review a sample of loans.  So we look at

4   various risk factors, and we try to look at what would be a

5   representative sample.  So say we'll look at some new loans, so

6   we can see what the current way that they're writing -- you

7   know, that they're underwriting these loans, how they look.  We

8   might -- if there's problems with the commercial real estate

9   industry in the area, we'll review some commercial real estate

10  loans.  If we're aware some loans have problems, we might

11  review some of those.

12          So the idea is that by reviewing the sample, we'll get

13  a feel for, we'll be able to know what the entire portfolio --

14  what's the quality of the entire portfolio.

15  Q.   And what happens at the conclusion of a bank examination?

16  A.   At the conclusion of the exam, we present all our findings

17  to bank management.  All the findings, we discuss them, and

18  then subsequent to that, we have a meeting with the board of

19  directors of the bank.

20  Q.   And what happens at the meeting with the board of

21  directors?

22  A.   At the meeting with the board of directors, we will do more

23  of a high level.  So we'll discuss, you know, the scope of our

24  exam, the concerns that we had.  So, really, we want the board

25  to understand what are the key issues, what are the key things

1    that warrant their attention.

2             So it's a very focused presentation.  It doesn't

3    cover -- but when we meet with management, we cover everything.

4    We cover a subset of that with the board at those meetings.

5    Q.   What is the board of directors?

6    A.   The board of directors is the ultimate source of authority

7    at the bank.  They don't conduct the day-to-day business of

8    running the bank, but they oversee management.  So it's an

9    extremely important position, because this oversight is really

10   the difference of whether this bank is going to be successful

11   or is going to -- the condition is going to be satisfactory.

12   It needs that proper oversight at the highest level to be able

13   to do okay.

14   Q.   And you mentioned that the board members don't run the

15   day-to-day operations at a bank.  Do directors typically have

16   other jobs?

17   A.   Yes.  Directors generally have, you know, responsible jobs

18   in the community.  They can be doctors, lawyers.  They can be

19   former bankers.  They can be -- but it's that diverse

20   experience that they bring.  But they're usually successful

21   people in whatever field they're in, and then they do this --

22   they serve in this role on the board of directors as,

23   essentially, in addition to what they would be doing for their

24   main living.

25   Q.   Do members of The board of directors have any special

1  duties to the bank?

2  A.  Well, they have a -- the board has a fiduciary duty to the

3  bank, and what I mean by a fiduciary duty is the depositors and

4  the investors in the bank, the board has -- the board members

5  have a duty to run the bank in such a way that it's -- that a

6  prudent person would run it.  And, you know, at all times they

7  have to keep the interests of the bank above -- above anything

8  else.  So above their personal or their professional interests.

9  It always has to be how would this benefit for the bank, and

10 that should be their guiding factor in everything they do as a

11 board member.

12 Q.  As part of their fiduciary duty, are directors required to

13 avoid conflicts of interest?

14 A.  Yes.  That's a very important part of being a director.

15 Q.  And why is that?

16 A.  Why is that?  Because at all times the director needs to be

17 -- have the interest of the bank paramount.  And if you have a

18 conflict, where there's something where it would be better to

19 do one thing because it would be better for you, but it would

20 be worse for the bank, you have to choose the thing that would

21 be better for the bank, because you've been entrusted with this

22 position.  This is a position of trust, being a member of the

23 board of directors.

24        And, you know, it's extremely important that you avoid

25 any conflicts of interest, because of the danger of the bank

1  being hurt while you were benefiting.

2  Q.  Are directors generally required to disclose conflicts of

3  interest?

4  A.  Yes.  They need to be disclosed, because if you can't avoid

5  it -- all the decision makers need to be aware that there is a

6  conflict of interest, so whatever course of action is taken,

7  folks can make sure that it's the right course, because they're

8  aware, hey, you know, this director has this conflict, but, you

9  know, we should be doing this.

10          So as long as people are aware, they can deal with it,

11  because it's -- it needs to be disclosed.  So it's very

12  important.

13  Q.  Would you expect loans made to a director to be disclosed

14  to you as part of an examination?

15  A.  Yes.

16  Q.  And why is that?

17  A.  Because as part of our exam, we need to review compliance

18  with laws and regulations, and if we're not aware that these

19  loans are insider loans -- there are certain laws that only

20  apply to insiders loans.  So if we're not aware of them, we

21  can't do our job as examiners and protect, you know,

22  depositors, and protect the consumer if we don't have this

23  knowledge.

24  Q.  You mentioned insider loans.  Can you give some examples of

25  what you mean by "insider?"

1   A.   Sure.  Insider loans are generally loans to executives,

2   directors, and what we call related interests of directors,

3   which might be a business that they might own or something like

4   that.  So those are generally the insider -- it's not uncommon

5   to see things like, say, your bank teller, a bank teller, you

6   know, that's -- they can actually get a preferential -- because

7   they're not considered in a position that they influence

8   policy, so, yes, if you want to give one of your employees a

9   better rate or something, that's not a conflict of interest,

10  because of that, but it's primarily geared towards, like I

11  said, directors and executive officers, and their related

12  interests.

13  Q.   And is there any regulation that governs loans to insiders?

14  A.   Regulation O.

15  Q.   Okay.  And we'll come back to that later.

16            Do you examine underwriting as part of a bank

17  examination?

18  A.   Yes, we do.

19  Q.   What is underwriting?

20  A.   Underwriting is basically -- it's the story of the loan.

21  So understanding is -- because you have to make a decision of

22  whether you're going to make a loan.  So there are certain

23  factors that go into underwriting.  You're going to look at the

24  character of the individual.  You're going to look at the

25  purpose of the loan.  You're going to look at how much cash

1    flow they have to pay the loan.  You're going to look at what

2    kind of collateral.

3          So those are all factors that play into the

4    underwriting, and, really, if the underwriting is good, you

5    know, that so much improves the chances of the loan being a

6    successful loan.  And, you know, so the underwriting is

7    extremely important to -- because it flows into the asset

8    quality, because if the underwriting is bad, more loans are

9    going to be bad, and that's going to harm asset quality, which

10   is going to adversely affect the institution.

11   Q.  And so you just mentioned a few factors that a bank

12   considers in assessing whether to extend credit.  Is the

13   identity of the borrower important to a bank?

14   A.  It's extremely important, because you need to assess the

15   character, and, you know, like, for example, the person's

16   credit history.  So if you don't know who the borrower is, you

17   don't know what their credit history, so that's a fundamental

18   first step to underwriting credit.  So that's very important.

19   Q.  Let's turn to a specific bank.  Are you familiar with a

20   bank called Park Avenue Bank?

21   A.  Yes.

22   Q.  And how do you know that bank?

23   A.  In my capacity as an examiner with the FDIC, I conducted

24   several examinations of Park Avenue Bank.

25   Q.  And about when did you first become involved in examining

1  Park Avenue Bank?

2  A.  In 2005, I was in charge of the bank exam of Park Avenue

3  Bank, and I believe that was my first exposure to the bank.

4  Q.  And were the deposits of Park Avenue Bank insured by the

5  FDIC?

6  A.  Yes.

7  Q.  And at your first examination, what was the bank's

8  condition at that point?

9  A.  The bank's -- we found the bank's condition at that exam to

10  be less than satisfactory.  Essentially, the FDIC rates banks

11  on a scale of one being the strongest, and five being the

12  weakest.  And we rated the bank a three, which is less than

13  satisfactory.

14        So that means we had concerns, and there were things

15  that the bank needed to do to prevent further deterioration.

16  Q.  And did you end up examining Park Avenue Bank again?

17  A.  Yes.  I was also the examiner in charge, and the next time

18  I was exposed was the 2008 examination of Park Avenue Bank.

19  Q.  And what was your role at that examination?

20  A.  I was also in charge of the exam in 2008.

21  Q.  And what was the condition of the bank in 2008?

22  A.  The condition of the bank had deteriorated, and it was a --

23  it was rated a four, which we call deficient.  So that's a

24  higher level of concern than it was when I previously examined

25  it.  You know, there's things that warrant -- that need to be

1   corrected to bring the bank back to a satisfactory condition.

2   Q.  And what were the FDIC's concerns at that point?

3   A.  At that point, we had concerns with the asset quality was

4   not satisfactorily.  The bank didn't have enough capital.  We

5   were concerned that they didn't have enough liquidity, that we

6   wouldn't be able to handle contingencies and things that would

7   come up.  And we were also concerned that management was not

8   performing in a satisfactory manner.

9           So there were concerns in a variety of areas at that

10  exam.

11  Q.  And what do you mean by asset quality?

12  A.  Asset quality, usually loans are the largest asset group,

13  and at Park Avenue Bank, you know, I believe they were.  So

14  when we say asset quality concerns, based on our sample that we

15  reviewed of the loans, we were concerned that there would be a

16  lot of losses in the loan portfolio, and that would flow

17  through to the bank.  And we had concerns about the bank's

18  ability to continue on a -- you know, as it was going, because

19  of these concerns with asset quality.

20  Q.  Did you present your 2008 findings to the board of

21  directors?

22  A.  Yes, we did.

23  Q.  Are you familiar with someone named Mendel Zilberberg?

24  A.  Yes, I am.

25  Q.  And who is he?

1    A.  He was a director at Park Avenue Bank.

2    Q.  Other than your presentations to the board, do you remember

3    any specific interactions with him?

4    A.  I do not remember any other specific interactions, other

5    than -- other than that.

6    Q.  Are you familiar with what are called board minutes?

7    A.  Yes, I am.

8    Q.  And what are board minutes?

9    A.  Board minutes are a -- sort of a record of the Board's

10   discussion at their regular meeting, discussing the business of

11   the bank.

12   Q.  And do you review them as part of your examination?

13   A.  We review them at every examination.

14            MS. MCLEOD:  And, Mr. Carbone, if you can pull up just

15   for the witness and counsel Government Exhibit 811.  And if you

16   could just scroll a little bit just to allow counsel to see.

17            Okay.  All right.  And you can scroll back up to the

18   top, Mr. Carbone.  Thank you.

19            All right.  Government Exhibit 811 was in one of the

20   stipulations I read earlier.  The government offers Government

21   Exhibit 811.

22            THE COURT:  Any objection?

23            MR. BRAFMAN:  No objection, your Honor.

24            THE COURT:  It will be admitted into evidence as

25   Government Exhibit 811.

1            (Government Exhibit 811 received in evidence)

2    Q.  Okay.  So directing your attention to the top of the

3    exhibit, what's the date of the meeting?

4    A.  October 29, 2008.

5            MS. MCLEOD:  Okay.  And, Mr. Carbone, you can go to

6    the -- if you can expand the -- sort of the second third of the

7    page.  Okay.

8    Q.  Towards the bottom it says, "Todd Goldman started the

9    meeting."  Is that you?

10   A.  Yes.

11   Q.  Okay.  Was that the meeting at which you presented the

12   findings of the exam?

13   A.  Yes, it is.

14           MS. MCLEOD:  Okay.  Mr. Carbone, if you could go -- if

15   you could click out of this, and let's start with liquidity.

16   Q.  And it notes that a rating of four was recommended on

17   liquidity.  What did you convey to the board of directors about

18   the bank's liquidity at this point in 2008?

19   A.  We conveyed to them that liquidity was deficient, so we had

20   substantial concerns with their ability to fund every -- fund

21   what needed to be funded on a day-to-day basis.

22           MS. MCLEOD:  And then if we can go to the next page,

23   Mr. Carbone, and let's look at capital.

24   Q.  Okay.  And it says a rating of four was recommended for

25   capital.

1    What did you convey to the bank about the capital of

2    the bank?

3    A.    That capital was deficient.  Meaning that they -- they

4    needed to get more capital essentially, that we -- this was not

5    a satisfactorily level of capital based on the level of capital

6    and the bank's risk profile.

7    Q.    Does "capital" just mean money, or what do you mean by

8    "capital?"

9    A.    Capital is essentially -- it's assets minus liability.  So

10   it's really what the bank would have left -- if a bank paid off

11   all its liabilities, sort of what they would have left to be

12   able to meet any obligations or -- so that cushion is the

13   bank's capital.

14   Q.    Okay.  And then towards the bottom of this it says "asset

15   quality recommended a three, or a fair rating."

16           What did you convey to the board about the asset

17   quality at this point?

18   A.    That asset quality was less than satisfactory, that we had

19   concerns both with the amount of classifications, and the way

20   the credits were administered.

21   Q.    And what do you mean by amount of classification?

22   A.    That we compared the level of classifications to capital,

23   and, you know, we had some concerns about the level of

24   classifications.  It's sort of like a warning indicator that --

25   you know, that this could be a problem, but it's when it's less

1    than satisfactory, it's made the radar, but it's not, you

2    know -- it is not yet deteriorated to a large scale concern.

3    Q.  Did you have concerns about underwriting at the bank at

4    this point?

5    A.  Yes.

6    Q.  And were those concerns conveyed as well?

7    A.  Yes.

8         MS. MCLEOD:  Thank you, Mr. Carbone.

9    Q.  At a high level, what were you trying to convey to the

10   board of directors at the 2008 meeting?

11   A.  We were really trying to convey that, hey, we've seen

12   deterioration at the bank, you know.  The board and management

13   need to do a better job of controlling risk at the institution,

14   and we're trying to give them a road map of saying, hey, these

15   are the things you really need to address, because we have a

16   high level of supervisory concern.  And if you don't address

17   these things, you know, the concern is just going to grow.

18        So that's really the big picture.  You know, hey, you

19   need to address these things, because they're -- the viability

20   of the bank could be threatened.

21   Q.  And you testified a little bit earlier about a regulation

22   that governs insider loans.  Do you recall that?

23   A.  Yes.  Regulation O.

24   Q.  And in basic terms, what is regulation O?

25   A.  Regulation O basically says that if you're going to make a

1    loan to an insider, it should be in the same terms and

2    conditions that you and I, who aren't insiders, would be able

3    to get if we went to the bank.  If you had the exact same

4    credit, the exact same assets, everything, you should get the

5    same rate and the same loan.  And if you don't, because you're

6    an insider and you get a preferential rate, that's the concern,

7    and that's a supervisory concern, because the concerns are the

8    insiders are using their position to benefit themselves, which

9    is a big concern.

10   Q.  Does the FDIC expect the banks to have a policy in place

11   about regulation O?

12   A.  Yes.

13   Q.  And as part of your examination, do you review the bank's

14   credit policy?

15   A.  We do.

16           MS. MCLEOD:  Mr. Carbone, could you pull up for the

17   witness and counsel what's been marked for identification as

18   Government Exhibit 51?

19           Okay.  And this was in one of the stipulation I read.

20   The government moves into evidence Government Exhibit 51.

21           THE COURT:  Any objection?

22           MR. KAPLAN:  No objection.

23           THE COURT:  It will be admitted into evidence as

24   Government Exhibit 51.

25           (Government Exhibit 51 received in evidence)

1      MS. MCLEOD:  And, Mr. Carbone, the bank policy, 2009,

2   if you could go to page 5.  And if you could expand the

3   paragraph that starts, regulation O.

4   Q.  "It is the policy of the Park Avenue Bank to comply with

5   all requirements of regulation O by assuring that any extension

6   of credit to any of its executive officers, directors,

7   principal shareholders, or any related interests of these

8   persons are made on substantially the same terms, conditions,

9   including interest, and underwriting procedures that are not

10  less stringent than those prevailing at the time for comparable

11  transactions by the bank with other persons not covered by

12  regulation O."

13      And is this consistent with your understanding of

14  regulation O?

15  A.  Yes, it is.

16      MS. MCLEOD:  And, Mr. Carbone, if you can go to page

17  7.  And if you can, under "credit authorities," if you can

18  expand the paragraph underneath it.

19  Q.  The second sentence here reads, "the board of directors

20  must approve all extensions of credit subject to regulation O."

21      Do you see that?

22  A.  Yes.

23  Q.  All right.

24      MS. MCLEOD:  Thank you, Mr. Carbone.  Oh, actually,

25  I'm sorry, can you pull it up?  I have one more thing.

1          If you go to page 6, Mr. Carbone.

2    Q.   Now, Mr. Goldman, you testified earlier about some of the

3    information that banks look at when they're assessing whether

4    to give a loan, and if we look at the very bottom of this page,

5    it says "prohibited loans."

6          Just give a second for the jury to read it.

7          And then if we turn to the next page, when it

8    continues, it says, the bank will not extend credit, you know,

9    for the following.  The second bullet point from the bottom

10   reads, "loans to borrowers with poor character and/or

11   reputation."

12         Does that relate to your earlier testimony about

13   considerations in lending?

14   A.   Yes, it does.  Character is one of the -- is one of the

15   most important things involved in underwriting, and the bank is

16   making a -- you know, a very important point that, you know,

17   you don't want to be making loans to borrowers with poor

18   character, for example, folks who haven't previously paid back

19   their debts.  They have a practice -- you know, they have a

20   pattern of doing that, you know.  Other concerns like that.

21         So everything starts with the character, and then once

22   you understand the character, then you look at the rest of the

23   underwriting.

24         MS. MCLEOD:  Thank you, Mr. Carbone.

25   Q.   And what happened after the 2008 bank examination?

1   A.  I was sent back to conduct the 2009 examination.

2   Q.  But between the 2008 and the 2009 examination, did the FDIC

3   continue to keep in contact with the management at the bank?

4   A.  Yes.  Basically, this would be done in two fashions:  One,

5   the FDIC office would have regular communication with bank

6   management over the course of the year between exams, and there

7   would also be some type of visit between the exams, where an

8   examiner or more than one examiner would actually go on site to

9   review certain -- a few things, certain key things.

10          So it's very important when you have a bank with this

11  type of condition, that you don't wait for an exam that the

12  FDIC wants to make sure that work is being done before they go

13  to the next exam.

14  Q.  And were those communications also directed to the board?

15  A.  Yes.

16  Q.  Okay.  You mentioned that you participated in the 2009

17  examination.  Approximately when did that examination occur?

18  A.  It started in September of 2009 I believe.

19  Q.  And what was the condition of the bank at that point?

20  A.  We found that the condition of the bank had deteriorated

21  from the 2008 examination.

22  Q.  And what were the specific issues facing the bank?

23  A.  At this point, we found that the -- we had a great deal of

24  concerns with the asset quality of the bank.  We had a great

25  deal of concerns with the management of the bank, the other

1    oversight by the board, the performance of management, that was

2    critically deficient.  Insufficient capital, liquidity.  They

3    also didn't have enough liquidity -- really, the problems were

4    in basically all areas, I believe, except for sensitivity to

5    market risk.  But, basically, it was a situation where,

6    basically, the condition, it deteriorated to what we call

7    critically deficient.

8         Critically deficient means that if something isn't

9    done immediately, or as soon as possible, we don't expect the

10   bank to be able to continue as a -- as an operating institution

11   if they don't take, you know, decisive, substantial action

12   really.  You know, when I say immediately, as soon as possible.

13   We expect that there's a good chance that the bank would fail.

14        So it was -- that's what we found when we conducted

15   the exam.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

1            MS. McLEOD:  OK.  One second.

2            Mr. Carbone, could you pull up for the witness and

3    counsel what's been marked for identification as Government

4    Exhibit 816, and you can scroll a little bit just to allow

5    everybody to see it.

6            All right.  The government offers Government

7    Exhibit 816.

8            MR. BRAFMAN:  No objection.

9            THE COURT:  What's the number?

10           MS. McLEOD:  816.

11           THE COURT:  It will be admitted into evidence.

12           MS. McLEOD:  Mr. Carbone, if we could start at the

13   first page.

14           (Government's Exhibit 816 received in evidence)

15   BY MS. McLEOD:

16   Q.  At the top it says "Minutes of the Meeting of the Board of

17   Directors, the Park Avenue Bank, December 16, 2009."  It says

18   the meeting took place at 7 Times Square.  And is

19   Mr. Zilberberg One of the people who's identified as present?

20   A.  Yes.

21           MS. McLEOD:  Thank you, Mr. Carbone.

22   Q.  And are you also present?

23   A.  Yes, I am.

24   Q.  It says that FDIC is there and NYSBD is there.  Who's

25   NYSBD?

1    A.   That's the New York State Banking Department.

2    Q.   Why would they be there?

3    A.   We have a joint examination process.  And what that means

4    is both the FDIC and New York State will examine banks that

5    have this type of state charter.  So sometimes we do it

6    together, like we did here, because the condition of the bank

7    is of substantial concern, so we examine it together.

8    Sometimes we alternate, but essentially, it's a joint process.

9    We both examine the bank, and we produce one report to the bank

10   to communicate all the regulatory expectations and findings

11   that we have.

12        MS. McLEOD:  Mr. Carbone, can you go to page 7,

13   please.

14   Q.   Was this the meeting at which you presented the findings of

15   the 2009 examination?

16   A.   Yes, it was.

17   Q.   It states in the second paragraph that Ms. Velasquez stated

18   that she and Mr. Goldman of the FDIC would be presenting the

19   results of the exam conducted as of June 30, 2009, with loan

20   information updated to September 30, 2009.

21        What does that mean?

22   A.   That means that we have what we call an "as of" date where

23   we'll look at all the loans as of a certain date, but then we

24   will look at future developments because we don't want to be —

25   if stuff's changed, we don't want to say, OK, this is what it

1   was June 30, but this is what it is now.  It's more important

2   now.

3             So what this is saying here is that we started off,

4   the exam was as of June 30, the loan information, but because

5   the classifications were so high, we updated it to

6   September 30, 2009, so that the balances would be more current,

7   so it would be more representative of what the condition was.

8   And it was done because of the high level of classifications.

9   The high level of problem assets, we needed to know, hey,

10  what's the situation right now more accurately.

11            MS. McLEOD:  Mr. Carbone, can you click out, please.

12  Q.  All right.  Let's start with management, and the rating is

13  5.  What does that mean?

14  A.  5 is critically deficient.  It is the lowest rating that we

15  assign.  And what it means when we're talking about management

16  is it —— not only is the performance of management poor and it

17  needs to improve, but we're also saying that management itself,

18  you're going to require changes, whether it's to the management

19  or to the board.  So not only are the people there not

20  performing, doing what they need to do, but you need to

21  strengthen the people who are there because it's that

22  concerning when we have a situation like this with management.

23  Q.  "As you conveyed, as of March 31, 2008, the bank dropped to

24  adequately capitalized.  Since then, total assets have grown

25  every quarter despite both the dictates of prudence and

1  regulatory concerns.  The director's failure to stop asset

2  growth is a significant failure of the board's fiduciary

3  responsibility."

4          What does that mean?

5  A.  Again, the board of directors is responsible for the

6  overall direction of the institution, the overall oversight.

7  So it was extremely concerning, this type of situation, because

8  the capital, which is really your safety margin for the risk

9  that you have, so the capital's getting lower.  And when you

10 increase and make more loans, you're magnifying the problem

11 because we know that the asset quality is bad, so they're

12 making a number of bad loans.  So they're making more bad

13 loans, which means your capital has to protect against more bad

14 assets, and your capital already is low.

15         So it really is — it's just an imprudent thing to do.

16 You know, you either need to — you know, you need to grow

17 capital first so then you can grow the loans.  And like I said,

18 it's even worse because you're putting — since the

19 underwriting is so weak, you're putting a number of bad loans

20 on the books as well.  So it's really — from multiple

21 directions it's a very concerning situation.

22 Q.  So by "asset growth," you meant lending?

23 A.  Primarily that would be lending, yes.

24         MS. McLEOD:  Mr. Carbone, can you go to the next page,

25 and let's look at the first paragraph.

1    Q.  So it says you stated the board had ceded excessive

2    authority to Mr. Antonnucci.  Who was Mr. Antonucci?

3    A.  He was the chief executive officer of the bank.

4    Q.  It says:  "He was the chief lending officer on nine loans.

5    The board did not question the loans of $1.5 million approved

6    by Mr. Antonucci and Mr. Beyer in which there were no

7    commitment letters.  Liens were not filed correctly, financial

8    information was either incomplete or negative, and the

9    guarantor was Mr. Antonucci's business partner."

10             I'm going to skip to the last sentence.

11             "You stated that the credit policy had allowed this

12   type of activity without going to the credit committee, and

13   board oversight was deficient."

14             What is the credit committee?

15   A.  The credit committee is a committee of the board of

16   directors that's going to review kind of the underwriting of

17   larger credits and make sure that it's consistent with the

18   bank's policies and it's the type of loans the bank should be

19   making.

20   Q.  And had your concerns about underwriting previously been

21   conveyed to the board?

22   A.  Yes, they had.  Throughout the exam we were communicating

23   them.  We were discussing individual loans and communicating to

24   them the weaknesses we were seeing in underwriting at the

25   institution.

1            MS. McLEOD:  Mr. Carbone, if you can expand the next

2    paragraph.

3    Q.  You mentioned a loan to Easy Wealth, an entity owned by

4    Mr. Antonucci, in violation of Reg O.  Why did you mention this

5    loan?

6    A.  It was just an egregious loan because not only was it a

7    poor loan, but it was a loan that an insider benefited from.

8    So, in effect, he's using his position to harm the bank while

9    benefiting himself.  So not only is this a concern because it's

10   a poor loan, but it's a concern because it's poor management

11   practices involved with it.  So it's concerning on a number of

12   levels, because it involves an insider.

13           MS. McLEOD:  Mr. Carbone, can you turn to page 9.

14   Q.  Let's look at capital, which appears also to have a 5

15   rating.  What did you convey to the board with the capital

16   situation?

17   A.  When we assign a 5 rating to capital, we're saying it's

18   critically deficient.  And what we mean by that is, hey, if you

19   don't get more capital, if you don't get people to invest in

20   this or somehow get more capital in this bank extremely soon,

21   this bank is not going to be viable.  It can't continue as a

22   bank because we have concerns about the depositors.  We want to

23   — we are protecting the depositors.  So we can't allow — if

24   capital stays like this, we can't allow this bank to continue

25   to operate at this kind of level.

1          So it's extremely concerning from a supervisory point

2     of view.  It's the highest level of concern, and it requires

3     urgent action.

4          MS. McLEOD:  Mr. Carbone, can you turn to page 10, and

5     let's look at the asset quality, which also appears to be a 5.

6     Q.   What did you convey to the board about asset quality?

7     A.   Again, we told them it was critically deficient; meaning,

8     not only was the level of classified assets really high, but

9     the underwriting, the way they're underwriting these loans, is

10    not satisfactory.  So any additional loans we have concerns

11    about.  And the way they're managing these loans also is not

12    satisfactory.

13         So we're extremely concerned because poor assets lead

14    to losses, and losses erode the bank's capital and, again, it

15    exacerbates the problems at the bank.  And that's why, you

16    know, in conjunction with the low level of capital, it's so

17    concerning, these concerns with asset quality.

18         MS. McLEOD:  Mr. Carbone, can you please turn to

19    page 11.

20    Q.   At the top where it says "Mr. Vogel," who's Mr. Vogel?

21    A.   He was the assistant regional director with the New York

22    region of the FDIC.

23    Q.   He conveyed to the board that ⸺ I'm looking in the middle

24    of the paragraph ⸺ that the loan portfolio is the board's

25    responsibility, and we hold the board accountable.  "The board

1    needs to show they did everything they could to make sure the

2    bank was sound and had accurate books and records.  We will

3    take action against the board and against individuals.

4    Management and the board have been deplorable.  If there is a

5    capital investment opportunity brought to the regulators, we

6    will not stall the process, but we will not be making any

7    accommodations and will not accept any contingencies."

8            What was being conveyed to the board here?

9    A.  He was really emphasizing, number one, how concerned we

10   were with the condition and the fact that, you know, despite

11   corrective action being —— you know, as I said, we had warned

12   them about things in the past and things that continued to get

13   worse, and he was really stressing that, you know —— that not

14   only is it the board's responsibility to do what they can to

15   improve this situation, but he noted that the individual

16   directors, you know, were responsible as well.  It's part of

17   their responsibility as being a director.

18           And, again, he could not be stronger with —— you know,

19   he really wanted the board to know that, hey, you know, you're

20   responsible for this.  You need to do something, and it's

21   urgent.  You need to do something now.  And, you know, at the

22   end he was just stressing that they needed to bring in capital,

23   not a promise of capital or some sort of contingency, but there

24   needed to be something material, a material amount of capital

25   brought in to be able to potentially save this institution.

1           MS. McLEOD:  Mr. Carbone, can you please turn to

2    page 12.

3    Q.  And the second paragraph reads:  "The bank is in very dire

4    straits.  They are very close to issuing a PCA which says the

5    bank has a maximum of 90 days before resolution, and the bank

6    should expect it sometime in January.  The 90 days is not a

7    guarantee, and if necessary, regulators will close the bank

8    sooner.  In the meantime, nobody should do anything that

9    jeopardizes the franchise value of the bank."

10          What was being conveyed to the board here?

11   A.  Well, PCA stands for prompt corrective action.  And

12   essentially, when capital reaches a certain point, in effect

13   the FDIC is mandated to take certain action because the idea is

14   to minimize the losses.  So he's stressing to the bank that ——

15   you know, that at most you have 90 days after this is issued,

16   and if things deteriorate further, it could even be sooner.

17          So, you know, again, this is really just emphasizing

18   again the urgency and really putting a number on it so the

19   bank, they would be aware that not only do they need to take

20   corrective action, but they need to take it quickly, extremely

21   quickly.  And it's —— again, this is as dire as it gets in ——

22   you know, when we're dealing with a bank, and that's what

23   Mr. Vogel was trying to stress to the directors.

24          MS. McLEOD:  Thank you, Mr. Carbone.

25   Q.  Mr. Goldman, what was the point of your last involvement

1    with Park Avenue Bank?

2    A.   When the charter was pulled by New York State, the FDIC

3    came for the —— what they call the resolutions process where we

4    work to maximize what we can from the failed bank.  I was there

5    that weekend when the bank closed in case they needed my

6    institutional knowledge during the closing process.  And so

7    that was the last time —— the weekend the bank was closed was

8    the last time I was involved with the Park Avenue Bank.

9    Q.   And approximately when did it close?

10   A.   March of 2010.

11   Q.   What happened to it when it closed?

12   A.   When it closed, some of the assets went to another bank,

13   and the —— I really don't get involved in that process.  But,

14   you know, the insured depositors would be paid off, and like I

15   said, another bank, I know, took some of the assets.  And it's

16   really that process that we have an area of the FDIC that deals

17   with that.

18            MS. McLEOD:  No further questions, your Honor.

19            THE COURT:  Cross-examination.

20            MR. KAPLAN:  Judge, could we take the morning break

21   before cross-examination?

22            THE COURT:  Sure.  We'll take a ten-minute break,

23   ladies and gentlemen.  Don't discuss the case.  Keep an open

24   mind.  I'll see you in ten minutes.

25            (Jury excused)

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  OK.  We'll continue in ten minutes.

3           (Recess)

4           THE COURT:  You can be seated.  Are we ready to

5    proceed?

6           MR. BRAFMAN:  We, your Honor.  We would ask the Court

7    give the Reg O instruction now, if you would.  It's been

8    mentioned numerous times in the witness' testimony on direct,

9    and we would ask that the Court give that instruction now

10   rather than let them speculate that he's charged with violating

11   Regulation O.

12          THE COURT:  All right.  What's the government's

13   position?  Same?

14          MS. McLEOD:  Yes, we have no objection to that.

15          THE COURT:  All right.  I'll give that instruction

16   now.  I'm just going to modify it to say "you have heard

17   testimony about a federal regulation."

18          MR. BRAFMAN:  Yes, your Honor.

19          MS. McLEOD:  Yes, your Honor.

20          THE COURT:  All right.

21          (Continued on next page)

22

23

24

25

1       (Jury present)

2       THE COURT:  You can be seated.

3       Now, ladies and gentlemen, before we go to the

4    cross-examination, I want to give you the following legal

5    instruction.

6       Now, you've heard testimony about a federal regulation

7    which governs loans to bank insiders, for example, a bank

8    executive or member of the board of directors, during this

9    trial.  This regulation is known as Regulation O.  Because this

10   is a criminal case, I want to emphasize that while you may

11   consider a relevant factor whether the defendant violated

12   Regulation O, you may not convict the defendant merely because

13   he violated a federal regulation.  Such a violation, if you

14   find one, would merely be one factor you may consider with the

15   other evidence in this case in determining whether he acted

16   knowingly and willfully.

17       All right.  We'll go to cross-examination, Mr. Kaplan.

18       Oh, did you have something?

19       MR. KAPLAN:  The witness.

20       MS. McLEOD:  Just getting the witness.

21       THE COURT:  Let the witness take the stand.

22       Mr. Kaplan.

23   CROSS-EXAMINATION

24   BY MR. KAPLAN:

25   Q.  Good morning, Mr. Goldman.

1  A.  Good morning.

2  Q.  My name is Jacob Kaplan.  I'm one of the lawyers

3  representing Mr. Zilberberg.  I'm only going to ask you a few

4  questions, but if you don't understand my question, please let

5  me know, and I'll rephrase it.  OK?

6  A.  Thank you.

7  Q.  As part of the examination of Park Avenue Bank, did the

8  FDIC or New York State ever prohibit the bank from extending

9  real estate loans?

10  A.  Yes.

11  Q.  As part of the examination, did the FDIC or New York State

12  ever prohibit the bank from extending lines of credit?

13  A.  As part of the examination?

14  Q.  Or, to your knowledge, did FDIC ever prohibit Park Avenue

15  Bank from issuing lines of credit not related to real estate?

16  A.  Not that I recall.

17          MR. KAPLAN:  No further questions.

18          THE COURT:  Any further questions?

19          MS. McLEOD:  No, your Honor.

20          THE COURT:  Thank you, sir.  You can step down.

21          THE WITNESS:  Thank you.

22          (Witness excused)

23          THE COURT:  Will the government call its next witness.

24          MR. NESSIM:  Your Honor, at this time we plan to offer

25  several exhibits based on the stipulation that's in evidence.

1          THE COURT:  Yes, Mr. Nessim.

2          MR. NESSIM:  So, your Honor, I'm reading from a

3    portion of Government Exhibit 1002 which is already in

4    evidence.  Paragraph 2 of this exhibit reads that Government

5    Exhibits 801 to 816 are true and correct copies of minute

6    entries relating to meetings of Park Avenue Bank's board of

7    directors and subcommittees of Park Avenue Bank's board of

8    directors.

9          And I'd also like to offer the following exhibits:

10   Government Exhibits 801, 803, 805, 807 through 810, and 813

11   through 815.

12         THE COURT:  Just for the record, these exhibits are

13   board minutes?

14         MR. NESSIM:  They are board minutes, yes, your Honor.

15         THE COURT:  From different board meetings?

16         MR. BRAFMAN:  Your Honor, these are offered by

17   stipulation.

18         THE COURT:  Then they will be admitted into evidence.

19         (Government's Exhibits 801, 803, 805, 807 through 810,

20   and 813 through 815 received in evidence)

21         MR. NESSIM:  Thank you.

22         Mr. Carbone, can you please publish Government

23   Exhibit 801, and let's just zoom into the portion with

24   substance from the top.  Thank you.

25         Minutes of meeting of the board of directors, the Park

1   Avenue Bank, April 19, 2006.  Present includes a list of names.

2   Not attending, Mendel Zilberberg.

3          Mr. Carbone, if you could zoom out and turn to the

4   next page, and if you could zoom in to Regulation O section.

5          "Regulation O.  Mr. Antonucci also informed the board

6   of Regulation O item with regard to Mr. Mendel Zilberberg.

7   Mr. Zilberberg was granted a cash collateralized loan by the

8   bank of $400,000 at 7.1 percent market rate.  The board

9   ratified this loan as presented."

10          You can zoom out, please, Mr. Carbone.  Let's turn to

11   Government Exhibit 803, please.

12          This is minutes of the meeting of the board of

13   directors, the Park Avenue Bank, June 21, 2006.  Present

14   includes a list of names.  Mendel Zilberberg is listed third

15   from the bottom.

16          Mr. Carbone, if you could just highlight that section.

17   Thank you.

18          "Review and approval of board meeting minutes from

19   May 17, 2006.  To correct the previously approved credit

20   committee minutes.  The board in this meeting has ratified, as

21   amended, the credit committee minutes of April 2006 the fact

22   that the board, being aware of the Regulation O loan (M.

23   Zilberberg) had been verbally approved on 3/30/2006."

24          Mr. Carbone, you can take that down, please.  Please

25   publish Government Exhibit 814.  This reads:  "The Park Avenue

1    Bank record, board of directors meeting of July 22, 2009."

2          Mr. Carbone, please turn to the second page.  Sorry.

3    If you could actually just scroll through.  We'll stop there

4    for one moment.

5          June 17, 2009, a meeting of the board of directors

6    took place at the bank's headquarters, 460 Park Avenue,

7    New York, New York.  Present includes a list of names including

8    Mendel Zilberberg.

9          Mr. Carbone, can you please scroll to page 5 of this

10   document.  Actually, it's page 7, sorry.  The loan section, if

11   you could highlight that or zoom in to it.  Thank you.

12         "Loans:  Total loan balance was up approximately

13   3.3 million to 393.7 million.  The loans-to-deposit ratio is

14   86.99 percent, and the total loans-to-total asset ratio is

15   75.31 percent, which is slightly above the current policy

16   maximum of 75 percent.  Efforts to manage the balance sheet and

17   reduce this are underway."

18         Mr. Carbone, please take that down and publish

19   Government Exhibit 815.

20         This reads:  "Draft Minutes of the Meeting of the

21   Board of Directors, the Park Avenue Bank, November 18, 2009.  A

22   meeting of the board of directors of the Park Avenue Bank took

23   place at the bank's headquarters, 460 Park Avenue, New York,

24   New York."  At present includes a list of names, including

25   Mendel Zilberberg.

1          Mr. Carbone, if you can turn to page 4 of this

2    document.  You could zoom in to that section.

3          "Status of regulatory examination.  Mr. Price reported

4    that the following ratings had been assigned at the closeout

5    meeting:  Capital equals 5.  Earnings equals 5.  Liquidity

6    equals 4.  Sensitivity equals 3.  He added that the bank can

7    expect a long list of comments and recommendations.  There was

8    some intimation that the bank had not cleaned up the comments

9    from last year's exam.  There is a meeting scheduled with

10   Mr. Todd Goldman at 4:30 p.m. November 18, 2009, to discuss the

11   wrap-up of the exam."

12         Mr. Carbone, please turn to page 10 of this exhibit.

13   Let's zoom in to the final update.

14         Final Update.  The following key financial indicators

15   as of October 31, 2009, were reviewed and discussed.  I'll read

16   from the balance sheet portion, if you could just highlight

17   that section.

18         "Total cash decreased by approximately 11 million to

19   18.3 million.  Net loans decreased by approximately

20   .756 million to 384.s million.  Total securities decreased by

21   approximately 9.6 million to 92.9 million.  Total assets

22   decreased approximately .878 million to 525.8 million."

23         You could take that down.  Thank you.

24         MS. McLEOD:  If we can ── can we proceed with the

25   next?

1          THE COURT:  Yes, please.

2          MS. McLEOD:  The government calls Abraham Kahan.

3          THE COURT:  Would you step up and just stand in the

4    witness box.

5    ABRAHAM KAHAN,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8          THE COURT:  You can inquire, Ms. McLeod.

9          MS. McLEOD:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MS. McLEOD:

12   Q.  Mr. Kahan, how old are you?

13   A.  I am 56 years old.

14   Q.  Where did you grow up?

15   A.  In Brooklyn.

16   Q.  How far did you go in school?

17   A.  I went to yeshiva.

18   Q.  What languages do you speak?

19   A.  Yiddish and English.

20   Q.  What's your first language?

21   A.  Yiddish.

22   Q.  Are you currently working?

23   A.  Yes, I am.

24   Q.  What kind of work do you do?

25   A.  I work in the Crown Home Care company.

1    Q.   What kind of business is that?

2    A.   That provides home health aids for help with elderly

3    people, sick people.

4    Q.   Directing your attention to 2018, around that time did you

5    come to find yourself involved in a federal criminal

6    investigation?

7    A.   Yes, I did.

8    Q.   What happened to you in approximately 2018?

9    A.   I was arrested for bank fraud.

10   Q.   After you were arrested, what you did decide to do?

11   A.   I pled guilty.

12   Q.   Why did you plead guilty?

13   A.   Because I am.

14   Q.   As part of your guilty plea, did you enter into an

15   agreement with the government?

16   A.   Yes, I did.

17   Q.   What kind of agreement?

18   A.   A cooperating witness agreement.

19   Q.   You mention you were arrested for participating in a bank

20   fraud.   Approximately when did that fraud occur?

21   A.   At approximately 2009.

22   Q.   Do you see anyone in this courtroom who participated in

23   that fraud with you?

24        MR. BRAFMAN:   Objection to the form of the question,

25   your Honor.

1        THE COURT:  No, overruled.  He can answer the

2    question.  You can cross-examine.

3    Q.  You can stand if you need to.

4    A.  Yes, I do.

5    Q.  Who?

6    A.  Person who's sitting next to Mr. Brafman, the lawyer.

7    Q.  What's his name?

8    A.  Mendel Zilberberg.

9    Q.  At the time you became involved in the bank fraud, had you

10   previously been convicted of a crime?

11   A.  Yes, I was.

12   Q.  Approximately when?

13   A.  Approximately 2004/2005.

14   Q.  Was that in federal court or state court?

15   A.  That was in federal court.

16   Q.  Which federal court?

17   A.  Brooklyn.

18   Q.  What crime did you commit?

19   A.  Health care fraud.

20   Q.  What specifically did you do as part of that fraud?

21   A.  I gave kickbacks to receive business.

22   Q.  And how did you plead?

23   A.  I pled guilty.

24   Q.  What was your sentence?

25   A.  Five years' probation, restitution of approximately

1    $130,000, and a fine of approximately $50,000.

2    Q.  Were you still on probation in 2009 when you participated

3    in the bank fraud?

4    A.  Yes, I was.

5    Q.  Now, you testified earlier that you were arrested for bank

6    fraud in 2018.  In addition to bank fraud, were you charged

7    with other crimes?

8    A.  Yes, I was.

9    Q.  Which ones?

10   A.  Lying for the FBI.  Lying for the government.

11   Q.  Lying for the government or to the government?

12   A.  To the government.

13   Q.  And what about making false statements to a bank?

14   A.  Making false statements, yes, I was.

15   Q.  Which bank did you defraud?

16   A.  Park Avenue Bank.

17   Q.  How did you defraud that bank?

18   A.  By applying for a loan with a straw borrower.

19   Q.  What do you mean by "a straw borrower"?

20   A.  I applied for the loan with a person that name is Herschel

21   Sauber, and he did not receive anything from the loan proceeds.

22   Q.  Why did you use a straw borrower?

23   A.  I did not have good credit to take loan on my own.

24   Q.  How much was the amount of the loan?

25   A.  1,400,000.

1    Q.  Besides you, who were the other individuals involved in the

2    scheme?

3    A.  Ari Fried and Mendel Zilberberg.

4    Q.  And who was supposed to receive money from the loan?

5    A.  Myself, Ari Fried, and Mendel Zilberberg.

6    Q.  And how did you agree to split the loan proceeds?

7    A.  A third of the loan went to Mendel Zilberberg and

8    approximately the balance was between me and Ari to invest in

9    Emanuel Home Care company.

10   Q.  As part of your cooperation, have you provided information

11   regarding your conduct and the conduct of others?

12   A.  Yes, I did.

13   Q.  And as part of your cooperation, did you also reveal

14   additional crimes to the government that you have committed?

15   A.  Yes.

16   Q.  Did you disclose your participation in any other fraud

17   schemes to the government?

18   A.  Yes.

19   Q.  What fraud scheme?

20   A.  In — what I did is I gave wage parity funds that were

21   supposed to go to the home care employees, gave it to a

22   captive, and from the captive I received profits which was

23   laundered through a shell company to myself.

24   Q.  What do you mean by a "captive"?

25   A.  A company where I gave the money to.

1    Q.  You mentioned that you also laundered money as part of that

2    scheme, is that correct?

3    A.  Yes.

4    Q.  As part of your cooperation agreement, did you plead guilty

5    to those crimes as well?

6    A.  Yes, I did.

7    Q.  And approximately when did that fraud occur?

8    A.  Approximately '17, '18.

9    Q.  During the course of your cooperation, did you also —— did

10   you also accept responsibility for lying to federal agents?

11   A.  Yes, I did.

12   Q.  What did you lie about?

13   A.  I minimized my partnership and involvement in the home care

14   company.

15   Q.  How so?

16   A.  I said that I'm just an employee.

17   Q.  And what was ——

18   A.  Not that I'm a partner.

19   Q.  Sorry, what was the truth?

20   A.  No, it was not.

21   Q.  So sorry, let me ask you one more time.  I think I confused

22   you.

23          What was the lie that you told?

24   A.  That I'm not a partner in the company.  I minimized my

25   involvement as a partner in the company.

1    Q.   And is lying to federal agents a crime?

2    A.   Yes, it is.

3    Q.   Did you plead guilty to that crime as well?

4    A.   Yes, I did.

5    Q.   Now, you testified that you've pled guilty.  Have you been

6    sentenced yet?

7    A.   Not yet.

8    Q.   What is your understanding of the maximum sentence you

9    could face based on the crimes that you pled guilty to?

10   A.   130 years.

11             MS. McLEOD:  Mr. Carbone, can you pull up for the

12   witness and counsel what's been marked as 3503-087, and if you

13   could scroll just to show the witness the document.  You can

14   keep going until the signature page.  OK.  And you can go to

15   the top.  Sorry, that was the wrong page.  Keep going.

16             All right.  Thank you.  And if we can go to the very

17   top, Mr. Carbone.

18   Q.   Do you recognize this document?

19   A.   Yes, I do.

20   Q.   What is it?

21   A.   Cooperating agreement.

22             MS. McLEOD:  Your Honor, the government offers

23   3503-87.

24             THE COURT:  Any objection?

25             MR. BRAFMAN:  No objection.

1          THE COURT:  It will be admitted into evidence.

2          (Government's Exhibit 3503-87 received in evidence)

3          MS. McLEOD:  OK.  Mr. Carbone, you can publish.

4     BY MS. McLEOD:

5     Q.  Is this your entire agreement with the government?

6     A.  Yes.

7     Q.  It's a number of pages, so I'm not going to read it.  But

8     I'm going to let the jury take a look at the first page.

9          If you'd go to the second page, and if you can go to

10    the next page.

11         OK.  If we look at the second full paragraph of this

12    page, it is understood that you shall truthfully and completely

13    disclose all information and shall cooperate fully, shall

14    attend all meetings, shall truthfully testify before the grand

15    jury and at any trial and other court proceeding, shall commit

16    no further crimes whatsoever, shall bring to the office's

17    attention all crimes that you have committed.  Is that your

18    understanding of your obligations under the agreement?

19    A.  Yes, I do.

20         MS. McLEOD:  Mr. Carbone, you can take that down.

21    Q.  What's your understanding of what the government will do if

22    you abide by the terms of the agreement?

23    A.  Write a letter to the judge.

24    Q.  What is the purpose of the letter?

25    A.  To give my background and that I am truthfully testifying

1    in court.

2    Q.  Does that letter go to the sentencing judge, the judge who

3    will sentence you?

4    A.  Yes.

5    Q.  What's your understanding of whether the government will

6    make a recommendation about the sentence you should receive?

7    A.  They will not.

8    Q.  Who determines what your sentence will be?

9    A.  The judge.

10   Q.  If the government sends the letter to the judge, what's the

11   maximum sentence you could face?

12   A.  130 years.

13   Q.  What sentence do you hope to receive by cooperating with

14   the government?

15   A.  Probation.

16   Q.  Has anyone from the government or anyone else made any

17   promise to you about what your sentence will be?

18   A.  No, they did not.

19   Q.  In addition to prison time, do you face any other

20   consequences at sentencing?

21   A.  Yes, I do.

22   Q.  What sort of consequences?

23   A.  Pay restitution.

24   Q.  And will you have to pay back the money you received as

25   part of your crimes?

1    A.  Yes, I will.

2    Q.  Is that true whether or not the government writes this

3    letter?

4    A.  Yes, it is.

5    Q.  If you violate the terms of your cooperation agreement,

6    what's your understanding as to whether the government will

7    still write the letter to the judge?

8    A.  They will not.

9    Q.  If you violate the terms of your cooperation agreement,

10   what's your understanding of whether you can take back your

11   guilty plea?

12   A.  I cannot.

13   Q.  If you lie during your testimony today, what's your

14   understanding of what could happen?

15   A.  Charged with additional crime.

16   Q.  What's your understanding of what would happen to your

17   cooperation agreement?

18   A.  It will be voided.

19   Q.  What's your understanding of whether the defendant has to

20   be convicted in this case in order to get a letter from the

21   government?

22   A.  He does not have to.

23   Q.  Directing your attention to 2009, what was your financial

24   condition at that time period?

25   A.  I did not have steady income at that time.

1    Q.  And why was that?

2    A.  I did not have a job.  I did not have a business that

3    produced income for me.

4    Q.  Were you taking any steps to improve your financial

5    condition?

6    A.  Yes, I did.

7    Q.  What were you doing?

8    A.  I was applying to obtain a home equity line of credit to my

9    house.

10   Q.  What was the amount of the loan that you were trying to

11   get?

12   A.  $400,000.

13   Q.  Could you obtain that loan on your own?

14   A.  No.

15   Q.  Why not?

16   A.  I did not have good credit score, good credit.

17   Q.  So what did you do?

18   A.  I asked my friend Hesche Sauber if he can be a cosigner on

19   the loan or co-borrower on my loan.

20   Q.  Had you previously asked Mr. Sauber for financial help?

21   A.  Yes, I did.

22   Q.  And what kind of financial help?

23   A.  I asked he should borrow me $60,000.

24   Q.  By "borrow," do you mean lend you?

25   A.  Yes, lend me $60,000.

1   Q.  And did you pay Mr. Sauber back for those loans?

2   A.  Very minimum.  About $5,000, if I correct — remember

3   correct.

4   Q.  Going back to the home equity loan, do you remember what

5   bank you were seeking that loan from?

6   A.  I do not recall the name of the bank.

7   Q.  Was it Park Avenue Bank?

8   A.  No, it was not.

9   Q.  Now, did you take any steps to try to convince Sauber to

10  help you with this loan?

11  A.  Yes, I did.

12  Q.  What did you do?

13  A.  I added him on to the deed of my house.

14          MS. McLEOD:  Mr. Carbone, can you pull up what's in

15  evidence as Government Exhibit 219.

16  Q.  This is, if you look at the top, document type, deed.

17  Document date, June 6, 2009.  Do you see that?

18  A.  Yes, I do.

19  Q.  And then if we can look at the middle area, address,

20  1264 57th Street.  And what address is that?

21  A.  My home.

22  Q.  Then it says "Grantor/seller, Toby Kahan."  Who is Toby

23  Kahan?

24  A.  My wife.

25          MS. McLEOD:  Thank you, Mr. Carbone.

1  Q.  Did you plan to keep Sauber on the deed for your house

2  forever?

3  A.  No.

4  Q.  What was the plan?

5  A.  Once I pay off the $400,000, he goes down from the deed.

6  Q.  And did you eventually take Mr. Sauber off the deed?

7  A.  Yes.

8  Q.  Are you familiar with someone named Aron Fried?

9  A.  Yes.

10  Q.  How do you know him?

11  A.  I know him from previous business dealings.

12  Q.  Around the same time, did you have any conversations with

13  Mr. Fried about a business opportunity?

14  A.  Yes, I did.

15  Q.  Can you describe those conversations?

16  A.  Ari Fried told me that he's looking to raise money to buy a

17  home care company.

18  Q.  And was there anything that he was looking for from you?

19  A.  He asked if I could bring him, at that point, investors.

20  Q.  And did you do that?

21  A.  I brought one potential investor.

22  Q.  And who was the potential investor?

23  A.  My uncle.

24  Q.  And where did you bring him?

25  A.  To Mendel Zilberberg's office.

1    Q.  Whose idea was it to have it at Mr. Zilberg's office?

2    A.  Ari told me to go to Mendel Zilberberg's office.

3    Q.  And who was at this meeting?

4    A.  Myself, my uncle, Ari Fried, and Mendel Zilberberg.

5    Q.  And what happened at the meeting?

6    A.  Basically, Mendel Zilberberg gave a whole presentation

7    about future investment of Emanuel Home Care.

8    Q.  Prior to this meeting, had you met Mr. Zilberberg before?

9    A.  I know of him, but I've — I don't remember being a client

10   of his and meeting him for business.

11   Q.  And I'm sorry, what was the business opportunity that

12   Mr. Zilberberg described?

13   A.  To invest — it was approximately a million dollars to

14   invest in the home care company.  I don't remember the exact

15   amount or percentage.  I think it was about 10 percent or

16   something.  I'm not clear what was discussed at the meeting

17   exactly.

18   Q.  And just to be clear, who — why was Fried there?

19   A.  Fried told me that Mendel is involved and helping him out,

20   and he's involved in this business investment.

21   Q.  Did your uncle decide to invest?

22   A.  No, he did not.

23   Q.  You testified earlier about a home equity loan that you

24   were trying to get with Mr. Sauber.  Did that loan ever close?

25   A.  No.

1    Q.   Did you discuss that fact with Mr. Fried?

2    A.   Yes.

3    Q.   And what did you tell him?

4    A.   Basically told him that I believe I remember that I

5    received a commitment, and it was basically with some stuff

6    that have to be taken care of to close, and it was not ready to

7    close yet.

8    Q.   And what was his response?

9    A.   He told me that I should reply to Park Avenue Bank.  That

10   he can help —— he, Ari Fried, can help me get a loan there

11   through his attorney Mendel Zilberberg.

12   Q.   And did you tell Mr. Fried about Mr. Sauber's involvement

13   in the loan?

14   A.   Yes, I did.

15   Q.   What did you tell him?

16   A.   I told him basically that on my other loan I have applied

17   with Hesche Sauber because my credit is not good.  So I need to

18   speak —— and I added him to the deed so I could get the loan

19   with him.  So I need to add him on to the bank, to this loan.

20   He should make sure that everything is OK, it's proper.

21   Q.   And did Mr. Fried come back to you with a response?

22   A.   Yes.

23   Q.   What did he say?

24   A.   Said it's OK.

25   Q.   And who did he tell you that information came from?

1    A.  Mendel Zilberberg.

2    Q.  Did you take Fried up on his offer to apply for a loan at

3    Park Avenue Bank?

4    A.  Yes.

5    Q.  What did you do next?

6    A.  I hold Hesche to apply to Park Avenue Bank.

7    Q.  And initially what was the loan amount that you were

8    seeking?

9    A.  $400,000.

10   Q.  Did that loan amount ever change?

11   A.  Yes, it did.

12   Q.  Why did it change?

13   A.  Ari Fried came over to me, and he said that — he brought

14   me the application, and he told me that Mendel Zilberberg told

15   him that if Paulina, Hesche's wife, was going to sign on the

16   loan, it could get approved to $1,400,000.

17   Q.  And were there any conditions on getting the loan approved

18   up to a higher amount?

19   A.  Yes.

20   Q.  What was the condition?

21   A.  A third of the loan should be loaned to Mendel Zilberberg.

22   He needs it for short term, for an investment of a business of

23   — I think it's a nursing business that he has.  And then he

24   offered me that the rest of the loan money we'll invest in

25   Emanuel Home Care, and I'll become a partner in Emanuel Home

1    Care.

2    Q.  And what is Emanuel Home Care?

3    A.  That's the company eventually that Ari Fried bought with

4    the proceeds of the loan.

5    Q.  So just to be clear, your — you would receive a portion of

6    the loan, is that correct?

7    A.  Correct.

8    Q.  Where would your portion of the loan go?

9    A.  Emanuel Home Care, to invest in the business.

10   Q.  And what would you receive in return for your investment?

11   A.  Just a little bit less than 10 percent profit from the

12   yearly profit plus a job, salary.

13   Q.  Where was the other third of the loan going to?

14   A.  Mendel Zilberberg.

15   Q.  Sorry, the other third, the third third?

16   A.  Ari Fried.

17   Q.  And what did he tell you, if anything, about what he was

18   going to do with that money?

19   A.  He told me that that has to go to Mendel Zilberberg.

20   Q.  Sorry, the third for himself, for Mr. Fried.

21   A.  Basically, the full amount other than the third that went

22   to Mr. Fried is going to be invested in Emanuel Home Care.

23   Q.  Who would be responsible for making payments on the loan?

24   A.  Ari Fried, Emanuel Home Care.

25   Q.  What did you do after Fried — sorry, withdrawn.

1          Did you agree to proceed with the $1.4 million loan?

2   A.  I basically told him that he has to meet with Hesche Sauber

3   to let him know because I'm taking out the loan with Hesche

4   Sauber.

5   Q.  And did you all agree to proceed with the higher amount?

6   A.  Yes.

7   Q.  Do you know who filled out the loan application, if there

8   was one?

9   A.  I have no recollection of that.

10  Q.  Did you provide information that was needed for the loan to

11  anyone?

12  A.  If you can be a little more clear with the question.

13  Q.  In order to get the loan processed, did you provide

14  information that was relevant to the loan processing to any

15  person?

16  A.  Yes, I did.

17  Q.  Who did you provide that information to?

18  A.  Herschel Sauber.

19  Q.  And sorry, just to clarify, did you provide the information

20  to Mr. Sauber or did you get the information from Mr. Sauber?

21  A.  I get — the question was to — what was the question?

22  Q.  It was who did you provide the information to?  Who did you

23  give the information to?

24  A.  I gave the information to Herschel Sauber.

25  Q.  OK.  Anyone else?

1  A.  If you can — I think I'm little bit confused with the

2  questions.

3  Q.  Let me rephrase the question.

4        What sort of information — did you at any point have

5  any information that was relevant to the loan processing?

6  Documents, for example.

7  A.  Yes.

8  Q.  And what sort of documents?

9  A.  Whatever the documents was.  I don't recall exactly

10  documents.  But Ari Fried would speak to me, and then I would

11  ask it from Hesche Sauber.

12  Q.  So you would get the documents that were needed from

13  Mr. Sauber?

14  A.  Correct.

15  Q.  And then provide them to Mr. Fried?

16  A.  To Mr. Fried.

17  Q.  You testified earlier that you didn't fill out a loan

18  application, but were you ever given a copy of the application?

19  A.  Yes, I was.

20  Q.  In what context?

21  A.  When Ari Fried told me, here's the application, I should

22  take the application and have — tell Hesche that Paulina

23  should sign it.  If she sign it, then it can be approved for

24  $1,400,000.

25  Q.  Did you ever direct Mr. Sauber what to tell the bank?

1   A.  Yes, I did.

2   Q.  And what did you tell him?

3   A.  Ari Fried told me that Mendel told him that he's going to

4   get a phone call from the bank to discuss the loan, and he

5   should basically say that it's going to be a business

6   investment loan.

7   Q.  That Sauber should say that?

8   A.  Yes.

9   Q.  A business investment loan for whose business?

10  A.  For Sauber.

11  Q.  Was that true?

12  A.  No.

13  Q.  Do you remember whether you gave that message to Sauber?

14  A.  Yes, I did.

15  Q.  Mr. Kahan, are you a member of any particular religion?

16  A.  Yes, I am.

17  Q.  What religion?

18  A.  Jewish faith.

19  Q.  Does your religion have any limitations on lending?

20  A.  Yes, it does.

21  Q.  At a high level, what is the limitation?

22  A.  In order to pay or receive interest, it has to be done with

23  a special form that's called heter iska.

24          MS. McLEOD:  OK.  If we could pull up just for the

25  witness and counsel what's been marked for identification as

 1   the Government Exhibit 418.

 2   Q.  What type of document are we looking at, just the type?

 3   A.  Email.  Copy of an email.

 4   Q.  Do you recognize this email?

 5   A.  I do.

 6   Q.  Are you a recipient of the email?

 7   A.  Yes, I am.

 8           MS. McLEOD:  The government offers Government

 9   Exhibit 418.

10           MR. BRAFMAN:  No objection.

11           THE COURT:  Which number is that?

12           MS. McLEOD:  418.

13           THE COURT:  418.  Any objection?

14           MR. BRAFMAN:  No objection.

15           THE COURT:  It will be admitted into evidence.

16           (Government's Exhibit 418 received in evidence)

17   BY MS. McLEOD:

18   Q.  So let's look at — is this an email chain?

19   A.  Yes, it is.

20   Q.  So let's look at the bottom email first.

21           If you can expand that, Mr. Carbone.  Can you actually

22   expand the whole email, Mr. Carbone.  Sorry, the whole bottom

23   email.

24           OK.  The bottom email says it's from Mordechai Freund.

25   Who is that?

1   A.   He works for Mendel Zilberberg.

2   Q.   And who is the email to?

3   A.   Ari Fried.

4   Q.   What's the date of the bottom email?

5   A.   Wednesday, September 16, 2009.

6   Q.   "Subject:  Heter iska.  Attached two heter iska.  One needs

7   to be signed by you and one by Kahan.  The one we need to sign

8   is here in our office.  Please get it signed before money

9   transfers hands."

10          OK.  If we look at the top email, was that — did

11  Fried forward that email to you?

12  A.   Yes, he did.

13  Q.   And did that email he forwarded have any attachments?

14  A.   Yes, he did.

15          MS. McLEOD:  Let's look at the next page of the

16  document, Mr. Carbone.

17  Q.   Is this one of the attachments?

18  A.   Yes, it is.

19  Q.   And what is it?

20  A.   Heter iska form between myself and Ari Fried.

21          MS. McLEOD:  If we can go to the next page,

22  Mr. Carbone.

23  Q.   And what's this?

24  A.   A heter iska between Herschel Sauber and myself.

25  Q.   Was this also attached to the email?

1    A.  Yes.

2            MS. McLEOD:  Thank you, Mr. Carbone.  You can take

3    that down.

4    Q.  Was the $1.4 million loan ultimately approved?

5    A.  Yes, it was.

6    Q.  How did you learn of the loan's approval?

7    A.  Ari Fried told me that the loan got approved.

8    Q.  Before the loan closed, did Fried tell you anything?

9    A.  Yes.

10   Q.  What did he tell you?

11   A.  He said I should make sure that once the loan is closed

12   that $466,000 should go to Mendel Zilberberg right away.

13   Q.  If not, what would happen?

14   A.  It will be called off, the loan.

15   Q.  And were you at the loan closing?

16   A.  I was by the house with Mordechai Freund.  I don't have

17   recollection being inside at the actual closing.

18   Q.  Did you sign any of the actual loan documents?

19   A.  No, I did not.

20   Q.  Was the loan eventually disbursed?

21   A.  Yes, it was.

22           MS. McLEOD:  Can we pull up for witness and counsel

23   what's been marked as Government Exhibit 416.

24   Q.  What type of document are we looking at?

25   A.  Copy of an email.

1    Q.  Do you recognize this document?

2    A.  Yes, I do.

3    Q.  Are you a recipient?

4    A.  Yes, I am.

5         MS. McLEOD:  The government offers Government

6    Exhibit 416.

7         MR. BRAFMAN:  No objection.

8         THE COURT:  Any objection?  It will be admitted into

9    evidence as Government Exhibit 416.

10        (Government's Exhibit 416 received in evidence)

11        MS. McLEOD:  Mr. Carbone, you can expand just the ——

12   yeah, yeah, that's great.

13   BY MS. McLEOD:

14   Q.  Starting with the bottom email, what's the date of the

15   bottom email?

16   A.  Wednesday, 16 September 2009.

17   Q.  Who is it from?

18   A.  Mordechai Freund.

19   Q.  And again, who is he?

20   A.  He works for Mendel Zilberberg.

21   Q.  And who is it to?

22   A.  Myself.

23   Q.  And what's the subject line?

24   A.  Sauber.

25   Q.  The first line says, "Please make sure that he signs a

1    drawdown request for $466,000."

2            What is the amount of $466,000 referring to?

3    A.  The one-third of the loan that was loaned to

4    Mr. Zilberberg.

5    Q.  And the next sentence reads, "Then that money should be

6    transferred into Aron Fried account number," etc.

7            What did you understand this direction to mean?

8    A.  The money that's going to be — that's going to end up by

9    Mendel Zilberberg's account should go to Ari Fried's account.

10   Q.  Why is the money being sent to Fried instead of directly to

11   Zilberberg?

12   A.  That's how he requested that the drawdown should go.

13   Q.  And the third sentence, "I'm in Manhattan, taking the

14   original docs to the bank," do you know what that is in

15   reference to?

16   A.  My understanding is that he told me that he's taking the

17   original loan documents that was just closed to the bank, to

18   the Manhattan branch of Park Avenue Bank.

19   Q.  And did you follow the directions given to you here?

20   A.  I believe I did, yes.

21           MS. McLEOD:  Thank you, Mr. Carbone.

22   Q.  Apart from the loan closing documents and a drawdown

23   request, did you ask Sauber to sign anything else?

24   A.  Yes, he did.

25   Q.  What did you ask him to sign?

1   A.  Sign me some blank checks so I can use from the loan.

2   Q.  And why did you ask him to sign those blank checks?

3   A.  So I can use the proceeds from the loan directly without

4   asking him every time signature.

5   Q.  Approximately how much of the loan money ended up with

6   Mr. Fried?

7   A.  At the total, approximately 900,000 was between myself and

8   Ari Fried's went into the purchase of Emanuel Home Care

9   Services.

10  Q.  And focusing on September 2009, did you keep any part of

11  the loan for yourself?

12  A.  I may have kept some.  I don't recall what amount was by

13  me.

14  Q.  Did you later benefit from additional funds from the loan?

15  A.  Sorry?

16  Q.  Did you later benefit or receive additional money from the

17  loan?

18  A.  Indirectly, yes.

19  Q.  How so?

20  A.  I was — I am a partner in Emanuel Home Care Services.  I

21  started working there.  I received salary, and then when Ari

22  said I should no longer stay an employee in the business

23  because Gilah Jacobowitz didn't want me to be there, so he

24  advanced me money.  I went into a trucking company.  So he

25  advanced me money from my profits for the trucking company.  So

1    I received more funds then.

2    Q.  Are you familiar with a company known as Ads Here, Inc.?

3    A.  Yes.

4    Q.  What is that?

5    A.  That is my company.

6    Q.  What does it do?

7    A.  Did advertisement, mobile billboards.

8    Q.  How about Outdoor Ads?

9    A.  Same thing.

10   Q.  Is that your company?

11   A.  Yes.

12   Q.  Were those companies involved with the loan money?

13   A.  Yes.

14   Q.  How?

15   A.  I draw down some money into those accounts, and then I gave

16   it to Ari Fried.

17   Q.  How much money from the loan did Mr. Sauber keep?

18   A.  Zero.

19   Q.  After the loan money was disbursed, did you have any

20   additional meetings with Mr. Zilberberg?

21   A.  Yes, I did.

22           MS. McLEOD:  OK.  If we can, Mr. Carbone, if we can

23   pull up for the witness and counsel what's been marked as

24   Government Exhibit 435.

25           All right.  The government offers Government

1    Exhibit 435.

2                  MR. BRAFMAN:  No objection.

3                  THE COURT:  It will be admitted into evidence.

4                  (Government's Exhibit 435 received in evidence)

5                  MS. McLEOD:  If we can just expand just the text area.

6    BY MS. McLEOD:

7    Q.  What are we —— what is this, Mr. Kahan?

8    A.  This is a copy of invite for a meeting.

9    Q.  And what's the subject at the very top?

10   A.  Meet Michael Ross.

11   Q.  Who is Michael Ross?

12   A.  A home care attorney.

13   Q.  Home care attorney?

14   A.  Health care attorney.

15   Q.  Health care attorney.

16   A.  Sorry.

17   Q.  And what was the date of the meeting?

18   A.  November 25, 2009.

19   Q.  Who is the organizer?

20   A.  Mendel Zilberberg.

21   Q.  And did this meeting happen?

22   A.  Yes, it did.

23   Q.  Whose idea was the meeting?

24   A.  Ari Fried and Mendel Zilberberg.

25   Q.  What was the purpose of the meeting?

1    A.  To review my previous indictment that I have in home care,

2    making sure that I can appropriately work in the home care

3    company, Emanuel.

4    Q.  By review your indictment, the fact that you had been

5    convicted of a felony in the past?

6    A.  Yes, I was.

7            MS. McLEOD:  Mr. Carbone, if you could pull up what is

8    marked as Government Exhibit 432.

9    Q.  What kind of document is this?

10   A.  This is a copy from an email.

11   Q.  Are you a recipient of the email?

12   A.  Yes, I am.

13           MS. McLEOD:  The government offers Government

14   Exhibit 432.

15           MR. BRAFMAN:  No objection.

16           THE COURT:  It will be admitted into evidence as 432.

17           (Government's Exhibit 432 received in evidence)

18           MS. McLEOD:  If you can just expand the text portion,

19   Mr. Carbone.

20   BY MS. McLEOD:

21   Q.  OK.  What's the date of the email?

22   A.  December 15, 2009.

23           MS. McLEOD:  Mr. Carbone, if you can expand the whole

24   email, including the title of the sender.

25   Q.  The original message is from Stacey Lopez.  Says "Assistant

1    to Mendel Zilberberg."  Do you see that?

2    A.  Yes.

3    Q.  "Subject:  Meeting on Friday with Mr. Zilberberg."  Do you

4    see that?

5    A.  Yes.

6    Q.  The email is to you, is that correct?

7    A.  Yes.

8    Q.  And also to Ari Fried?

9    A.  Yes.

10   Q.  Did this meeting happen?

11   A.  Yes.

12   Q.  And who was at the meeting?

13   A.  Myself, Ari Fried, and Mendel Zilberberg.

14   Q.  What was the purpose of the meeting?

15   A.  To discuss my employment and my — my partnership in

16   Emanuel Home Care Services.

17   Q.  What specifically was discussed?

18   A.  That I'm going to be approximately 10 percent partner.

19   Cannot be full 10 percent in home care.  On the 10 percent you

20   can get right away.  Plus I will get a — I'll get a salary as

21   an employer plus profits of the — my employment in Emanuel

22   Home Care.

23         And he also mentioned to me that he's working on the

24   documents, and he's going to give me the actual documents.  He

25   kind of said this is the deal, but the documents is coming

1  because there's more partners and more paperwork that has to be

2  done in Emanuel Home Care.  He'll give it to me once it's done.

3  Q.  When you say "he," who do you mean?

4  A.  Mendel Zilberberg.

5  Q.  Did you ever receive the documents that he was referencing?

6  A.  No.

7  Q.  Before your involvement in this criminal investigation,

8  were you involved in any other investigations of the loan from

9  Park Avenue Bank?

10  A.  I was subpoenaed by the FDIC.

11  Q.  And did you discuss — and was the FDIC conducting an

12  investigation?

13  A.  Yes, it was.

14  Q.  Did you discuss that investigation with Mr. Fried?

15  A.  Yes, I did.

16  Q.  Was he aware of the investigation?

17  A.  Yes, he was.

18  Q.  How was he aware?

19  A.  He told me he also received a subpoena.

20  Q.  And what did you discuss about the FDIC investigation with

21  Mr. Fried?

22  A.  Basically, he told me that he also received a subpoena and

23  that he has hired an attorney, and he's also going to hire

24  attorney for me and is going to pay me all the expenses for the

25  subpoena.

1    Q.  Did he tell you anything about what he was going to tell

2    the FDIC?

3    A.  Yes, he did.

4    Q.  What did he say?

5    A.  He said basically that the money that he gave to Mendel

6    Zilberberg was to pay bills.

7    Q.  And to your understanding, was that true?

8    A.  No.

9    Q.  Why not?

10   A.  My understanding was, the way he told me original about the

11   loan, in order to get the loan, a third of the loan should be

12   borrowed to Mendel Zilberberg for an investment that he needs

13   in — he needs it short term for his nursing company or

14   something.

15   Q.  And did you have an attorney representing you for the FDIC

16   investigation?

17   A.  Ari Fried got me an attorney, yes.

18   Q.  So, sorry, who selected that attorney?

19   A.  Ari Fried.

20   Q.  Who paid for that attorney?

21   A.  Ari Fried.

22   Q.  And during the FDIC investigation, did you provide a sworn

23   statement to the FDIC?

24   A.  Yes, I did.

25   Q.  Were you truthful in that statement?

1    A.  Not fully, no.

2    Q.  During that statement, did you disclose the involvement of

3    Mr. Zilberberg in the $1.4 million loan?

4    A.  I did not.

5    Q.  Why didn't you tell the truth?

6    A.  I was just hiding the fact to protect myself and everybody

7    from the investigation from the loan.

8    Q.  What do you mean by protecting yourself and everybody?

9    Who's everybody?

10   A.  Myself, Ari Fried, and Mendel Zilberberg being directly

11   involved from the loan.

12   Q.  What ultimately happened to the debt on the loan?

13   A.  It was settled.

14   Q.  And did you have any involvement with the settlement?

15   A.  Indirectly.

16   Q.  What was your involvement?

17   A.  I was between Ari Fried and Hesche Sauber.  Whatever needed

18   to be done, if there was a question, it was related through me.

19   Q.  Do you know if any part of the loan was repaid?

20   A.  Ari told me that he paid $400,000 from the loan.

21   Q.  Did you ever repay any part of the loan?

22   A.  No, I did not.

23   Q.  As far as you know, did Mendel Zilberberg repay any part of

24   the loan?

25   A.  I'm not aware of that.

1   Q.  Approximately when was the last time you spoke with

2   Mr. Zilberberg?

3   A.  I would say a decade ago.  Long time ago.

4            MS. McLEOD:  No further questions, your Honor.

5            THE COURT:  Why don't we take the lunch break at this

6   point in time.  We'll break until 1:50, and we'll pick up at

7   that time.  We're making good time.  I think we're ahead of

8   schedule, and I want to keep it so.

9            I'll see you at 1:50.

10           (Jury not present)

11           MS. McLEOD:  Your Honor, can the witness step down?

12           THE COURT:  Yes, we'll continue at 1:50.  I'll see

13  everyone then.

14           (Lunch recess)

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              1:50 p.m.

3            (In open court; jury not present)

4            THE COURT:  Thank you.  You may be seated.

5            You can put the witness back in the box.

6            THE COURT:  You can be seated.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE DEPUTY CLERK:  Jury entering.

3              THE COURT:  You can be seated.

4              Would you do me a favor?  Just pull the microphone

5    down a little closer to your mouth.

6              Thank you.

7              Mr. Brafman, cross-examination.

8              MR. BRAFMAN:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. BRAFMAN:

11   Q.  Good afternoon, Mr. Kahan.

12   A.  Good afternoon.

13   Q.  You and I have never discussed the facts of this case; is

14   that correct?

15   A.  That is correct.

16             THE COURT:  Mr. Brafman, could you just point the

17   microphone a little closer to your mouth?

18             MR. BRAFMAN:  Sorry, your Honor.

19   Q.  You and I have never discussed the facts of this case,

20   correct?

21   A.  Yes, that is correct.

22   Q.  Could you tell us how many times you've gone over with the

23   government the facts?

24   A.  I went over with them a lot of times.  I don't have a count

25   how many times.

1    Q.   More than ten?

2    A.   Possibly.

3    Q.   Less than 20?

4    A.   No.  No.

5    Q.   Excuse me?

6    A.   I cannot give you a number how much, but it was a lot of

7    times.

8    Q.   A lot of times, and each of those times, and words, and

9    substance they asked you at least some of the questions they

10   asked you today; is that correct?

11   A.   That is correct.

12   Q.   So these were like rehearsals?

13   A.   Correct.

14   Q.   Now, can I ask you a question?  You are 56; is that

15   correct?

16   A.   Yes.

17   Q.   Can you tell this jury, since your adult life, let's say

18   since you're 25, how many crimes you have committed, either

19   state or federal?

20   A.   Yes.  I did admit the crimes that I did.

21   Q.   I'm sorry?

22   A.   Yes, I did tell them the crimes I did today in my

23   testimony.

24   Q.   You told them the crimes that you were caught doing; is

25   that correct?

1   A.  I tell them the crimes that I feel that I did.

2   Q.  But you don't know whether or not your activities over the

3   years violated the law in other areas; is that correct?

4   A.  I presume that I didn't -- I'm not aware of any other

5   crimes that I did.

6   Q.  Okay.  So in the last 25 years, your suggestion -- your

7   testimony is that the only crimes that you committed were the

8   crimes that you plead guilty to in Brooklyn 25, 20 years ago,

9   and the crimes you admitted to in the Southern District of New

10  York in the last two or three years; is that correct?

11  A.  Based on my recollection, I've been admitting myself all

12  the crimes that I did.

13  Q.  All right.  Can you tell me, Mr. Kahan, in meeting with the

14  government, on the occasions that you met with them, before you

15  got your cooperation agreement, you signed what are known as

16  proffer agreements; is that correct?

17  A.  Yes.

18  Q.  And the proffer agreement says basically, this is not a

19  cooperation agreement, but it is a proffer so that we can

20  evaluate your testimony, before they decide whether to give you

21  a cooperation agreement; is that correct?

22  A.  Yes.

23  Q.  But you knew that every time you met with the government

24  and signed a proffer agreement, your obligation was to tell the

25  truth; is that correct?

1    A.  That is correct.

2    Q.  And can you tell us, or tell the jury, how many times you

3    met with the government when you looked them in the eye and

4    lied primarily about your wife's ownership or your ownership of

5    Crown of Life?

6    A.  Multiple times.

7    Q.  How many times?

8    A.  Multiple times.

9    Q.  More than five?

10   A.  Probably, yes.

11   Q.  Okay.  Now at the time that you said that, you did this

12   knowingly and intentionally, correct?

13   A.  That is correct.

14   Q.  And it wasn't until months later or years later where you

15   ultimately admitted that with respect to Crown of Life, you

16   personally had an ownership interest; is that correct?

17   A.  That is correct.

18   Q.  And when they confronted you, did you tell them in words or

19   substance that you didn't tell them the truth, because you were

20   in denial; is that correct?

21   A.  Yes.

22   Q.  That's the words you used?

23   A.  I don't recall the words that I used.

24   Q.  Well, I'm going to -- when you have an inability to recall

25   when we get to those proffer sessions, I'm going to show you

1   notes that were taken when you were in the room to see if it

2   refreshes your recollection.

3           MS. MCLEOD:  Objection.

4           THE COURT:  I'm going to sustain it as to the form of

5   the question.  You shouldn't identify the documents --

6   Q.  Okay.  When you were in the room, you knew that the agents

7   were taking notes; is that correct?

8   A.  Yes.

9   Q.  And one or more agents were taking notes?

10  A.  Yes.

11  Q.  And primarily there were two law enforcement agencies that

12  were in the room with you, the FBI, investigators of the

13  Department of Health, OIG people; is that correct?

14  A.  That is correct.

15  Q.  Okay.  Now let me ask you a question, going back to your

16  plea of guilty in 2006, that had nothing to do with banks,

17  correct?

18  A.  That is correct.

19  Q.  It had to do with Health Star Industries, correct?

20  A.  That is correct.

21  Q.  And that was a durable medical equipment company that you

22  owned at the time?

23  A.  That is correct.

24  Q.  And durable medical equipment, I'll call it DME for short,

25  they basically covered wheelchairs, crutches, any type of

1   equipment that you might need if you were disabled, or old, or

2   sick, or frail, correct?

3   A.  That is correct.

4   Q.  And in that case, what you did was you made arrangements

5   with employees of the Oxford health insurance company to give

6   them bribes or kickbacks, correct?

7   A.  That is correct.

8   Q.  And this was your idea, right?

9   A.  Yes, it was.

10  Q.  And you took an employee of Oxford, and you essentially

11  corrupted him, correct?

12  A.  Correct.

13  Q.  Now, what you did was you said "if you give me business,

14  I'll give you a percentage of the money I get?"

15  A.  That is correct.

16  Q.  And the money you got was from either Medicare or Medicaid,

17  right?

18  A.  That is correct.

19  Q.  So what you did basically was you intentionally violated

20  the law, and you knew at the time it was wrong?

21  A.  Correct.

22  Q.  And not only did you pay kickbacks to the Oxford employees,

23  you ultimately hired one of them to be your sales

24  representative?

25  A.  Correct.

1  Q.  And you didn't understand at the time, or did you

2  understand at the time that it was a criminal idea?

3          MS. MCLEOD:  Objection to form.

4          THE COURT:  Sustained as to form.

5  Q.  I'll withdraw it, as to form.

6          You knew it was a crime to do that, didn't you?

7  A.  To do what?

8  Q.  To give Oxford money to give you business?

9  A.  To do that, yes, that is a crime.

10  Q.  And when you hired them to be a salesperson for your

11  company, did you understand that to be a crime?

12  A.  It is not a crime.

13  Q.  It is not a crime.  So while he was working for Oxford, you

14  hired him?

15  A.  No, I did not.

16  Q.  So it was after he left Oxford?

17  A.  Correct.

18  Q.  And his job was to get you payments from Oxford, correct?

19  A.  His job was to bring business through Health Star.

20  Q.  But you hired him primarily because you knew he had

21  experience in the industry, right?

22  A.  Yes.

23  Q.  Okay.  Now, in addition to this, paying that employee from

24  Oxford, you had him corrupt another employee; is that correct?

25          MS. MCLEOD:  Objection.

1          THE COURT:  Overruled.  You can answer.

2     Q.  Did you have him corrupt another employee?

3     A.  I don't know if I had him corrupt, if I made him corrupt

4     another employee.

5     Q.  But you did pay another employee as well?

6     A.  Yes, I did.

7     Q.  So there were two employees that you paid for sending you

8     business, correct?

9     A.  Correct.

10    Q.  And you understood those to be kickbacks, correct?

11    A.  Correct.

12    Q.  And who were those employees?

13    A.  From Oxford.

14    Q.  I know, but who were they?

15    A.  What do you mean who were they?

16    Q.  What are their names?

17    A.  I don't recall their names.

18    Q.  And how much money did you pay them?

19    A.  I don't remember.  It was a very long time ago.  It was a

20    substantial amount of money.  I don't remember the amount.

21    Q.  Is it hundreds of thousands of dollars?

22    A.  I believe not.

23    Q.  No?

24    A.  No.

25    Q.  Okay.  So it went on for several years though?

1    A.  I do not recall that it went on for so long.

2    Q.  Well, this was 20 years ago, correct?

3    A.  At least.

4    Q.  Okay.  And the loan in this case was in 2009, so that's

5    about 15 years ago, 14 years ago, correct?

6    A.  Okay.

7    Q.  Excuse me?

8    A.  If you say -- yes.

9    Q.  All right.  Now, when you testified under oath here this

10   afternoon, did you testify about pleading guilty to the

11   Brooklyn kickback scheme?

12   A.  Yes.

13   Q.  And when you plead guilty to the kickback scheme, what did

14   you actually -- what did you actually explain to the Court?

15   A.  I don't understand your question.

16   Q.  Well, do you remember your indictment in that case?

17   A.  Yes.

18   Q.  And your indictment indicated that not only were they

19   taking kickbacks, but they also gave you inflated prices for

20   the equipment they were authorizing, right?

21   A.  I do not recall all the details from the indictment.

22   Q.  Well, I am not asking you all the details.  That seems to

23   be one detail that's outlined in your indictment.

24           MS. MCLEOD:  Objection.  If counsel could please let

25   the witness answer the question before proceeding to the next

1    question.

2            THE COURT:  Overruled.  He can answer.

3            THE WITNESS:  I don't remember all the details that

4    was in the indictment.

5            MR. BRAFMAN:  Okay.  Can I ask for the Brooklyn

6    indictment, 3503025, to be put on the screen just for the

7    witness and for counsel and for me?

8            MS. MCLEOD:  Objection as to identifying a document if

9    it's being used to refresh recollection.

10           MR. BRAFMAN:  That's what we're going to use it for.

11           THE COURT:  I know, but just identify the document by

12   exhibit number.

13           MR. BRAFMAN:  3503025.

14           THE COURT:  You want that document before you?

15           MR. BRAFMAN:  Yes.

16   Q.  Do you have it, sir?

17   A.  Yes.

18   Q.  And this is an indictment filed in the Eastern District of

19   New York against you, right?

20           MS. MCLEOD:  Objection.  The same objection,

21   identifying the document.

22           THE COURT:  No.  He can ask him whether or not he

23   recognizes that document.

24           MS. MCLEOD:  Oh, this is not to refresh recollection?

25           MR. BRAFMAN:  It is to refresh his recollection, but

1    how do I ask him to refresh recollection without letting him

2    know what the document is?

3              THE COURT:  If the two of you want to argue, you can

4    go outside, but --

5              MS. MCLEOD:  Can I be heard at --

6              THE COURT:  No.  He can ask about the information in

7    the previous indictment, whether it is accurate.

8              MS. MCLEOD:  I agree, if it's refreshing recollection.

9              THE COURT:  Well, it's not refreshing recollection.  I

10   don't buy that argument.  So ask what you want about the

11   substance.

12   Q.  Yes.  Do you remember inflating prices for the equipment

13   these people are authorizing?

14   A.  I do not recall what's on the indictment.

15   Q.  Okay.  Can you look at page 3, read it to yourself, and

16   tell me if paragraph 8 alleges -- refreshes your recollection.

17   A.  Here it says, it doesn't --

18             MS. MCLEOD:  Objection.

19             THE COURT:  Okay.  What is your question?

20   Q.  Does it refresh your recollection that one of the charges

21   against you alleged that, in return for kickbacks, they gave

22   you inflated prices for the durable medical equipment they were

23   authorizing?

24   A.  This is not what it says on this piece --

25   Q.  No.  I asked if it refreshes your recollection.

1    A.  It does not.

2    Q.  Okay.  This was your own indictment, correct, that you

3    plead guilty to?

4            MS. MCLEOD:  Objection.  This is not in evidence, your

5    Honor.

6            THE COURT:  Overruled.  You can answer that question.

7    Q.  Is that correct, sir?

8    A.  Yes.

9    Q.  Okay.  Now, I want you to also -- did you plead guilty to a

10   conspiracy in that case, if you recall?

11   A.  Yes.

12   Q.  And does it indicate who the other co-conspirators were?

13   A.  I don't recall the details of the indictment.

14   Q.  Okay.  Now, if you could look -- I'm sorry.  If you -- does

15   it tell you whether or not the invoices that you submitted for

16   reimbursement were false or not false?

17   A.  I do not recall to -- sending false invoices.  I remember

18   giving kickbacks to get business to just come my way instead of

19   going to another company.

20   Q.  Right.  And you got reimbursed by Oxford for these

21   invoices, correct?

22   A.  I got reimbursed, yes.

23   Q.  And were you reimbursed at a higher rate or a standard

24   rate?

25   A.  If my memory's correct, I got the approved rate I had with

1    them in the contract.

2    Q.  Okay.  Now, in order to get this business, you had to give

3    them money, correct?

4    A.  Please rephrase the question.

5    Q.  In order to get the business from Oxford, you had to pay

6    these guys, correct?

7    A.  For these guys to send business to myself, I paid them.

8    Q.  And they approved this -- they had the authority to approve

9    or disapprove your submitted claims, correct?

10   A.  I don't -- I have no recollection of that.  I have no

11   knowledge of that, of them approving --

12   Q.  Tell the jury, how did the scheme work -- let me see -- in

13   your own words?

14   A.  The way it worked is, basically, I had a surgical supply

15   company, and if a doctor needed supplies, from the whole

16   burrough, let's say Manhattan, it needs supplies, if a patient

17   is an Oxford patient, they would send it to Oxford, and it

18   would go down to a person who would order it.  They have a

19   choice to order the supplies that a patient needs by anybody

20   that they choose, as long as it's in the contract.  So, you

21   know, what equipment is ordered, they can choose to order it by

22   company A, company B, company C.  So I gave kickbacks, so

23   instead of giving them to company A, they gave it to my

24   company.  And I plead guilty for that crime, and I am guilty

25   for it.  I took responsibility for it.

1    Q.  Now, did you pay them each month?  How was your

2    arrangement?

3    A.  I don't recall paying them each month.

4    Q.  Well, did you pay them by cash or in checks?

5    A.  I don't recall how the payments were done.

6    Q.  Come on, you -- I'm sorry.  Withdrawn.

7         This is your crime that you plead guilty to, and you

8    don't remember whether you paid them by cash or by check?

9    A.  I don't remember if it was cash, check, or by gifts.

10   Q.  What?

11   A.  I don't remember if it was by check, cash, or gifts.  I

12   don't remember how it was paid.

13   Q.  If you paid them by cash, who did you get the cash from?

14   A.  I don't recall how the payments were made.

15   Q.  Do you remember pleading guilty in the Eastern District on

16   this case -- on that case?

17   A.  Yes, I do.

18   Q.  Okay.  And you stood before a federal judge or a federal

19   magistrate judge?

20   A.  Yes.

21   Q.  And you entered a plea of guilty?

22   A.  Yes.

23   Q.  And you were put under oath at the time, correct?

24   A.  Yes, I was.

25   Q.  And the judge told you in words or substance you have to

1   tell the truth, or you could be prosecuted for additional

2   crimes, correct?

3   A.  Yes.

4   Q.  And you admitted to the crimes in this case, correct?

5   A.  Yes.

6   Q.  And then ultimately you had to say what you did, correct?

7   A.  I don't recall the details of my -- what I said at that

8   time.

9   Q.  And do you remember being sentenced in that case?

10  A.  Yes, I was.

11  Q.  And do you remember being sentenced by Judge Nina Gershon

12  in the Eastern District of New York?

13  A.  I don't remember the judge's name.

14  Q.  You were standing there for the first time you tell us in

15  your life about to be sentenced, and you don't remember the

16  judge?

17  A.  I do not remember the judge's name, no.

18  Q.  Was he male or female?

19  A.  I don't recall who the judge was in 2004.  I'm sorry.

20  Q.  So let me ask you this:  You told us today that you had a

21  restitution payment of $100,000; is that what you said?

22  A.  Approximately, $130,000.

23  Q.  And the 30,000 was for the fine as well?

24  A.  I believe there was a fine, an extra fine.

25  Q.  Okay.  Isn't it a fact that you were sentenced to $231,000,

1   between restitution and paying the fine?

2   A.   I don't have the calculation for both.  I remember paying

3   -- I remember it was about 50,000 -- it was a penalty of

4   approximately $50,000, and then there was a restitution of

5   approximately $130,000.  I don't recollect the exact amount.

6          MR. BRAFMAN:  Could we have the -- I'm sorry, the

7   minutes just put up for him, to see if it refreshes his

8   recollection?

9          Hold it there for a minute.

10  Q.   Could you look at this page, and see if it refreshes your

11  recollection as to whether or not this is your sentencing

12  hearing in the Eastern District of New York?

13         MS. MCLEOD:  Objection to the identification.

14  A.   I don't remember seeing the document.

15         THE COURT:  Slow down.  I couldn't hear.

16         MS. MCLEOD:  Objection again to the identification of

17  the document, which is supposed to be to refresh his

18  recollection.

19         THE COURT:  All right.  I'll allow it.

20  Q.   Could you look at the front page, and see if it refreshes

21  your recollection if this is, in fact, a copy of your

22  sentencing minutes?

23  A.   I do not remember seeing this document.

24  Q.   Okay.  Now, let's look at it again, and see if it refreshes

25  your recollection that the judge who was about to sentence you

1    was the Honorable Nina Gershon.

2    A.   Her name rings a bell.

3    Q.   It rings a bell?

4    A.   Yes.  I remember now the name, Nina Gershon.

5    Q.   So it was a woman?

6    A.   Yes.

7    Q.   Okay.  And do you remember what you said to her before she

8    sentenced you?

9    A.   No, I do not.

10   Q.   Well, do you remember appearing before her, and she

11   sentenced you -- instead of prison, she sentenced you to

12   probation, correct?

13   A.   Yes.

14   Q.   And do you remember what you said to Judge Gershon?

15   A.   I do not remember the sentencing.

16   Q.   Do you remember saying "I will never do this again?"

17   A.   Probably I did.

18   Q.   Well, what do you mean "probably?"  Did you say it or did

19   you not say it?

20   A.   I do not remember what I said in 2006 when I was in front

21   of the judge at that point.

22          MR. BRAFMAN:  Could we show him page 15, please?

23   Q.   Look at where my finger is pointed, where it's blocked out.

24          Did you say that -- does it refresh your recollection

25   that you said, "I'm very sorry for what I did.  It will never

1   happen again?"

2   A.  Again, I do not remember what I said over there by the -- I

3   don't have a recollection of my sentence in front of the judge.

4   I see what it says here on the paper.  I cannot say that I went

5   back -- that I remember now what happened in 2006 or 2004.

6   Q.  But by telling the judge, if you said it, that it will

7   never happen again, you meant that you would never commit a

8   crime again; is that correct?

9            MS. MCLEOD:  Objection.

10            THE COURT:  Overruled.

11  A.  I have no recollection of anything about what I said about

12  the sentencing in 2004, 5, or 6.  It was a long time ago.

13  Q.  Okay.  Well, let's look at the date, because the judge

14  ultimately sentenced you to probation; is that correct?

15  A.  Yes.

16  Q.  And part of the sentence is that you should make $230,000

17  restitution to Oxford; is that correct?

18  A.  I don't remember the exact number, but whatever it was, it

19  was a payment.

20  Q.  Did you pay 100,000 or 230,000?

21  A.  I paid in full everything that I have.  I do not have the

22  exact amount that I had to pay.  I'm sorry.

23  Q.  And when did you pay it?

24  A.  It was done in the time that it was supposed to be due,

25  maybe even a little bit earlier.

1    Q.  Okay.  Did you go to the Eastern District in January to get

2    a copy of a satisfaction of judgment?

3    A.  I don't remember going to get a copy of a satisfaction of

4    judgment for the document.  I do remember getting in the mail

5    that it was ready, that I have a release of the payment.

6    Q.  And when did you get that in the mail?

7    A.  Not too long ago.

8    Q.  A couple of months ago?

9    A.  Yes.

10   Q.  And did you know if the Southern District prosecutors

11   arranged for you to get that in the mail?

12   A.  I'm not aware of if they should arrange such a thing for

13   me, no.

14   Q.  Well, didn't they tell you before you testified that you

15   had to have proof that your judgment was satisfied?

16   A.  I do not have any recollection that they said it.

17   Q.  So 20 years after the fact, you just got it in the mail?

18   A.  It was very surprising to me when I received it.  It was

19   paid up, and I had a -- it was paid up right in the time that I

20   had to pay it up.

21   Q.  All right.  I'm going to show you what I want to mark for

22   identification as Kahan A.

23         I'm showing you for identification Defendant's Exhibit

24   Kahan A, and ask if you recognize this document as the

25   satisfaction of judgment from the Eastern District of New York?

1    A.   Yes.

2    Q.   And is that in connection with your own case?

3    A.   Yes.

4              MR. BRAFMAN:  I offer it into evidence, your Honor.

5              MS. MCLEOD:  No objection.

6              THE COURT:  It will be admitted into evidence.

7              (Defendant's Exhibit Kahan A received in evidence)

8    Q.   Would you look at the date?

9    A.   January 17, 2023, that date?

10   Q.   Yeah.  January 17 of 2023?

11   A.   Yes.

12   Q.   You understand that the original trial date in this case

13   was set for January of 2023?

14   A.   I do remember it was set for that time.

15   Q.   And you don't admit that that -- I'm sorry, and your

16   position is it just appeared in your mailbox one day?

17   A.   Yes.

18   Q.   Do you need a copy of the exhibit?

19             THE COURT:  What's the exhibit number?

20             MR. BRAFMAN:  Kahan A.  Kahan A.

21             THE DEPUTY CLERK:  Okay.

22             THE COURT:  I have it.

23             MR. BRAFMAN:  Thank you.

24   Q.   And is it true that the judge also sentenced you to

25   community service in connection with your Brooklyn case?

1    A.  Yes.

2    Q.  And can you tell this jury what kind of community service

3    you performed?

4    A.  I went to community service, to Hatzalah.

5    Q.  What?  I'm sorry?

6    A.  I went to community service, to Hatzalah.

7    Q.  That's a Jewish charity that helps people who are sick,

8    right?

9    A.  Yes.

10   Q.  And did the judge specifically tell you she didn't want you

11   to perform community service at a charity?

12   A.  I'm not aware of it.

13   Q.  Okay.  Let me ask you to -- if we can see page 17.

14           Can you look at page 17, and in that paragraph that's

15   been highlighted now, does it refresh your recollection that

16   the judge did not -- will not accept community service, the

17   defendant simply working at a charity of his choice?  Does it

18   refresh your recollection that she told you that?

19   A.  No, it does not.

20   Q.  So you picked Hatzalah, right?

21   A.  I don't remember how it was done.  I think it was done

22   together with my probation officer.

23   Q.  And what did you do at Hatzalah?

24   A.  I don't remember.  It was a very long time ago.

25   Q.  Well, everything in this case is a long time ago.  Your

1   memory seems to be quite refreshed about the activities in this

2   case that was 15 years ago.

3            MS. MCLEOD:  Objection, argumentative.

4            THE COURT:  Sustained, argumentative.

5   A.  Please rephrase the question.

6   Q.  What did you do for Hatzalah?

7   A.  I don't remember.

8   Q.  You did 200 hours of community service for three years,

9   that's 600 hours, and you don't remember anything about the

10  work you performed?

11  A.  I remember helping them out with certain things that they

12  asked me.  I don't remember what it was.

13  Q.  Well, you didn't become a medical technician, did you?

14  A.  No, I did not.

15  Q.  You didn't become an EMT, did you?

16  A.  No, I did not.

17  Q.  So that's an ambulance service that serves the Jewish

18  community primarily, but all communities, correct?

19  A.  Correct.

20  Q.  Have you ever used Hatzalah?

21  A.  Personally?

22  Q.  Yeah.

23  A.  I don't remember using it personally.

24  Q.  Okay.  So now you have -- you have your first proffer.  Do

25  you remember what date you had your first proffer with the

1  government?

2  A.  I do not.

3  Q.  Can I refresh your recollection that it was December of

4  2017?

5  A.  I don't remember the exact date.  It was after the arrest,

6  so I don't remember what date it was.

7  Q.  Okay.  So let's assume for the purposes of this discussion

8  that we're talking about your first proffer with the

9  government, correct?

10 A.  Correct.

11 Q.  And you signed a proffer agreement?

12 A.  Yes, I did.

13 Q.  And you had a lawyer who was with you when you signed it,

14 right?

15 A.  Yes.

16 Q.  And the lawyer essentially explained to you in words or

17 substance that you needed to tell the truth at this proffer,

18 correct?

19         MS. MCLEOD:  Objection as to attorney --

20         THE COURT:  Sustained as to the form of the question.

21         MR. BRAFMAN:  Yes, your Honor.

22         THE COURT:  About the communications with his lawyer.

23         MR. BRAFMAN:  Yes, your Honor.  Understood.

24 Q.  When you sat down with the government, you needed to tell

25 the truth regardless of what you were asked about, correct?

1    A.  Yes.

2    Q.  And you lied to them on that date, correct?

3    A.  Please be specific with the question, what I lied.

4    Q.  You tell me, what did you lie about?

5    A.  I'm not aware what you're referring to.

6    Q.  You met with the government.  They asked you questions.

7    Did you lie to them or not?

8    A.  Please be specific, what question you're referring to.

9    Q.  Let me ask you, did you tell them at that meeting that you

10   talked about the first loan that had nothing to do with

11   Mr. Zilberberg or anybody else except you and Mr. Sauber?

12   A.  I'm not -- I'm sorry.  I'm not understanding your question.

13   Q.  Did you talk about the first loan?

14   A.  Yes, I did.

15   Q.  Okay.  And let's explain, if we can, that the first loan

16   was Mr. Kahan's idea, but it had nothing to do with anybody

17   else besides you, Mr. Sauber, and Mr. Kahan, correct?

18            MS. MCLEOD:  Objection as to form.

19            THE COURT:  Overruled.  You can answer the question if

20   you understand.

21   A.  Please rephrase the question.

22   Q.  You told them about the first loan application for

23   $400,000, where you're going to get some type of a loan,

24   correct?

25   A.  Correct.

1    Q.  And that was established at a different bank, but it wasn't

2    a Park Avenue Bank?

3    A.  That is correct.

4    Q.  And what is the bank that you went to with that?

5    A.  I don't recall the name for the bank.  It was not Park

6    Avenue Bank.

7    Q.  So it wasn't Park Avenue, but you don't remember what bank

8    it was, right?

9    A.  I do not know the exact name, correct.

10   Q.  And then the woman who brokered the loan for you was Sarah

11   Hoffman?

12   A.  That is correct.

13   Q.  And she was from Muncie, correct?

14   A.  Correct.

15   Q.  And she was the one who set you up with this bank, correct?

16   A.  That is correct.

17   Q.  Have you ever testified at a criminal case involving

18   Ms. Hoffman?

19   A.  No.

20   Q.  Have you ever testified at any other criminal case except

21   this one?

22   A.  No.

23   Q.  Now, when you went to this loan, this was Mr. Kahan's idea,

24   as you understood it?

25   A.  It was myself and Hesche Sauber, correct.

1    Q.  Okay.  When you say Hesche Sauber, he was a neighbor and

2    somebody from Laurel Park who you knew and had befriended,

3    correct?

4    A.  He's not a neighbor from Laurel Park.  He's a friend of

5    mine that I know.

6    Q.  How many years do you know him?

7    A.  A lot of years.

8    Q.  Did he ever help you in the past with financial issues that

9    you had?

10   A.  Yes.

11   Q.  And you went to him and asked him, basically, help me out,

12   I need money?

13   A.  I helped him to be a cosigner on a loan.

14   Q.  Let's not talk about that.  Let's talk about when he gave

15   you 50, 60, or $70,000 years ago.

16   A.  Okay.

17   Q.  And did you go to him and say, I need money; I'm broke; I'm

18   going to be making a wedding; can you help me?

19   A.  I did ask him that he should borrow me money.

20   Q.  Lend you money?

21   A.  Lend me money.

22   Q.  And when you asked him to lend you money, you didn't draw

23   up any paperwork?  It was just him, out of the goodness of his

24   heart, giving you money?

25   A.  That is correct.

1    Q.  And out of the goodness of his heart, he never asked you

2    for anything in connection with that loan, no security, just a

3    friendship loan?

4    A.  That is correct.

5    Q.  And you've never paid that whole loan back, have you?

6    A.  I did not.

7    Q.  Okay.  So now we're moving into the loan that you talked

8    about on direct examination, the loan that's charged in this

9    indictment, okay?  Just for frame of reference.

10   A.  Okay.

11   Q.  Okay.  And in that loan, you convinced Hesche Sauber to

12   help you again, correct?

13   A.  Correct.

14   Q.  And what you told him was that you wanted to buy into a

15   health care business that was being run by Mr. Fried?

16   A.  Are you referring to the first loan?

17   Q.  The $400,000 loan.

18   A.  I have no recollection of telling Hesche Sauber that I

19   wanted the $400,000 to be as -- for this business with Ari

20   Fried.

21   Q.  But you told him you wanted $400,000?

22   A.  I told him that I am taking -- I would like to take out a

23   home equity line of credit, and because of my bad credit, I

24   need to get someone as a cosigner.

25   Q.  What you told him was you had tax problems?  You didn't

1    tell him you were a convicted felon, did you?

2    A.   He knew my past history I imagine.

3    Q.   I'm asking you whether you told him that you had tax

4    problems, which is why you needed the money?

5    A.   I do not recall what I told him at the time, and I don't

6    remember if I needed it to pay specific bills at that time.  I

7    know that I was trying to get a home equity line of credit, so

8    I can start putting myself back on my feet, or have some income

9    to work on something.

10   Q.   So, again, this was out of friendship by him to you,

11   correct?

12   A.   The cosigner was a friendship by him to me, that is

13   correct.

14   Q.   And did you arrange to transfer the ownership of your house

15   to him?

16   A.   To him -- oh, to transfer -- to add him onto the deed.

17   Q.   I'm sorry?

18   A.   He was added onto the deed.

19   Q.   Well, the deed was in your wife's name at the time?

20   A.   Correct.

21   Q.   Her name is Toby Kahan, correct?

22   A.   Correct.

23   Q.   When you told her you wanted to sign him on the lease, you

24   were going to give him $10 to do that, correct?

25   A.   I don't -- I guess.  I don't recall exactly how the

1   transaction took place.

2   Q.  But your wife ultimately signed the deed, which allowed him

3   to become a co-owner; is that correct?

4   A.  That is correct.

5   Q.  And you knew at the time that your house was worth several

6   million dollars at least, correct?

7   A.  Correct.

8   Q.  And at the time you knew also that as a -- with a criminal

9   record, it would be difficult to convince the bank to lend

10  money to you?

11  A.  Not on a home equity loan.

12  Q.  Okay.  So you went to Sauber, and whatever you told him,

13  you said, and I'd like you to transfer the deed -- I'd like to

14  transfer the deed to you, so that you can show that you have

15  some assets?

16  A.  That's not what I did.

17  Q.  But what you ultimately did is what you did, right?  That

18  ultimately happened, you transferred the deed to him, and it

19  says for $10, correct?

20  A.  What I ultimately did is I asked him that he should be a

21  cosigner on the loan, and if he would have been -- and in order

22  to be a cosigner physically, to get a loan, my understanding is

23  you don't have to transfer the deed for that alone.  For him to

24  feel secure that the loan gets paid back, his wife gave him a

25  hard time, that he should not do it, so he gave me that option,

1    which had been discussed with his attorney, and they said,

2    basically, that he will feel more secure if he has something on

3    my house.  So that's when he was added onto the deed of the

4    house.

5    Q.  And did you discuss this with your wife?

6    A.  I don't recall what I discussed with her.

7    Q.  Well, but she was the owner at the time on paper, right?

8    A.  I don't recall the discussions that I had with her.

9    Q.  But she owned the house, because you didn't want anything

10   in your name at that time, right, because you had lawsuits?

11   A.  I don't recall exactly if my name was also -- prior to her

12   was with me and her together or not.

13   Q.  We'll move on for a minute.  I'm getting a document, but

14   now let's move on to the Park Avenue Bank loan, okay?

15   A.  Yes.

16   Q.  Now, in that loan, you applied for a loan to the Park

17   Avenue Bank, but you asked Mr. Sauber to be the front for you,

18   correct?

19   A.  Yes.

20   Q.  He was going to be what we call a straw borrower, right?

21   A.  Yes.

22   Q.  Do you know what that means?

23   A.  Yes.

24   Q.  What does it mean?

25   A.  Borrower who doesn't get any of the proceeds from the loan.

1    Q.  And borrower who's not getting the loan, right?

2    A.  Correct.

3    Q.  And the decision was that you and he were going to try and

4    do this so the loan would be ultimately approved by the bank,

5    correct?

6    A.  Correct.

7    Q.  And in order to get the loan that high, you knew that he

8    had to have an asset in his name that would give the bank at

9    least some kind of security that they would not feel it would

10   be difficult to lend to him, correct?

11   A.  I'm not sure of what you're referring to.

12   Q.  Let me show you the copy of the loan application, which is

13   Government Exhibit 219.

14         MS. MCLEOD:  The deed.

15   Q.  I'm sorry.  The deed.  I misspoke.  It's the deed.

16         I'm going to show you Government Exhibit 219, which is

17   already in evidence, and ask you to look at it.  And tell me if

18   you recognize that as the deed to your home.

19   A.  Yes, I do.

20   Q.  Okay.  And this is the deed to your home, and it's --

21         MR. BRAFMAN:  If we can show it to the jury, because

22   it's already in evidence, your Honor.

23         THE COURT:  Yes.

24   Q.  And if you look at the -- where it says "parties," the

25   middle of the page, you go down a little bit -- no, down a

1   little.  Right.

2           Do you see that?

3   A.  Yes.

4   Q.  All right.  This says Toby Kahan?

5   A.  Yes.

6   Q.  To Herschel Sauber, right?

7   A.  Yes.

8   Q.  Okay.  So how did you -- what did you say to your wife in

9   order to get her to go along with this fraud?

10  A.  I don't -- the transferring -- which fraud?  Adding her to

11  the deed was not a fraud.

12  Q.  I didn't say adding her.

13  A.  Adding Hesche Sauber to the deed is not a fraud.  What's

14  the fraud?

15  Q.  Can we move up to the next page?  And the next page.

16          You see where it says, Toby Kahan, with an address at

17  1264 57th Street?  That's your home address, right?

18  A.  That is correct.

19  Q.  And Toby Kahan, with an address at 1264 57th Street, and

20  Mr. Sauber, with an address of 1477 East 27th Street, are the

21  parties to this transaction, correct?

22  A.  Yes.

23  Q.  And you see below that, it says, "witnesseth that the party

24  of the first part, in consideration of ten dollars."

25          Now, the party of the first part is Toby Kahan,

1  correct?

2  A.  Yes.

3  Q.  And she was getting $10 for the several million dollar home

4  that you were going to essentially on paper transfer to

5  Mr. Sauber?

6  A.  Hesche Sauber was added to the deed to be a collateral for

7  the 400,000 home equity loan that I was applying to take out

8  from the first bank.

9  Q.  And that was before you ever got to the Park Avenue Bank;

10  is that correct?

11  A.  That is correct.

12  Q.  And I'm asking you again, what did you tell your wife that

13  she would go along with this, to add him to the deed?

14          MS. MCLEOD:  Asked and answered, your Honor.

15          MR. BRAFMAN:  He didn't answer it.

16          THE COURT:  Overruled.

17  A.  I don't recall what I told my wife at that time.

18          MR. BRAFMAN:  You can take that down.

19  Q.  So the transfer of the house, or the putting Sauber on the

20  deed was an agreement between you and Mr. Sauber long before

21  you went to the Park Avenue Bank, correct?

22  A.  That is correct.

23  Q.  And at that time is when you agreed or you decided to use

24  him as a front, if you will, to help you get a loan, correct?

25  A.  Yes.

1   Q.  All right.  And then, ultimately, you actually produce

2   these papers in connection with the loan at the Park Avenue

3   Bank; is that correct?

4   A.  I don't recall if I'm the one who submitted the actual

5   loan.  I have no recollection of filling out the loan.

6   Q.  Was this deed used by the Park Avenue Bank?

7   A.  I don't know the details how Park Avenue did the assessment

8   on this loan.

9   Q.  Well, let me ask you a question.  Do you remember talking

10  to the government in one of your proffers, and specifically,

11  for the purpose of the record, on February 20, 2019, do you

12  remember talking to the government, if that's the date, several

13  times about these transactions?

14  A.  I remember talk -- I don't -- I remember talking to --

15  again?

16  Q.  Do you remember talking to the agents on numerous occasions

17  about these transactions?

18          MS. MCLEOD:  Objection as to "these transactions."

19          THE COURT:  Overruled.  You can answer.

20  A.  I remember talking to the government about the

21  transactions.

22  Q.  And how many times did you tell the government that you

23  never discussed the Sauber loan with Mendel Zilberberg?

24  A.  I never -- I said today that I have no recollection of

25  discussing directly the loan from Park Avenue Bank with Mendel

1  Zilberberg.

2  Q.  But you told them on several occasions, sir, isn't it

3  correct, that you never discussed this loan with Mendel

4  Zilberberg?

5  A.  What do you mean "this loan?"  The --

6  Q.  The Park Avenue Bank loan.

7  A.  Which part of it?  By applying for the loan, or later?  Can

8  you be more specific in the question?

9  Q.  Did you tell the government, yes or no, that you never

10  talked about this loan with Mendel Zilberberg, period, end of

11  question?

12  A.  I did.

13  Q.  And how many times did you tell them that?

14  A.  A lot of times.

15  Q.  And what is it, five times, ten times, 20 times?

16  A.  I didn't -- I'm sorry.  I didn't count.  But I did say that

17  I did not speak with Mendel Zilberberg directly about this

18  loan.

19  Q.  Okay.

20  A.  Prior to taking out the money of the loan, just to be more

21  specific -- in what year we're talking about?

22  Q.  During the application process.

23  A.  During the application process, I still say it now, I have

24  no recollection of speaking with Mendel Zilberberg about this

25  loan.

1   Q.  So when you say "directly," you were referring to the

2   conversations you claim you had with Aron Fried, correct?

3   A.  That is correct.

4   Q.  So the only knowledge you have directly about

5   Mr. Zilberberg's involvement is through Mr. Fried; is that

6   correct?

7   A.  That is correct.

8   Q.  And is Mr. Fried the person who threw you out of Emanuel

9   Health Care?

10  A.  Yes, he is.

11  Q.  And is he the person who basically said, you can't be a

12  partner, because you have a criminal conviction?

13  A.  No.

14  Q.  What did he say?

15  A.  He just said, you stay a partner, and because Gilah

16  Jacobowitz is a partner, she doesn't want you to come in as an

17  employer.

18  Q.  And you -- go ahead.

19  A.  And so he said, listen, I know you're a partner.  You'll

20  still get your percentage from the company.  He used the Hebrew

21  word (Remarks in Hebrew), you are a partner --

22          MR. BRAFMAN:  He'll spell it for you later

23  phonetically.  Okay.

24  A.  I'll take it back.  I'll say it in English.  He basically

25  said, you'll stay a partner, as a partner like the other

1   partners that I have, but you should no longer come in as an

2   employee for the company.

3   Q.  Because his partner, Gilah Jacobowitz, didn't like you?

4   A.  He said, Gilah Jacobowitz doesn't want me to be at the

5   company.

6   Q.  And Gilah Jacobowitz was his partner?

7   A.  To me he told that Gilah Jacobowitz is not a partner.  He

8   only having the license on her being -- until he has -- he has

9   a court case with another person, and he also told me that the

10  documents are signed by Mendel Zilberberg, that once he decides

11  he's going to put it in his name, he doesn't have to get

12  signatures from Gilah Jacobowitz.  So, for me, he said Gilah is

13  not a -- my knowledge is Gilah Jacobowitz very much is not an

14  actual partner in the business, just like she has percentage

15  interest, just like I have a business.

16  Q.  But you don't have any percentage in the business?

17  A.  According to me, I do have percentage in the business

18  today.

19  Q.  Do you have any documentation to prove that?

20  A.  Mr. Zilberberg never gave me the documentation.  It was

21  discussed in his office with Ari Fried that I will get my

22  partnership once he finalizes everything with all the

23  investors.

24  Q.  And we have to take your word for that; is that correct?

25  A.  Well, I was in Mr. Zilberberg's office.  I believe he's not

1  going to deny that I was supposed to be a partner in Emanuel

2  for, as he explained, just under ten percent, because ten

3  percent has to go through an approval.  So for nine percent --

4  just saying just under ten percent, and I will get a -- he will

5  send me the documentation once he finished it, the whole sale.

6  Q.  But you never got the documentation?

7  A.  Unfortunately not.

8  Q.  Okay.  Now, let me ask you, sir, if, when you were talking

9  to the government, did you tell them that -- now, you

10  understood -- I'm going back to the proffer agreements.  You

11  understood that the proffer agreements were essentially forms

12  signed by you and your attorney every time you met with the

13  government?

14  A.  Yes.

15  Q.  And you understood that it was essentially a form that the

16  government insisted that you sign, so they could evaluate your

17  testimony or cooperation, and then determine whether or not

18  they should give you a cooperation agreement?

19  A.  Correct.

20  Q.  So you met with them on a number of occasions, and you had

21  essentially given them a preview of the testimony you would

22  provide, correct?

23  A.  Correct.

24  Q.  And after several meetings with the government, you gave

25  them a preview of your testimony, ultimately, they basically

1   said, we're almost satisfied, correct?

2   A.  I don't recall such a statement from the government

3   directly.

4   Q.  Okay.  When did you get your cooperation agreement?

5   A.  I don't have it in front of me.  I cannot give you a date.

6   Q.  I'm sorry?

7   A.  I do not -- you asked me when.  You're referring to a date.

8   I'm sorry.  I don't know the date.

9   Q.  What year?

10  A.  For me, this five years has been one -- I've been arrested

11  about five years ago, so for me like I cannot judge the date.

12  It was a couple of years ago I believe.

13  Q.  Okay.  Now, you were arrested you said five years ago?

14  A.  I think it was about '18.

15  Q.  And in 2018, did you go before a judge and enter a plea of

16  not guilty?

17  A.  The first time I pled not guilty.

18  Q.  And were you released on bail?

19  A.  Yes.

20  Q.  And are you still on bail?

21  A.  Yes.

22  Q.  And since your arrest in 2015, you have not served any time

23  in jail, correct?

24  A.  Correct.

25  Q.  And this is the only trial in which you were testifying

1    according to you, correct?

2    A.   That is correct.

3    Q.   Now, I want to show you a copy of -- I want to show you --

4    I want to show you a copy of what's identified by 3503070,

5    which is a copy of the proffer agreement form.

6          Do you recognize that document?

7    A.   Yes.

8          MR. BRAFMAN:   Now, can you put it up on the screen

9    just for Mr. Kahan?

10   Q.   Do you see it?

11   A.   Yes.

12   Q.   And it says -- or does it refresh your recollection that it

13   in bold letters -- it basically tells you, this is not a

14   cooperation agreement?

15   A.   Correct.

16   Q.   And does it also advise you that --

17         MR. BRAFMAN:   Take that down.   Not the document.   Just

18   the -- take that down.

19         Can you remove that?   Not the whole document.   All

20   right.

21   Q.   Do you see where -- does it also say that the purpose of it

22   is to evaluate your testimony?

23   A.   Yes.

24   Q.   Now, do you remember being interviewed by the government in

25   December of 2017?

1  A.  I've been interviewed, but referring to dates exactly is

2  going to be just hard for me to remember.

3  Q.  Okay.  Well, let's focus on your very first interview with

4  the government.

5  A.  Yes.

6  Q.  And accept my representation that it's in December of 2017,

7  okay?

8  A.  Yes.

9       MS. MCLEOD:  Objection.

10       THE COURT:  Overruled.

11  Q.  Do you remember everything you said to the government on

12  that date?

13  A.  No.

14  Q.  And if you were to see a copy of the proffer, do you think

15  it might help you to refresh your recollection?

16  A.  I can try.

17  Q.  Okay.

18       MR. BRAFMAN:  May I approach the witness, your Honor.?

19       THE COURT:  Yes.

20  Q.  Do you remember telling him that you told Sauber that the

21  reason you needed to use him to get the loan is because you had

22  tax issues?

23       MS. MCLEOD:  Objection.  It's improper refreshing of

24  recollection.

25       THE COURT:  Well --

A.  I don't remember that I told Sauber that it's for -- I
don't remember telling him any specific reason why I need the
loan.

Q.  Okay.  Could you look at the third paragraph, and read it
for yourself, and tell me if you remember, if it refreshes your
recollection that you told Sauber it was for a tax issue?

A.  I don't recall saying that, but I did have -- I didn't have
-- I know I did not have good credit, because I had debts.  So
that's why I was not able to use my credit score to get a loan.
I needed to get a cosigner.

Q.  Do you remember telling them the reason the house was in
your wife's name was because you had lawsuits, and you didn't
want to get the house involved?

A.  Could be, yes.

Q.  Do you remember saying that?

A.  I don't recall saying that, but it's very possible that is
the reason it wasn't in my name, because I did have lawsuits in
my name at the time.

Q.  Just slow down for a minute.  You had judgments against you
from a number of civil lawsuits; is that correct?

A.  I don't remember having judgments.  I do remember having
lawsuits.

Q.  Okay.  And the lawsuits were for money, right?

A.  Yes.

Q.  And you didn't want the house to become involved, so you

1    put it under your wife's name, right?

2    A.  Correct.

3    Q.  And that way, if someone got a judgment against you, they

4    wouldn't be able to collect it?

5    A.  Correct.

6    Q.  Now, do you remember telling them that the deed was signed

7    over to Mr. Sauber, so that you could get a bank loan, and you

8    said you'd take full responsibility for transferring the house

9    to Sauber's name?  Did you tell them that?

10   A.  I did discuss with Sauber to transfer him to the deed of my

11   house.  I don't recall the exact conversations that I had in

12   the first proffer with the government.

13   Q.  Okay.  Well, look at the last paragraph on the first page,

14   and read it to yourself, and tell me if it refreshes your

15   recollection that you were taking full responsibility to --

16   transferring the house into Sauber's name.

17   A.  I remember saying that it was not Ari Fried or anybody else

18   that had been part of transferring -- adding on Hesche Sauber

19   to my deed.

20   Q.  But your wife did it, too; isn't that true?

21   A.  I don't recall exactly.  It was in her name, so I don't

22   recall exactly how the process was, but I'm responsible.

23   Q.  Let me ask you a question.  This house was in your wife's

24   name, correct?

25   A.  Correct.

1    Q.  And you were adding Sauber to the deed, correct?

2    A.  Correct.

3    Q.  And that couldn't happen under the law without your wife

4    willingly signing, correct?

5    A.  Yes.  Correct.

6    Q.  And she signed the deed to allow Sauber to become a part

7    owner of the house for $10, correct?

8    A.  Correct.

9    Q.  So your wife was up to her eyeballs in this fraud, wasn't

10   she?

11   A.  No.

12   Q.  Can you remember any part of that conversation with her?

13   A.  I do not recall the conversation that I had with her.

14   Q.  But she signed the deed, right?

15   A.  Yes.

16   Q.  And your wife is an intelligent woman, correct?

17   A.  Yes.

18   Q.  And she's worked in business for many years?

19   A.  Yes.

20   Q.  And you hand her the deed and say, I want you to sign this

21   because I want Sauber to be on it, and she doesn't ask you why?

22   A.  Again, I don't recall exactly how the conversations were at

23   that time, and exactly what it was, but we did add her to the

24   -- Sauber was added to the name on the -- to be a security for

25   the refinancing on the original loan that I was trying to take

1    out.

2    Q.  And the government never asked you about the conversation

3    with your wife?

4    A.  I do not recall what the conversations were in the first

5    proffer.

6    Q.  And do you know if your wife was ever interviewed by the

7    government?

8    A.  Not to my knowledge.

9    Q.  You still married?

10   A.  Yes.

11   Q.  Now, when you were originally arrested, it was in

12   connection with a criminal information filed in the Southern

13   District; is that correct?

14        MS. MCLEOD:  Objection -- yes, I was going to ask

15   about the exhibit, or the document still being up.

16        THE COURT:  I didn't hear a word you said.

17        MS. MCLEOD:  The document was still in front of the

18   witness.  I was going to ask for it to be taken down, given

19   that it seems that we're moving on.  But it just was --

20        THE COURT:  Mr. Brafman.

21   Q.  When you were first arrested in the Southern District, it

22   was in connection with the straw borrower scheme that you

23   testified to on direct, correct?

24   A.  Yes.

25   Q.  And do you recall that there were no other crimes charged

1    in your criminal information other than that count?

2    A.  I don't recall the details of the charge.

3    Q.  Did you read the indictment or the information when you saw

4    it?

5    A.  Yes.

6    Q.  And do you not remember anything in it?

7    A.  I remember that I was charged for bank fraud.

8    Q.  Okay.  And did you ultimately go to the government and

9    agree to cooperate?

10   A.  Yes.

11   Q.  Now, when you committed this crime in 2009, you were still

12   on probation from the Eastern District fraud that Judge Gershon

13   sentenced you to, correct?

14   A.  Yes.

15   Q.  Because she sentenced you in 2007 to five years' probation,

16   correct?

17   A.  2006, but I was still on probation, yes.

18   Q.  And, in your opinion, this particular case, the crime

19   begins, according to the information, in 2009?

20   A.  Correct.

21   Q.  So it's only two years after you said to Judge Gershon,

22   "I'm never going to do this again," that you got arrested

23   again?

24   A.  I didn't get arrested then.

25   Q.  You got arrested in connection with this criminal

1    information?

2    A.  You said two years later, in 2009?

3    Q.  No.  You were sentenced to probation in 2007?

4    A.  Right.

5    Q.  For five years?

6    A.  Right.

7    Q.  And two years later in 2009, in connection with this case,

8    you were arrested again?

9    A.  Yes.

10   Q.  And this was within two years of essentially telling Judge

11   Gershon that you were never going to do a crime again?

12   A.  Yes.

13   Q.  Now, did anyone from probation violate you or seek to

14   violate you for committing a crime while on probation?

15   A.  No.

16   Q.  You knew that one of the conditions of getting probation

17   was that you were not allowed to commit a crime while on

18   probation?

19   A.  Correct.

20   Q.  And anybody from the Eastern District or the Southern

21   District came to tell you you just really lost your probation?

22   A.  No.

23   Q.  And you were not put in jail at that time, right?

24   A.  No.

25   Q.  Now, when you came to the Southern District, you came to

1    them in 2009, and you entered a plea of not guilty you said,

2    correct?  Initially?

3              MS. MCLEOD:  Objection.  Objection.

4    Q.  Initially.  You entered a plea of not guilty in court on

5    the date that you were arrested, correct?

6    A.  Correct.

7    Q.  Now, do you have your criminal information in front of you?

8    A.  No -- yes.  This one?

9    Q.  The one from this case.

10   A.  Yes.

11   Q.  Okay.

12             MR. BRAFMAN:  I'm going to correct the record.  He

13   didn't plead in 2009, your Honor.  That was the time of arrest.

14   Okay.

15   Q.  So when I say 2009, that was the alleged date of the crime,

16   correct?

17   A.  Yes.

18   Q.  And you weren't arrested until about 2018?

19   A.  Correct.

20   Q.  Okay.  So that's about nine years later?

21   A.  Correct.

22   Q.  So that should have been a surprise to you when they showed

23   up at your house, right?

24   A.  Yes.

25   Q.  And they took you to court in this building?

1    A.  Yes.

2    Q.  And you were let go later that day?

3    A.  Yes.

4    Q.  And did you have to go to probation later that day and say,

5    I screwed up, or words to that effect?

6    A.  I don't recall going to probation and saying anything.  If

7    you can clarify what you mean.

8    Q.  But you were never violated?  Okay.  That we've

9    established?

10   A.  Correct.

11   Q.  And they never denied you future probation, correct?

12   A.  Correct.

13   Q.  Now, if you -- do you have the document in front of you?

14   The information?

15          MR. BRAFMAN:  Can we put it on the screen just for him

16   and the Court and us?  Can you put it the next page, please?

17   And the one after that?

18          That's not the right document.  It's the first

19   information -- okay.  Page 3.  Stop.

20   Q.  Read it to yourself, and tell me whether it refreshes your

21   recollection, that overt act, under paragraph (a)(5), overt act

22   (a) says to you that you arranged for the conveyance to the

23   straw borrower of a property located at 57th Street in

24   Brooklyn, New York, held in the name of Kahan's wife, for

25   consideration of $10.

1   A.   And what is the question?

2   Q.   Is that one of the charges against you?

3   A.   Yes.

4   Q.   And that was considered an overt act in furtherance of the

5   conspiracy, correct?

6   A.   Correct.

7   Q.   And you understand what "overt act" means by now, don't

8   you?

9   A.   Please explain it to me.

10  Q.   It was one of the things that you or someone else did to

11  further the conspiracy?

12  A.   Yes.

13  Q.   And you do not -- I'm sorry.  And do you see that they

14  allege that your wife transferred the property for $10?

15          MS. MCLEOD:  Objection, mischaracterization.

16          THE COURT:  Sustained.

17  A.   Please ask the question.

18          THE COURT:  Sir, if I say "sustained," don't answer.

19  Q.   Now, there comes a time when they say to you, Mr. Kahan,

20  you're going to have to be confronted with the fact that you've

21  now admitted to us to having lied during the proffer

22  agreements, correct?

23  A.   Yes.

24  Q.   And during the proffers, one of the things you lied about

25  was ownership in Crown of Life, correct?

1   A.  Correct.

2   Q.  And you told them that your wife was the owner?

3   A.  I said my -- that I'm not a part of the ownership.  My wife

4   was the owner.  I didn't say -- didn't disclose that I'm also a

5   partner in the company.  I downplayed my partnership in the

6   company.

7   Q.  You didn't downplay.  You lied.

8   A.  I lied by not saying my full involvement in the company

9   that I have.

10  Q.  But you told them over and over and over again at several

11  proffers that your wife, Toby, owned this company, correct?

12  A.  She still owns the company.  That's not the point.  The

13  point is that I said that I'm not a part of the owner of the

14  company -- that I'm not part of it.

15  Q.  And you were at the time?

16  A.  I was.

17  Q.  And you knew that you were?

18  A.  Yes, I was.

19  Q.  And you looked these agents and prosecutors in the eye and

20  you lied to them?

21  A.  Yes, I did.

22  Q.  Okay.  And you agree it came easy to you?

23  A.  What?

24  Q.  To lie to them.

25  A.  No.

1    Q.   It was hard?

2    A.   Very.

3    Q.   What?

4    A.   I answered your question.

5    Q.   So it was hard, right?

6    A.   Yes.

7    Q.   But it didn't stop you?

8    A.   I was very nervous when I was asked about it, so I lied

9    about it.  And I plead guilty about it, and I did lie about it.

10   Q.   How many times did you lie to them about it?

11   A.   Whenever they were talking about my involvement in the

12   company, I lied about it.

13   Q.   And did you lie to protect your wife?

14   A.   To protect myself.

15   Q.   But when they finally confronted you and they asked you why

16   you lied, you said that you were in denial?

17   A.   Correct.

18   Q.   What were you in denial about?

19   A.   I was -- I knew that I have a lot of work in the company.

20   I didn't -- I got nervous, because I received my flashback from

21   my old conviction that I had, and I just did not -- I lied.  I

22   did not say the truth.  And then I admitted that I'm a partner,

23   part of the company.

24   Q.   And you admitted it much later; is that correct?

25   A.   When I was confronted about it, I admitted it.  That is

1  correct.

2  Q.  They confronted you by saying, we know that you lied to us

3  about Crown of Life, right?

4  A.  Yes.

5  Q.  And that's when you admitted it?

6  A.  Yes.

7  Q.  You didn't just go in and volunteer it, because you're

8  basically an honest person, did you?

9  A.  No, I didn't volunteer.

10 Q.  With respect to Crown of Life, that's a licensed health

11 care company, correct?

12 A.  Yes.

13 Q.  Because of your criminal record, if you were considered to

14 be an owner, it would jeopardize their license?

15 A.  Please rephrase the question.

16 Q.  You knew that, as an owner of a licensed health care

17 agency, you would not be able to be approved, because you had a

18 convicted felony, correct?

19 A.  It was after the probation.  According to the legal counsel

20 that I had, I knew that it may have prolonged to get approved.

21 It's not for sure that I would have gotten denied, because it's

22 after the probation, so that's -- in other words, I did not add

23 on myself to the license, because it would have probably made

24 it a longer --

25 Q.  Approval process?

1    A.  -- wait of approval.  It was after my probation.  I was no

2    longer on the -- on the barred list.  So I can choose to apply

3    for it.

4    Q.  But you didn't?

5    A.  No, I did not.

6    Q.  And you knew if you applied for it, it would delay your

7    approval if you were ever approved, right?

8    A.  It may have delayed the approval.  That is correct.

9    Q.  And you may have been disapproved, because of your felony

10   conviction?

11   A.  I may have been disapproved, or, more so, the owner may not

12   even want to sell the company to us.

13   Q.  Okay.  So let's talk about that.  You told the government

14   that when you were negotiating the sale -- or the purchase of

15   Crown of Life, that if they knew that you had a criminal

16   record, they would not have sold it to you, correct?

17   A.  The sellers?

18   Q.  Yes.

19   A.  Very much possible, yes.

20   Q.  So you don't consider that a fraud on them?

21   A.  On them a fraud?  No, I do not.

22   Q.  When you lied to someone who was trying to sell you a

23   property, and you keep a material fact from them, in your mind,

24   that's not a fraud?

25   A.  I did not lie to them.  I said, "my wife is going to buy

1  the company."

2  Q.  But she was not the owner.  You are.

3  A.  She was the owner.  She worked in the company.  She was

4  trained in the company.  And she met with them.  She was in the

5  company.

6  Q.  But you were, too?

7  A.  I was, too, and they also knew that I was there.  So I

8  didn't give them my name, so I should expose my whole history,

9  and then they're going to say they don't want to sell it to me.

10 Q.  So my question is, again, when you met with the government

11 last week in preparation for your testimony, did you tell them

12 in words or substance that you knew that if they knew you had a

13 criminal record, they would not sell the company to you?

14 A.  That is my opinion.

15 Q.  Okay.  And that is a fraud.  Do you not accept that?

16 A.  No.

17 Q.  That's not a fraud?

18 A.  No.

19 Q.  You could buy something from a person, and keep something

20 material from them, and they could just say, okay, it's good?

21 A.  I can go and buy from you your tie, and I don't have to

22 tell you I'm a criminal.  I don't have to tell you I'm a

23 criminal.  I give you the money for the tie, and I have it.  I

24 don't see it as a fraud.

25 Q.  My tie is not a licensed health care agency.

1   A.  I'm not buying a license.  I'm buying a business.

2   Q.  And if they knew that you were a criminal, you told the

3   government, they would not want to sell it to you?

4   A.  My opinion is they would not want to deal with me, but in

5   the end, they did find out that I'm part of it, and they still

6   sold it to me.

7   Q.  They found out after the sale; is that correct?

8   A.  In the transition part.

9   Q.  What did you tell them?  Were you there when it was sold?

10  A.  I was part of it, yes.

11  Q.  What did you say to them about your --

12  A.  I was --

13  Q.  You told them you were a bookkeeper, right?

14          MS. MCLEOD:  Objection.  If counsel --

15          THE COURT:  Slow down, Mr. Brafman.

16  A.  I was doing -- my part in the company was the finances, the

17  books.  That is correct.

18  Q.  So you basically told them you were a salaried employee?

19  A.  Correct.

20  Q.  And you never told them that you had a partnership interest

21  in the company, correct?

22  A.  Correct.

23  Q.  And you never told them that, because you did not want to

24  nix the deal, correct?

25  A.  Correct.

1    Q.  Let's talk about the plea you took in the Southern District

2    after your lies were -- your lie was uncovered, okay?

3    A.  Yes.

4    Q.  And I'm referring to Kahan 350342, which is the second

5    information.  And I want to go down, sir, to the new charge,

6    because you had already been charged with bank fraud, correct?

7    A.  Yes.

8    Q.  And then they made you plead guilty for one other -- at

9    least one other crime, which is conspiracy to commit health

10   care fraud; is that correct?

11   A.  Yes.

12   Q.  And this was in connection with Crown of Life, correct?

13   A.  Yes.

14   Q.  And explain to us what the health care fraud was that you

15   were involved in.

16   A.  I -- there was wage parity money that is supposed to be

17   given to the -- when you have an employee, part of the payment

18   is that -- you can give as a benefit.  And I gave to them the

19   benefit through a captive.  And the captive provided the

20   benefit for the home health aides.  And then I received profit

21   from that captive, so that was the fraud.

22        It's the government's position, the charge, the fact

23   that I benefited from the funds, and it wasn't given directly

24   to the employees, it's health care fraud.

25   Q.  Okay.  Well, let's see if we can break that down, so maybe

1    the jury will be able to understand this better.  Okay?

2    A.  Yes.

3    Q.  You and your wife were running Crown of Life, correct?

4    A.  Yes.

5    Q.  And you knew about the Wage Parity Act, correct?

6    A.  Yes.

7    Q.  And the Wage Parity Act employs health care aides, is

8    people who go to the home of sick people and help them get

9    dressed, and disabled people.  You know the employees we're

10   talking about, right?

11   A.  Yes.

12   Q.  And you have hundreds of these employees who are supposed

13   to be paid a certain amount, right?

14   A.  Yes.

15   Q.  And you and your wife basically figured out a way to not

16   pay them, correct?

17   A.  There's two options you can pay --

18   Q.  Let me ask the questions.  Did you and your wife figure out

19   a way to not pay the employees wages or benefits that they were

20   entitled to?

21   A.  I figured out a way to get them benefits through a captive

22   company, and then I received a K-1 from the captive company.

23   So they did receive a benefit through the captive.

24   Q.  What benefit did they get?

25   A.  I don't recall what the package of benefits were.

1    Q.  Let's talk about it, see if it refreshes your recollection.

2    Was it medical insurance?

3    A.  Not medical insurance, but it was a medical benefit.

4    Q.  What was the benefit?

5    A.  I don't recall the details of the benefit, and I plead

6    guilty, because the government feels the benefit they received

7    wasn't a good benefit.

8    Q.  So when the judge said to you, "are you pleading guilty

9    because you are guilty," were you lying to the judge?

10   A.  I am guilty, because they did not receive the benefit that

11   I gave them.  I received back the kickback, the K-1, the

12   fraudulent money, and I plead guilty for that.

13   Q.  Okay.  So let's see if we can explain this.  You had

14   hundreds of nurses and aides who worked for your company,

15   correct?

16   A.  Correct.

17   Q.  They were not employees.  They were what we refer to as

18   independent contractors, or outside people who were getting a

19   salary or wages from you and some benefits, right?

20   A.  Correct.

21   Q.  And that was required under the law?

22   A.  Correct.

23   Q.  And you decided, I'm not going to pay them the full amount

24   that they're entitled to, because me, A. Kahan, is going to

25   figure out a way to get money out of this, right?

1    A.   Correct.

2    Q.   And you knew at the time that it was wrong?

3    A.   Correct.

4    Q.   And your wife was running the company, correct?

5    A.   It was my decision to do that.

6    Q.   But your wife is running the company, so you're telling me

7    that you imposed your decision on Toby Kahan?

8    A.   I said that I made a decision to, at the time -- that

9    happens to be at the time when the decision was made to go with

10   that company, Toby had a brain tumor surgery, and I was more in

11   charge at that particular time when we made the agreement with

12   this company.

13   Q.   And then Toby ultimately recovered enough to sign the

14   agreements with the government where you agreed to pay back

15   millions of dollars, right?

16   A.   Correct.

17   Q.   Now, during this period when your wife was not -- in your

18   words, maybe active in the business, did you have signature

19   authority on the company?

20   A.   I don't recall exactly how it was done at that point.

21   Q.   Well, let me see if I can help you.  Did you go to an

22   insurance company and say, I want to have a captive, which will

23   hold the money in trust, and if they don't put in any claims, I

24   get it?

25   A.   Please rephrase the question.

1  Q.  You don't understand your own fraud?

2          MS. MCLEOD:  Objection, argumentative.

3  A.  I'm agreeing to my fraud.

4          THE COURT:  I'm going to sustain the objection.

5          MR. BRAFMAN:  Yes, your Honor?

6          THE COURT:  Rephrase the question.

7  Q.  You knowingly committed this fraud, right?

8  A.  Yes.

9  Q.  And at the time that you did it, you knew it was wrong?

10 A.  I plead guilty that it's wrong, correct.

11 Q.  No.  No.  You knew at the time that you did this that it

12 was wrong, right?

13 A.  Correct.

14 Q.  All right.  And whoever else was involved, this was your

15 decision?

16 A.  Correct.

17 Q.  And you are accepting responsibility?

18 A.  Correct.

19 Q.  All right.  Now, can you tell me how much money these

20 nurses aides and other aides were not getting as a result of

21 this?

22 A.  My part that I have received was approximately -- I think

23 it was approximately four -- if I --

24 Q.  How much?

25 A.  I don't recall the exact amount.  I think what they were

1    not paid was approximately $400,000.

2    Q.  And you got that?

3    A.  What's that?

4    Q.  Did you get that?

5    A.  I received approximately $400,000.

6    Q.  And you knew it was not right to get this money?

7    A.  I plead guilty for not taking that money, correct.

8    Q.  For taking the money?

9    A.  For taking the money, correct.

10   Q.  Now, at the time that you agreed to this captive, as you

11   called it, you knew that taking it for personal use was a

12   crime?

13   A.  I plead guilty that receiving the money is a crime.

14   Q.  Now, you also plead guilty to money laundering?

15   A.  Yes.

16   Q.  Now, explain to this jury how you laundered money in

17   connection with this scheme?

18   A.  The money that came from the K-1 captive was deposited into

19   a shell company, which I owned the shell company.

20   Q.  And you did it to deceive anyone who might be looking at

21   these transactions, correct?

22   A.  Correct.

23   Q.  And you did it to conceal the fact that you were the one

24   getting the money, right?

25   A.  Correct.

1    Q.  So let's explain how this works.  You get a check.  You

2    know you're not entitled to it.  So instead of putting it in,

3    say, Abraham Kahan's account, you put it in a shell company

4    account, right?

5    A.  Correct.

6    Q.  And that's what you plead guilty to, and the account was

7    45SVH, right?

8    A.  Correct.

9    Q.  And you just made that up?  That account was made by you,

10   right?

11   A.  Yes.

12   Q.  And you didn't have any other legitimate transactions going

13   through that account, right?

14   A.  That was my main thing that I opened the account for.

15   Q.  For money laundering?

16   A.  To accept money laundering from the K-1, from the

17   agreement, from the captive.

18   Q.  So the money didn't come directly to you?

19   A.  Correct.

20   Q.  It went to this shell account, and then it went to you?

21   A.  Went to the shell account, and I benefited out of it.

22   Q.  And then it went to you?

23   A.  I don't recall the transaction, but the shell account is

24   me, 45SVH is me.

25   Q.  Now, when -- part of what you plead guilty to was knowing

1    that the property involved in certain financial transactions

2    represented proceeds from unlawful activity; isn't that

3    correct?

4    A.  I don't understand your question.

5    Q.  Part of what you plead guilty to was essentially taking

6    money that you knew to be proceeds of unlawful activity, and

7    laundering it through a shell account, correct?

8    A.  Yes.

9    Q.  And what was the unlawful activity that this money was

10   derived from?

11   A.  From the aid that the -- the Medicaid funds that were

12   supposed to go to the aides.

13   Q.  And you knew they never would have any claims on this fund,

14   because they all had Medicaid, right?

15   A.  I'm not understanding your question.

16   Q.  You knew that the aides would never make a claim for the

17   insurance that was supposed to be provided, because they all

18   had Medicaid?

19   A.  I'm not -- no, not at all.

20   Q.  You didn't know that?

21   A.  No, I did not.  Not at all.  No.

22          MR. BRAFMAN:  Give me one minute, your Honor?

23          THE COURT:  Yes.

24          MR. BRAFMAN:  Can we take five minutes, your Honor?

25          THE COURT:  Sure.  Why don't we take the afternoon

1    break.

2              Ladies and gentlemen, we'll take a 12-minute break.

3    Don't discuss the case.  Keep an open mind.  I'll see you back

4    in the courtroom in 12 minutes.

5              (Recess taken)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE DEPUTY CLERK:  All rise.

3              THE COURT:  Be seated.

4              Bring the witness.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  You can be seated.

2           Mr. Brafman.

3           MR. BRAFMAN:  Yes.

4           THE COURT:  Mr. Brafman, you keep moving away from the

5    microphone.  Could you just point that towards you.

6           MR. BRAFMAN:  Sorry.  Thank you.

7    BY MR. BRAFMAN:

8    Q.  Mr. Kahan, I want to go back for a minute and steer your

9    mind, if I can, to the Sauber loan.  OK?

10   A.  Yes.

11   Q.  And you told Sauber, did you not, that if this all works

12   out and this is — my business is going to be successful, you

13   can be a partner in it, correct?

14   A.  You're talking the second loan?

15   Q.  Second loan.

16   A.  My recollection is I offered him a partnership, correct.

17   Q.  So Sauber in effect was not only trusting you but was

18   investing in you, correct?

19   A.  Correct.

20   Q.  Excuse me?

21   A.  Correct.

22   Q.  Now I want to go back to the new charges that you faced

23   when you were arrested in the Southern District after you were

24   confronted by your lies.  You were arrested again, correct?

25   A.  Yes.

1    Q.  And you were —— you made the decision to plead guilty

2    again, correct?

3    A.  Correct.

4    Q.  And this was to a new information which charged you with

5    additional crimes beyond the Park Avenue Bank loan, correct?

6    A.  I was not arrested additional for that.

7    Q.  But they told you you had to come to court?

8    A.  I was charged with it.

9    Q.  That's what I meant, that you were charged with additional

10   crimes.

11   A.  Correct.

12   Q.  And this was separate and apart from the Park Avenue Bank

13   loan, correct?

14   A.  Correct.

15   Q.  And one of the crimes they charged you with was conspiracy

16   to commit health care fraud, correct?

17   A.  Yes.

18   Q.  And that related to the Wage Parity Act that you, in

19   effect, violated, right?

20   A.  Correct.

21   Q.  And you knowingly violated it?

22   A.  Correct.

23   Q.  And at the time you violated it, the government basically

24   accused you of being the *de facto* owner.  You know what that

25   word means?

1    A.  Please explain.

2    Q.  It means that you're the owner.  That, in fact, you are the

3    owner of Crown of Life.

4    A.  I'm a partner in Crown of Life.

5    Q.  They didn't accuse you of being a partner.  They accused

6    you of being a *de facto* owner.

7    A.  OK.

8    Q.  Is that yes?

9    A.  I don't have the charges.  I cannot respond.

10           MR. BRAFMAN:  OK.  If we can — do you have it online?

11   We can show the information from — second information.  It's

12   3503-042.  Just show it to the witness and the judge.

13   Q.  Do you recognize that?

14   A.  Yes.

15   Q.  All right.  If we can go to Count Five, this charges you

16   with conspiracy to commit health care fraud, correct?

17   A.  Correct.

18   Q.  And if you read down at the bottom, you're essentially

19   being accused of, as Crown of Life, a licensed home care

20   service company operating in New York State of which — next

21   page, please — of which Kahan was the *de facto* owner.

22   A.  Can you please scroll it up.

23   Q.  Can you scroll.  It's right there at the top of the page?

24   A.  To the page before.  Oh, OK.

25   Q.  Did you see it?

1    A.  Yes.

2    Q.  This is a charge you pleaded guilty to, correct?

3    A.  Yes.

4    Q.  And you accepted their accusation that when this Wage

5    Parity Act was going on, you were in fact the owner of Crown of

6    Life?

7    A.  Correct.

8    Q.  And you were, right?

9    A.  Correct.

10   Q.  Now, if you move to the next — to the paragraph that

11   continues under *de facto*, which is on the top of page 6, and

12   they charged you with not providing — with not providing to

13   Crown of Life home health care aids and diverting at least in

14   part to Kahan for his personal use, correct?

15   A.  Correct.

16        MS. McLEOD:  Objection.  This is improper refreshing

17   of recollection or it's reading from a document —

18        MR. BRAFMAN:  I'm happy to put it into evidence if

19   that's what you prefer.

20        MS. McLEOD:  Has to be something —

21        THE COURT:  You don't have to argue with each other.

22        MR. BRAFMAN:  I'm just using it to refresh his

23   recollection, Judge.

24        THE COURT:  I'm going to overrule the objection.  This

25   is what he pled guilty to.

1          MR. BRAFMAN:  Yes, sir.

2          THE COURT:  He can acknowledge whether it's true or

3     not true.

4          MR. BRAFMAN:  Thank you very much, sir.

5     BY MR. BRAFMAN:

6     Q.  And then it explained that it was part of the conspiracy

7     that you and others willfully and knowingly would and did

8     execute a scheme and artifice to defraud one or more health

9     benefit programs, either Medicare and Medicaid.  Do you see

10    that?

11    A.  Yes.

12    Q.  And you knew, did you not, that these people who worked for

13    you were, in effect, getting part of their salary paid by

14    either Medicare or Medicaid?

15    A.  Correct.

16    Q.  They would pay you, these agencies, and you were then

17    supposed to pay them, correct?

18    A.  Correct.

19    Q.  But they accused you of diverting part of their payments

20    from Medicare or Medicaid for your own personal use?

21    A.  Correct.

22    Q.  And that's, in fact, what you did?

23    A.  Correct.

24    Q.  And then in an attempt to conceal that, you laundered it

25    through HBS, whatever it's called, right?

1   A.  Correct.

2   Q.  Now, you then also had to plead guilty to money laundering,

3   correct?

4   A.  Correct.

5   Q.  And the money laundering referred to the money that was

6   being received by Crown of Life through the Wage Parity Act ——

7   I'm sorry, that was supposed to go to these aids under the

8   terms of the Wage Parity Act?

9   A.  Correct.

10  Q.  And you as a licensed nursing home or health care agency

11  was familiar with the Wage Parity Act, right?

12  A.  Correct.

13  Q.  You understood it?

14  A.  Correct.

15  Q.  You knew you were violating the law when you diverted the

16  money?

17  A.  Correct.

18  Q.  And you didn't care?

19  A.  Correct.

20  Q.  And you wanted the money for yourself?

21  A.  Correct.

22  Q.  And it ultimately got you hundreds of thousands of dollars

23  that you were not entitled to?

24  A.  Correct.

25  Q.  And that's what made you and whoever else was involved in

1    Crown of Life agree to repay it at some point?

2    A.  Correct.

3    Q.  And we're talking about over a million, $1.5 million,

4    correct?

5    A.  Correct.

6    Q.  And when did you agree to repay it?

7    A.  What do you mean by "when"?

8    Q.  When did you agree to repay it?  After you were caught?

9    A.  Correct.

10   Q.  And who signed the agreements to repay it?

11   A.  My wife.

12   Q.  Not you?

13   A.  No.

14   Q.  And your wife signed it, then, as the owner of Crown of

15   Life, correct?

16   A.  Correct.

17   Q.  And when did she again become the owner?

18   A.  When we bought the business.

19   Q.  I'm sorry?

20   A.  When we bought the business.

21   Q.  I understand.

22          So why were you accused of these crimes and not your

23   wife, if you know?

24   A.  I do not know why only I was charged with this.

25   Q.  OK.  Because, in your mind, she was knowingly participating

1    in defrauding these home health care aids, right?

2    A.   No.

3    Q.   She didn't understand the Wage Parity Act?

4    A.   I'm the one who was charged with this crime, and I pled

5    guilty with the crime.

6    Q.   I understand that.  But you were charged with conspiracy,

7    correct?

8    A.   Correct.

9    Q.   And you knew that conspiracy requires at least one other

10   person to agree to this, right?

11   A.   Correct.

12   Q.   And you knew that your wife was essentially an owner of

13   Crown of Life, right?

14   A.   She was not in the conspiracy from this.

15   Q.   Let me ask —— finish the question.

16           Your wife was at this time technically an owner of

17   Crown of Life?

18   A.   Correct.

19   Q.   And you knew that she understood the obligations under the

20   Wage Parity Act, correct?

21   A.   I know what I understood.  I'm testifying to what I

22   understood.

23   Q.   And you never discussed this with her at the time?

24   A.   No.

25   Q.   You never said, Toby, what we're doing violates the Wage

1    Parity Act.  Do you not understand it?

2              MS. McLEOD:  Objection.

3              THE COURT:  Overruled.

4    A.  No.

5    Q.  You never had that conversation?

6    A.  With my wife, no.

7    Q.  OK.  Now, you also pled guilty to making false statements,

8    correct?

9    A.  Correct.

10   Q.  And you knew that it was a crime to lie to a government

11   agent who's conducting a criminal investigation?

12   A.  Correct.

13   Q.  And in this count you were charged with making false

14   statements to them from in or about 2017 to 2019, correct?

15   A.  Correct.

16   Q.  And that was essentially lies to them during the proffers?

17   A.  Correct.

18   Q.  And I think you testified earlier that you really don't

19   know how many times you lied to them?

20   A.  Correct.

21   Q.  OK.  But you did lie to them?

22   A.  Yes.

23   Q.  Over and over and over again, is that correct?

24   A.  Yes.

25   Q.  And was it as many as ten times you lied to them?

1  A.  I lied to them whenever I was asked this question.  I don't

2  have an exact number.

3  Q.  And you only had to plead guilty to one count, right?

4  A.  Correct.

5  Q.  Each time you lied to them, that was technically a crime,

6  right?

7            MS. McLEOD:  Objection.

8            THE COURT:  Overruled.  You can answer.

9  Q.  Do you understand that?

10  A.  I'm not ─ I'm not charging myself.  Whatever I was charged

11  I pled guilty for.

12  Q.  So who made that decision as far as you know?

13  A.  I didn't discuss it with anybody.

14  Q.  I'm sorry?

15  A.  I don't make the decision on charging me.

16  Q.  Is it the prosecutors at this table who made that decision,

17  if you know?

18  A.  I do not know.

19  Q.  OK.  But you accepted it, right?

20  A.  Yes, I did.

21  Q.  It gave you coverage for all of the lies, right?

22  A.  Yes.

23  Q.  And in fact, your charging instrument, the information,

24  tells you that you made materially false, fictitious, and

25  fraudulent statements and representations.  Kahan falsely

1    denied his ownership interest in Crown of Life and falsely

2    concealed his involvement in the conduct underlying Five and

3    Six to officials from the Federal Bureau of Investigation, the

4    Federal Deposit Insurance Corporation, and the United States

5    Attorney's Office.

6    A.  Correct.

7    Q.  And all of those people you lied to?

8    A.  Yes.

9    Q.  Now, there's also a forfeiture position in your new

10   information?

11   A.  What means "forfeiture"?

12   Q.  You pled guilty to it and you accepted it.  You don't

13   understand what "forfeiture" means?

14   A.  Yes.

15   Q.  What does it mean?

16   A.  I accept — accepted the guilt on it.

17   Q.  No, it means that you will have to forfeit; means you will

18   have to give back all of the money you made under these crimes.

19   Do you understand that?

20   A.  Correct.

21   Q.  And how much money did you make under these crimes?

22   A.  I don't recall the exact amount.

23   Q.  Is it millions of dollars?

24   A.  I don't recall the exact amount.

25   Q.  Well, is it less than a million?  More than 100,000?  Tell

1    us.

2    A.   Couple hundred thousand.

3    Q.   That's your statement?

4    A.   That's what I recall.

5    Q.   And why did you agree, then, to the Eastern District AOD

6    and the New York State settlement that you would give back more

7    than a million dollars?

8    A.   With penalties.

9    Q.   I'm sorry?

10   A.   That was with penalties.

11        MR. BRAFMAN:  Now —— can I have a minute, your Honor?

12   Q.   Now, even though, Mr. Kahan, even though —— you knew that

13   by lying to the agents, especially in the U.S. Attorney's

14   Office, that that could basically ruin your cooperation

15   agreement, correct?

16   A.   Correct.

17   Q.   But it didn't?

18   A.   Correct.

19   Q.   You're still vying for a cooperation agreement?

20   A.   Correct.

21   Q.   And I think the cooperation agreement is going to be sent

22   to Judge Schofield before she sentences you, and the

23   government's going to say, you know, he cooperated; this is

24   what he did, correct?

25   A.   Correct.

1   Q.  And you know, do you not, that when you filed —— I'm sorry,

2   when Toby signed and filed a settlement agreement with the

3   United States District Court for the Eastern District of

4   New York, that was in the Eastern District, is that correct?

5   A.  Correct.

6   Q.  And were you involved in that settlement at all?

7   A.  What do you mean by "involved"?

8   Q.  Did you review it before you settled?

9   A.  Yes.

10  Q.  Did you agree to the terms?

11  A.  Yes.

12  Q.  And do you understand the terms?

13  A.  I don't recall the exact terms, but I do understand what

14  the agreement is.

15  Q.  What does it agree to?  It's filed in March of 2022.

16  That's, like, last year.

17  A.  My understanding is that there was a —— one payment that

18  was paid right away, and then there's going to be some monthly

19  payments.  I'm not sure exactly all the details.

20  Q.  But you agreed to it?

21  A.  Yes.

22  Q.  And your wife signed it?

23  A.  Yes.

24  Q.  And she signed it as the owner, right?

25  A.  Correct.

1          MR. BRAFMAN:  All right.  Now, if we could put on the

2     screen ⸺ do you have it?  No.  All right.  Do we have a copy

3     of it?

4     Q.  Do you know if this was a civil settlement as opposed to a

5     criminal settlement?

6     A.  I had attorneys that we worked with, and it was done based

7     on the attorneys.

8     Q.  So you don't understand what it is.  Just based on the

9     attorneys, right?

10    A.  That's not what I said.  You asked me if ⸺ which

11    settlement?

12    Q.  The Eastern District settlement that was filed in the

13    Eastern District before Judge Glasser in March of '22, you

14    understand that that's a civil settlement or ⸺

15    A.  That is a civil settlement.

16    Q.  I'm sorry?

17    A.  You're talking the one for the business?

18    Q.  Yeah.

19    A.  That's a civil settlement.

20    Q.  You sure?

21    A.  I believe it's civil settlement, yes.

22          MR. BRAFMAN:  Your Honor, I don't have a copy.  May I

23    approach the witness and show him a copy of this to see if it

24    refreshes his recollection?

25          THE COURT:  Yes.  Show to the government.

1        (Counsel confer)

2   Q.  Review this document.  And do you recognize it as the

3   settlement in the Eastern District between Crown of Life and

4   your company?

5   A.  Yes.

6   Q.  Can I turn to the last page and ask you, sir, if you

7   recognize the signature of the person who signed it ── I'm

8   sorry, the name of the person who agreed to it on behalf of

9   Crown of Life?

10  A.  My wife, Toby.

11  Q.  And do you understand that this document refers to all of

12  the money that Crown of Life should have to pay back?

13  A.  Yes.

14  Q.  And that's for making false claims, correct, to Medicaid

15  and Medicare in connection with the Wage Parity Act?

16  A.  I don't think that's related to false claims.

17        MS. McLEOD:  Can counsel please step back if he's

18  going to resume questioning?

19        MR. BRAFMAN:  I only have one document, and I'm going

20  to keep walking back and forth.  I'm happy to do it --

21        THE COURT:  Do you have much more to do with the

22  document?

23        MR. BRAFMAN:  Not a lot.

24        THE COURT:  Well, take a couple minutes there, but

25  your back's to the jury.

1        MR. BRAFMAN:  Yes, your Honor, I'm sorry.

2        THE COURT:  You don't really want to do that.

3        MR. BRAFMAN:  I'm sorry.

4        THE COURT:  Whenever you can, get back to the podium.

5        MR. KAPLAN:  Your Honor, it's on the screen now.

6        MR. BRAFMAN:  It's on the screen.

7        THE COURT:  Oh.

8        MR. BRAFMAN:  I can walk back.  Thank you.

9        Page 3, please.  Could you move this up a little bit.

10   Little more.

11   BY MR. BRAFMAN:

12   Q.  I want to direct your attention to — if you move it up a

13   little more, please — paragraph K, as in cat — I'm sorry,

14   cat, as in knight, K as in Kool-Aid.  I don't know.  It said

15   that relaters, meaning the Crown of Life, is alleged, among

16   other things, that defendant Crown violated the PCA and

17   New York FCA by knowingly presenting or knowingly causing false

18   claims to be presented by submitting claims to MLTCPs for home

19   care services provided by aids who received less than the

20   requisite total compensation as mandated by the Wage Parity

21   Act.

22        Do you see that?

23   A.  Yes.

24   Q.  All right.  Can you tell me, in this case relaters are the

25   government in this case, the federal government or the state

1  government who is bringing this action.  You understand that?

2  A.  Yes.

3  Q.  And Crown of Life was the company that was run by you and

4  your wife, correct?

5  A.  Correct.

6  Q.  All right.  Now, if we can also turn to paragraph I — I'm

7  sorry, paragraph L, and they say:  "Based on the civil action,

8  the United States and the state determined that Crown caused

9  MLTCPs with which Crown contracted to provide home care

10  services to submit false Medicaid claims to fiscal agents of

11  the State of New York."

12          Do you see that?

13  A.  Yes.

14  Q.  So you knew that this money, this request for money, was

15  going to be going to Medicaid and Medicare, correct?

16  A.  Yes.

17          MR. BRAFMAN:  And can you move up to paragraph M,

18  please.

19  Q.  Paragraph M, subparagraph (1):  "Crown did not pay its home

20  care aids the requisite total compensation pursuant to the Wage

21  Parity Act."

22          Do you see that?

23  A.  Yes.

24          MS. McLEOD:  Objection to reading from a document not

25  in evidence.

1          THE COURT:  No, the questions, I think, are

2     appropriate, although I think we're getting repetitive.

3          MR. BRAFMAN:  Yes, your Honor I understand.

4     Q.  Now, you told us what the amount is that you would have to

5     pay to the government in connection with this, and how much was

6     that in your estimation?

7     A.  Over a million dollars.

8     Q.  And how did they come to that, if you know?

9     A.  They multiplied it with fines.

10    Q.  They what?

11    A.  It was —— they came up with —— they multiplied with fines.

12    I don't know the details.  I don't know the formula, but it was

13    whatever ——

14    Q.  What was the formula?  The number of aids who didn't get

15    their compensation?

16    A.  It was based on the dollar amount that was received that

17    was not given multiple, multiple times.

18    Q.  OK.  Now —— and if you go to paragraph 6, please, on the

19    next page.  I'm sorry, keep going up.  Page 8.  It's page 8.

20    All right.  If you'd stop there.

21          I'm sorry, this confirms what you said:  "Crown

22    acknowledges that its acts and the acts of persons acting in

23    concert with it was losses to the United States and the State

24    of New York of at least $1.4 million and exposed Crown to

25    additional penalties."

1              Do you see that?

2    A.   Yes.

3    Q.   And that's what you and your wife agreed to?

4    A.   Yes.

5    Q.   And now I asked you about whether or not the agreement

6    talks about criminal activities.  Do you remember that?

7    A.   Yes.

8    Q.   And you said that it doesn't?

9    A.   Correct.

10   Q.   Now I want to turn to page 13, please.  Can you read

11   paragraph 11 on page 8 to yourself.

12              Have you read it?

13              MS. McLEOD:  Your Honor, at this point the government

14   would ask that this be published to the jury if this is ⸺

15              THE COURT:  You want to publish it to the jury, you

16   said?

17              MS. McLEOD:  At this point it's being read into

18   evidence.

19              THE COURT:  What do you want to do?

20              MS. McLEOD:  I have an objection to reading from a

21   document not in evidence.

22              THE COURT:  Well, it's not being offered for the truth

23   of what's in the document.  He's being asked about whether

24   those allegations are true or not.  He can be asked that.

25              MS. McLEOD:  No objection to the questions.  I'm

1    objecting to reading from the document which is not in

2    evidence.

3                  THE COURT:  So what do you want me to do?

4                  MS. McLEOD:  I would like the defense counsel not to

5    read from a document that's not in evidence.

6                  THE COURT:  Well, I ——

7                  MS. McLEOD:  He could offer it.

8                  THE COURT:  What do you want to do, Mr. Brafman?

9                  MR. BRAFMAN:  I'm happy to offer it, and I'm also

10   happy to confront the witness with the fact that this agreement

11   does not preclude criminal prosecution.  That's the only point

12   I want to make before I move on.  So it's up to you.

13                 THE COURT:  Why don't you make that point, and then we

14   can move on.

15                 MR. BRAFMAN:  Yes.

16   BY MR. BRAFMAN:

17   Q.  Can you read it to yourself.

18   A.  Yes.

19   Q.  And it says that you don't have any protection for criminal

20   prosecution, correct?

21   A.  Correct.

22   Q.  Excuse me?

23   A.  Correct.

24   Q.  And you understood that what you did was not only violate a

25   civil agreement to pay the Wage Parity Act, but that's also

1    what you pled guilty to as a crime?

2    A.  Correct.

3    Q.  Now, at the same time as resolving this with the federal

4    court, you also resolved it with the New York State Attorney

5    General's Office, right?

6    A.  Correct.

7    Q.  Because you knew that Crown was under investigation by the

8    New York State Attorney General for the very same conduct,

9    correct?

10   A.  Correct.

11          MR. BRAFMAN:  And if we have that, can we put that on

12   the — do you have that?  Can you go to the last page.  Go to

13   the first page and the last page.  OK.  Sorry.

14   Q.  Do you see that in front of you?

15   A.  Yes.

16   Q.  This is known as an assurance of discontinuance, which

17   means you're pledging to the attorney general that Crown is

18   going to stop doing this, correct?

19   A.  Correct.

20   Q.  All right.  If we go to the last page, please, do you see

21   who signed it for Crown of Life?

22   A.  Yes.

23   Q.  Who is that?

24   A.  My wife.

25   Q.  And you didn't sign it, did you?

1    A.  Correct.

2    Q.  OK.  Now if we can move on.

3        You understand what the Paycheck Protection Program

4    is?

5    A.  I'm not sure.

6    Q.  You understand that during the COVID pandemic, the court —

7    the government essentially agreed to provide benefits to

8    companies who claimed that their employees were not working

9    because of the pandemic, correct?

10   A.  Correct.

11   Q.  So you know what it is, correct?

12   A.  PPP, correct.

13   Q.  Yeah, it's called PPP, right?

14   A.  Yes.

15   Q.  And your company got $1,200,000 by submitting a claim,

16   correct?

17   A.  Correct.

18   Q.  That's a lot of money.

19   A.  Correct.

20   Q.  And you represented that there were 300 employees who

21   didn't work during the pandemic?

22   A.  I'm not sure that the PPP is that it didn't work.  I'm not

23   aware of that.  We did have — we received PPP for patient —

24   for employees that did work.

25   Q.  Going to show you a copy of Exhibit 35 — I'm sorry,

1    3503 —

2              MR. KAPLAN:  We can put it on the screen.

3              MR. BRAFMAN:  You can put it on the screen, 3503-063.

4    Q.  Would you look at what's before you.  And I ask if that's

5    the — if you recognize that as the application for Paycheck

6    Protection Program funds?

7    A.  Yes.

8    Q.  And if you'd look at the back and see if that was signed by

9    your wife again.

10   A.  Yes.

11   Q.  And she signed as an authorized representative of the

12   applicant, correct?

13   A.  Correct.

14   Q.  And the applicant is Crown of Life?

15   A.  Correct.

16   Q.  And you did not disclose your partnership interest in this

17   company at the time, did you?

18   A.  Correct.

19   Q.  But you knew that not disclosing it was a crime?

20   A.  No, I did not.

21   Q.  Look at the — on the first page No. 6 and read it to

22   yourself.

23   A.  This application was done with advice from — from the

24   attorneys that it was done with and was — I don't recall all

25   the details from this application.

1  Q.  But look at No. 5 and read it to yourself.

2  A.  Yes.  Make it big, please.

3  Q.  No. 5 right above No. 6, do you see it?

4  A.  Yes.

5  Q.  Did you own any ownership interest in Crown of Life at the

6  time?

7  A.  As a partner with my wife, yes.

8  Q.  I'm sorry?

9  A.  As a partner with my wife.

10  Q.  But it tells you that if any individual or any individual

11  owning 20 percent or more of the equity of the applicants is

12  subject to an indictment, criminal information, arraignment, or

13  other means by which formal criminal charges are brought in any

14  jurisdiction or presently incarcerated or on probation or

15  parole, and the X is marked in the "no" box?

16  A.  Correct.

17  Q.  What lawyer told you this was a good thing to do?

18  A.  Individual owning 20 percent or more.

19  Q.  That's you.

20  A.  I don't own 20 percent or more.

21  Q.  You were partners with your wife?

22  A.  We're partners because we're partners.

23  Q.  How much did you own?

24  A.  My wife owns 99 percent of the company.

25  Q.  99 percent?

1    A.   Yes.

2    Q.   And you were not an owner of the applicant?

3    A.   As says here, if the applicant, individual more than

4    20 percent.

5    Q.   But look at the next one.  It says within the last five

6    years.  Within the last five years has —— in the last five

7    years for any felony, has the applicant or any owner of the

8    applicant.  That includes you, didn't it?  During the last five

9    years, you were an owner of this applicant.

10   A.   I'm a partner with my wife, that is correct.

11   Q.   No, no, no, no, let's stop that for a minute and just

12   answer my question.

13             MS. McLEOD:  Objection.  Argumentative.

14             THE COURT:  Rephrase.

15   Q.   In the last five years, were you an owner of the applicant?

16   A.   Being that I was with my wife, I'm considered an owner from

17   the company.  I do not own anything on any documents.  I'm not

18   a legal owner of the company, just by the fact that I'm married

19   to her and working together with her.  And I understand the

20   application was based on who legally owns the company on the

21   documents, and this is how they were —— the way the

22   applications were applied for.

23   Q.   You finished?

24   A.   Yes.

25   Q.   Can I ask another question?

1   A.  Yes.

2           MS. McLEOD:  Objection.  Argumentative.

3           THE COURT:  Let's move forward.

4   Q.  Within the last five years, whether you owned the company

5   or not, you've been convicted of felonies, right?

6   A.  Yes, I was.

7   Q.  And this document is signed in 19 — I'm sorry, in 2022, am

8   I correct?

9   A.  Yes.

10  Q.  And in 2022, if you go back five years, we're talking about

11  to 2017, right?

12  A.  Correct.

13  Q.  And since then you've pled guilty to a number of different

14  serious felonies, isn't that correct?

15  A.  Correct.

16  Q.  And that's not listed here, is it?

17  A.  And it's not requested here according to my understanding.

18  Q.  I'm sorry?  I'm sorry?

19  A.  It's not requested over here according to my understanding.

20  The way it was told, it's based on who owns the documents of

21  the company.  My wife owns the company on the documents.  I do

22  not own documents.  I'm not a document owner from the company.

23  Q.  What does that mean?  You don't have a license in your

24  name?

25  A.  No, that means the corporation is not owned by me.  On the

1  legal documents, I'm not an owner.

2  Q.  Was that conveniently done so that you'd get the money?

3  A.  It was done with advice for the attorneys how to apply the

4  corporation.

5  Q.  So they told you that you could remove yourself from the

6  corporate ownership so you could get like a million dollars?

7  A.  Not at all.  The application, the way I understand, asked

8  who are the legal documents on paper, the legal documents, and

9  that is not me.  That is my wife.

10 Q.  But they asked within the last five years has the applicant

11 or any owner of the applicant, and this is during the last five

12 years.  You were an owner of this company during the last five

13 years, yes or no?

14 A.  I am not an owner on this company, a legal document owner.

15 I'm married to my wife.  That's why this makes me an owner,

16 being working together with her.

17 Q.  OK.  Now, if you look at the next page, above the signature

18 of your wife, she further certifies that the information

19 provided in this application and the information provided in

20 all supporting documents and forms is true and accurate in all

21 material respects.  I understand that knowingly making a false

22 statement to obtain a guaranteed loan from the Small Business

23 Administration is punishable under the law for five years'

24 imprisonment and fines, and they would —— a fine not more than

25 $1 million.

1          Do you see that?

2   A.  Yes.

3   Q.  And your understanding is that she's OK with saying that?

4   A.  My understanding is that I'm not a legal document owner on

5   this application, on Crown of Life at all.

6          MR. BRAFMAN:  You could take it down, please.

7   Q.  Well, this document is signed on May 7 of 2020, OK.  That's

8   the date it's signed.  On 9/19 you told government agents that

9   you were the owner of that company.

10  A.  I am an owner, but not on the documents.  They were

11  referring to me as far as my involvement with the company, and

12  that is what I testified —— that is what I agreed that I'm

13  considered an owner by working together and being involved with

14  the company.  That did not refer to me, who is owner on

15  document.

16  Q.  That's why you had to plead guilty to making a false

17  statement to the agents when you told them that you were not

18  the owner.  They said it was a lie.

19  A.  They said that the fact that I was hiding the fact that I

20  was involved as an owner, that is a lie.  They were not talking

21  about who was the legal owner on the documents.  These are two

22  different things according to my understanding.

23  Q.  Look at the —— I'm sorry, if you could put that back,

24  please, and look at the last page.  I'm sorry, the page 4.

25          Can you read the last paragraph to yourself.  Have you

1    read it?

2    A.   Yes.

3    Q.   It says within the last three years, the owner, whoever

4    that is, is certifying that no one was debarred in the last

5    three years from working in a company that's getting money from

6    Medicaid and Medicare.

7    A.   Correct.

8    Q.   You were debarred?

9    A.   I'm not debarred.

10   Q.   How?

11   A.   And it's not talking about me.

12   Q.   Excuse me?

13   A.   This is not talking about me.  Based on the applicant, the

14   applicants, they're talking the owner who was the legal owner

15   on documents.

16   Q.   That's your wife?

17   A.   What's that?

18   Q.   That was your wife at the time, right?

19   A.   Still is.  My wife owns the company legally.

20   Q.   Did the government ever confront you with the fact that

21   they believe you deleted emails?

22   A.   I'm sorry?

23   Q.   Did the government during your proffer sessions ever

24   confront you with the fact that they believe you deleted

25   emails?

1   A.  I don't know what their position was.  They asked me — I

2   remember them asking access to all my emails, and I was happy

3   to give it to them.

4   Q.  And?

5   A.  That's the end of my statement.

6   Q.  That's it?

7   A.  As far as I'm — as far as I know, that is the end of my

8   statement.

9   Q.  But on January 12 of 2021, the government said that they

10  believe you deleted emails in connection with Mr. Zilberberg,

11  Mr. Sauber, and Mr. Fried.  Didn't they accuse you of that?

12  A.  And I showed them that I did not delete any emails special

13  from — from this — from anybody, actually.

14  Q.  How did you show them?

15  A.  I gave them access to all my emails.

16  Q.  Look at — I'm sorry.

17          If we could put this up.  I'm sorry.  It's proffer

18  notes.

19  A.  I'll rephrase it in the statement.  I did not delete any

20  emails about anybody about the investigation.

21  Q.  They didn't tell you that they had seen emails between the

22  parties in this loan and you deleted them?

23  A.  That does not mean I deleted it.  It could be that they'd

24  seen emails prior that was very old, but I did not delete

25  specially any emails.

1  Q.  So what happened to them?  They disappeared?

2  A.  Well, emails after a while, when it's so many years ago,

3  automatically when old emails go out, new emails come in to

4  make space.  So it was not deliberately deleted any emails

5  specifically for the investigation.

6  Q.  Did the agents tell you that they believed that the emails

7  were purposely deleted by you?

8  A.  I'm not aware that they accuse me of that.  That's the

9  first time, surprisingly, that I'm hearing it.  But I would

10 like to say that I did not delete specially any emails

11 pertaining to the investigation.

12        MR. BRAFMAN:  We can put up 3503-072, please.

13 Q.  You see it in front of you?

14 A.  Yes.

15 Q.  Does it refresh your recollection that on January 22, 2021,

16 you and your lawyer met with agents and government officials?

17 A.  Yes.

18 Q.  And do you see in the middle of the second paragraph ——

19 right here, if you can highlight this paragraph —— do you see

20 the agents note that ——

21        MS. McLEOD:  Objection.

22        THE COURT:  Mr. Brafman, if it's simply someone else's

23 notes that you want to quote from, then I'm going to sustain

24 the objection.

25 Q.  I'll ask him to look at it and see if it refreshes your

1  recollection.

2  A.  What is the question?

3  Q.  That you were confronted with the fact that they believed

4  you deleted emails.

5  A.  I remember they asked access to all my emails.  I was not

6  — I'm not aware that they accused me that I — that I did it.

7  I feel that I gave them all the access to my emails, and I told

8  them that I did not delete any emails.  And I'm saying here

9  that I did not delete any emails specially for — to hide

10  anything from the government or anybody.

11  Q.  Can you look at the second page, please.  Did you tell the

12  agents that you denied deleting emails with knowledge of this

13  investigation, but that you did remember deleting emails in the

14  past, but it was not his general practice to delete emails,

15  correct?

16  A.  No.  What I — I don't recall anything, but I can say what

17  it was.  Basically, I do not just delete emails unless if they

18  were very old.  I remember having at one point a problem.  I

19  couldn't get more emails.  So I had the IT person, whoever it

20  was, just made me more room that I should get newer emails.

21            MR. BRAFMAN:  OK.  Now put up the cooperation

22  agreement.

23  Q.  You identified this on direct examination as your

24  cooperation agreement, correct?

25  A.  Yes.

1    Q.  And that's already in evidence, so I'd ask you to please

2    ignore the ticket on the bottom that says defense exhibit,

3    because it has a government exhibit.

4            Do you know what the exhibit is, Ms. --

5            MS. McLEOD:  It's actually just the same number.

6            MR. BRAFMAN:  What?

7            MS. McLEOD:  It's just the same number, 3508-87.

8    Q.  This is Government Exhibit 3503-87, and it's identified as

9    your cooperation agreement.  Do you see that?

10   A.  Yes.

11   Q.  Now, you reviewed this document carefully, right?

12   A.  Yes.

13   Q.  And you reviewed it with your lawyer, right?

14   A.  Yes.

15   Q.  This is an important document in your life at the time,

16   right?

17   A.  Yes.

18   Q.  Because despite lying over and over again, they agreed to

19   give you a cooperation agreement?

20   A.  Yes.

21   Q.  That would allow them to write a letter if they believed

22   you — to Judge Schofield and giving her the report about your

23   testimony and involvement in this case, right?

24   A.  Yes.

25   Q.  So this was a document you reviewed carefully with your

1    lawyer, right?

2    A.  Yes.

3    Q.  And if you look at the paragraph Count One, this paragraph

4    that refers to you —— refers to the bank fraud that you

5    committed in connection with this case, correct?

6    A.  Yes.

7    Q.  And it indicates that you have a maximum 30-year prison

8    sentence, correct?

9    A.  Yes.

10   Q.  And other financial penalties, correct?

11   A.  Yes.

12   Q.  And Count Two charges you with participation in a bank

13   fraud, and it also exposes you to 30 years in prison, correct?

14   A.  Yes.

15   Q.  And Count Three exposes you to —— this is making false

16   statements to a financial institution, and that's a five-year

17   count, correct?

18   A.  Yes.

19   Q.  And Count Four charges you with violating section —— for

20   making false statements to a financial institution, and that

21   exposes you to 30 years in prison, correct?

22   A.  Yes.

23   Q.  All right.  So just for those counts that are in effect,

24   the basis of this bank fraud case, you were exposed to 30

25   years, 30 years, 10 years, and 5 years, correct?

1   A.   Yes.

2   Q.   So that was 95 years?

3   A.   Yes.

4   Q.   So if you get the maximum sentence, you would get 95 years

5   in prison?

6   A.   Yes.

7   Q.   Now, you're 56 years old, correct?

8   A.   Yes.

9   Q.   So if you had a 90-year sentence, it would make you 140

10  when you finished that sentence, right?

11  A.   Yes.

12  Q.   So you didn't understand that that was a real punishment.

13  You just thought those were the maximum sentences, right?

14  A.   It is — it is a real — it's a potential maximum sentence.

15  Q.   No, I understand that's the maximum sentence.  But in your

16  own mind at the time you signed this, did you believe that that

17  was the kind of sentence you would be exposed to?

18  A.   I am exposed to the amount of the crimes.  This is what my

19  exposure is.

20  Q.   And then they made you plead guilty to additional crimes,

21  crimes that you committed basically in their offices by denying

22  ownership in Crown of Life and by participating in the money

23  laundering and by making false statements, correct?

24  A.   Correct.

25  Q.   So you got an additional exposure under Count Five to 10

1    years for the health care fraud; on Count Six to 20 years for

2    health care fraud and money laundering; and for Count Seven,

3    false statements, that was an additional five years, correct?

4    A.   Yes.

5    Q.   So that's an additional 35 years, correct?

6    A.   Yes.

7    Q.   I did the math.  It's additional 100 —— additional 35

8    years, correct.  So you would have to be like 180 by the time

9    you got out of prison if you were ever sentenced to prison for

10   the crimes you admitted to, right?

11   A.   Yes.

12   Q.   Now, if you look at the paragraph below that, it is further

13   agreed, you've agreed to this, this one right here:  It is

14   further agreed that you will —— two weeks prior to sentencing,

15   you shall file with the Internal Revenue Service amended tax

16   returns for the years 2009 through 2018, correct?

17   A.   Yes.

18   Q.   And you understood that to mean that you've got to fess up

19   to all the money you didn't declare for those nine or ten

20   years, correct?

21   A.   Yes.

22   Q.   Can you estimate for us how much money that will be?

23   A.   No.

24   Q.   Millions?

25   A.   I'm not estimating, I'm sorry.

1    Q.  But you don't know whether it's $100 or millions?

2    A.  I'm not estimating it.  I'll give it to an account, a

3    professional.  He'll not estimate; he'll do it accordingly.

4    Q.  And then what will you do?  You'll pay the money?

5    A.  Should I predict the future, is that the question?

6    Q.  No.  Are you going to agree to pay all of that money?

7    A.  I am agreeing to do everything that I have to do

8    accordingly.

9    Q.  But this agreement doesn't protect you from prosecution by

10   the IRS for tax crimes, does it?

11   A.  No, it does not.

12   Q.  But you committed tax crimes every year from 2009 to 2018,

13   correct?

14   A.  No.

15   Q.  Well, haven't you just admitted that you're going to file

16   amended returns so that they will be accurate?

17   A.  You're asking two questions.

18   Q.  I am asking you whether you believe that you have coverage

19   under this agreement for tax crimes that you committed, and the

20   answer is no, you don't, right?

21   A.  I believe ——

22              MS. McLEOD:  Objection as to form.

23              THE COURT:  Overruled.  You can answer.

24   A.  I believe that this does not protect me against tax crimes,

25   if there is.

1    Q.  And you don't know ——

2    A.  If —— can I please finish my question —— my answers?  Let

3    me make it easier.

4            I believe that if there's any tax crimes that I have,

5    it's not protected by this.  I have to deal accordingly.  So

6    that's the answer to one question.  If you can please tell me

7    the second question, I'll be more than happy to answer it to

8    you.

9    Q.  Have you filed tax returns between 2009 and 2018?

10   A.  I believe I'm currently current with all my tax —— all my

11   taxes.

12   Q.  But you didn't declare all of the money during that period,

13   did you?

14   A.  I believe it was done according to whatever I was supposed

15   to declare.

16   Q.  And who told you that?  An accountant?

17   A.  I do my things with accounting, correct.

18   Q.  Now, you tell me that —— the paragraph on the top of

19   page 3, it is understood —— the second line, the second

20   paragraph.  There it is.  If you could look at that.

21           This tells you what you've got to do, and that means

22   you've got to testify truthfully, correct?

23   A.  Correct.

24   Q.  And then the government will determine whether or not, in

25   their opinion, you have in fact done that, correct?

1    A.  Correct.

2    Q.  And they will determine whether or not you get the 5K

3    letter, right?

4    A.  Yes.

5    Q.  And if the government believes you haven't been truthful,

6    you don't get it, right?

7    A.  Correct.

8    Q.  But you have this agreement that's already in your hands

9    after you haven't been truthful with them?

10   A.  Correct.

11   Q.  So they gave you a pass on that, right?

12   A.  Please rephrase the question.  I would like to answer it

13   accordingly.

14   Q.  You already lied to them by the time you got this

15   agreement, correct?

16   A.  I don't remember if the lie was prior to the agreement or

17   after.  I just don't remember the dates.

18   Q.  Excuse me.  The agreement is signed in 19 —— in 2022, which

19   is last year.

20   A.  OK.

21   Q.  You lied to them from '17, '18, '19, '20 ——

22   A.  Correct.

23   Q.  —— about your ownership, right?

24   A.  Correct.

25   Q.  They caught you, they confronted you, and they made you

1    plead guilty to lying to the agent?

2    A.   Yes.

3    Q.   So what does it mean that if in their opinion you've been

4    truthful?  You have already lied to them, haven't you?

5    A.   Correct.

6    Q.   And you got the agreement anyway?

7    A.   Correct.

8    Q.   Now, most of your crimes have been committed in Brooklyn,

9    is that correct?

10   A.   Correct.

11   Q.   Have you gotten protection from any other law enforcement

12   agency that they will not prosecute you?

13   A.   Not that I'm aware of.

14   Q.   Well, it says here that this agreement only binds the

15   Southern District of New York.

16   A.   OK.

17   Q.   Is that correct?

18   A.   Correct.

19   Q.   And the Eastern District of New York is in Brooklyn where

20   most of your crimes were committed, correct?

21   A.   Correct.

22   Q.   They didn't sign this agreement, did they?

23   A.   No.

24   Q.   So you may have exposure in Brooklyn that you don't know

25   anything about?

1  A.  Correct.

2  Q.  And you may have exposure in the Brooklyn District

3  Attorney's Office or any of the state agencies where you have

4  traveled while committing these crimes, correct?

5  A.  Correct.

6  Q.  But nobody has arrested you or filed any criminal charges

7  against you, isn't that correct?

8  A.  Correct.

9  Q.  What did the government say to you in the middle of the

10  page on page 4, this paragraph here?

11       If you can highlight "it is understood."

12       Can you read that to yourself, and then I'm going to

13  ask you a question.  The sentence —— we'll go through it so

14  nobody gets confused:  It is understood that the sentence to be

15  imposed upon you is within the sole discretion of the Court,

16  correct?

17  A.  Correct.

18  Q.  And they're referring to Judge Schofield who will be your

19  sentencing judge?

20  A.  Correct.

21  Q.  She's not a signatory to this agreement, which means you

22  have no assurance from her what your sentence will be?

23  A.  Correct.

24  Q.  What the government then says:  In addition, if this office

25  determines that Kahan has provided substantial assistance in an

1    investigation or prosecution, and if he has fully complied with

2    the understanding specified in this agreement, this office will

3    file a motion pursuant to Section 5K1 of the sentencing

4    Guidelines requesting the Court to sentence Kahan in light of

5    the factors set forth in 5K1.

6            Is that correct?

7    A.  Yes.

8    Q.  So in the first instance, the prosecutors will make the

9    determination as to whether they want to write this 5K letter,

10   right?

11   A.  Yes.

12   Q.  And you're going to be bound by their decision?

13   A.  Yes.

14   Q.  And they won't tell you what their decision is until after

15   this case is finished, right?

16   A.  Correct.

17   Q.  And I think you testified on direct that you would not ——

18   you would get your agreement whether or not Mr. Zilberberg was

19   or was not convicted.  Do you remember saying that?

20   A.  Yes, I do.

21   Q.  And do you remember being ——

22           MS. McLEOD:  Objection.  Mischaracterization.

23           THE COURT:  Overruled.  You can ——

24   Q.  Do you remember pleading guilty in April of 2021?  Just

25   accept the date, and we can move on.

1    A.  Yes.

2    Q.  OK.  April of '21 you went to a plea by phone or by Zoom

3    because it was during the pandemic, correct?

4    A.  Yes.

5    Q.  And you pled guilty before a judge who asked you a bunch of

6    questions?

7    A.  Yes.

8    Q.  And you were under oath?

9    A.  Yes.

10   Q.  And you admitted in that plea that you had committed the

11   crimes that you were pleading guilty to?

12   A.  Correct.

13   Q.  Including the health care fraud and the false statements

14   and money laundering, correct?

15   A.  Yes.

16   Q.  And the judge advised you of what the maximum penalties

17   would be, correct?

18   A.  Yes.

19   Q.  And the judge then went over with you the government's

20   obligation under 5K, or with the 5K, correct?

21   A.  Yes.

22   Q.  But didn't the judge tell you that they'll decide whether

23   your cooperation has been good enough and productive enough for

24   the government to make the motion?

25   A.  I don't recall exactly what he said, but he did tell me

1    that they gonna make the decision.

2    Q.  I'm not asking whether you remember that he said they're

3    going to make the decision.  I'm going to ask you whether you

4    remember being asked this question and being asked this ——

5    giving this answer to a judge under oath:

6    "Q.  Do you understand that the government could make a motion

7    before your sentencing called a 5K motion that would allow

8    Judge Schofield to give you a sentence below the guidelines

9    range or below the mandatory minimum?

10   "THE DEFENDANT:  Yes, your Honor.

11   "Q.  Do you understand that it's up to the government, not to

12   Judge Schofield, to decide whether your cooperation has been

13   good enough and productive enough for the government to make

14   that motion?"

15          Do you remember being asked that question and you

16   answering yes?

17   A.  Yes.

18   Q.  And what did you understand that to mean when the judge

19   asked you that question?  That you've just got to tell the

20   truth?

21   A.  Yes.

22   Q.  So what does good enough or productive enough mean?

23   A.  To cooperate and tell the truth.

24          MR. BRAFMAN:  I have nothing further, your Honor.

25          THE COURT:  Any further questions, Ms. McLeod?

1          MS. McLEOD:  Very briefly, your Honor.

2          All right.  Mr. Carbone, can you pull up 3503-042.

3   REDIRECT EXAMINATION

4   BY MS. McLEOD:

5   Q.  Do you remember being asked questions about this on

6   cross-examination?

7   A.  Yes.

8   Q.  And this is the information that you've pled guilty to,

9   correct?

10  A.  Correct.

11         MS. McLEOD:  The government offers 3503-042.

12         THE COURT:  Any objection?

13         MR. BRAFMAN:  No objection.

14         THE COURT:  It will be admitted into evidence.

15         (Government's Exhibit 3503-042 received in evidence)

16  BY MS. McLEOD:

17  Q.  So let's take a look, because I don't think it's been

18  published yet to the jury.  So let's show them.

19         Were you asked —— do you remember being asked

20  questions on cross-examination about lying to federal agents,

21  that charge?

22  A.  Yes.

23  Q.  Do you remember being asked that that charge didn't cover

24  all of the statements?  There weren't separate counts for every

25  single statement.  Do you remember that question?

1   A.  Correct.

2           MS. McLEOD:  Let's go to Count Seven, Mr. Carbone.

3   OK.  If you can — yes, thank you.

4   Q.  Do you see that Count Seven covers materially false,

5   fictitious, and fraudulent statements and representations that

6   were made --

7   A.  Correct.

8   Q.  -- by you?

9           Thank you, Mr. Carbone.

10          And I want to go back briefly.  You were asked a lot

11  of questions on cross-examination about your prior fraud

12  activity.  Do you remember those questions?

13  A.  Yes.

14  Q.  And you testified on direct that you spoke to Mendel

15  Zilberberg at his office, correct, at one point?

16  A.  Correct.

17  Q.  And Mendel Zilberberg knew that you were a convicted felon,

18  correct?

19  A.  Yes, he do.

20  Q.  He knew about your fraud conviction, correct?

21  A.  Yes.

22  Q.  But he had discussions with you about being a partner in

23  Emanuel Services?

24  A.  Correct.

25  Q.  And that was in 2009, correct?

1  A.  Correct.

2              MS. McLEOD:  No further questions, your Honor.

3              THE COURT:  Any further questions?

4              MR. BRAFMAN:  Nothing, your Honor.  Thank you.

5              THE COURT:  All right.  You can step down, sir.  Thank

6  you.

7              (Witness excused)

8              THE COURT:  Did you want to take about 20 minutes with

9  another witness?

10             MR. BRAFMAN:  Can we just have this discussion at the

11 sidebar, your Honor?

12             THE COURT:  Yes.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        (At sidebar)

2        MR. BRAFMAN:  Your Honor, yesterday when the

3    government asked me if they should have another witness and I

4    suggested I can't imagine not taking the whole day, I think

5    subject to some of the rulings, I had to cut out some of the

6    cross.  So it's not their fault, but it was impossible for me

7    to predict how long it would take.  So I did tell them that I

8    would go till 5:00, and it's now 4:30.  So I've covered as much

9    as I could do.

10        THE COURT:  Do you have another witness you want to

11   call?

12        MS. McLEOD:  We don't today.

13        THE COURT:  OK.

14        MS. McLEOD:  I think we'd ask --

15        MR. NESSIM:  We are, I think, moving ahead of

16   schedule.

17        THE COURT:  I think so too.  I think there's a good

18   chance — I'm about to tell the jury I think we should be able

19   to finish the witnesses next week.

20        MR. BRAFMAN:  I think that's fair.

21        THE COURT:  I'm not going to make any promises how

22   long after we have summations and charge and deliberations, but

23   I think I'm fairly confident I can tell them next week we'll

24   finish the witnesses.

25        Do you have another five or so?

1        MR. NESSIM:  Five more witnesses.

2        MS. McLEOD:  Five more witnesses, but they're all a

3   lot shorter.

4        MR. BRAFMAN:  And the cross-examination's going to be

5   very brief with many of them.

6        THE COURT:  How many do you think you can do tomorrow?

7        MS. McLEOD:  We're going to do at least two ──

8        MR. NESSIM:  Potentially three.

9        MS. McLEOD:  ── if not three.

10        THE COURT:  So you may rest, then, Monday?

11        MS. McLEOD:  We think we are almost certainly going to

12   rest on Monday.

13        THE COURT:  All right.

14        MR. BRAFMAN:  Thank you.

15        THE COURT:  We'll adjourn for the day.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

1     (In open court; jurors present)

2     THE COURT:  All right.  Ladies and gentlemen, we're

3 going to adjourn for the day.  I want to tell you now that I

4 think we're making very good progress.  We're ahead of

5 schedule.  I'm fairly confident that we can finish the

6 witnesses sometime before the end of next week.  So hopefully

7 —— I can't make any promises.

8     After we finish the witnesses, then we have to have

9 summations or closing arguments of the lawyers, then I have to

10 instruct you on the law and then send you in for your

11 deliberations.  So I can't —— and who knows how long

12 deliberations will take?  That will be up to you.

13     But I'm fairly confident —— I'm going to try to work

14 it out so that we finish the witnesses next week, and if we

15 finish them early enough, then we'll move forward with all

16 those other aspects of the trial.  But I'm fairly confident

17 that at least the witnesses themselves will be finished before

18 the end of next week.  So we will keep —— I'm sure we'll keep

19 this case within the next week and a half, two weeks, at the

20 most.

21     So I'm going to ask you to come in at 9:45 tomorrow.

22 I'm going to try to start on time tomorrow.  I think if we make

23 good progress tomorrow, it might give me some basis to give you

24 a more specific instruction about how we're going to do next

25 week.

1          I may let you go home a little early tomorrow,

2     depending on what it is.  It's Friday.  We'll see if we can do

3     that, but I do want to keep us on schedule.  So we'll see how

4     we proceed next week.

5          So don't discuss the case.  Keep an open mind.  I'll

6     see you tomorrow morning 9:45, and we'll continue then.

7          (Jury not present)

8          THE COURT:  OK.  We'll continue tomorrow morning at

9     9:45.  Have a good evening.  See you then.

10          MS. McLEOD:  Thank you, your Honor.

11          (Adjourned to July 7, 2023, at 9:45 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2  Examination of:                          Page

3   TODD GOLDMAN

4  Direct By Ms. Mcleod . . . . . . . . . . . . 119

5  Cross By Mr. Kaplan . . . . . . . . . . . . 152

6  ABRAHAM KAHAN

7  Direct By Ms. McLeod . . . . . . . . . . . . 158

8  Cross By Mr. Brafman . . . . . . . . . . . . 193

9  Redirect By Ms. McLeod . . . . . . . . . . . 303

10                   GOVERNMENT EXHIBITS

11  Exhibit No.                              Received

12   811  . . . . . . . . . . . . . . . . . . 132

13   51   . . . . . . . . . . . . . . . . . . 135

14   816  . . . . . . . . . . . . . . . . . . 140

15   801, 803, 805, 807 through  . . . . . . . . 154

16         810, and 813 through 815

17  3503-87  . . . . . . . . . . . . . . . . . 165

18   418  . . . . . . . . . . . . . . . . . . 178

19   416  . . . . . . . . . . . . . . . . . . 181

20   435  . . . . . . . . . . . . . . . . . . 185

21   432  . . . . . . . . . . . . . . . . . . 186

22  3503-042  . . . . . . . . . . . . . . . . 303

23                   DEFENDANT EXHIBITS

24  Exhibit No.                              Received

25   Kahan A  . . . . . . . . . . . . . . . . . 212

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300