N77HZil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

1

2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        19 Cr. 802 (GBD)

5    MENDEL ZILBERBERG,

6                                        Trial
                  Defendant.
7
     ------------------------------x
8
                                        New York, N.Y.
9                                        July 7, 2023
                                         9:45 a.m.
10

11   Before:

12                 HON. GEORGE B. DANIELS,

13                                       District Judge
                                         -and a Jury-
14
                       APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   DINA McLEOD
     DANIEL G. NESSIM
18        Assistant United States Attorneys

19   BRAFMAN & ASSOCIATES, P.C.
          Attorneys for Defendant
20   BY:  BENJAMIN BRAFMAN
          JACOB KAPLAN
21

22   Also Present:

23   Robert Stout, Special Agent FBI
     Nicholas Tranchitella, Special Agent FDIC
     Joseph Carbone, Paralegal Specialist, USAO
24   Lia Newman, Defense Paralegal

25

N77HZil1

1                    (Trial resumed; jury not present)

2                    THE COURT:  I believe all our jurors are here, so

3     we're ready to proceed.  How did the government intend to

4     proceed?

5                    MR. NESSIM:  Sorry, your Honor?

6                    THE COURT:  What did you intend to present?  How long

7     would it take?

8                    MR. NESSIM:  Our first witness is Mordechai Freund.

9     We expect his direct examination to be a little more than an

10    hour and then cross-examination, and then we'll have — our

11    second witness will be Moshe Rosenwasser, who will also testify

12    for maybe an hour and a half or so.

13                   THE COURT:  What about a third witness?

14                   MR. NESSIM:  We have a third witness if necessary.  It

15    will be a very short witness, and that's —

16                   THE COURT:  You think we can do all three of those

17    today?

18                   MR. NESSIM:  I think we can.  I guess we'll see where

19    we are at the lunch break.

20                   MR. BRAFMAN:  Yes.

21                   MR. NESSIM:  But that's our expectation.

22                   THE COURT:  All right.  And then you would anticipate

23    two more witnesses on Monday?

24                   MR. NESSIM:  Two more witnesses on Monday.  So we

25    expect the government will likely rest either probably early in

1     the afternoon on Monday.

2              THE COURT:  So you think they'll spill over into the

3     afternoon?

4              MR. NESSIM:  It may not.  It may not, but at least by

5     the early afternoon we will rest.

6              THE COURT:  All right.  Is there anything we need to

7     address before we go to these witnesses today?

8              MR. NESSIM:  Just as long as we're on the topic of

9     timing, your Honor, the parties have discussed this.  Just

10    given our schedule and where we stand, our hope, if it's

11    acceptable to the Court, would be for the government to rest

12    either late morning or early afternoon on Monday.  Whether or

13    not the defendant chooses to testify, we understand that he

14    likely will not.

15             MR. BRAFMAN:  Correct.

16             MR. NESSIM:  And a charge conference Monday afternoon,

17    and then we would come back on Tuesday for summations and the

18    charge, if that's acceptable to the Court.  That's sort of what

19    the parties had hoped could be the schedule going forward.

20             THE COURT:  That's fine.  I just didn't want to — I

21    don't really want to bring the jury in for like 40 minutes on

22    Monday and then send them home, but we'll plan on that.  Unless

23    these three witnesses go really fast and those other two — or

24    one of those two we could do this afternoon.

25             MR. NESSIM:  Unfortunately, just so the Court knows,

1    the two witnesses really have to go on Monday.  One is a

2    summary witness who will be the last witness in the trial, and

3    the other is a witness that's the subject of the immunity order

4    that the Court signed.  Her attorney is traveling in from out

5    of state and won't be here until Monday, and he needs to be

6    present to invoke on her behalf.

7            THE COURT:  What did you intend to do with regard to

8    the similar act evidence that we discussed?

9            MR. NESSIM:  The other loans?

10           THE COURT:  Yes.

11           MR. NESSIM:  So one of the witnesses today relates to

12   one of those loans, and actually, all three of the witnesses

13   today will be discussing, through emails, portions of those

14   other acts.

15           THE COURT:  You intend to present that evidence

16   through those witnesses today?

17           MR. NESSIM:  Portions of it, yes.

18           THE COURT:  When you say "portions of it," are there

19   additional portions that we would hear on Monday?

20           MR. NESSIM:  The summary witness will testify to part

21   of it, and the other witness on Monday will testify to part of

22   it.

23           THE COURT:  All right.  Mr. Brafman.

24           MR. BRAFMAN:  I was standing just to straighten up a

25   little bit, Judge.  Sorry.

1          THE COURT:  All right.  Then the jurors are here, so

2     let's bring them in promptly.  As soon as we adjourn, as soon

3     as we finish those three witnesses, we'll adjourn for the day.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Now, ladies and gentlemen, after my

3     discussion with the lawyers, I'm fairly confident that we can

4     finish all of the witnesses by early next week.  So I'll give

5     you further instructions.  I think we're going to try to do two

6     or three witnesses today, and then when we finish those

7     witnesses, we'll adjourn for the day, and then we'll follow up

8     with witnesses on Monday, and then we'll see where we are.  But

9     I'm fairly confident that Monday, Tuesday, or Wednesday, we

10    might finish all of the witnesses, and we can get the case to

11    you for your deliberations.

12         So with that, I thank you for being prompt, because

13    that helps.

14         We'll turn to the government.  Will the government

15    call its next witness.

16         MR. NESSIM:  Yes, your Honor.  The government calls

17    Mordechai Freund.

18         THE COURT:  Would you step up, sir.  Step up into the

19    witness box and stand there for a second.

20         Thank you.

21    MORDECHAI FREUND,

22         called as a witness by the Government,

23         having been duly sworn, testified as follows:

24         THE COURT:  You can inquire, Mr. Nessim.

25         MR. NESSIM:  Thank you, your Honor.

1    DIRECT EXAMINATION

2    BY MR. NESSIM:

3    Q.  Good morning, Mr. Freund.

4            How old are you?

5    A.  50.

6    Q.  In what neighborhood do you live?

7    A.  Borough Park.

8            THE COURT:  You have to keep your voice up.  Get a

9    little closer to the mic.

10   Q.  How far did you go in school?

11   A.  Some college.  I'm not sure if I finished at the end.

12   Q.  What do you do for work?

13   A.  I manage real estate and I sell title insurance.

14   Q.  Turning your attention to approximately 2009, who did you

15   work for at that time?

16   A.  Mendel Zilberberg.

17   Q.  And for approximately how long did you work for Mendel

18   Zilberberg?

19   A.  I think about 20 years.

20   Q.  How did you meet Mr. Zilberberg?

21   A.  Through family.  He's my wife's — his wife is my wife's

22   aunt.

23   Q.  Approximately how long have you known him?

24   A.  Probably close to 30 years.  Twenty-eight, 29 years, I

25   think.

1   Q.  Are you testifying today voluntarily?

2   A.  No.

3   Q.  Why are you testifying today?

4   A.  I received a subpoena.

5   Q.  You testified that you worked for Mr. Zilberberg.  What

6   sort of role did you have working for Mr. Zilberberg?

7   A.  Over the course of 20 years, things change over time, but I

8   did a little bit of everything.  Certain times I was office

9   manager.  I did closings.  I did title closings, bank closings,

10  accounts receivable, billing.

11  Q.  During your time working for Mr. Zilberberg, did he have

12  more than one company?

13  A.  I'm sorry.  Repeat the question.

14  Q.  During your time working for Mr. Zilberberg, did he have

15  more than one company?

16  A.  Yes.

17  Q.  And did you work for him in a particular — for a

18  particular company or in more than one?

19  A.  More than one.

20  Q.  What were some of the businesses that you were involved in

21  working for Mr. Zilberberg in?

22  A.  In a law firm.  He had a title company.  Then he had a

23  company that was called Law Bucks that did cash advances for

24  injury cases, I think.  Then he had a company that did medical

25  billing and nursing.  And maybe there's some that I don't

1   remember.

2   Q.   What was the name of his legal practice?

3   A.   Mendel Zilberberg & Associates.

4   Q.   What was the name of his title company?

5   A.   Brookwood Title Agency.

6   Q.   What was the name of the nursing and medical billing

7   company?

8   A.   Had a few different names, and I may not remember

9   everything.  GS3 Medical Billing, GS3 India, One World United,

10  and I think maybe Brookwood Staffing at one point as well.

11  Q.   Mr. Freund, I want to show you a few emails.

12           Mr. Carbone, can you please publish for the witness

13  and the parties what's been marked for identification as

14  Government Exhibit 602.

15           Before I offer this, I'd like to read and offer a

16  stipulation between the parties.  The government offers

17  Government Exhibit 1004, which is a stipulation between the

18  parties.

19           THE COURT:  Yes.

20           (Government's Exhibit 1004 received in evidence)

21           MR. NESSIM:  I'll just read a portion of that.  This

22  is a stipulation which is an agreement between the parties, and

23  this stipulation reads, in part, that Government Exhibits 401

24  to 437, 501 to 506, 551 to 562, and 601 to 608, including

25  sub-exhibits, are true and correct copies of emails contained

1    in Park Avenue Bank employee email accounts or in email

2    accounts belonging to Mendel Zilberberg's employees and

3    associates.

4             The stipulation also states that this exhibit can be

5    received into evidence as Government Exhibit 1004.

6             With that stipulation, the government offers

7    Government Exhibit 602.

8             MR. KAPLAN:  No objection.

9             THE COURT:  It will be admitted into evidence.

10            (Government's Exhibit 602 received in evidence)

11            MR. NESSIM:  Mr. Carbone, can you please publish this

12   for the jury, and zoom in to the portion of the document with

13   text.  Thank you.

14            So I'll read from the bottom.  It says from Mordechai

15   Freund to Mendel Zilberberg.  It's dated August 7, 2009.  The

16   subject line is a dollar:  "Did not hear yet from Abe.  Mendel

17   Klein left a VM that I should mail him a statement as of

18   7/30/09.  Fried?  Mordechai Freund."

19            And then on top, Mendel Zilberberg to Mordechai Freund

20   also on August 7:  "Fried is working on it.  I spoke to him

21   earlier today and figure I can call him Sunday or Monday noon

22   when I get to India.  When do you want me to call him?  Mendel

23   Zilberberg."

24            Mr. Freund, turning your attention to the email on the

25   bottom, the email that you sent, who is Abe?

1    A.  I assume Abe Klein.

2    Q.  Why do you think it's Abe Klein?

3    A.  Because I see underneath that Mendel Klein, so I'm assuming

4    it's related, and I think that's the person that I most of the

5    time spoke to.

6    Q.  Are Mendel Klein and Abe Klein related?

7    A.  Yes.

8    Q.  What's the relationship?

9    A.  Mendel Klein is Abe Klein's father.

10   Q.  Who is Abe Klein?

11   A.  Client of Mendel Zilberberg.

12   Q.  And who is Fried, or what does Fried refer to?

13   A.  Aron Fried.  He was also a client of Mendel Zilberberg, I

14   believe, at that time.

15   Q.  The email on top, Mr. Zilberberg writes, "I can call him

16   Sunday or Monday noon when I get to India."  What's the — why

17   was Mr. Zilberberg traveling to India?

18   A.  Why he was traveling to India?

19   Q.  Yes.

20   A.  I do not know exactly, but he had some business over there.

21   Q.  What was the business in India?

22   A.  It changed over time.  I think at that time it was nursing

23   or medical billing as well.

24        MR. NESSIM:  Mr. Carbone, you can take this down,

25   please.  Let's please pull up just for the witness and the

1    parties what's been marked as Government Exhibit 401.

2              The government offers Government Exhibit 401.

3              MR. KAPLAN:  No objection.

4              THE COURT:  It will be admitted into evidence.

5              (Government's Exhibit 401 received in evidence)

6              MR. NESSIM:  Mr. Carbone, can you please publish this

7    for the jury and let's just zoom in to it.

8    BY MR. NESSIM:

9    Q.  This is an email dated August 10, 2009, from Vinod Sankaran

10   to Mordechai Freund.  Subject line, MZ India number.  There are

11   some digits there, and it says:  "Also have Aron Fried call

12   Mr. Z.  Thank you.  Good night.  Vinod Sankaran."

13             Who is Vinod Sankaran?

14   A.  He worked for Mendel Zilberberg.

15   Q.  Generally speaking, what did he do for Mr. Zilberberg?

16   A.  He mostly managed the India operations.

17             MR. NESSIM:  Mr. Carbone, you can take that down,

18   please.  The government offers Government Exhibit 402.

19             THE COURT:  Any objection?

20             MR. KAPLAN:  No objection.

21             THE COURT:  It will be admitted into evidence.

22             (Government's Exhibit 402 received in evidence)

23             MR. NESSIM:  Mr. Carbone, please pull that up and

24   publish it for the jury.  Let's just scroll down so that we can

25   see the — yeah, if you can zoom in to that email on the

1    bottom.

2    BY MR. NESSIM:

3    Q.  This email is from the next day, August 11, Vinod Sankaran

4    to Mordechai Freund.  Subject, "Mr. Z wants to know if you

5    spoke to Aron Fried.  Vinod Sankaran."

6            Let's look above this.  Mordechai Freund wrote to

7    Vinod Sankaran on August 11:  "I emailed him yesterday when you

8    said MZ asked that I email him.  He emailed me back this

9    morning that he will call MZ."

10            Let's look at the email at the top, please,

11   Mr. Carbone.

12            Vinod Sankaran to Mordechai Freund also on August 11:

13   "Great.  Ask Aron if he has any news, else Mr. Z will call him

14   tomorrow.  He can call Mr. Z at numbers now.  He wants to go to

15   sleep soon.  Vinod Sankaran."

16            Mr. Carbone, you can take this down.

17            The government offers Government Exhibit 603.

18            THE COURT:  Any objection?

19            MR. KAPLAN:  No objection.

20            THE COURT:  603 will be admitted into evidence.

21            (Government's Exhibit 603 received in evidence)

22            MR. NESSIM:  Your Honor, may I have one moment?

23            THE COURT:  Yes.

24            MR. NESSIM:  Is this published to the jury?  Thank

25   you.  Let's just zoom in to the portion of content, please.

1   BY MR. NESSIM:

2   Q.  The email on the bottom is from Mordechai Freund to Mendel

3   Zilberberg, August 11, 2009.  Subject, Fried:  "Did you speak

4   to him?"

5            Mendel Zilberberg responded:  "Yes."

6            Mr. Carbone, you can take that down.

7            The government offers Government Exhibit 604.

8            MR. KAPLAN:  No objection.

9            THE COURT:  It will be admitted into evidence.

10           (Government's Exhibit 604 received in evidence)

11           MR. NESSIM:  Let's publish that to the jury, please.

12   Let's scroll to page 3, please.

13   BY MR. NESSIM:

14   Q.  It reads:  From Mendel Zilberberg to Mordechai Freund on

15   September 1, 2009.  Subject, call A. Klein:  "He was give the

16   50 tomorrow.  Mendel Zilberberg."

17           Let's scroll up, please, and let's just zoom in to

18   those two emails there.  Thank you.

19           Mordechai Freund to Mendel Zilberberg, September 1,

20   2009:  "Thank you.  He funded?"

21           Mendel Zilberberg said:  "No, but I told him it is

22   approved and will fund next week."

23           Mr. Freund, what does this discussion of he funded and

24   it's approved and will fund next week refer to?

25   A.  Abe Klein was in the process of taking out a loan.

1   Q.  From what bank was he taking out a loan?

2   A.  Park Avenue Bank.  I think he took out —— he may have had

3   two different loans.  I'm not sure.  For some odd reason that's

4   in my memory.  That's what I think, but I'm not sure.

5          MR. NESSIM:  We'll scroll up, please, Mr. Carbone.

6   There's one email there.  Thank you.

7   Q.  Mordechai Freund to Mendel Zilberberg, September 1, 2009:

8   "Thank you.  Did he tell you he is sending tomorrow 50?  Can we

9   bank on it?  Thank you."

10         Just to be clear, what is 50 in reference to?

11  A.  $50,000 that Mr. Zilberberg told me that he's sending.

12         MR. NESSIM:  Let's scroll up, please, Mr. Carbone.

13  Q.  The email on the bottom says from Mendel Zilberberg to

14  Mordechai Freund, September 1, 2009:  "He told me, but I told

15  him you would call.  Mendel Zilberberg."

16         And then you wrote back:  "Called and spoke to him.

17  He will wire the 50K tomorrow, I assume later afternoon or

18  Thursday.  Any hope on Fried?  Vinod needs money desperately to

19  pay the donor on Thursday, and rent is past due."

20         You testified earlier that Vinod was associated with

21  Mr. Zilberberg's India businesses, is that right?

22  A.  Yes.

23  Q.  And what, if anything, do you remember about the money

24  needs of the India businesses at this approximate time?

25  A.  I don't know the details, but I know we were sending money

N77HZil1                    Freund - Direct

1   every month or for a number of months to India for him to cover

2   expenses of his operations over there.

3   Q.  Do you remember money being sent out to India?

4   A.  Correct.

5           MR. NESSIM:  Mr. Carbone, let's scroll up, please.

6   Q.  Mendel Zilberberg wrote back to you on September 1, 2009:

7   "Today is the first, so the rent can't be past due.  Donor is

8   leaving Thursday.  He is giving a check which she won't deposit

9   till Monday.  Will we have anything left of the 50?"

10          Do you know what the reference to donor is?

11  A.  I think at one point he had a company.  I think it was like

12  surrogates.  I'm not sure what the right word is.  And I'm

13  assuming that's the donor, relates to that.

14          MR. NESSIM:  Mr. Carbone, you can take that down,

15  please.

16          The government offers Government Exhibit 605.

17          THE COURT:  Any objection?

18          MR. KAPLAN:  No objection.

19          THE COURT:  It will be admitted into evidence.

20          MR. NESSIM:  Mr. Carbone, please publish this for the

21  jury and please turn to page 2.

22          (Government's Exhibit 605 received in evidence)

23  BY MR. NESSIM:

24  Q.  Mordechai Freund to Mendel Zilberberg, September 1, 2009.

25  Subject, GM:  "Any update from Fried?"

1              Mendel Zilberberg wrote back:  "Not yet."

2              Let's scroll up, please.

3              Mordechai Freund to Mendel Zilberberg:  "When is

4    Caring funding?"

5              Mr. Freund, do you know what Caring refers to?

6    A.   Caring is Abe Klein's business, or one of his businesses.

7    Q.   Mendel Zilberberg wrote to you:  "When are you gone this

8    week?"

9              And let's scroll up, please, Mr. Carbone.

10             Mordechai Freund to Mendel Zilberberg, September 1,

11   2009:  "Wednesday and Thursday.  Today I'm here, but in and out

12   running around."

13             Mendel Zilberberg to Mordechai Freund:  "Will you be

14   able to do what you have to remotely re money?"

15             Mr. Carbone, you can take this down, please.

16             The government offers Government Exhibit 412.

17             MR. KAPLAN:  No objection.

18             THE COURT:  It will be admitted into evidence.

19             (Government's Exhibit 412 received in evidence)

20             MR. NESSIM:  Let's pull this up and publish this to

21   the jury.  Let's zoom in to the email.

22   BY MR. NESSIM:

23   Q.   This is from September 13, 2009, from Mendel Zilberberg to

24   Mordechai Freund.  Subject line, Misc.  And it reads:

25             "K-1.

1              "Sauber - Fried - Park Avenue Bank.

2              "Trebitsh appraisal net worth.

3              "Paul Larch docs, balances checking accounts.

4              "Mendel Zilberberg."

5          Turning your attention to the second line of the

6     email, Sauber - Fried - Park Avenue Bank.  Do you know what

7     Sauber refers to?

8     A.   There was a transaction, a loan, that related through

9     Sauber and Fried.

10    Q.   It related to Sauber and Fried?

11    A.   Yeah.

12    Q.   Who's Fried?

13    A.   Aron Fried.

14    Q.   And who is Sauber?

15    A.   I don't know.

16    Q.   At a high level about this transaction you reference, what,

17    if any, involvement did you have in that transaction?

18    A.   In the Sauber-Fried?  I believe I got ⎯ I got to ⎯ I went

19    to sign the documents, the loan documents, with Sauber, and

20    there was some things that I got them to do or they needed to

21    do, so I was after them to make sure it gets done.

22    Q.   And who gave you that responsibility to make sure those

23    things got done?

24    A.   I believe Mendel Zilberberg.

25    Q.   The line below Trebitsh appraisal net worth, what does that

1  refer to?

2  A.   There was a loan with a fellow named Trebitsh.  So I'm not

3  sure what appraisal is.  I'm assuming some —— he needed an

4  appraisal of something, but I remember he needed a net worth

5  statement.

6  Q.   And below that, what does Paul refer to?

7  A.   There was an attorney that worked in our office.  His name

8  was Paul.

9  Q.   And what it does Larch refer to?

10 A.   I assume relating to documents through different business

11 or transaction or investment that was called Larchmont.

12         MR. NESSIM:  Mr. Carbone, you can take that down,

13 please.

14         The government offers Government Exhibit 413.

15         MR. KAPLAN:  No objection.

16         THE COURT:  It will be admitted into evidence.

17         (Government's Exhibit 413 received in evidence)

18         MR. NESSIM:  Mr. Carbone, please publish that for the

19 jury, and let's zoom in to portion with content.

20 BY MR. NESSIM:

21 Q.   The email at the bottom is from Mordechai Freund to Mendel

22 Zilberberg, September 14, 2009.  Subject, Misc.:

23         "1. Sauber —— Moshe said it's out of his hands, and

24 you can get it moved along, etc.

25         "2.  1099 to be emailed in a few minutes.  Just

1   confirmed it is interest payments only, correct?

2           "3.  Trebitsh needs new net worth on his form.  I will

3   get it typed up and get it signed by Fried.

4           Then Mendel Zilberberg wrote back on top, if you can

5   highlight that, thank you:

6           "1.  OK.

7           "2.  Interest only.

8           "3.  Please keep me posted.

9           "Mendel Zilberberg."

10          Mr. Carbone, you can take that down, please.

11          The government offers Government Exhibit 436.

12          MR. KAPLAN:  No objection.

13          THE COURT:  It will be admitted into evidence.

14          (Government's Exhibit 436 received in evidence)

15          MR. NESSIM:  Mr. Carbone, let's publish this and

16   please zoom in to the email.

17   BY MR. NESSIM:

18   Q.  This is from Mordechai Freund to Moshe Rosenwasser on

19   September 15, 2009.  Subject, Sauber.  And the content reads:

20   "See attached Mendel comment on the loan docs for Sauber.

21   Please advise.  Thank you."

22          Mr. Carbone, if you could zoom out, and let's scroll

23   down.  And let's just zoom in to the top here.  Yep.  Great.

24          This reads:  "Promissory Note.  Principal, $1,400,000"

25   — if you could highlight that.  Thank you — "$1,400,000.

1   Loan date, September 15, 2009."  The borrower, if you could

2   highlight that section, reads:  "Herschel Sauber, Pauline

3   Sauber."  And then there's some handwriting here on the screen.

4           Mr. Freund, whose handwriting is that?

5   A.  It looks like Mendel Zilberberg.

6   Q.  Over the course of working for Mr. Zilberberg, did you

7   become familiar with his handwriting?

8   A.  Yes.

9           MR. NESSIM:  Mr. Carbone, if you could zoom out, and

10  let's just scroll through the rest of the document so the jury

11  can see it.

12          You can take this down, please, Mr. Carbone.

13          The government offers Government Exhibit 414.

14          MR. KAPLAN:  No objection.

15          THE COURT:  It will be admitted into evidence.

16          (Government's Exhibit 414 received in evidence)

17          MR. NESSIM:  Mr. Carbone, please publish this for the

18  jury, and let's zoom in to the email.

19  BY MR. NESSIM:

20  Q.  The email, the second email on the screen, is from

21  Voula Petridis on September 15, 2009, to Mordechai Freund with

22  a cc to Moshe Rosenwasser.  Subject, ref documents attached.

23  And it says:

24          "Attached are the documents regarding the loan.

25  Please have Mr. Sauber and Ms. Sauber sign where indicated.

1  The documents must be notarized and a copy of picture

2  identification is required for the file.

3         "Should you have any other questions, do not hesitate

4  to contact the bank.

5         "Thank you."

6         And Mr. Carbone, let's just scroll through the rest of

7  this email, please.

8         You can take that down, please.

9         The government offers Government Exhibit 423.

10         MR. KAPLAN:  No objection.

11         THE COURT:  It will be admitted into evidence.

12         (Government's Exhibit 423 received in evidence)

13         MR. NESSIM:  And let's zoom in to the portion with

14  content, please, Mr. Carbone.  Is this published?  Thank you.

15  BY MR. NESSIM:

16  Q.  So the email on the bottom ⎯ if you could highlight the

17  content there, please, Mr. Carbone ⎯ it's from Mordechai

18  Freund to Mendel Zilberberg on September 16, 2021.  The subject

19  line is Sauber:  "GM."

20         What does GM mean?

21  A.  Good morning.

22  Q.  "Did you do an iska with Fried?  Fried with Kahan?  Kahan

23  with Sauber?  Thank you.  Mordechai Freund."

24         And then the email on the top, please, Mr. Carbone.

25         Mendel Zilberberg wrote back to you:  "No, we have not

1    drawn any documents.  Paul can do that.  Same with Trebitsh to

2    Fried.  Mendel Zilberberg."

3                Mr. Freund, what is an iska.

4    A.  That's a Jewish document that relates to when two people

5    have some transaction that involves interest payments.

6    Q.  And why is a document like an iska necessary in such a

7    transaction?

8    A.  Whenever there's interest in a transaction, interest

9    payments.

10   Q.  So here at the bottom it says:  "Did you do an iska with

11   Fried?  Fried with Kahan?  Kahan with Sauber?"  What did those

12   set of iskas indicate about the money flow?

13   A.  That there was interest between all these different

14   parties.

15   Q.  So who's borrowing from whom?  Can you tell from the list

16   of names or not?

17   A.  No, from this list of names, you can't say who's borrowing

18   from whom.  You can see who's transacting with whom.

19   Q.  So the transactions are you, meaning who?

20   A.  You, Mendel Zilberberg.

21   Q.  With Fried?

22   A.  Right.

23   Q.  And then Fried with Kahan?

24   A.  Correct.

25   Q.  And then Kahan with Sauber?

1   A.  Correct.

2   Q.  And who is Paul?  I think you've already mentioned that.

3   A.  Paul?

4   Q.  Mr. Zilberberg says "Paul can do that."

5   A.  Was an attorney that worked for Mr. Zilberberg.

6           MR. NESSIM:  We can take that down, please,

7   Mr. Carbone.

8           The government offers Government Exhibit 417.

9           MR. KAPLAN:  No objection.

10          THE COURT:  It will be admitted into evidence.

11          (Government's Exhibit 417 received in evidence)

12          MR. NESSIM:  Let's publish this to the jury, please.

13  Let's zoom in to the email at the bottom, please.  Thank you.

14  BY MR. NESSIM:

15  Q.  This is from Mordechai Freund to Paul Salazar.  Is that the

16  Paul who worked for Mr. Zilberberg?

17  A.  Correct.

18  Q.  September 16, 2009, the same day.  Subject, iska

19  agreements.  And the content says:  "We need iska agreement for

20  Herschel Sauber and Pauline Sauber, lender; Abraham Chaim

21  Kahan, borrower.  Aron Fried, lender; One World United,

22  borrower.  Can I get it soon?"

23          What is One World United?

24  A.  That was a company of Mr. Zilberberg's.

25  Q.  And what sort of work was it involved in?

1   A.   I'm sorry?

2   Q.   What sort of work was One World United engaged in?

3   A.   Medical billing, nursing —— all these India-based

4   businesses.

5   Q.   Let's scroll to Mr. Salazar's response, please.

6            Paul Salazar wrote to you on September 16, 2009:

7   "Attached."

8            You can zoom out, please, Mr. Carbone.  Mr. Carbone,

9   please —— the government offers Government Exhibit 417.

10           MR. KAPLAN:  No objection.

11           THE COURT:  It will be admitted into evidence.

12           (Government's Exhibit 417 received in evidence)

13           MR. NESSIM:  Let's please publish this for the jury.

14   Sorry.  The government offers Government Exhibit 418, excuse

15   me.

16           MR. KAPLAN:  I think it's already in.

17           MR. NESSIM:  It's already in.  OK.  Thank you.

18           Let's publish this for the jury.

19   BY MR. NESSIM:

20   Q.   So here on the bottom, if we could zoom in to the portion

21   with content, you wrote to afriedwillsee@gmail.com on

22   September 16, 2009.  Subject, heter iska:

23           "I attached two heter iska.  The one need to be signed

24   by you and one by Kahan.  The one we need to sign is here in

25   our office.  Please get it signed before money transfers hands.

1        "Thank you."

2        So the one we need to sign, who is the "we" there?

3    A.  Mendel Zilberberg and One World United.

4        MR. NESSIM:  You can zoom out, please, Mr. Carbone.

5    Q.  Then at the top here, afriedwillsee forwarded your email to

6    Abraham Kahan, also on September 16, 2009.

7        Mr. Carbone, let's just scroll to the next page,

8    please.

9        What is this, Mr. Freund?

10   A.  Heter iska.

11       MR. NESSIM:  Let's scroll to the next one, please,

12   Mr. Carbone.

13   Q.  And what's this one?

14   A.  Same thing, a heter iska.

15   Q.  And so this one is between which parties?

16   A.  Sauber and ——

17   Q.  Let's highlight the bottom.

18   A.  —— and Kahan.

19       MR. NESSIM:  And the one above it, if we can scroll

20   up, please, Mr. Carbone.

21   A.  Between Kahan and Fried.

22       MR. NESSIM:  Mr. Carbone, we can take this down.

23       The government offers Government Exhibit 422.

24       MR. KAPLAN:  No objection.

25       THE COURT:  It will be admitted into evidence.

N77HZil1                      Freund - Direct

1          (Government's Exhibit 422 received in evidence)

2          MR. NESSIM:  Let's publish this, please, and let's

3  turn to page 2.

4  BY MR. NESSIM:

5  Q.  So this is the beginning of that email we saw earlier on

6  September 16:  "GM.  Did you iska with Fried, Fried with Kahan,

7  Kahan with Sauber?  Thank you.  Mordechai Freund."

8          Let's scroll up, please.  Actually, could we just zoom

9  in to the 6:24 email, please, Mr. Carbone.

10          Mendel Zilberberg wrote back to you on September 16:

11  "The iska with Fried is to OWU.  Same with the Larchmont guys."

12          What is OWU?

13  A.  One World United.

14  Q.  That's signed Mendel Zilberberg.

15          Let's look at the email on top, please, Mr. Carbone.

16          You wrote to Mendel Zilberberg on September 16:  "I

17  signed the iska for OWU," or One World United.  "I gave the two

18  other to Fried, one for him to sign and one for Kahan."

19          And let's just scroll up, please, Mr. Carbone.

20          Mendel Zilberberg wrote to you on September 16, 2009,

21  "Ty."

22          What does Ty mean?

23  A.  Thank you.

24  Q.  "Mendel Zilberberg."

25          Mr. Carbone, you can take this down, please.

1          I believe this may already be in evidence, but if not,

2   the government offers Government Exhibit 416?

3          MR. KAPLAN:  No objection.

4          THE COURT:  It will be admitted into evidence.

5          (Government's Exhibit 416 received in evidence)

6          MR. NESSIM:  And let's just zoom in to the email on

7   the bottom, please.

8   BY MR. NESSIM:

9   Q.  This email, Mr. Freund, also on September 16, 2009, you

10  wrote to abekahan1@gmail.com.  Subject, Sauber:  "Please make

11  sure that he signs a drawdown request for $466,000.  Then that

12  money should be transferred into Aron Fried account number,"

13  and then a string of numbers.  "I'm in Manhattan taking the

14  original docs to the bank.  Thank you."

15         Mr. Carbone, let's zoom out and let's zoom in to the

16  email on top.  Abekahan1@gmail.com replied to you:  "What's

17  your cell?"

18         Mr. Carbone, you can take this down, please.

19         The government offers Government Exhibit 421.

20         MR. KAPLAN:  No objection.

21         THE COURT:  It will be admitted into evidence.

22         (Government's Exhibit 421 received in evidence)

23         MR. NESSIM:  Let's just start from the bottom email on

24  this page.  This is also on September 16 of 2009, Mordechai

25  Freund to Mendel Zilberberg:  "I told Paul and I already gave

1    him the info he need from me to draft the docs."

2            Let's scroll up.  Mendel Zilberberg wrote to you, also

3    on September 16:  "I meant that aside from the assignments, we

4    need heter iskas.  Mendel Zilberberg."

5            You replied:  "I understood that."

6            Let's look at the top email, please, Mr. Carbone.

7            And then Mendel Zilberberg wrote to you on

8    September 16, 2009:  "OK.  By the way, when it funds, I need

9    10,000 repaid to my Park Avenue Bank account.  Mendel

10   Zilberberg."

11           Mr. Carbone, you can take that down, please.

12           The government offers Government Exhibit 424.

13           MR. KAPLAN:  No objection.

14           THE COURT:  It will be admitted into evidence.

15           (Government's Exhibit 424 received in evidence)

16           MR. NESSIM:  Now, let's please publish this for the

17   jury.  And I think — is there a second page, or is this the —

18   no.  OK.

19           So let's start with the bottom email, please, if we

20   can zoom in there, please, Mr. Carbone.

21   BY MR. NESSIM:

22   Q.  This is an email from Mordechai Freund to

23   abikahan1@gmail.com.  It was also on September 16, 2009.  The

24   subject line also reads "Sauber," and you wrote:

25           "Since the loan is on the husband's and wife's name,

338

N77HZil1                    Freund - Direct

1    the disbursement should be to both as well.  The new account in

2    PAB is only in the husband's name.  Therefore, please have

3    Pauline (the wife) send an email to Voula Petridis" —— and

4    there's an email address —— "at the bank stating that she

5    authorizes all loan proceeds disbursements to her husband's

6    account and include the account number.

7            "Please confirm receipt of this email and let me know

8    when it is done.

9            "Thank you.

10           "Mordechai Freund."

11           Let's zoom out, please, and let's look at the emails

12   on top.

13           Mordechai Freund, you sent this to Mendel Zilberberg

14   September 16, 2009.  Subject, forward Sauber.  And you wrote,

15   "FYI."

16           And then Mendel Zilberberg wrote back to you:  "Please

17   advise when this is finished.  Mendel Zilberberg."

18           Then on top you wrote:  "Will do."

19           You can take this down, please, Mr. Carbone.

20           The government offers Government Exhibit 428.

21           MR. KAPLAN:  No objection.

22           THE COURT:  It will be admitted into evidence.

23           (Government's Exhibit 428 received in evidence)

24           MR. NESSIM:  Let's turn to page 3, please,

25   Mr. Carbone.

1    BY MR. NESSIM:

2    Q.  This is an email from Voula Petridis to Mordechai Freund

3    with enclosed copy to Ray Barcia.  Subject, EF: loan.  And it

4    reads:

5           "Mr. Freund, the account was opened at the branch.

6    Please note the proceeds of the loan can be disbursed to both

7    names, Herschel Sauber and Pauline Sauber.  The account was

8    opened in Mr. Sauber's name only."

9           And that's signed Voula Petridis, vice president,

10   Small Business Lending/Loan Administration, the Park Avenue

11   Bank, 460 Park Avenue, New York, New York.

12          Let's look at the email above, please, Mr. Carbone.

13          You wrote back to Voula Petridis with a cc to Ray

14   Barcia.

15          Who's Ray Barcia?

16   A.  He worked at Park Avenue Bank.

17   Q.  And you wrote:  "Did you get the email from the wife?  She

18   was out, and she said when she get home, she will send it.

19   TX."

20          And then Voula Petridis wrote to you:  "Good morning.

21   No, I haven't."  And this is on September 17, 2009, the next

22   day.

23          You wrote to Ms. Petridis:  "Good morning.  I just

24   spoke to them.  You will have it by 10 a.m.  Please advise when

25   this is done.  Thank you.  Mordechai Freund."

1          Ms. Petridis wrote back:  "Thank you.  Once received,

2    I will disburse the funds."

3          Then you wrote on September 17 to Voula Petridis:

4    "Did you get the email?  Was it funded?  Thank you."

5          And vow Voula Petridis wrote back:  "I haven't

6    received anything."

7          You wrote:  "She said she emailed it in the morning.

8    She is not in the office now.  I will follow up with her

9    later."

10          And Ms. Petridis wrote:  "I haven't received anything.

11    I don't mean to inconvenience you, but it is required."

12          And you wrote to Ms. Petridis:  "I spoke to them.

13    They had the wrong email address.  You should have it by now.

14    Thanks."

15          And she wrote back:  "As of this moment, I have not

16    received any email."

17          Mr. Carbone, you can take that down, please.

18          The government offers Government Exhibit 427.

19          MR. KAPLAN:  No objection.

20          THE COURT:  It will be admitted into evidence.

21          (Government's Exhibit 427 received in evidence)

22          MR. NESSIM:  Mr. Carbone, please publish this, and

23    then zoom in to the second half of the page after original

24    message.

25    BY MR. NESSIM:

1    Q.  This is from Penina Sauber to Mordechai Freund on

2    September 17, 2009, and then it reads:  Begin forwarded

3    message.  Subject line is blank.  Date, 9/17/09, from Penina

4    Sauber to V. Petridis:

5           "I hereby authorize the distribution of the loan

6    proceeds to my husband's account at Park Avenue Bank.  Please

7    confirm receipt of this email.  Thank you, Pauline."

8           Let's look above this, please, Mr. Carbone.

9           You forwarded this to Ms. Petridis, and you wrote:

10   "Finally they sent me a copy of the email that was sent to you.

11   They had a wrong email address.  They re-sent it to your

12   correct address.  Please see below.  Thank you."  And that's on

13   September 17 of 2009.

14          Mr. Carbone, you can take that down.

15          The government offers Government Exhibit 426.

16          MR. KAPLAN:  No objection.

17          THE COURT:  It will be admitted into evidence.

18          (Government's Exhibit 426 received in evidence)

19          MR. NESSIM:  Let's please publish that for the jury

20   and turn to page 4.

21   BY MR. NESSIM:

22   Q.  So the thread below on September 16, 2009, is one we've

23   already seen before from you to Abe Kahan.  Abekahan1@gmail.com

24   replied to you on September 16:  "Already forwarded to Sauber."

25          Let's look above, please.

1          Mordechai Freund, you wrote to abekahan1@gmail.com on

2   September 16:  "Did you hear from Sauber?"

3          And he wrote back:  "No.  Please be in contact with

4   him.  Thanks."

5          And you wrote back:  "I just spoke to him.  He is not

6   home yet.  It will be done when he gets home.  Tx."

7          And abekahan1 wrote back to you:  "Tx."

8          Then you wrote to abekahan1@gmail.com also on

9   September 16:  "Did you hear from Sauber?  If not, please ask

10  him if it's done.  Thank you."

11         And then there's no content in that email.

12         Then abekahan1@gmail.com writes to you on

13  September 16:  "If he said he will do it when he gets home, he

14  will.  Let's just give him a chance.  When is the last time you

15  spoke to him?  Thanks."

16         Then you wrote back to Abe Kahan:  "I spoke to him

17  about six-ish."

18         Abekahan1@gmail wrote to you:  "Did you hear from him"

19  — I'm sorry, earlier abekahan1@gmail wrote to you:  "I think

20  you should text him at 10 o'clock," and then, "Did you hear

21  from him?"

22         You wrote to abekahan1@gmail.com:  "He is not in the

23  office.  He will try to forward me a copy.  Please give me his

24  email address.  Ty."

25         And then abekahan1@gmail.com wrote to you:  "I don't

1    have it."

2             And then on the email on the top, abekahan1@gmail.com

3    wrote on September 17:  "Please tell him it's done.  Also that

4    he should to the checking acc when she has an chance.  Thanks."

5             Mr. Carbone, can you zoom out.

6             We've now seen a few emails with abekahan1@gmail.com.

7    Do you know who that is?

8    A.  Abraham Kahan.

9    Q.  And who is Abraham Kahan?

10   A.  In the context of this loan?

11   Q.  Yes.

12   A.  He was involved in this transaction.

13   Q.  In what way was he involved in the transaction?

14   A.  I don't know.  He had some business dealing with Sauber and

15   Fried.

16   Q.  Do you know anything about Mr. Kahan generally?

17   A.  A little bit.

18            THE COURT:  Keep your voice up.

19   Q.  At a high level, what do you know of Mr. Kahan?

20            MR. BRAFMAN:  Objection.

21   A.  I know who he is.

22            THE COURT:  I can't hear you.

23            MR. BRAFMAN:  Objection.  Sorry, your Honor.

24            THE COURT:  You have to stand.  When you stand up, I

25   see you.

1          MR. BRAFMAN:  Sorry.

2          THE COURT:  That's OK.

3          MR. NESSIM:  I'll move on, your Honor.

4          THE COURT:  All right.

5          MR. NESSIM:  Mr. Carbone, you can take this down.

6          The government offers Government Exhibit 425.

7          MR. KAPLAN:  No objection.

8          THE COURT:  It will be admitted into evidence.

9          (Government's Exhibit 425 received in evidence)

10          MR. NESSIM:  Let's zoom in to the two emails at the

11   bottom.

12   BY MR. NESSIM:

13   Q.   This is on September 17 of 2009, Mordechai Freund to

14   afriedwillsee@gmail.com.  Just to be clear, who does that email

15   account belong to?

16   A.   Aron Fried.

17   Q.   And you wrote, subject, Sauber:  "Loan will fund tomorrow.

18   When do you have time to talk?  Mordechai Freund."

19          Afriedwillsee@gmail.com wrote to you on September 17:

20   "Done for tomorrow."

21          You wrote to afriedwillsee@gmail.com:  "Thank you.

22   Please let me know when part 1 and 2 are physically done.

23   Thank you.  Mordechai Freund."

24          And then Mendel Zilberberg wrote to you re Sauber:

25   "Please call me if you have a moment.  Mendel Zilberberg."

1          Mr. Carbone, you can take this down, please.

2          The government offers Government Exhibit 429.

3          MR. KAPLAN:  No objection.

4          THE COURT:  It will be admitted into evidence.

5          (Government's Exhibit 429 received in evidence)

6          MR. NESSIM:  Let's just zoom in to the email.

7  Q.  This is an email from Mendel Zilberberg to

8  rbarcia@parkavenuebank.com with a cc to you, Mordechai Freund,

9  on September 18, 2009.  Subject, Sauber:  "Did it fund?  Please

10  advise ASAP.  Mendel Zilberberg."

11          Mr. Carbone, you can take this down.

12          The government offers Government Exhibit 430.

13          MR. KAPLAN:  No objection.

14          THE COURT:  That will be admitted into evidence.

15          (Government's Exhibit 430 received in evidence)

16          MR. NESSIM:  Let's just zoom in to the emails at the

17  bottom.

18  BY MR. NESSIM:

19  Q.  The email at the bottom here is the one we just read,

20  Mendel Zilberberg to Ray Barcia and Mordechai Freund:  "Did it

21  fund?  Please advise ASAP.  Mendel Zilberberg."

22          And then Ray Barcia to Mendel Zilberberg,

23  September 18, 2009:  "Credit not processed yet.  They also want

24  me to wire out $466,000 to HSBC?"

25          Then Mendel Zilberberg wrote back:  "Can you call me?

1    What's holding this up?  917-836-8101.  Mendel Zilberberg."

2             Mr. Carbone, you can take that down, please.

3             The government offers Government Exhibit 552.

4             MR. KAPLAN:  No objection.

5             THE COURT:  It will be admitted into evidence.

6             (Government's Exhibit 552 received in evidence)

7    BY MR. NESSIM:

8    Q.  Mordechai Freund to Moshe Rosenwasser, September 23, 2009:

9    "What's the status with Trebitsh?"

10            What is "Trebitsh" referring to?

11   A.  It was a transaction with the fellow Mr. Trebitsh.

12   Q.  And what type of transaction?

13   A.  Loan.

14   Q.  Where was the loan?

15   A.  From Park Avenue Bank.

16            THE COURT:  You have to keep your voice up, I'm sorry.

17   Speak louder.

18   Q.  At Park Avenue Bank?

19   A.  Correct.

20   Q.  This is a name that we've seen several times.  This email

21   is to Moshe Rosenwasser.  You're asking about this Trebitsh

22   loan at Park Avenue Bank.  Who is Moshe Rosenwasser?

23   A.  He worked at Park Avenue Bank.

24   Q.  Was he involved in the loans?

25   A.  I assume yes.

1                MR. NESSIM:  Mr. Carbone, you can take this down,

2    please.

3                The government offers Government Exhibit 555.

4                MR. KAPLAN:  No objection.

5                THE COURT:  It will be admitted into evidence.

6                (Government's Exhibit 555 received in evidence)

7                MR. NESSIM:  Let's zoom in here.

8    BY MR. NESSIM:

9    Q.  This is an email a little later from Mordechai Freund to

10   Moshe Rosenwasser, October 12, 2009.  Subject is Trebitsh:

11   "Good morning.  What is the status of this loan?"

12               Moshe Rosenwasser wrote back to you:  "I needed some

13   info.  Asked him.  He sent me to his partner, Mr. Singer.

14   Called him.  He didn't know the answers offhand.  He'll get

15   back to me today.  M."

16               Mr. Carbone, you can zoom out and take this down.

17               The government offers Government Exhibit 554.

18               MR. KAPLAN:  No objection.

19               THE COURT:  It will be admitted into evidence.

20               (Government's Exhibit 554 received in evidence)

21   BY MR. NESSIM:

22   Q.  This is an email from Mendel Zilberberg to Moshe

23   Rosenwasser with enclosed copy to you.  It's dated October 12,

24   2009.  The subject line is "Please advise when Trebitsh is

25   funding," and the email says:  "Mordechai from my office will

1    be on top of it.  Thanks in advance.  Mendel Zilberberg."

2              Mr. Carbone, you can zoom out.

3              The government offers Government Exhibit 557.

4              MR. KAPLAN:  No objection.

5              THE COURT:  It will be admitted into evidence.

6              (Government's Exhibit 557 received in evidence)

7    BY MR. NESSIM:

8    Q.  This is an email from Mordechai Freund to Moshe

9    Rosenwasser.  Subject line is "Trebitsh," and it says:  "Letter

10   attached.  I have the original.  Please confirm receipt.  Per

11   MZ, when can this fund?  Thank you."

12             What does "MZ" refer to?

13   A.  Mendel Zilberberg.

14             MR. NESSIM:  Mr. Carbone, is there a second page to

15   this?  You could take this down, please, Mr. Carbone.

16             The government offers Government Exhibit 558.

17             MR. KAPLAN:  No objection.

18             THE COURT:  It will be admitted into evidence.

19             (Government's Exhibit 558 received in evidence)

20             MR. NESSIM:  Mr. Carbone, let's zoom in to the email

21   at the bottom of the second page.  Thank you.

22   BY MR. NESSIM:

23   Q.  This is an email dated October 27, 2009, from Mordechai

24   Freund to Moshe Rosenwasser.  The subject line is Trebitsh.

25   The importance is high.  It says:  "GM — what is the status?"

1        What does "GM" mean?

2    A.  Good morning.

3    Q.  And then Moshe Rosenwasser wrote to you:  "Completed.  Gave

4    in for approval.  M."

5        Let's scroll up, please, Mr. Carbone.

6        You wrote on October 27, 2009, to Mr. Rosenwasser:

7    "Per MZ, is there any way to get this funded today?  Thank

8    you."

9        And Moshe Rosenwasser wrote back to you:  "I doubt it.

10   Ed Beyer is out, and he needs to sign."

11       You wrote to Mr. Rosenwasser:  "Do you expect him

12   tomorrow?  I would like to set app. a closing tomorrow with the

13   borrower.  Tx."

14       And then Mr. Rosenwasser wrote to you:  "Have Mendel

15   make a discreet phone call to him.  M."

16       The government offers Government Exhibit 506.

17       MR. KAPLAN:  No objection.

18       THE COURT:  It will be admitted into evidence.

19       (Government's Exhibit 506 received in evidence)

20       MR. NESSIM:  Mr. Carbone, can you scroll down.

21   Q.  So the email at the bottom is from Mordechai Freund to

22   abe@flexocraft.com.  Who is abe@flexocraft.com?

23   A.  Abe Klein.

24   Q.  And the subject is Caring:  "Good morning, Abe.  You have

25   two open invoices for Caring, the October invoice and the

1    November invoice.  I attach copies of the invoice and a

2    statement.  Thank you."

3              Let's scroll up.  Let's scroll up a little bit,

4    please.  Actually, the next page, Mr. Carbone.  Let's just zoom

5    in to the email from Mr. Zilberberg down, so the second half of

6    this page.

7              So in the bottom here Abe wrote to Mordechai Freund,

8    you, on November 10, 2009, re Caring:  "I don't know.  Ray in

9    the bank has not responded to my email yet, and he is not

10   picking up the phone either.  Actually, nobody is picking up

11   the phone in the bank.  It all goes to general VM.  This is why

12   I don't like doing wires with them.  It's extremely

13   cumbersome."

14             THE COURT:  You have to slow down for the court

15   reporter.

16             MR. NESSIM:  Sorry.

17   Q.  And then Mordechai Freund, you sent this to Mendel

18   Zilberberg on November 10:  "FYI."

19             And then Mendel Zilberberg wrote to Ray Barcia, also

20   November 10:  "Off the record.  He owes me money, and I need to

21   get paid today.  Can you call him so I get paid?  Please keep

22   me posted.  Mendel Zilberberg."

23             Mr. Carbone, you can take this down, please.

24             Mr. Freund, we've looked at emails relating to the

25   three loans you talked about, Sauber, Klein, and Trebitsh.  At

1    a high level, what was your role with those transactions?

2    A.   Trying to get it to completion.

3    Q.   And who do you gave you that role or those

4    responsibilities?

5    A.   I assume Mendel Zilberberg.

6    Q.   Why do you assume Mendel Zilberberg?

7    A.   Because he is generally who ── I wasn't involved in this

8    other than that.

9              MR. NESSIM:  Can I have a moment, your Honor?

10             THE COURT:  Yes.

11             (Counsel confer)

12             MR. NESSIM:  No further questions, your Honor.

13             THE COURT:  Cross-examination.

14             MR. KAPLAN:  Yes, sir.

15             MR. NESSIM:  I just want to offer just a couple more

16   exhibits.

17             MR. KAPLAN:  OK.

18             MR. NESSIM:  415.

19             MR. KAPLAN:  No objection.

20             MR. NESSIM:  419.

21             MR. KAPLAN:  No objection.

22             MR. NESSIM:  420.

23             MR. KAPLAN:  Wait a second.  No objection.

24             MR. NESSIM:  No further questions, your Honor.

25             THE COURT:  They'll be admitted into evidence.

1          (Government's Exhibits 415, 419, and 420 received in

2      evidence)

3      CROSS-EXAMINATION

4      BY MR. KAPLAN:

5      Q.  Good morning, Mr. Freund.

6      A.  Good morning.

7      Q.  My name is Jacob Kaplan, and I'm one of the attorneys

8      representing Mendel Zilberberg.

9          I'm going to ask you some questions.  If I talk too

10     fast or you don't understand the question, please let me know,

11     and I'll try to slow down or rephrase my question.  OK?

12     A.  OK.

13     Q.  You started working at Mendel Zilberberg & Associates

14     around 1998, correct?

15     A.  Correct.

16     Q.  Was this your first professional job?

17     A.  Yes.

18     Q.  When you started, what sort of duties did you have at the

19     office?

20     A.  When I started, I was basically taking care of his computer

21     equipment, setting up and —— setting up a document assembly

22     program.

23     Q.  When you started, Mendel Zilberberg & Associates was a

24     fairly small firm, correct?

25     A.  Correct.

1  Q.  About how many attorneys were there?

2  A.  I think two.  Either one or two besides for Mendel

3  Zilberberg.

4  Q.  Was there an attorney named Joseph Berger working there?

5  A.  Yes.

6  Q.  Do you recall how long Joseph Berger worked at the firm?

7  A.  He was there before me, and I don't remember how many years

8  after I was there he left.  Not much after I was there.  I

9  don't know if a year or two.

10 Q.  Now, you testified at some point you worked as office

11 manager at the firm, correct?

12 A.  Correct.

13 Q.  What sort of duties did you have as office manager?

14 A.  Just making sure that everything is running and everything

15 —— whatever needs to be bought, logistics, cleaning —— anything

16 that ran in the office, to make sure that everything was done

17 and working.

18 Q.  Physically, how far away was your office from Mendel

19 Zilberberg's office?

20 A.  Not far.

21 Q.  Fifteen feet?  Twenty feet?

22 A.  Maybe.  At different times.  I was different places

23 different times.

24 Q.  But the office itself is not that large, is it?

25 A.  Correct.

1    Q.  As office manager, were you responsible for invoicing and

2    billing clients for legal services?

3    A.  At certain times, yes.

4    Q.  Is it fair to say that, as office manager, part of your job

5    was to follow up with clients to make sure that the firm got

6    paid?

7    A.  That is correct, yes.

8    Q.  And that would mean calling and emailing clients trying to

9    make sure they paid the fees?

10   A.  Correct.

11   Q.  And sometimes you'd have to reach out to them numerous

12   times in a row to get them to pay?

13   A.  More than a few times, yeah.

14   Q.  And as part of your job, you would send them invoices?

15   A.  Correct.

16   Q.  So you said you worked for the firm for about 20 years?

17   A.  I think so, about.

18   Q.  Is it fair to say that during this time the firm had a

19   fairly steady stream of clients coming in and out?

20   A.  I think so.

21   Q.  And is it fair to say that some of the cases that the firm

22   handled were relatively small, like real estate closings?

23   A.  Correct.

24   Q.  And the firm also handled more extensive cases, more

25   complicated cases like, you know, litigation cases, correct?

1    A.  Correct.

2    Q.  Some of these litigation cases lasted for years, isn't that

3    right?

4    A.  Correct.

5    Q.  And the fees related to some of these cases could sometimes

6    be upwards of hundreds of thousands of dollars, correct?

7    A.  Yeah, more than that.

8    Q.  Even more than that.

9            OK.  The government went through some emails with you.

10   I'd like to go through some, not all, of those emails.

11           Ms. Newman, if you could pull up Government

12   Exhibit 402 and display it for the jury.

13           Mr. Freund, do you recall being asked some questions

14   about Exhibit 402?

15   A.  I think so.

16   Q.  So on the bottom it's an email from Vinod Sankaran to you,

17   asking if you spoke with Aron Fried?

18   A.  Correct.

19   Q.  Do you know why he was asking if you spoke to Aron Fried?

20   A.  No.  I'm assuming it's relating to money, but I can't tell

21   you for sure.

22   Q.  And Aron Fried was a client of the firm, correct?

23   A.  Correct.

24   Q.  And as a client of the firm, sometimes he would owe money,

25   correct?

1   A.  Correct.

2           MR. KAPLAN:  If we could scroll to the top of the

3   page, that first email.

4   Q.  When Vinod emails you and says, "Great.  Ask Aron if he has

5   any news," do you know what he's referring to, "any news"?

6   A.  I'm assuming when he's going to have money, but I don't

7   know for sure.

8           MR. KAPLAN:  OK.  Ms. Newman, if you could pull up

9   Government Exhibit 603 in evidence.

10  Q.  So this is another email regarding Aron Fried, correct?

11  A.  My screen is blank.

12  Q.  We'll try again.  Hold on a second.  Is it there?

13  A.  Yep.

14  Q.  All right.  So this is another email between you and Mendel

15  Zilberberg relating to Aron Fried, correct?

16  A.  Yes.

17  Q.  And again you're asking Mr. Zilberberg if you spoke to him?

18  A.  Yes.

19  Q.  Do you know if this conversation related to fees?

20  A.  I don't.  I'm sure it related to money somehow because

21  that's usually how I was involved.

22          MR. KAPLAN:  If we can go to Government Exhibit 604,

23  and if you can start with the last page of the exhibit.

24  Q.  So this is an email from Mendel Zilberberg to you asking

25  about — subject, call A. Klein, and the body says, "He will

1    give the 50 tomorrow," correct?

2    A.  Correct.

3    Q.  So based on this email, it's your understanding that Mendel

4    Zilberberg expects Mr. Klein to give $50,000 the next day?

5    A.  Correct.

6    Q.  Now, at this point was Mr. Klein a client of the firm?

7    A.  Yes.

8    Q.  As a client of the firm, did he sometimes owe fees?

9    A.  Yeah, lot of fees.

10   Q.  Let's talk about Mr. Klein for a second.

11          At a pretty high level, do you recall what the firm

12   represented Mr. Klein on?

13   A.  There were a number of different cases that the firm

14   represented the Kleins.  I think at that time it was Caring.  I

15   think it was the major one.  Could be there were other ones

16   also.

17   Q.  Did Caring involve a business dispute with his partner?

18   A.  Correct.

19   Q.  The Caring case, did that last a pretty long time?

20   A.  A very long time.

21   Q.  Do you know if it went through arbitration?

22   A.  It went through arbitration.

23   Q.  Went through litigation?

24   A.  A lot of litigation, yeah.

25   Q.  And is it fair to say that that case lasted several years?

1   A.  Yes.

2   Q.  Were there significant fees, legal fees, in that case?

3   A.  Yes.  It was probably, I think, over a million dollars.

4   Q.  And you would send him invoices for payment, correct?

5   A.  Correct.

6   Q.  And Mr. Klein would pay the invoices when they were sent or

7   soon thereafter?

8   A.  Or sometimes he would make payments.

9   Q.  And would he pay his fees fairly regularly?

10  A.  I'm sorry?

11  Q.  Would he pay his fees regularly?

12  A.  Yes.  He was always sending money.

13          MR. KAPLAN:  If we can go — if we can pull back up

14  that exhibit, 604.  Go to the second page, bottom of the second

15  page.  Yeah, the bottom email.

16  Q.  You respond to Mr. Zilberberg saying:  "Thank you.  He

17  funded?"

18  A.  Yes.

19  Q.  What do you think that's referring to?

20  A.  A loan that he was getting from the bank.

21  Q.  From Park Avenue Bank?

22  A.  I believe this is Park Avenue Bank.  He may have had other

23  ones as well.

24  Q.  Do you know when Mr. Klein got a loan from Park Avenue

25  Bank?

1   A.  No.

2   Q.  Do you know if that loan was around September time, 2009?

3   A.  I think it was somewhere there, but I don't know exactly if

4   it was September, November, or August.  I'm not sure.

5   Q.  Could it have been earlier in 2009?

6   A.  Could be, but I don't remember when.  I don't know.

7          MR. KAPLAN:  All right.  If we can get to Exhibit 605.

8   Go to the last page, the bottom email from Mr. Freund to

9   Mr. Zilberberg.

10  Q.  See that email, "Any update from Fried?"

11  A.  Yes.

12  Q.  Is your understanding that that was a question about fees?

13  A.  It was about money, and he owed — I believe at that time

14  he owed — he must probably owed money at that time in legal

15  fees.

16         MR. KAPLAN:  OK.  If we can go to Exhibit 413, please.

17  Let's focus first on the bottom email.

18  Q.  You email Mr. Zilberberg:  "Number one, Sauber.  Moshe said

19  it's out of his hands, and you can get it moved along, etc."

20         Is Moshe, Moshe Rosenwasser?

21  A.  I assume so, yes.

22  Q.  And when you say that Rosenwasser says that you can get it

23  moved along, are you referring to Mr. Zilberberg getting it

24  moved along?

25  A.  Correct.

1    Q.  And what is your understanding of how Mr. Zilberberg can

2    get it moved along?

3    A.  Because the way a loan works is there's different parts,

4    different steps to it.  And Moshe Rosenwasser, I don't know if

5    he was the first step or the second, or I don't know how many

6    steps afterwards there are.  So he told me that he finished

7    whatever he supposed to do, and it's, I guess, in the queue for

8    the next person since Mr. Zilberberg knew people over there, so

9    he could call somebody, get this done.

10   Q.  By "get this done," you mean move to the next step?

11   A.  Right, meaning put it on top of the queue.  It shouldn't

12   take a week for whatever needs to be done.

13           MR. KAPLAN:  We can go to, now, Exhibit 436.

14   Q.  So this is an email from you to Moshe Rosenwasser with an

15   attachment of the loan documents to the Sauber loan, correct?

16   A.  Yes.

17   Q.  It says:  "See attached.  Mendel comment on the loan docs

18   for Sauber," correct?

19   A.  Yes.

20           MR. KAPLAN:  Ms. Newman, can we go to the next page.

21   Q.  And we see on the next page it's a promissory note, and we

22   see some handwriting which you said is Mr. Zilberberg's

23   handwriting on the top of the page, correct?

24   A.  Correct, it looks like it.

25   Q.  And if we see, it says "Per discussion" and circled where

1   it has the payment, I guess, terms, unpaid interest on

2   October 21, 2010, it's circled says "Min 3 yr."  Do you

3   understand that to be minimum three years?

4   A.  Correct.

5   Q.  And is that a suggested edit that you believe

6   Mr. Zilberberg had to the promissory note?

7   A.  Correct.

8         MR. KAPLAN:  We can go to the next page.  You could

9   highlight that middle section.

10  Q.  Again, this is part of the promissory note, and you see

11  where it says "conditions," you see there's some handwriting?

12  A.  Uh-huh.

13  Q.  Is that a question mark and it says "If applicable?"

14  A.  Correct.

15  Q.  So does this seem to indicate that Mr. Zilberberg is asking

16  if that condition is applicable to the loan?

17  A.  Correct.

18        MR. KAPLAN:  We can scroll out of this for a second.

19  Q.  So let's look at the next page.  That's still part of the

20  promissory note, correct?

21  A.  Yes.

22        MR. KAPLAN:  Let's go to the next page.

23  Q.  Now, this is another document called "Business Loan

24  Agreement."  Are there any notations on this document from

25  Mr. Zilberberg?

1    A.  No.

2            MR. KAPLAN:  Let's go to the next page.

3    Q.  Any on this page?

4    A.  No.

5            MR. KAPLAN:  We can scroll a little faster.  Yeah.

6    Q.  Any on this page?

7    A.  No.

8    Q.  Next page?

9    A.  No.

10   Q.  Next page?

11   A.  No.

12   Q.  Next page?

13   A.  No, no.

14   Q.  No.  So that's the end of the business loan agreement.

15           Let's go to the next page.

16           This is the notice of final agreement.  Is there any

17   notation on this page?

18   A.  No.

19   Q.  What about the next page?

20   A.  No.

21   Q.  How about the next page?

22   A.  No.

23   Q.  This is a disbursement request and authorization.  Any

24   notations from Mr. Zilberberg?

25   A.  No.

1    Q.  Let's go to the next page.  Any notations?

2    A.  No.

3    Q.  And the last page, there's some handwriting on top, but

4    that's not Mr. Zilberberg's handwriting, is it?

5    A.  No, that's, I believe, the bank.  That came from the bank.

6    Q.  That came from the bank.

7            So in this document that you sent to Moshe

8    Rosenwasser, the only notations that Mr. Zilberberg had were in

9    the first two pages on the promissory note, correct?

10   A.  Right.

11           THE COURT:  You have to say yes or no.

12   A.  Yes.

13   Q.  Do you know if Mr. Zilberberg even read the rest of the

14   pages?

15   A.  I assume he did.

16           MR. NESSIM:  Objection.

17           THE COURT:  You want --

18           MR. NESSIM:  Withdrawn.

19           THE COURT:  You want it to stand or strike?

20           MR. NESSIM:  Sorry?

21           THE COURT:  I said do you want the answer to stand or

22   strike?

23           MR. NESSIM:  We'll withdraw the objection.

24           MR. KAPLAN:  If we could go to Exhibit 423 in

25   evidence.

1    BY MR. KAPLAN:

2    Q.  You were asked some questions about iska, correct?

3    A.  Correct.

4    Q.  Is that referred to as a heter iska?

5    A.  Correct.

6    Q.  And these emails pertain to drafting a heter iska involving

7    some transactions with Mr. Zilberberg and Mr. Fried, correct?

8    A.  Correct.

9    Q.  Mr. Fried and Mr. Kahan?

10   A.  Correct.

11   Q.  Mr. Kahan and Mr. Sauber?

12   A.  Correct.

13          MR. KAPLAN:  If we can go to Government Exhibit 418,

14   we can go to the third page of the exhibit.

15   Q.  Mr. Freund, is this the heter iska involving the Saubers

16   and Abraham Chaim Kahan?

17   A.  Yes.

18   Q.  Do you see in the —— if you could just highlight the first

19   paragraph, Ms. Newman.

20          You see it says:  "We, the undersigned, have received

21   the sum of" —— and that section's left blank —— "from Herschel

22   Sauber and Pauline Sauber (hereinafter referred to as the

23   investing partner) to be used for business purposes."

24          Do you see that?

25   A.  Yes.

1    Q.  Do you see the next sentence:  "We obligate ourselves to

2    utilize these funds in a manner which we believe will generate

3    profits"?

4    A.  Yes.

5          MR. KAPLAN:  Thank you, Ms. Newman.

6          We could go to Exhibit 416.

7    Q.  So this is an email from you to Mr. Kahan.  Do you see

8    where it says, "Please make sure he signs a drawdown request

9    for 466,000"?

10   A.  Yes.

11   Q.  And then it says that money should be transferred into Aron

12   Fried's account and then an account number?

13   A.  Yes.

14   Q.  Do you know what happened to that $466,000?

15   A.  What do you mean "what happened"?  If it was done or what

16   was done with the money afterwards?

17   Q.  What was done with the money?  What was done with that

18   money?

19   A.  I don't know.  I believe — I believe Mendel Zilberberg or

20   one of his accounts, I'm not sure which one, received 466,000,

21   but I'm not sure where the money came from or if it was this

22   money.

23         MR. KAPLAN:  OK.  We can pull up Exhibit 430, please.

24   Q.  Do you see the email in the middle of the page from Ray

25   Barcia to Mendel Zilberberg?

1  A.  Yes.

2  Q.  "Credit not processed yet.  They also want me to wire out

3  $466,000 to HSBC."  Do you see that?

4  A.  Yes.

5  Q.  Did Mr. Zilberberg have accounts at HSBC?

6  A.  Yes.

7  Q.  Was the One World United account, his company, his account

8  at HSBC?

9  A.  Yes.

10 Q.  Do you know if the $466,000 was sent to Mr. Zilberberg's

11 account at HSBC?

12 A.  I think it was.

13        MR. KAPLAN:  Ms. Newman, you can take it down.

14 Q.  I think we've established that Aron Fried was a client of

15 the firm, right?

16 A.  Correct.

17 Q.  And what's your understanding of what Mr. Zilberberg was

18 doing as legal services on behalf of Mr. Fried?

19 A.  He had the major —— I don't know if it was a legal case at

20 that time or an arbitration or both.  I'm not sure.

21 Q.  Do you recall if the Fried case lasted for several years?

22 A.  It definitely did.

23 Q.  And do you also recall if that case involved hundreds of

24 thousands of dollars in legal fees?

25 A.  Yeah, a lot.

N77HZil1                    Freund - Cross

```
 1    Q.  And do you recall a time prior to September 2009 where

 2    Mr. Fried was frequently or regularly paying his fees?

 3    A.  I think so.

 4    Q.  So you were office manager, correct?

 5    A.  Correct.

 6    Q.  As office manager, were you aware that Aron Fried sent

 7    $466,000 to Mr. Zilberberg's account at One World United?

 8    A.  I think so.

 9    Q.  What is your understanding of why Mr. Fried sent that money

10    to Mr. Zilberberg?

11              MR. NESSIM:  Objection.

12              THE COURT:  Sustained as to the form of the question.

13    Q.  Do you know if that money to Mr. Zilberberg was a loan?

14    A.  I don't.

15    Q.  Do you recall whether Mr. Zilberberg gave Mr. Fried a

16    mortgage on his building for $466,000?

17    A.  Yes, he did.

18    Q.  Do you recall when he gave that mortgage?

19    A.  At the same time.

20    Q.  At the same time as the 466 went to Mr. Zilberberg?

21    A.  Right.  I don't know dates, but I think it was the same

22    time or maybe the same day.  I'm not sure.

23    Q.  Let me try to refresh your recollection as to the date for

24    a second.

25              If you could scroll to the second page.  And just for
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    clarity purposes, we'll refer to this as DX 302.

2              Do you see the document in front of you?

3    A.  Yes.

4    Q.  Could you just take a look at that document.

5    A.  Yes.  It's the mortgage.

6              MR. KAPLAN:  Can you scroll to the next page, the

7    following page.

8    Q.  You see on the bottom of the page?

9    A.  Yes.

10             MR. KAPLAN:  OK.  Can you scroll to the next page.

11   Q.  Do you see that?

12   A.  Yes.

13   Q.  Does this document refresh your recollection as to when the

14   mortgage was given?

15   A.  Yeah, September 18, 2009.

16   Q.  Do you recall when the loan was given to Mr. Zilberberg?

17   A.  No.

18   Q.  Do you know if it was around the same time in

19   September 2009?

20   A.  I think so.

21   Q.  What was your understanding as to why Mr. Zilberberg gave a

22   mortgage to Mr. Fried?

23   A.  I — I believe it was collateral for the money that

24   Mr. Zilberberg had, because he gave a lot of money in advance

25   of the — for legal fees.  So I think he was afraid, if I

1   remember correctly.  I'm not sure if Fried told me this or

2   Zilberberg or somebody.

3   Q.  What was he afraid of?

4         MR. NESSIM:  Objection.  Hearsay.

5         THE COURT:  Sustained.

6   Q.  After your conversations with either of these individuals,

7   did there come a point where you continued to send invoices to

8   Mr. Fried?

9   A.  I believe every month, whenever there was activity.

10  Q.  And were these invoices that you were expecting him to pay

11  at that time?

12  A.  No.  After this, I believe no.  We just kept — we just

13  sent invoices so he knows where his money is going or what

14  we're up to.

15  Q.  So you would send him almost like informational invoices so

16  he can keep track of how much time and legal fees he was

17  accruing?

18  A.  Correct.

19  Q.  Do you recall how long you sent — how many years you sent

20  these informational invoices?

21  A.  I don't.

22  Q.  Could it have been more than a year?

23  A.  Very possible.

24  Q.  More than two years?

25  A.  Possible.  I don't know how long.

1  Q.  Do you recall Aron Fried paying any legal fees in 2011?

2  A.  I don't.

3  Q.  Do you recall Aron Fried paying any legal fees in 2012?

4  A.  I don't.

5  Q.  What about in '13?

6  A.  I don't.

7  Q.  Did Mr. Zilberberg continue to provide legal services to

8  Mr. Fried during this time?

9  A.  I think yes, but I really don't remember.  I remember he

10  had a very long, drawn-out case, but I don't know when it was

11  active and when it wasn't.  So I don't know.

12  Q.  Refresh your recollection.

13        Ms. Newman, can we pull up 3502-005.

14        Mr. Freund, can you look at the first page for a

15  second.

16  A.  Yes.

17        MR. KAPLAN:  Can we go to the next page.  Go to the

18  last page.

19  Q.  Does this document refresh your recollection as to whether

20  Mr. Zilberberg continued to provide legal services to Aron

21  Fried into 2013?

22  A.  Yes.  If there's invoices, that means there was services;

23  there was work.

24        MR. KAPLAN:  Ms. Newman, can you take that document

25  down for a second.

1  Q.  Do you recall, just generally, how much those fees were

2  that he was accruing?

3  A.  I don't.  If it was an active month, it could be 50 or 70

4  or I don't remember how many thousand dollars, depending how

5  many sittings there were or how many people worked at that

6  particular day or sitting or week, preparation before,

7  afterwards.  And if there was little activity, could have been

8  just a few thousand dollars.

9  Q.  Do you recall if in 2013 there were hundreds of thousands

10  of dollars of invoices that had been sent to Mr. Fried but not

11  paid?

12  A.  If I remember, no, I don't.

13          MR. KAPLAN:  Ms. Newman, if you can pull up that

14  document again.  It's 3502-005.  We can scroll to the last

15  page.

16  Q.  Does this document refresh your recollection as to how much

17  approximately — well —

18          MR. NESSIM:  Take the exhibit down.

19          MS. McLEOD:  Take the exhibit down before you ask.

20  Q.  Does that document refresh your recollection as to

21  approximately how many legal fees Mr. Fried owed in 2013?

22  A.  I didn't read the bottom numbers, but I see there were a

23  lot of invoices, open ones.

24          MR. NESSIM:  Objection.

25          THE COURT:  I'm going to sustain the objection.

1    Strike that question.

2              MR. NESSIM:  And to strike the answer, your Honor?

3              THE COURT:  Yes.

4    BY MR. KAPLAN:

5    Q.  Do you recall if there was a time that Mr. Fried was

6    credited on his account at Zilberg's office?

7    A.  I'm sorry.  Ask again.

8    Q.  So I had previously asked about legal fees that Mr. Fried

9    owed Mr. Zilberg.  Do you know if there was a time that

10   Mr. Zilberg credited Mr. Fried's account based on the loan

11   money he had given him years earlier?

12   A.  Yes.

13   Q.  And is that your understanding of how Mr. Zilberg gave

14   back that money to Mr. Fried?

15   A.  Correct.

16             MR. KAPLAN:  One second, your Honor, please.

17             I have no further questions.

18             THE COURT:  Any further questions for this witness by

19   the government?

20             MR. NESSIM:  Yes, your Honor.

21             Your Honor, this might be a good time for a midmorning

22   break, actually, before redirect.

23             THE COURT:  How much longer do you have?

24             MR. NESSIM:  I expect 15 minutes or so.

25             THE COURT:  All right.  You want to take the break

1    before that or after?

2              MR. NESSIM:  I think before would make more sense.

3    Thank you.

4              THE COURT:  We'll take a 15-minute break.  Ladies and

5    gentlemen, don't discuss the case.  Keep an open mind.  And

6    we'll come back and finish this witness right after.

7              (Jury not present)

8              THE COURT:  You can step down, sir.  We'll take a

9    15-minute break.

10             (Recess)

11             (Continued next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury present)

2            THE COURT:  You can be seated.  Thank you.

3            Do you have further questions?

4            MR. NESSIM:  Yes, your Honor.  Briefly.

5    REDIRECT EXAMINATION

6    BY MR. NESSIM:

7    Q.  Mr. Freund, Mr. Kaplan asked you some questions on

8    cross-examination about whether you handled invoicing for legal

9    fees.

10           Do you remember discussing that?

11   A.  Yes.

12   Q.  Can you remind us, what was the name of Mendel Zilberberg's

13   law firm?

14   A.  Mendel Zilberberg & Associates, PC.

15   Q.  And One World United was not the name of his law firm?

16   A.  Correct.

17   Q.  That is -- what did One World United do around 2009?  What

18   was One World United engaged in in 2009?

19   A.  It did a number of different things.  I'm not sure what it

20   did at that particular time, but one of it was nursing, and

21   there was medical billing, and -- I don't know, and some other

22   back office stuff, but I'm not sure what.  I don't remember

23   what.

24   Q.  So businesses unrelated to his legal business?

25   A.  I think so.  It could be.  I'm -- it could be that they did

1  some back office legal stuff, but I'm not sure.  I remember

2  there was a discussion, but I don't remember if it became

3  actual.

4  Q.  Okay.

5          MR. NESSIM:  Mr. Carbone, can you please publish

6  Government Exhibit 604?

7  Q.  So, Mr. Kaplan asked you some questions about Abraham

8  Klein.

9          Do you remember that?

10  A.  Yes.

11  Q.  Whether he was a client of Mr. Zilberberg?

12  A.  Right.

13  Q.  And this e-mail here talks about that $50,000 that Mr.

14  Klein was going to transfers?

15  A.  Correct.

16  Q.  And that money was going to come out of a loan, right?

17  A.  I don't know that.

18          MR. NESSIM:  Well, let's just scroll down for a

19  second, Mr. Carbone.  And can you zoom into these two emails at

20  the bottom of the screen?

21  Q.  Mordechai Freund:  Thank you.  He funded?

22          And Mendel Zilberberg said:  No, but I told him it was

23  approved and will fund next week.

24          And that refers to a loan, right?

25  A.  Correct.  But it appears that the money is not coming from

1   a loan.

2   Q.  It's related to a loan, right?

3   A.  From Mr. Zilberberg's answer to me, it appears it's not

4   related.  I asked, because I thought it is, but it appears from

5   the answer that he didn't fund it.

6   Q.  Okay.

7          MR. NESSIM:  Well, let's look at Government Exhibit

8   506, please, Mr. Carbone.  And let's zoom into the November 10

9   email at 2:40 p.m.

10  Q.  Mendel Zilberberg to Ray Barcia.  Subject is:  Caring.

11  "Off the record, he owes me money, and I need to get paid

12  today.  Can you call him, so I get paid?  Please keep me

13  posted.  Mendel Zilberberg."

14         Who is Ray Barcia?

15  A.  He worked at Park Avenue Bank, the local branch.

16  Q.  This is money that Mr. Zilberberg is going to get paid

17  directly from Park Avenue Bank?

18  A.  Directly from Park Avenue Bank.

19  Q.  Well, he's reaching out to Ray Barcia, right?

20  A.  Correct.  Right.

21  Q.  And he's at Park Avenue Bank?

22  A.  Right.

23  Q.  And that's where the money is going to come from?

24  A.  Meaning from which bank it's coming from?

25  Q.  Yes.

1    A.  But it's not talking about their money.

2    Q.  It's Mr. Klein's?

3    A.  Right.

4         MR. NESSIM:  Mr. Carbone, can you please pull up

5    Government Exhibit 418?

6    Q.  This is an e-mail about heter iskas.

7         Let's scroll to the next page, please.  And the next

8    page, the second page, please -- the third page.

9         You were asked some questions about this heter iska

10   document?

11   A.  Yes.

12   Q.  Let's zoom into the first paragraph, please.

13        I'll just read part of the first paragraph.

14        "We, the undersigned, have received the sum of blank

15   from Herschel Sauber and Pauline Sauber, hereinafter referred

16   to as the investing partner, to be used for business purposes.

17   We obligate ourselves to utilize these funds in a manner which

18   we believe will generate profits.  Any profits realized or

19   losses sustained will be shared equally."

20        This is language of a business investment or business

21   partner.  Is a heter iska an investment in a business?

22   A.  I believe so, yes.

23   Q.  Is that what it's used for?

24   A.  Correct.  I'm not --

25   Q.  In what context is a heter iska employed?

1    A.   I'm sorry?

2    Q.   In what context is a heter iska employed?

3    A.   In any transaction that two people have, I believe.  I'm

4    not a Rabbi.  But in -- I believe any transaction that two

5    people have that relates to interest, that there may be one

6    person is paying interest on behalf of the other one, or one

7    person paying from one person to the other, they need a heter

8    iska as far as I know.

9    Q.   So is it a way to have a loan with interest while staying

10   consistent with Jewish law?

11   A.   Correct.

12   Q.   So the language of a business or an investment, that's like

13   a legal term to get around the interest rules, right?

14   A.   I don't know.  I think so, but I'm not sure.

15   Q.   Okay.  But is there actually like a business that's being

16   created here, or invested in, or is it like a loan?

17   A.   We are here.

18   Q.   And a heter iska, is it like a loan or an actual investment

19   in a business?

20   A.   It's -- it depends how you look at it.  From a Jewish

21   perspective, it's really I believe -- I'm not a Rabbi, but

22   that's my understanding at least what a heter iska is, that

23   really two people are partners in a business, or in a

24   particular business transaction, and for one person not to have

25   to give the other one exact books and records, how much he

1    made, how much he lost, what came, what went, you know, I'll

2    give you ten percent on your money a year, and we'll call it a

3    day.  And whatever I make more than that, or less than that, is

4    my headache, not the other partner's headache.

5    Q.  But in the secular world, it's a way for Jews to lend money

6    and pay interest.

7    A.  In the secular world, there is no heter iska.

8    Q.  Well, in terms of monetary terms employed in the secular

9    world -- it's a way for Jews to lend money and still pay

10   interest or receive interest, right?

11   A.  Right.

12        MR. NESSIM:  You can zoom out, Mr. Carbone.

13   Q.  So this is a heter iska where the undersigned, which is

14   Abraham Chaim Kahan, received a sum of money from Herschel

15   Sauber and Pauline Sauber, so who is borrowing money here?

16   A.  Kahan is borrowing money from Sauber.

17        MR. NESSIM:  And then if you'll scroll up, please,

18   Mr. Carbone.

19   Q.  This one, "we the undersigned have received a sum of money

20   from Abraham Chaim Kahan."

21        And at the bottom is the signature line.  Who is

22   borrowing money from whom here?

23   A.  Here Aron Fried is borrowing from Kahan.

24   Q.  So Aron Fried is borrowing from Kahan, who borrowed from

25   the Saubers?

1    A.  That's not what it shows.  Each one is a separate thing.

2    Q.  In terms of the two in context, Kahan is borrowing from the

3    Saubers, and Fried is borrowing from Kahan?

4    A.  I would assume.

5          MR. NESSIM:  Let's pull up Government Exhibit 417,

6    please, Mr. Carbone.

7          If you could zoom in to the September 16 email -- the

8    second one.  Excuse me.  September 16.

9    Q.  So here is a heter iska agreement for Herschel Sauber and

10   Pauline Sauber, lender; Abraham Chaim Kahan, borrower.  That's

11   one.  And I just wanted to -- Aron Fried, lender; One World

12   United, borrower.

13         So who is the borrower in that transaction?

14   A.  One World United.

15   Q.  And who is the lender?

16   A.  Aron Fried.

17   Q.  And One World United, that is Mr. Zilberberg's business?

18   A.  Correct.

19   Q.  Is that a nursing or a medical device billing business?

20   A.  He had medical billing -- a whole bunch of back office

21   work.

22   Q.  Okay.  One moment.

23         No further questions.

24         THE COURT:  Any further questions by the defense?

25         MR. KAPLAN:  No questions, your Honor.

N77DZIL2                    Rosenwasser – Direct

1          THE COURT:  Thank you, sir.  You can step down.

2          THE WITNESS:  Thank you.

3          THE COURT:  The government can call its next witness.

4          MR. NESSIM:  Yes, your Honor.  The government or --

5    I'll wait for the witness to step down.

6          Your Honor, the government calls Moshe Rosenwasser.

7          THE COURT:  Would you step up into the box?  Step up

8    into the witness box.  Just stand there for a second.

9          THE WITNESS:  Sure.

10          THE DEPUTY CLERK:  Please raise your right hand.

11          (Witness sworn.)

12          THE COURT:  You can be seated.

13          THE WITNESS:  Thank you.

14          THE COURT:  Just watch the microphone.  Point it

15    towards your mouth.  Keep your voice up, and move it a little

16    closer.

17          Thank you.

18          You can inquire, Mr. Nessim.

19          MR. NESSIM:  Thank you, your Honor.

20    MOSHE ROSENWASSER,

21        called as a witness by the government,

22        having been duly sworn, testified as follows:

23    DIRECT EXAMINATION

24    BY MR. NESSIM:

25    Q.  Mr. Rosenwasser, in what county do you live?

1    A.   Rockland.   Rockland County.

2    Q.   And how far did you go in school?

3    A.   I have a doctorate.

4    Q.   What is your doctorate in?

5    A.   Philosophy.

6    Q.   What is your education history?   What other degrees do you

7    have?

8    A.   An undergraduate degree in chemistry, and an MBA in

9    finance.

10   Q.   And what do you do for work?

11   A.   Commercial banking.

12   Q.   Are you currently working?

13   A.   No.

14   Q.   Are you retired now?

15   A.   Yes.

16   Q.   When did you retire?

17   A.   2017.

18   Q.   And you said you did commercial banking.   Is that what you

19   were doing before you retired?

20   A.   Correct.

21   Q.   Turning your attention to 2008 and 2009, where were you

22   working at that time?

23   A.   Park Avenue Bank.

24   Q.   Approximately when did you start working at Park Avenue

25   Bank?

1    A.   2005.

2    Q.   And approximately when did you stop working at Park Avenue

3    Bank?

4    A.   2010.

5    Q.   And during the time that you worked at Park Avenue Bank,

6    what was your title?

7    A.   I was senior vice president.

8    Q.   And what were your responsibilities, or work

9    responsibilities as a senior vice president?

10   A.   I was in charge of commercial lending.

11   Q.   What is commercial lend?

12   A.   Commercial lending is lending to businesses primarily, but

13   also to individuals.  But not real estate oriented, unless it's

14   owner-occupied real estate.  Owner-occupied real estate would

15   be included in my responsibilities, but other real estate, like

16   investment real estate and things like that were not included

17   in my responsibilities.

18   Q.   Owner occupied?  What do you mean by that?

19   A.   Owner occupied.  I'll give you an example.  Let's say

20   there's a person who has a business, and she needs to buy a

21   warehouse.  That would be considered owner occupied, because

22   the warehouse serves the purposes of the business.  So

23   something that's integrally connected to the business.

24        Or a person needs an office, so they want to buy an

25   office for whatever reason, rather than rent.  That would be

1    considered an owner-occupied business.

2    Q.   It's owner occupied by a business.  It's not an individual

3    in their personal capacity, their personal property?

4    A.   Correct.

5    Q.   In approximately 2009, did other people work with you in

6    commercial lending?

7    A.   Other people worked with me?  Yes.

8    Q.   Approximately how many other people were working in

9    commercial lending?

10   A.   We were altogether five.

11   Q.   And where was Park Avenue Bank's headquarters during this

12   time?

13   A.   On Park Avenue, corner of 57th Street.

14   Q.   In Manhattan?

15   A.   Correct.

16   Q.   And where was your office located?

17   A.   There.

18   Q.   So you said you were in charge of commercial lending for

19   Park Avenue Bank; is that right?

20   A.   Yes.

21   Q.   So I want to ask some questions about the loan process.

22            How would you learn of potential new loans?

23   A.   Anywhere and everywhere.  And I -- people -- first of all,

24   accountants, lawyers, other bankers, existing customers,

25   friends, family, anybody would approach me or one of my

1   teammates, and suggest or recommend something, and we would

2   follow it up from there.

3   Q.  And what would you do once a loan was referred to you?

4   A.  What I would do --

5   Q.  What sort of follow-up would you engage in?

6   A.  Oh, I would start asking questions.  I would interview the

7   person that is borrowing, and I would ask them questions.  And

8   afterwards I would request documents to support the answers to

9   those questions, and whatever documents I thought were

10  necessary in order to support the loan.

11  Q.  And when you say "support the loan," what sort of like

12  central question or what's your sort of central goal in this

13  process of gathering information?

14  A.  The ultimate idea is to ensure that the borrower can pay

15  me, can repay, the ability to repay, and the intention to

16  repay, and wherewithal to repay.

17  Q.  And so what sort of questions did you find were most

18  helpful in getting to the answer to that central question?

19  A.  Oh, so many questions.  What the business is about; why

20  they need the money; how strong the business is; how much

21  equity it has; how much it earns; or if it's a new business,

22  how much it's expected to earn, and what's the basis for those

23  expectations.  So many various parameters, it's like -- really,

24  it's very, very broad.

25  Q.  And would you also collect documents from potential

1    borrowers?

2    A.   Yes.

3    Q.   What sort of documents or records would you collect?

4    A.   There were a lot of documents, but primarily financial

5    statements, tax returns, and financial statements from

6    accountants, personal financial statements, and other evidence

7    of either financial wherewithal or ownership of property, et

8    cetera.

9           MR. NESSIM:  Mr. Carbone, can you please publish

10   what's in evidence as Government Exhibit 51?

11   Q.   And this would be Park Avenue Bank -- the Park Avenue Bank

12   credit policy 2009.

13          Mr. Rosenwasser, do you recognize this document?

14   A.   Yes, I can see it.

15          MR. NESSIM:  Let's turn to page 6, please,

16   Mr. Carbone.

17          Let's zoom into the "undesirable loan" section.

18   Q.   I will just read a portion of this.

19          "Undesirable loans.  The Park Avenue Bank will make

20   every effort to service the borrowing needs of its customers

21   within its marketplace.  There are, however, loan purposes

22   types that exhibit inherent risk characteristics which are

23   greater than normal.  These loan purpose types are considered

24   exceptions to bank policy, and are to be extended only to the

25   bank's most creditworthy customers and prospects.  Loans that

1    the bank would not consider desirable include the following."

2            And the first one is "loans to borrowers with limited

3    repayment ability."

4            It may be obvious, but why is that an undesirable

5    loan?

6    A.  If they can't repay, then they can't repay.  That's not

7    desirable.

8    Q.  And the third one down, "loans with no clearly defined

9    purpose or source of repayment."

10           Why is a loan without a clearly defined purpose

11   undesirable?

12   A.  Because we want to know, the bank needs to know what the

13   intention of the borrower is, perhaps in a more general way,

14   but at least to know what the intention of the borrower is to

15   do with the funds.

16   Q.  And why is a loan without a clearly defined source of

17   repayment undesirable?

18   A.  If there's no clearly defined source of repayment, then

19   that leads to the question, am I able to get repaid; is the

20   bank able to get repaid.

21           MR. NESSIM:  Okay.  Mr. Carbone, you can zoom out,

22   please.

23   Q.  And then there's a prohibited loan section.  It says, "the

24   bank will not extend credit for purposes that are illegal, or

25   generally considered to be immoral, including but not limited

1    to the following."

2            MR. NESSIM:  You can turn to the next page, please,

3    Mr. Carbone.  And let's zoom into the --

4    Q.  So the second from the bottom here is "loans to borrowers

5    with poor character and/or reputation."

6            Do you see that?

7            Why is an assessment of character, reputation

8    important as you're considering a loan?

9    A.  Well, if the -- if this particular borrower engaged in bad

10   practices, or hasn't paid a bank previously, then they're very

11   likely to do it again.

12   Q.  And as a loan officer assessing a loan, is it important

13   that you understand who it is you're lending to?

14   A.  I'm sorry.  I did not hear the question.

15   Q.  As a loan officer assessing a loan, is it important that

16   you understand who you're lending to?

17   A.  Yes.  Yes.

18   Q.  And why is that?

19   A.  Well, that touches on the purpose of the loan, and that

20   also touches on the fact that the -- I need to make sure that

21   the documentation that I'm receiving is reflective of either

22   the individual or the business, who is the borrower.  Okay.  If

23   the person gives me documents which reflect A as a borrower and

24   really it's B who's the borrower, then that confuses me.

25           MR. NESSIM:  Okay.  Mr. Carbone, could you please turn

1    to page 7?

2             And let's zoom into the credit authorities section.

3    And you can zoom in to the whole table as well.

4    Q.  So this reads, "creditor authorities.  The board of

5    directors has the authority to approve new loans, renewals, and

6    other extensions of credit up to the legal lending limit of the

7    bank, and within the statutory guidelines of the governing

8    regulatory agencies.  The board of directors must approve all

9    extensions of credit subject to regulation O.  The credit

10   approval authority levels are outlined below.  All of the

11   levels of authority discussed in this credit policy are subject

12   to compliance with all governing regulations then in effect."

13            So what does this table illustrate?

14   A.  The table delineates -- it's a chart, and it delineates who

15   is entitled to approve loans.  So the columns are the purpose

16   for which the loan is going, and the rows are the people or the

17   functions of the people who are filling those functions, and

18   who they are, and how much they can approve.

19   Q.  So let's just take an example.  So I guess let's look at

20   the function row if you could.

21            MR. NESSIM:  Mr. Carbone, if you can highlight that

22   column.

23   A.  Okay.

24   Q.  So CEO, CLO, CFO.  So what is CEO?

25   A.  Chief executive officer.

390

N77DZIL2            Rosenwasser - Direct

1   Q.  And who was Park Avenue Bank's CEO in 2009?

2   A.  Charles Antonucci.

3   Q.  And what is CLO?

4   A.  Chief lending officer.

5   Q.  And who was Park Avenue Bank's chief lending officer in

6   2009?

7   A.  As I recall, it was Ed Beyer.

8   Q.  Okay.  And what does CFO stand for?

9   A.  Chief financial officer.

10  Q.  Okay.  So just looking at the CEO row, let's just take that

11  across.

12          What was the amount of cash secured loans that the CEO

13  could approve?

14  A.  $2 million.

15  Q.  And what about real estate secured?

16  A.  A million five.

17  Q.  And C&I?

18  A.  A million.

19  Q.  And what is C&I?

20  A.  Commercial and industrial.

21  Q.  And what does that mean?

22  A.  That's the area that I was in charge of.

23  Q.  And unsecured loan?

24  A.  Unsecured means unsecured, like a credit card.

25  Q.  What's the amount that the CEO could approve?

1    A.  I'm sorry?

2    Q.  What is the amount of an unsecured loan that a CEO could

3    approve?

4    A.  $500,000.

5    Q.  And a reg. O loan?

6    A.  C&I line?

7    Q.  A reg. O loan, the next column?

8    A.  Oh, a reg. O loan is zero.

9            MR. NESSIM:  Mr. Carbone, you can zoom out.  And then

10   if you can zoom into the second paragraph under that table,

11   please, Mr. Carbone.

12   Q.  "Three signatures are required for each loan approval with

13   at least two signatures having the requisite authority to

14   approve the loan amount, with the third signature of the vice

15   president of the commercial real estate department required on

16   all real estate loans, and the signature of the senior vice

17   president of commercial lending required on all C&I loans.

18           In the event unanimity cannot be reached between the

19   requisite parties, a signature of the chairman of the board, or

20   any other member of the Directors Credit Committee can be used.

21   The originating loan officer can also request the loan be

22   presented to the Directors Credit Committee."

23           So what is this paragraph?  Can you summarize what

24   this paragraph says?

25   A.  The paragraph delineates what kind of signatures are

1   required on each loan presentation.

2   Q.  So for -- does your title appear in this paragraph?

3   A.  I was the senior vice president of commercial lending.

4   Q.  So for a C&I loan, for example, how would a C&I loan be

5   approved if it was below the threshold approved in the table

6   above?

7   A.  A C&I loan could be approved by two signatures of -- well,

8   it was the CLO and the CFO -- CEO and CLO.  Those are the two

9   signatures that are required.  Or it could be substituted with

10  the chairman of the board, et cetera, and -- yeah.

11  Q.  The screen just went out.

12          Are you able to see your screen, Mr. Rosenwasser?

13  A.  I'm sorry?

14  Q.  Are you able to see something on your screen?

15  A.  Yeah, now I can.

16  Q.  Okay.  This paragraph also references the Directors Credit

17  Committee.

18          What is the credit committee?

19  A.  That is a committee composed -- at Park Avenue Bank, was

20  composed of directors of the bank.  And I think it was

21  exclusively all directors, but I'm not 100 percent sure.  And

22  their function was to approve or disapprove loans which are

23  above the threshold that was allowed by the CEO or the CLO.

24  And that was what we saw before, above that grid, above that

25  matrix that we saw before.

1   Q.  And did you say -- approximately how many people were a

2   part of that committee?

3   A.  Something like seven or eight.  I'm not sure.

4   Q.  And just so I understand you, within the world of bank

5   loans, what does the term "credit" mean in that context?

6   A.  "Credit" means the extension of credit.  In other words,

7   lending money with the expectation of being repaid.

8           MR. NESSIM:  Can you zoom out, Mr. Carbone?

9   Q.  So you testified that there are these loan thresholds, and

10  loans above these thresholds go to the credit committee, and

11  loans above them can be approved by other authorities?

12  A.  Correct.

13  Q.  In practice, how did this policy actually operate at Park

14  Avenue Bank?

15  A.  I'm sorry.  I didn't hear the question.

16  Q.  In practice, how did this policy operate at Park Avenue

17  Bank?

18  A.  In practice, it's to be noted that anything under one and a

19  half million dollars was able to be approved by the two

20  signatures of the CEO and the CLO.  In practice, that's what we

21  did.

22  Q.  So everything below 1.5 was considered by those two

23  individuals?

24  A.  Correct.

25  Q.  And everything above 1.5, what happened to those loans?

1   A.  Would have to go to credit committee.

2           MR. NESSIM:  Mr. Carbone, can you please turn to page

3   51?

4   Q.  So this page reads, the Park Avenue Bank loan risk ratings?

5   A.  Yes.

6           MR. NESSIM:  If you can just zoom in to the top few

7   lines?

8           Yeah.  That's great.  Thank you.

9   Q.  And so the top here says, "the following are ratings that

10  the bank will employ with respective definitions."

11          And here it's, one, pass - excellent.

12          What are these risk ratings?

13  A.  These are ratings for loans depending on the quality of the

14  loan.

15  Q.  And what's the scale of these risk ratings?

16  A.  Technically, it was one to eight, but, in practicality, the

17  loans that we did were between one and four.

18  Q.  And within that scale, what's the best four possible and

19  what is the worst four possible?

20  A.  The best score is the excellent, is one; and the lowest of

21  them, which is still a fine loan, is number four.

22          MR. NESSIM:  Mr. Carbone, can you zoom out, please?

23          And let's turn to the next page.  And can you zoom

24  into the number four, pass - acceptable?

25  Q.  Is that the rating of the four you're referencing?

1   A.  Correct.

2   Q.  Considered pass - acceptable?

3   A.  Correct.

4           MR. NESSIM:  Mr. Carbone, can you zoom out, please.

5   Q.  And I'll read titles of rating five, six, and seven.  Five

6   is special mention, six is substandard, seven is doubtful.

7           MR. NESSIM:  And can you turn to the next page,

8   please, Mr. Carbone.

9   Q.  Eight is loss.  What does "loss" mean?

10  A.  "Loss" means probably it's written off.

11  Q.  "Written off" meaning it won't be repaid?

12  A.  Oh, no.  That's way after that.  "Loss" means that the bank

13  has decided that this loan is not getting repaid.

14  Q.  Okay.

15          MR. NESSIM:  Mr. Carbone, you can take this down,

16  please.

17  Q.  Did Park Avenue Bank have an application for commercial

18  loans?

19  A.  No.

20  Q.  Why not?

21  A.  No bank that I ever worked at, in my capacity, has ever had

22  an application for commercial loans.

23  Q.  And why is that?

24  A.  Simply because it's -- the parameters are so broad.  It's

25  not like a mortgage that we're all used to, that has a few

396

1   limited parameters, the credit score, the value of the house,

2   et cetera.  So there are five or six, and you can actually

3   distill those down onto an application -- an application, where

4   as over here, the parameters are so broad, there are so many,

5   and you can evaluate them in so many different ways that it's

6   just not possible to have an application.

7   Q.  So understanding that these parameters are very broad,

8   speaking for you as a loan officer, what are the things that

9   are the most important to you in evaluating a potential

10  commercial loan?

11  A.  The equity in the business, the reputation of the borrower,

12  the earnings, or at least projected earnings of the business,

13  all those would be considered very important.

14  Q.  So you've testified that you would -- when you referred a

15  loan, you would ask questions, you would collect documents.

16  Once you have collected some of that information and documents,

17  what's the next step in the loan approval process?

18  A.  Then we write it.  We write all that information.  We

19  combine all that information, and write it up in a coherent

20  way, which either the credit committee, if it's above a million

21  and a half dollars, or the officers who need to sign off on it

22  if it's below a million and a half dollars, but -- in a way

23  that's coherent for them to understand.

24  Q.  And what do you call that write-up?  Is there a title for

25  it?

1    A.   It's called loan presentation.  I think it was called loan

2    preparation at Park Avenue Bank.  Every bank calls it something

3    different.

4    Q.   You're mentioning a lot of banks.  How many different banks

5    have you worked at in your career?

6    A.   Five.

7    Q.   Within Park Avenue --

8    A.   Over about 40 years.

9    Q.   Within Park Avenue Bank's commercial lending department,

10   who would draft these loan presentations?

11   A.   Anybody on the team, including myself.

12   Q.   And who would review them within the team?

13   A.   So the first review was done by a credit person.  That --

14   that he would review it, and then it would go on -- usually

15   would go to the chief lending officer, or to the president for

16   them to have a first look at it and say, is this something we

17   want to do or not.

18          And then afterwards it would go for an official

19   signature.  In other words, what I'm trying to say is I

20   wouldn't take something, walk it into credit committee and say,

21   here, here's what it is.  No.  It would go through a little bit

22   of a process before other people take a look at it and see this

23   is something maybe we can do, maybe we can't.

24   Q.   During your time at Park Avenue Bank, did you come to know

25   a person named Mendel Zilberberg?

1    A.  Yes.

2    Q.  And how did you meet him?

3    A.  He was a member of the board, and also on the credit

4    committee.

5    Q.  He was on the credit committee?

6    A.  Correct.

7    Q.  During your time at Park Avenue Bank, approximately how

8    often would you interact with Mendel Zilberberg?

9    A.  Very often.

10   Q.  And in what context would you interact with him?

11   A.  The door of my office was exactly opposite the door of the

12   conference room where the board would meet and the credit

13   committee would meet, so any time somebody would walk out, they

14   would walk into my office.

15   Q.  During your time at Park Avenue Bank, did Mendel Zilberberg

16   ever refer loans to you?

17   A.  Ever --

18   Q.  Ever refer loans to you?

19   A.  Look for?

20   Q.  Ever refer.  Refer.  Refer loans to you?

21   A.  Yes.  Yes.  Yes.

22   Q.  And how would he do that?

23   A.  Generally, by walking into the office, and/or by calling me

24   up and saying, hey, I've got this deal.  I'd like you to take a

25   look at it.

1    Q.  And how would you treat loans that Mendel Zilberberg or

2    other directors referred?

3    A.  I would pay them more immediate attention than somebody

4    else.  They would go a little higher on the list, and it's just

5    a question of how quickly I would attend to it or how quickly I

6    assign or ask one of the members of my team to deal with it.

7    Q.  I want to take a look at a few specific loan presentations.

8    These are based on a stipulation that's already in evidence.

9           MR. NESSIM:  But at this time the government would

10   offer Government Exhibits 203, 210, 212, and 213.

11          MR. BRAFMAN:  No objection, your Honor.

12          THE COURT:  Then they will be admitted into evidence.

13          (Government Exhibits 203, 210, 212, and 213 received

14   in evidence)

15          MR. NESSIM:  Mr. Carbone, can you please publish

16   Government Exhibit 203?

17          And let's zoom into the top half, down to "purpose."

18   That's fine.

19   Q.  So this reads, "Park Avenue Bank loan presentation."

20          What's the date of this presentation?

21   A.  May 21, 2009.

22   Q.  And on these presentations, what does the date correspond

23   to?

24   A.  Probably the date that it was first written up.  In other

25   words, that the write-up started, began.

1   Q.  Okay.  So it's the beginning of the process.  It's the

2   date -- it's not necessarily when the presentation was

3   submitted or approved or anything like that?

4   A.  No.

5   Q.  Who were the borrowers associated with this presentation?

6   A.  Abraham Klein and Rebecca Klein.

7   Q.  And the line amount reads "$600,000 unsecured line of

8   credit available for direct debt?"

9   A.  Correct.

10  Q.  And then the purpose is, "to be used for working capital

11  for a business investment, see background section."

12          MR. NESSIM:  Mr. Carbone, can you please publish

13  Government Exhibit 210?

14          And let's zoom in.  Yes.

15          Thank you.

16  Q.  What's the date of this loan presentation?

17  A.  September 14, 2009.

18  Q.  And who are the borrowers?

19  A.  Abraham Klein and Rebecca Klein.

20  Q.  And the line amount here reads, "$1 million unsecured line

21  of credit available for direct debt, increase from $600,000."

22  And the purpose, "is to be used for working capital for a

23  business investment, see background section."

24          MR. NESSIM:  Mr. Carbone, can you please turn to

25  Government Exhibit 208?

1                And let's zoom in to the same area.

2    Q.   What's the date of this loan presentation?

3    A.   August 31st, 2009.

4    Q.   And who are the borrowers?

5    A.   Herschel Sauber and Pauline Sauber.

6    Q.   And the line amount here is what?

7    A.   A million four.

8    Q.   And the purpose is, "to be used for working capital for

9    business investments, see background section?"

10   A.   Correct.

11               MR. NESSIM:  Mr. Carbone, can you please publish

12   Government Exhibit 212?

13   Q.   What's the date of this presentation?

14   A.   September 30, 2009.

15   Q.   And who are the borrowers?

16   A.   Moses Trebitsh and Sylvia Trebitsh.

17   Q.   And what's the line amount?

18   A.   A million four.

19   Q.   And what's the purpose?

20   A.   To be used for working capital for business investments.

21               MR. NESSIM:  And let's publish Government Exhibit 213,

22   please.

23   Q.   What's the date of this presentation?

24   A.   December 18, 2009.

25   Q.   And who are the borrowers?

1    A.   Moses Trebitsh and Sylvia Trebitsh.

2    Q.   And what's the line amount on this presentation?

3    A.   $300,000 unsecured line of credit available for direct

4    debt.

5    Q.   And what is the purpose?

6    A.   The purpose is, "personal line of credit, $300,000 to be

7    used to expand and improve Aron's Fruit Emporium, Inc. located

8    at 5208 13th Avenue, Brooklyn, New York."

9              MR. NESSIM:   Okay.  Mr. Carbone, you can take this

10   down for a moment.

11   Q.   Mr. Rosenwasser, from whom did you get the referrals for

12   these five loan presentations we just looked at?

13   A.   Mr. Zilberberg.

14   Q.   Let's look to the first of these, the May line of credit

15   involving Abe Klein.

16             MR. NESSIM:   The government offers Government Exhibit

17   502 as part of the email stipulation that's in evidence.

18             MR. BRAFMAN:   No objection.

19             THE COURT:   It will be admitted into evidence.

20             (Government Exhibit 502 received in evidence)

21             MR. NESSIM:   Let's please publish this for the jury.

22             Mr. Carbone, can you zoom into the e-mail on the

23   bottom, please?

24   Q.   This is an email from Mendel Zilberberg on Thursday,

25   May 21, 2009, to Mrosenwasser@parkavenuebank.com and

1   Abe@flexocraft.com.

2           The subject line is "time sensitive."  And it says,

3   "M., please call me asap.  Mendel Zilberberg."

4           Look above.  This is from Abe to Moshe Rosenwasser

5   copying Mendel Outside, on May 21, 2009.  And he writes, "dear

6   Mr. Rosenwasser, attached please find the information you

7   require for the desired credit line.  As it has been explained

8   to you, this is extremely time sensitive.  Therefore, I would

9   appreciate this being looked into and processed immediately.

10  Thanks so much in advance for your attention in this matter.

11  Abraham Klein."

12          Let's zoom in to the top email, please.

13          You wrote to Matt Salmon, "Hi Matt.  Please do a one

14  pager on an unsecured loan to Abe Klein.  Mendel's deal.  He

15  has some room in the house.  He needs it in order to fund a

16  business in which he invested, and which he will take over

17  soon.  When he takes it over, they will be a PAB customer.  We

18  get husband and wife as borrowers.  Do a credit check, please.

19  Thanks, M."

20          So a few questions on this.  Who is Abe Klein?

21  A.  Abe Klein was the borrower on the deal that we just looked

22  at.  Abraham Klein.  Abraham, yeah.

23  Q.  And who is Matt Salmon?

24  A.  Matt Salmon was at the time a credit analyst for the bank.

25  He worked on my team.

1   Q.  And what is a one-pager?

2   A.  A one-pager means a more brief description of a loan than

3   an entirely blown up loan presentation.

4   Q.  Let's take a look at this loan presentation.

5           MR. NESSIM:  Mr. Carbone, please go back to Government

6   Exhibit 203.

7           So this is the May 21st, 2009, presentation we looked

8   at part of a moment ago.

9           Mr. Carbone, can you zoom into the risk rating

10  section?  It's about -- there.

11  Q.  What was the risk rating on this loan?

12  A.  Pass - acceptable.

13  Q.  And what does that mean?

14  A.  It means that it's a loan that could be done.

15  Q.  But within the range of quality that we discussed, where

16  does it fall within the bank's spectrum of loan quality?

17  A.  It's the lowest loan quality that I would do.

18  Q.  And can we look at the existing relationship section?

19  A.  I would say that I would consider doing -- sorry.

20  Q.  It reads here, "existing relationship.  Mr. Klein is a

21  client of Mendy Zilberberg, PAB board member."

22          What is the purpose of the existing relationship

23  portion of a presentation?

24  A.  Well, we'd like to know if there's some kind of nexus to

25  the bank, some kind of relationship with the bank.

1            MR. NESSIM:  Mr. Carbone, can you please turn to the

2      last page, page 3?

3            And let's look at the recommendation.

4      Q.  The recommendation reads, "based on the information

5      provided, the $600,000 line of credit is recommended."

6            MR. NESSIM:  And zoom out, please, Mr. Carbone.

7      Q.  Who were the names here under prepared -- who is the

8      "prepared by" individual?

9      A.  Well, Matt Salmon prepared it.  Mike Dray reviewed it, and

10     I'm the officer.  I also reviewed it.  And the two approving

11     officers were Edward Beyer and Charles Antonucci.

12     Q.  And who's Matt Dray?

13     A.  Mike Dray.

14     Q.  Mike Dray?

15     A.  William Michael Dray.  He's a person in charge of credit,

16     looking at credit to see from a credit point of view whether

17     it's warranted or not.

18            MR. NESSIM:  Okay.  Mr. Carbone, can you take it down,

19     please?

20            The government offers Government Exhibit 504.

21            MR. BRAFMAN:  No objection.

22            THE COURT:  It will be admitted into evidence.

23            (Government Exhibit 504 received in evidence)

24            MR. NESSIM:  Let's turn to page 4, please,

25     Mr. Carbone.

1         I'm sorry.  Actually -- I'm sorry.  Can you go a page
2    up?
3         So this is a -- the email at the bottom from Ed Beyer,
4    if we can zoom in there.
5    Q.  This is from Edward Beyer to Jerry Feuerstein and Brian
6    Lutz.
7         Who are those people?
8    A.  Jerry Feuerstein was an attorney who represented the bank
9    to do closings, to do the documentation that's required for
10   closing in a loan.
11   Q.  And it states, this part of this, "Friday afternoon, 2:30
12   p.m. Mendy Zilberberg wanted the documentation done as he has a
13   meeting this morning with the borrowers.  Charlie will sign
14   this when he comes in today."
15        Who is Charlie?
16   A.  Charles Antonucci probably.
17   Q.  And who is that again?
18   A.  I'm sorry?
19   Q.  Who is that?  Who is Charles Antonucci?
20   A.  The president of the bank.
21        MR. NESSIM:  Okay.  Mr. Carbone, you can zoom out.
22        And let's turn to the second page.  And can you zoom
23   into that email from Mendel Zilberberg on May 26?
24   Q.  This email is from Mendel Zilberberg to Brian Lutz, and it
25   copies Mordechai Freund, on May 26, 2009.  "The docs will be

1    delivered to you soon.  Borrower needs 200,000 funded to his

2    checking account asap.  Mendel Zilberg."

3            MR. NESSIM:  Can you zoom out, please, Mr. Carbone.

4    Q.  And then Brian Lutz writes to Mendel Zilberg --

5    Zilberg, copy to Mordechai Freund, "does the borrower have

6    an account with the bank?"

7            Mendel Zilberg writes back, "yes.  Ray has all the

8    info, Mendel Zilberg."

9            And then Brian Lutz writes to Voula Petridis.  Who's

10   that?

11   A.  She was in charge of actually producing the documents.

12   Q.  And Fiona Chiang, who that is?

13   A.  I don't exactly recall.  I'm sorry.

14   Q.  And the message says, "this loan closed today.  Please draw

15   $200,000 against the line, and fund the account held at PAB.

16   Ray Barcia has the account info.  Mr. Zilberg will be

17   sending the executed note shortly."

18           And then the email above, the Ray Barcia email, that's

19   from Ray Barcia to Mr. Lutz, copy to Voula Petridis, to Arthur

20   Erenburg on May 26, 2009.  "Here is the wire account" --

21   there's numbers -- "Abraham and Rebecca Klein.  As soon as the

22   account is funded, let me know, as I have wire instructions to

23   process today."

24           MR. NESSIM:  We can take that down.

25   Q.  So let's jump forward a little to August of 2009.  I want

1   to show you a few other emails.

2           MR. NESSIM:  The government offers Government Exhibit

3   404.

4           MR. BRAFMAN:  No objection, your Honor.

5           THE COURT:  It will be admitted.

6           (Government Exhibit 404 received in evidence)

7           MR. NESSIM:  Let's publish this for the jury, and

8   let's zoom into the portion of this email with content.

9   Q.  So the email below, where it says "original message" at the

10  sort of halfway portion of this zoom in it says, from Stacey

11  Lopez to Mendel Zilberg on August 31st.

12          And down below, from Stacey Lopez to Stacey Lopez.

13  And it says that the e-mail includes attached files.

14          And the email at the top is from Mendel Zilberg to

15  Moshe Rosenwasser, August 31, 2009.  And the email reads, "the

16  net worth statement for the first.  The second package will be

17  sent later today."

18          MR. NESSIM:  Mr. Carbone, can you please zoom out of

19  this.  And let's turn to page 2.  And let's just zoom into the

20  very top.

21  Q.  The title here is "statement of personal net worth as of

22  June 30, 2009," and the name is Herschel Sauber.

23          Who is Herschel Sauber?

24  A.  Herschel Sauber was a potential borrower that we handled.

25  Q.  Okay.

1            MR. NESSIM:  Mr. Carbone, can you zoom out.

2            And let's look at the balance sheet.  You can zoom in

3    to assets and liabilities, and down to personal net worth.

4    Q.  So over here it reads, "assets."  About partway through

5    there's a line for real estate.

6            Do you see that?

7    A.  Yes.

8    Q.  What's the amount listed as his assets for real estate?

9    A.  $2,950,000.

10   Q.  And what is Mr. Sauber's total assets on this statement,

11   personal net worth?

12   A.  $3,205,000.

13   Q.  And what are his total liabilities?

14   A.  $706,586.

15   Q.  And what is his total net worth?

16   A.  The total worth is about $2.5 million.  Right here,

17   $2,498,414.  I did the math.

18   Q.  Sorry to do that.

19   A.  Hey, I'm 71 years old, man.  You have to give it to me.

20           MR. NESSIM:  Let's zoom out, please, Mr. Carbone.  And

21   let's zoom into the real estate section here.

22   Q.  Can you just read the properties that are listed as

23   Mr. Sauber's real estate, and the market value of those

24   properties?

25   A.  Okay.  So he's got a property at 1477 E. 27th Street in

1   Brooklyn, and market value as lifted is $1 million.  And then

2   he has one at 1264 57 Street, Brooklyn, value listed,

3   $2.5 million.  And then one at 73 Laurel Court, which is about

4   $450,000, listed.

5   Q.  Okay.

6              MR. NESSIM:  Mr. Carbone, you can zoom out, and we can

7   take this down, please.

8              The government offers Government Exhibit 405.

9              MR. BRAFMAN:  No objection, sir.

10             THE COURT:  It will be admitted into evidence.

11             (Government Exhibit 405 received in evidence)

12             MR. NESSIM:  Can you scroll down to the second page,

13  please, Mr. Carbone?

14             And let's zoom in to just these two messages on the

15  screen here -- sorry, the two above that.

16             So the email below what we saw a moment ago.

17  Q.  On August 31, Mendel Zilberberg to you, "net worth

18  statement for the first.  The second package will be sent later

19  today."

20             And then you wrote, "do I get his wife."

21             What do you mean by that?

22  A.  What I meant is do I get his wife as a personal guarantor.

23  Q.  Okay.

24             MR. NESSIM:  And let's scroll up, please, Mr. Carbone.

25  Q.  And then Mendel Zilberberg wrote to you on August 31, "if

1    you need it."

2            And you wrote back, "I do."

3            And then Mendel Zilberberg wrote to you, on August 31,

4    "okay.  So have attorney draft the papers for her to sign as

5    well.  Mendel Zilberberg."

6            And then you wrote back, "okay.  What should I put

7    down as the purpose of the loan?  M."

8            MR. NESSIM:  Can you zoom out of that, please,

9    Mr. Carbone.  And let's zoom in to the top.

10   Q.  And Mendel Zilberberg wrote to you on August 31, 2009, "to

11   be able to take advantage of business opportunities?  Mendel

12   Zilberberg."

13           MR. NESSIM:  You can take that down, please,

14   Mr. Carbone.

15           The government offers Government Exhibit 406.

16           MR. BRAFMAN:  No objections.

17           THE COURT:  It will be admitted into evidence.

18           (Government Exhibit 406 received in evidence)

19           MR. NESSIM:  And let's zoom in to the top two emails

20   on this page, please, Mr. Carbone.

21   Q.  So the one on the bottom here is from Moshe Rosenwasser to

22   Mendel Zilberberg on August 31, 2009, and the email says,

23   "Mendy, one, didn't hear from her last night.  Two, I need

24   Pauline Sauber as a co-borrower.  Three, where's the other

25   deal?  Best regards, Moshe."

1           All right.  And Mendel Zilberberg wrote back to you,

2     "I will call her.  Two, understood.  Three, a little later."

3           And the reference to Pauline Sauber here, what's that?

4     A.  It's Herschel Sauber's wife.

5     Q.  And why did you need her added to the loan presentation?

6     A.  Well, it gives more faith to the credit when I have a

7     husband and wife guarantee.  Very often there are assets that

8     are owned between them, et cetera, and I would need the husband

9     and wife guarantee, yes.

10    Q.  Does it strengthen the loan in the bank's eyes?

11    A.  Correct.

12           MR. NESSIM:  Mr. Carbone, you can take that down.

13           And the government offers Government Exhibit 403.

14           MR. BRAFMAN:  No objections.

15           THE COURT:  It will be admitted into evidence.

16           (Government Exhibit 403 received in evidence)

17           MR. NESSIM:  Let's zoom into the email at the bottom,

18    please.

19    Q.  So this is an e-mail also on August 31 from Mendel

20    Zilberberg to you.  Subject, "sorry for the delay."  It reads,

21    "you will have the docs emailed within the next half hour from

22    Stacey of my office.  The only thing missing is the appraisal,

23    which you will have tomorrow a.m.  Please process ASAP, and

24    remember the other matters we discussed Friday as well.  I

25    remember the story of Cinderella, who had until 12:00 to do

1    what had to be done, and afterward the pumpkin thing.  Mendel

2    Zilberberg."

3            MR. NESSIM:  Let's scroll up, please.

4    Q.  And then let's look at your response to that.

5            This is your response, also on August 31.  You wrote,

6    "don't worry.  Charlie says he will not stop lending."

7            Who is Charlie?

8    A.  Antonucci.

9    Q.  And you wrote, "Charlie says he will not stop lending."

10           What, if anything, did you understand about Park

11   Avenue Bank's possible issues in making loans?

12   A.  There was a rumor at that time that the government would

13   require Park Avenue Bank to stop lending entirely, and I

14   presume that was Mr. Zilberberg's concern, that if we would not

15   be able to lend, then we couldn't get any loans done.

16           MR. NESSIM:  Mr. Carbone, you can zoom out, and let's

17   look at the top two emails.

18   Q.  Mendel Zilberberg responded to you saying, "Charlie says he

19   won't stop lending."  Also on August 31, "I don't want to be

20   the guy pushing the point, Mendel Zilberberg."

21           And then you wrote, "it may be close, so he may need

22   you on his side.  M."

23           MR. NESSIM:  Mr. Carbone, you can take that down,

24   please.

25           The government offers Government Exhibit 551.

1          MR. BRAFMAN:  No objection.

2          THE COURT:  It will be admitted into evidence.

3          (Government Exhibit 551 received in evidence)

4          MR. NESSIM:  So if you can just zoom into the portion

5    with content, please, Mr. Carbone.

6    Q.  This is an email also on August 31, 2009, from Stacy Lopez

7    to Moshe Rosenwasser.  The subject line is "forward, Fried part

8    one of four."

9          And it reads, "good evening, Mr. Rosenwasser.  Please

10   confirm Mr. Zilberberg's email.  Please find part one of four

11   attached.  Subsequent parts will immediately follow.  Please

12   confirm receipt of each part.  Thank you.  Regards, Stacey Ann

13   Lopez, assistant to Mendel Zilberberg."

14         MR. NESSIM:  Mr. Carbone, could you scroll to the next

15   page?

16   Q.  The subject line of this email, also August 31, is, "Fried,

17   part two of four."

18         MR. NESSIM:  Let's scroll to the next page, please.

19   Q.  The subject line of this email is, "Fried, part three of

20   four."

21         Let's look at the next page.

22         "Fried, part four of four."

23         Let's look at the next page, and let's zoom in,

24   please.

25         This is from Stacey Lopez to you on August 31, 2009.

415

1   "Mr. Rosenwasser, please accept my apology, and disregard

2   subject line of emails as the correct label should be Trebitsh

3   part one of, et cetera, et cetera, et cetera.  Stacey Ann

4   Lopez, assistant to Mendel Zilberberg."

5             Who is Trebitsh?

6   A.   Trebitsh is one of the borrowers that we were considering

7   at the time.

8             MR. NESSIM:  Mr. Carbone, you can take that down,

9   please.

10            And the government offers Government Exhibit 407.

11            MR. BRAFMAN:  No objection.

12            THE COURT:  It will be admitted into evidence.

13            (Government Exhibit 407 received in evidence)

14            MR. NESSIM:  Okay.  So if you can just -- let's start

15  with the email on the bottom, please, Mr. Carbone.  At the very

16  bottom.  Yes.

17            Thank you.

18  Q.   So at the bottom here, that's an email from you to Mendel

19  Zilberberg on September 1st of 2009.  And the subject line

20  reads, "what does Abe Klein need the money for?  Taxes?  What

21  kind?"

22            Mendel Zilberberg wrote back to you, "withholding that

23  the person who ran the company before did not pay.  Remember he

24  has a receiver in there.  Mendel Zilberberg."

25            And then you wrote back, "I need much more information

1   on Trebitsh and Sauber.  How do I get it?"

2           And on the top, Mr. Zilberberg writes to you, "what do

3   you need?  Mendel Zilberberg."

4           So this email references Sauber, Klein, and Trebitsh.

5   What was going on with those loans at the same time?

6   A.  At the beginning of September, they were in the process of

7   being reviewed and approved.

8   Q.  And those were all -- they were --

9   A.  They were not approved --

10  Q.  -- all sort of happening in parallel?

11  A.  There was a period of time when they were.  Yeah.

12  Q.  And Abe Klein, we saw earlier, there were the two lines of

13  credit related to him, the expansion and the initial one?

14  A.  Well, initially, it was $600,000, and then it was

15  increased.

16  Q.  Let's just look back at the increase.

17          MR. NESSIM:  Mr. Carbone, can you please publish

18  Government Exhibit 210?

19          And let's just zoom in to the top.

20  Q.  What was the date of this presentation on the increase?

21  A.  September 14, 2009.

22  Q.  And what was the line amount related to this presentation?

23  A.  A million dollars.

24  Q.  This is September 14, 2009.

25          MR. NESSIM:  Let's publish what's in evidence as

1  Government Exhibit 505.

2          And let's zoom in to the email, please.

3  Q.  So this is dated September 15 of 2009, the date after that

4  loan presentation.  It's from Matt Salmon to Edward Beyer, with

5  a copy to you.

6          The subject line is, "Mendy deal."  And it reads, "hi

7  Ed.  I'm holding onto one of Mendy's deals for approval.  At

8  your convenience, please advise when I may drop it off for your

9  review."

10         And then you -- the email on top is from you to

11 Mfreund@Brookwoodtitle.com.  Forward, Mendy deal.  And it

12 reads, "this is the Abe Klein deal.  The VeAsisa

13 keChochmasecha.  M."

14         What does that mean?

15 A.  So I was telling Mr. Freund that this is regarding the Abe

16 Klein deal, that it's up for signature, and I'm advising him to

17 -- well, that's a quote from actually Kings, first chapter of

18 Kings, Kings 1.  First chapter, yeah.  I don't remember the

19 verse.  I'm sorry.  It means judgment.

20 Q.  Can I pause you for just one moment?

21 A.  Oh, I'm sorry.

22         MR. NESSIM:  For the clarity of the record, 505 is not

23 admitted.  It's offered, I believe without objection.

24         MR. BRAFMAN:  Without objection.

25         THE COURT:  It will be admitted.

1          (Government Exhibit 505 received in evidence)

2     Q.   And what did you mean by that?

3     A.   It meant that if you think you would like to speak with

4     Mr. Beyer and Mr. Antonucci about this loan and to express your

5     feelings about it, that maybe you know the person, things that

6     I cannot write in the loan presentation, but there are other

7     things that may impact on the loan, and legitimately so.  Fine.

8     Go ahead and communicate.

9          MR. NESSIM:  Your Honor, I see we're approaching 1:00.

10    I don't know when you want to take lunch.  This might be a good

11    time.

12         THE COURT:  All right.  Ladies and gentlemen, don't

13    discuss the case.  Keep an open mind.  Let's come back before

14    2:10.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  You can step down, sir.

3              THE WITNESS:  Yes.

4              THE COURT:  We are adjourned until 2:10.

5              MR. MCCABE:  Thank you, your Honor.

6              (Recess taken)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N77HZil3                            .

1                      AFTERNOON SESSION

2                         2:10 p.m.

3           (In open court; jury not present)

4           THE COURT:  Can we bring the witness back.

5           MR. NESSIM:  Yes, your Honor.

6           MR. BRAFMAN:  Your Honor, if I may, we are requesting

7    after the government's direct that your Honor give a brief

8    limiting instruction to the jury that the only loan that

9    Mr. Zilberberg is charged with is in connection with the Sauber

10   loan.  That they have heard testimony with respect to the Klein

11   loan and to the Trebitsh loan, but those are not crimes charged

12   in the indictment.  So we would request that loan — that

13   instruction.

14          THE COURT:  Why don't you give me word for word what

15   you're requesting.

16          MR. BRAFMAN:  OK.

17          THE COURT:  I do intend to give a 404(b) instruction.

18          MR. BRAFMAN:  In your charge?

19          THE COURT:  In the final charge.  But I'm not sure he

20   said anything yet that triggers that.

21          MR. BRAFMAN:  Well, they've talked a lot about the

22   Klein loan and the Trebitsh loan.

23          THE COURT:  Right.

24          MR. BRAFMAN:  I don't want the jury to think those are

25   additional crimes that Mr. Zilberberg is charged with.  So

N77HZil3                              .

1    we're going to give you language that we both agree on, but we

2    request that it be given to the jury after the direct is

3    finished.

4              THE COURT:  I anticipated that we'd have witnesses who

5    will be called on Monday who are going to explain what the

6    circumstances were with regard to those other loans, or no?

7              MR. NESSIM:  Your Honor, Mr. Trebitsh, who's one of

8    the borrowers, will be called today.

9              THE COURT:  He's going to be called — the third

10   witness?

11             MR. NESSIM:  Yes.  And then some witnesses on Monday

12   will also speak to this.

13             THE COURT:  OK.

14             MR. NESSIM:  But much of the 404(b) would also come in

15   through the argument drawn from the evidence.

16             THE COURT:  No, I understand that, but I'm just trying

17   to figure out — I mean, so far the jury doesn't know any of

18   the circumstances with regard to these other loans or have any

19   reason to conclude at this point that those loans were

20   illegitimate in my way.

21             MR. BRAFMAN:  I understand that, your Honor, but the

22   import of the direct examination is that Mr. Zilberberg

23   encouraged those loans, asked the bank to fund those loans.

24   And I think the implication is that that was part of a common

25   scheme and plan, and therefore, the jury has a right to

1    consider those loans.

2         We don't object to a 404(b) instruction as part of

3    your Honor's charge, but we would ask, since the government put

4    so much evidence into the direct of this witness, that the

5    Court consider, at the end of the government's direct, that the

6    jury receive that instruction now.  And I think that would be

7    an appropriate limiting instruction at this time.

8         THE COURT:  Well, tell me exactly what language you

9    want, and let me look at the 404(b) instruction.  I want to

10   make sure it's consistent.

11        MR. BRAFMAN:  We're writing it out as we speak, your

12   Honor.

13        THE COURT:  But I want to be able to ⸺ unless this

14   issue, at the time that I give the instruction, is clearly

15   before the jury, I think the instruction is premature.  At this

16   point I don't know of anything in this case that's before this

17   jury that is a claim that somehow these other loans were

18   illegitimate.

19        MR. BRAFMAN:  I think it's the only purpose that the

20   government ⸺

21        THE COURT:  It may be their future purpose.

22        MR. BRAFMAN:  No, I think it's current because I think

23   the only relevance, as they argued to your Honor when we

24   discussed this issue in the motions *in limine*, is they believe

25   that it was 404(b) prior bad acts, otherwise it would have no

1    relevancy.

2          THE COURT:  I know.  But the timing of this is my

3    concern because, as of the end of the government's direct, the

4    only person who will have said anything about those loans not

5    being legitimate would be the Court.

6          MS. McLEOD:  I just want to — I'll speak to this

7    briefly.

8          So, first of all, the government has no objection to

9    the timing of the limiting instruction that's proposed by

10   defense counsel.

11         I think it is true that they are hearing evidence

12   about these loans.

13         THE COURT:  Right.

14         MS. McLEOD:  And we at some point will argue

15   inferences from those evidence.  I don't think it's unfair to

16   say you have heard evidence about these loans, but we're not

17   going to say — I don't think you need to get — we'll come up

18   with specific language, and I think once we come up with the

19   language, it might make more sense.

20         So maybe let us come up with the proposed language,

21   and then your Honor can assess whether this language, given the

22   timing, makes the most sense.

23         THE COURT:  I think the proposed language is the

24   standard 404(b) instruction that's given at the end of the

25   case, once these arguments are made.  It is not my practice to

1  give limiting instructions every ten minutes to the jury when

2  they hear something that we think at the end they should ——

3  it's appropriate to give them jury instructions on.  We've

4  already given one limiting instruction.  I just don't want to

5  interject myself into this case ——

6          MR. BRAFMAN:  But, your Honor, if the government ——

7          THE COURT:  —— because of the parties' arguments.

8          MR. BRAFMAN:  If the government is not objecting to

9  it, then we are requesting it, and I think it's fair to the

10  defendant that the jury at least understand that now.

11          THE COURT:  All right.  Well, that's usually my

12  standard practice too.  If you both want it, it's your case,

13  you can both have it.

14          MR. BRAFMAN:  OK.

15          THE COURT:  But give me some language and make sure ——

16  as I always say, be careful what you ask for.  You may get it.

17  So if you want me to raise this issue with —— the Court to

18  raise this issue now and have the jury try to figure out

19  between now and whenever exactly what they're supposed to do

20  with this, then I'm willing to do it, if that's what you want.

21          MR. BRAFMAN:  Let's see if we can agree on language.

22          THE COURT:  Yes, that's the first thing.

23          MR. BRAFMAN:  And we'll ask for the Court's advice.

24          THE COURT:  In the meantime, I'll look at my 404(b)

25  instruction.  If you can make some —— give me something that's

1  consistent with that, that would make me more comfortable to

2  give an instruction now.

3        MR. BRAFMAN:  Yes.

4        THE COURT:  OK.  So let's try to — how much more do

5  you have on direct?

6        MR. NESSIM:  I would guess it's probably like 25, 30

7  minutes, your Honor.  It's some reading, so it takes some time.

8        THE COURT:  Let's try to get this witness done.  And

9  the next witness will be how long?

10        MR. NESSIM:  Very short on direct.  Five minutes on

11  direct.

12        THE COURT:  All right.  So let's see if we can finish

13  these up and let the jury go home early, if possible.

14        All right.  Bring in the jury.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  I'm sorry.  Bring the witness back.

3           You can have a seat.

4           You can continue.

5           MR. NESSIM:  Thank you, your Honor.

6   MOSHE ROSENWASSER, resumed.

7   DIRECT EXAMINATION CONTINUED

8   BY MR. NESSIM:

9   Q.  Mr. Rosenwasser, before the lunch break, we had discussed

10  the Sauber loan a little bit.  I want to ask you some more

11  questions about that transaction.

12          The government offers Government Exhibit 408.

13          THE COURT:  Any objection to 408?

14          MR. BRAFMAN:  No.

15          THE COURT:  It will be admitted into evidence.

16          (Government's Exhibit 408 received in evidence)

17          MR. NESSIM:  Let's publish this, please.  Let's turn

18  to the page 2, please, and let's zoom in to these two emails.

19  BY MR. NESSIM:

20  Q.  So I think earlier we saw the August 31 email was the

21  initial statement of net worth for Mr. Zilberberg.  This is

22  September 8 of 2009, approximately a week later, is that right?

23  A.  I guess.

24  Q.  And this is an email from Mendel Zilberberg to you:  "How

25  are fires?"

1          And you replied. "All out. Now I can work. However,

2    I need to leave soon to go to Brooklyn. Moshe."

3          Let's scroll up, please, Mr. Carbone.

4          Mr. Zilberberg wrote back to you also on September 8:

5    "Come late, but please take care of this. It's important."

6          And you wrote back: "I can only present Klein and

7    Sauber. Don't have the appraisal for Trebitsh. Moshe."

8          What does "I can only present" mean?

9    A. That means I can only complete the write-up and present it

10   to whomever needs to sign or however it needs to be taken care

11   of.

12         MR. NESSIM: Mr. Carbone, if you could scroll up,

13   please. And let's look at the email in the middle. If you

14   could highlight that.

15   Q. Mr. Zilberberg, wrote to you: "Sauber is the important

16   one. Klein is OK for tomorrow."

17         And you replied: "Can we get him to open his business

18   account with us? How about a UCC on the business?"

19         What's the meaning of these questions?

20   A. Well, the first question is can we get him to open a

21   business account with us? OK. Business should be opened with

22   us.

23         Secondly, the second question is can I — whatever the

24   business was, can I put a UCC on it?

25   Q. What's a UCC?

1  A.  A UCC is the registration of the fact that I have a lien

2  and the registration of that with the Secretary of State, in

3  this case the state of New York.

4  Q.  And the question of if a borrower was opening a business

5  account with Park Avenue Bank, would that make the application

6  more desirable or less desirable?

7  A.  More desirable.

8  Q.  And if a borrower had a UCC placed on their business, what

9  would that do to their application?

10  A.  If the UCC made sense, yes.

11  Q.  Yes what?

12  A.  Then it would be an improvement.  Then it would enhance the

13  quality of the credit, but only —— but if the UCC was empty,

14  then there's no reason to do it.

15          MR. NESSIM:  Mr. Carbone, let's look at the email

16  above this, please.

17  Q.  Mendel Zilberberg wrote back to you, also on September 8 of

18  2009:  "I will try to get it, but please let's make this happen

19  first:  Mendel Zilberberg."

20          Mr. Carbone, you can take that down.

21          The government offers Government Exhibit 409.

22          MR. BRAFMAN:  No objection.

23          THE COURT:  It will be admitted into evidence as 409.

24          (Government's Exhibit 409 received in evidence)

25          MR. NESSIM:  Mr. Carbone, please publish this, and

1    let's turn to page 2.  If we can zoom in to the top —— well,

2    zoom in to the top message, but it actually begins on the

3    bottom of page 1, I'm sorry.

4    BY MR. NESSIM:

5    Q.  So this is from Moshe Rosenwasser, you, to Mendel

6    Zilberberg on September 9, 2009, the following day, and the

7    subject line is "I'm done."  And you wrote:  "I tried several

8    times.  Left messages, no response."

9              Can you please scroll up, Mr. Carbone.

10             And then Mendel Zilberberg forward your email to

11   afriedwillsee@gmail.com on September 9, 2009, and he wrote:

12   "Can we have the guy call the bank now?"

13             And then afriedwillsee@gmail.com says:  "What's the

14   number and name?"

15             Then let's look at —— and then below here,

16   September 9, 2009, email is from Mendel Zilberberg to

17   afriedwillsee@gmail.com:  "Do not forward.  Moshe Rosenwasser."

18   Then there's a phone number.  Signed Mendel Zilberberg.

19             You can take that down, please, Mr. Carbone.

20             The government offers Government Exhibit 410.

21             MR. BRAFMAN:  No objection, sir.

22             THE COURT:  It will be admitted into evidence.

23             (Government's Exhibit 410 received in evidence)

24             MR. NESSIM:  Let's zoom in to the bottom two emails.

25   BY MR. NESSIM:

1  Q.  The email on the bottom is from Moshe Rosenwasser to Mendel

2  Zilberberg on September 10, 2009, the next day.  The subject

3  line is "Can't get hold of Sauber:  He's not calling me back.

4  I guess he doesn't consider it urgent.  I am calling Peter now.

5  M."

6         Then Mendel Zilberberg responded:  "Are we on track?

7  When will this fund?"

8         Then you wrote back the same day:  "I still need info

9  on additional income for the DSCR.  Never got it.  M."

10        What is the DSCR?

11 A.  Debt service coverage ratio.  It is a fraction, a ratio.

12 And the numerator of the ratio is the amount of income that the

13 person has, and the denominator is the debt service, in other

14 words, the amount of money that's required on an annual basis

15 to service the debt, either that's principal or interest or

16 both.

17        MR. NESSIM:  Mr. Carbone, can we scroll up, please.

18 Q.  Mr. Zilberberg wrote to you:  "Does the borrower know what

19 you need, and does he have it?"

20        And then you responded:  "Yes.  We had a conversation

21 this morning.  I told him that it appears that he makes 171,000

22 and that I need to deduct 35 percent for expenses, and that the

23 interest on this $1.4 million loan alone is 91,000 plus the

24 existing debt service would make the DSCR about .77:1.  We need

25 1.25:1.  He said that I didn't include the income from the

1    Borough Park building and the K-1 from SSSZ.  I said, OK, give

2    it to me.  He said he will send it to me.  Moshe."

3             So just to summarize, what are you saying in this

4    email?

5    A.  Well, the debt service coverage ratio was low; in other

6    words, in this case the numerator was less than the

7    denominator.  The minimum requirement that the bank had was

8    that it be 1.25 percent; in other words, that the numerator

9    should be 25 percent bigger than the denominator.  So if the

10   denominator was $100,000, which is his debt service, and it was

11   more than that, then he needs $125,000 in income, in total

12   income, to cover that.

13            The response was that —— the response that I had

14   gotten, according to this, was that we have additional income

15   which he didn't tell me about.  So I said, OK.  So tell me.

16            MR. NESSIM:  Mr. Carbone, you can take this down,

17   please.

18            The government offers Government Exhibit 411.

19            MR. BRAFMAN:  No objections.

20            THE COURT:  It will be admitted.

21            (Government's Exhibit 411 received in evidence)

22            MR. NESSIM:  Let's just zoom in to the email on the

23   top, please.

24   BY MR. NESSIM:

25   Q.  This is an email from Stacey Lopez to you the next day, on

1    September 11, 2009:  "Good morning, Mr. Rosenwasser.

2    Mr. Zilberberg sends the following documents and asks if you

3    would return reply with a funding date, please.  Thank you.

4    Stacey Ann Lopez, Assistant to Mendel Zilberberg."

5              Can we scroll up to those documents, please,

6    Mr. Carbone.  And it's just this first page.

7              This is a letter addressed to SSSZ Holdings, and it's

8    regarding BRG Talbot LLC, and it says:  "Attached is your copy

9    of the partnership form 1065 schedule K-1."

10             What was the typical — what was the typical conduct

11   you would experience from referral sources once they had

12   submitted a loan to you?  Would they check in on the loan, or

13   what would happen?

14   A.  I didn't understand the question.

15   Q.  In your experience at Park Avenue Bank, would referral

16   sources typically follow up with you once they'd referred a

17   loan?

18   A.  Oh, yeah.  Oh, yeah, absolutely.

19   Q.  So what was — did all referral sources follow up with you?

20   A.  I can't recall many that didn't, that's for sure.

21   Q.  So it was somewhat typical for referral source to ask you

22   what the response status was?

23   A.  Absolutely.

24             MR. NESSIM:  You can take that down, please,

25   Mr. Carbone.  Let's publish Government Exhibit 208, please.

1          MR. BRAFMAN:  No objection, sir.

2          THE COURT:  Are you offering that?

3          MR. NESSIM:  It's in evidence.

4    Q.  We've looked at this.  This is the loan presentation for

5    the Sauber loan.  Let's just zoom in to the top half.

6          So, again, this is the Herschel Sauber and Pauline

7    Sauber loan.  What's the line amount?

8    A.  A million four.

9    Q.  What's the purpose?

10   A.  Working capital for business investments, see background

11   section.

12   Q.  Then let's look at the existing relationship section.  It's

13   at the bottom of the page.  It says:  "Mr. Sauber is a client

14   of Mendy Zilberberg, PAB board member."

15         What is the purpose of including an existing

16   relationship in these loan presentations?

17   A.  It establishes a certain nexus of the bank to the

18   individual beyond just this loan.

19   Q.  And where an existing relationship exists, does it make a

20   borrower more desirable or less desirable?

21   A.  More desirable.

22         MR. NESSIM:  Mr. Carbone, can you please turn to the

23   next page.  Now zoom in to the business description.  I'll read

24   part of this:

25         "Mr. Sauber owns Orthocraft, Inc., which produces

1    artificial limbs, braces, and other orthopedic products, and he

2    also owns two smaller companies, S & G Product Service, Inc.,

3    which supplies replacement parts for the orthopedic industry,

4    and Long Island Winery, the only kosher winemaker on Long

5    Island."

6            And then the third paragraph that's highlighted here:

7    "Mr. Sauber stated that he needs funds to make additional

8    investments, such as down payments on properties, etc.  The

9    flexibility of a line of credit will make these investments

10   possible."

11           Mr. Carbone, let's zoom out here, and let's look at

12   the borrower's financial discussion.

13           This states:  We have the tax returns for Herschel and

14   Pauline Sauber for 2006, 2017, and 2008.  AGI —— what's that?

15   A.  Just the gross income.

16   Q.  —— was 61,000, 106,000, and 171,000.  Primarily dividends

17   from K-1s from the businesses and salaries.

18           The Sauber's also provided a joint personal financial

19   statement, not on PAB form, dated June 30, 2009, on which they

20   reported a net worth of $2.5 million, comprised primarily of

21   185,000 in liquidity; their personal residence, value of

22   1 million with mortgage of 316,000; a three-family house in the

23   Borough Park section of Brooklyn valued at 2.5 million with a

24   mortgage of 290,000; and a house in Waterbury, Connecticut,

25   valued at 450,000 with a mortgage of 100,000.

1          We can take that down, please, Mr. Carbone.  It goes

2     down from there.  Sorry, please keep the exhibit at page 2,

3     GX 208 at page 2.  Thank you.  If you can just zoom in to the

4     debt service table.

5          So what's the — what is the DSCR, or debt service

6     coverage ratio, in this loan presentation?

7     A.  In this case it's 1.25 times.

8     Q.  And what is — what did you say was the minimum DSCR for a

9     loan to be considered at Park Avenue Bank?

10    A.  1.25.

11    Q.  This includes income from, if you look at the three lines

12    up, the K-1 income from SSSZ LLC?

13    A.  Correct.

14         MR. NESSIM:  Mr. Carbone, you can zoom out from this,

15    and let's turn to page 3.

16    Q.  Mr. Rosenwasser, do you see your name here?  It says

17    "prepared by Moshe Rosenwasser"?

18    A.  Yes.

19    Q.  And you're also the loan officer?

20    A.  Yes.

21    Q.  Did you understand that the information in this loan

22    presentation was accurate when you prepared and submitted it?

23    A.  Yes.

24    Q.  And what was your recommendation as to this loan?

25    A.  No recommendation.

1    Q.  Where do you see that?

2    A.  I'm sorry?

3    Q.  So do you see where recommendation says "reviewed without

4    recommendation"?

5    A.  Yes.

6    Q.  What does that mean?

7    A.  It means that the loan is doable, but I'm not recommending

8    to the bank that does the loan because the debt service

9    coverage ratio was acceptable but not more than that, and I

10   wasn't comfortable recommending it.  But that doesn't mean that

11   I wouldn't do it.

12   Q.  So you did not recommend it, but was it approved?

13   A.  Yes.

14   Q.  And what are the signatures that indicate that this was

15   approved?

16   A.  Edward Beyer, the chief lending officer, and Charles

17   Antonucci, the chief executive officer.

18            MR. NESSIM:  I'd like to publish Government

19   Exhibit 414, which I think is already in evidence.

20   Q.  This is an email from Voula Petridis to Mordechai Freund,

21   and it copies you on September 15 of 2009:  "Attached are the

22   documents regarding the loan.  Please have Mr. Sauber and

23   Ms. Sauber sign where indicated."

24            You can zoom out of there, and let's just look at the

25   loan.  And let's just zoom in to the very top.

1          This is a promissory note with a principal of

2    $1,400,000.  The borrowers are Herschel Sauber and Pauline

3    Sauber.

4          Mr. Carbone, you can take this down, please.

5          Then there was the third borrower, Moses Trebitsh.

6    Let's take a look at the email relating to them.

7          Mr. Carbone, can you please publish what's in evidence

8    as Government Exhibit 552.

9          This is from Mordechai Freund to you on September 23.

10   Subject, Trebitsh:  "What's the status with Trebitsh?"

11         The government offers Government Exhibit 553.

12         MR. BRAFMAN:  No objection, your Honor.

13         THE COURT:  It will be admitted into evidence.

14         (Government's Exhibit 553 received in evidence)

15         MR. NESSIM:  Let's publish that, please.

16   BY MR. NESSIM:

17   Q.  This is on October 2, 2009.  You emailed Mendel outside,

18   mz@mzesq.com.  Subject, "What is Mr. Trebitsh's phone number?

19   I need to ask him a few questions."

20         Mr. Carbone, you can take this down.  The government

21   offers Government Exhibit 556.

22         MR. BRAFMAN:  No objection, your Honor.

23         THE COURT:  It will be admitted into evidence.

24         (Government's Exhibit 556 received in evidence)

25         MR. NESSIM:  Let's turn to page 3, please.

1   BY MR. NESSIM:

2   Q.  This is Mordechai Freund to you on October 12:  "Good

3   morning.  What is the status of this loan?"

4           You replied above:  "Needed some info.  Asked him.  He

5   sent me to his partner, Mr. Singer.  Called him.  He didn't

6   know the answers offhand.  He'll get back to me today.  M."

7           Let's scroll up, please.

8           Then on October 13, the next day, Mr. Freund emailed

9   you:  "Did Mr. Singer call you?  Is it all squared away?"

10          And then you replied on the bottom here to Mordechai

11  Freund:  "No, not yet."

12          He wrote back to you on October 15, two days later,

13  attached:  "Are the docs requested from Mr. Singer?  Please

14  advise if you need anything further.  Tx."

15          Then you write down at the bottom to Mordechai Freund:

16  "I need to understand the Xs and the writing.  What happened to

17  the supper [sic]?"

18          And then he wrote to you:  "The markings are what the

19  partners did when they were reviewing the reports for

20  themselves.  Mr. Singer or Trebitsh will be calling you a

21  little later today."

22          Then this is on October 15.  On the bottom here you

23  replied to Mordechai Freund and added Mendel Zilberberg in the

24  cc line:

25          "Now that I have the whole picture, I'm having trouble

1    putting this together.  We have a shortage of cash flow.  He is

2    pulling 57,000 from the rent of the two upstairs apartments in

3    his house, another approx. 39,000 from the building in Borough

4    Park, and maybe $12,000 from the building in Hartford.  His tax

5    return shows $1,400 a year from the fruit store.  Altogether,

6    maybe $10,000.  Take off 35 percent for living expenses leaves

7    $71,500 to pay debt.  He has a mortgage on his residence which

8    requires $67,000 a year and another $13,000 for the

9    Williamsburg mortgage, and that's already $80,000.  If you pile

10   on another $91,000 in debt (6.5 percent on 1.4 million), he

11   will not be able to pay it.  Am I missing something?  Moshe."

12          So just at a high level, what's the concern that

13   you're communicating to Mr. Zilberberg in that email?

14   A.  Again, not enough money.  Not enough cash flow.

15   Q.  And then Mendel Zilberberg writes back to you on the top

16   email, also on October 15:  "We discussed this re the fruit

17   store and other matters, but I don't want to put this in an

18   email.  However, you also showed other income last on another

19   note.

20          "I can call you Thursday evening your time if this is

21   going to be a problem.  Please advise.  I am on a plane and

22   they are about to close the doors.

23          "Mendel Zilberberg."

24          You can take this down, please, Mr. Carbone.

25          Please publish what's in evidence as Government

1    Exhibit 557.

2              And this is from Mordechai Freund to you on

3    October 22, 2009:  "Letter attached.  I have the original.

4    Please confirm receipt.  Per MZ, when can this fund?  Thank

5    you."

6              And let's scroll to page 2, and let's just zoom in

7    from the letterhead to the end of the letter.  Thank you.

8              This is October 22, 2009:  "To whom it may concern:  I

9    am the accountant for Mr. and Mrs. Moses Trebitsh.  Mr. and

10   Mrs. Moses Trebitsch intends to take an annual distribution of

11   $105,000 from Aaron's Fruit Inc.  For further information,

12   please call the above number.

13             "Sincerely, Irving Brunner, CPA."

14             Let's look at what's already in evidence as Government

15   Exhibit 212.  This is the first Trebitsh loan presentation.

16   And if you can just zoom into the top.

17             What was the amount of this presentation?

18   A.  A million four.

19   Q.  The same amount as the Sauber loan?

20   A.  Correct.

21             MR. NESSIM:  And Mr. Carbone, if you could zoom out.

22   Q.  What's the existing relationship?

23   A.  Mr. Trebitsh is a client of Mendy Zilberberg, PAB board

24   member.

25   Q.  And what was the purpose of this loan?

1   A.  Purpose to be used for working capital for business

2   investments.

3           MR. NESSIM:  Mr. Carbone, can you please turn to

4   page 3.  Let's zoom in to the debt service.

5   Q.  Do you see the third line from the bottom here —— or second

6   line from the bottom is income from fruit store, $105,000 per

7   attached CPA letter?

8   A.  Yes.

9   Q.  What's the total effective AGI?

10  A.  1.24 times.

11  Q.  That's --

12  A.  The AG, I'm sorry, 213.

13  Q.  What's the DSCR?

14  A.  1.24 times.

15  Q.  And what kind of DSCR is that?

16  A.  That's debt service coverage ratio.

17  Q.  Is that a poor debt service coverage ratio or strong one?

18  A.  It's weak.  1.24 is weak.  It's low.

19  Q.  OK.  Let's turn to the recommendation on this loan

20  presentation.

21          What was your recommendation?

22  A.  No recommendation.

23          MR. NESSIM:  Mr. Carbone, let's please publish what's

24  in evidence as Government Exhibit 558.

25  Q.  And then just the email at the bottom of this page,

1    October 27, 2009, to Moshe Rosenwasser regarding Trebitsh:

2    "Per MZ, is there any way to get this funded today?  Thank you.

3    Mordechai Freund."

4           And then you responded:  "I doubt it.  Ed Beyer is

5    out, and he needs to sign."

6           And then Mordechai Freund wrote:  "Do you expect him

7    tomorrow?  I would like to set app. a closing tomorrow with the

8    borrower.  Tx."

9           And then at the top, this top email is on October 27,

10   you wrote to Mordechai Freund:  "Have Mendel make a discreet

11   phone call to him."

12          What does that mean?

13   A.  What I meant by that was have Mendel call him, and if he

14   feels that the loan should be done, say in a nice way that he

15   feels that it should be done.  Discreet doesn't mean quiet or

16   secret.  I misused the word.

17          MR. NESSIM:  Mr. Carbone, you can take that down,

18   please.

19          The government offers Government Exhibit 559.

20          MR. BRAFMAN:  No objection.

21          THE COURT:  It will be admitted into evidence.

22          (Government's Exhibit 559 received in evidence)

23          MR. NESSIM:  Let's just zoom in to it.

24   Q.  This is an email from Alex Kozlowsky.  Who's that?

25   A.  Alex was one of the members of our team.

1    Q.  At Park Avenue Bank?

2    A.  Correct.

3    Q.  And this is to Moshe Rosenwasser on October 28, 2009.  The

4    subject line is Moses Trebitsh, and it reads:  "Moshe, Ed does

5    not want to do this deal.  He wants to speak to you.  Call him.

6    Alex."

7            Who's Ed?

8    A.  I'm sorry?

9    Q.  Who's Ed?

10   A.  Oh, Ed Beyer probably.

11           MR. NESSIM:  And you can take that down, please,

12   Mr. Carbone.

13   Q.  Was the $1.4 million Trebitsh loan ever approved.

14   A.  No, I think it was approved for a significantly lesser

15   amount.

16           MR. NESSIM:  The government offers Government

17   Exhibit 560.

18           MR. BRAFMAN:  No objections.

19           THE COURT:  It will be admitted into evidence.

20           (Government's Exhibit 560 received in evidence)

21           MR. NESSIM:  Let's just publish this, please.

22   Q.  This is from Mordechai Freund to Moshe Rosenwasser and Matt

23   Salmon, and it's subject line Trebitsh.  And this is from

24   November 20, 2009, almost a month after the emails we were just

25   looking at, and it reads:

1          "I attach the list of open mortgage and payment info.

2          "Please note.  Trebitsh owns a 50 percent interest in

3   some buildings..." and then he says a few lines down:

4          "Please review and advise if you need anything

5   further.  It would be greatly appreciated if this can be

6   expedited.

7          "Thank you, and have a great weekend."

8          Let's just look at the second Trebitsh loan

9   presentation.  It's Government Exhibit 213, please,

10  Mr. Carbone.

11         What's the date of this presentation?

12  A.  December 18, 2009.

13  Q.  And what is the amount of the second Trebitsh loan

14  presentation?

15  A.  $300,000.

16         MR. NESSIM:  Let's zoom out, please, Mr. Carbone.

17  Let's turn to page 6.

18  Q.  What was the recommendation on this loan?

19  A.  The loan is recommended based on the following high credit

20  scores of the borrowers and high debt service coverage ratio.

21  Q.  And was this approved?

22  A.  Yes.

23  Q.  And the high debt service coverage ratio, Mr. Carbone, can

24  we turn up —— I think it's to page 4.  I'm sorry, might be ——

25  sorry, page 5.

1          So on the prior presentation, the debt service

2     coverage ratio was 1.24.  What is it here?

3     A.  3.33.

4     Q.  And is that because the debt service has been decreased

5     because the loan has decreased?

6     A.  The income is $150,000, and the debt service is $50,000

7     because the loan is down to $300,000.

8          MR. NESSIM:  OK.  Mr. Carbone, you can take that down,

9     please.

10    Q.  Who referred all the loans that we've looked at today?

11    A.  Mendel Zilberberg.

12    Q.  And in addition to referring the loans, what, if any, role

13    did Mr. Zilberberg continue to play in the consideration of

14    those loans?

15    A.  Well, Mr. Zilberberg or members of his office, or people

16    who presented themselves as being members of his office,

17    forwarded to me various different documents which I requested

18    or felt I needed.  And over the period of time, yeah, that was

19    their function.

20    Q.  And what did you understand about the accuracy of the

21    information that you included in the loan presentations that we

22    looked at?

23    A.  I understood that it was accurate.

24    Q.  And how did you use that information in determining the

25    creditworthiness of those borrowers?

1    A.  I used it.  It was — it was important, significant,

2    central.

3              MR. NESSIM:  One moment, your Honor.

4              No further questions.

5              THE COURT:  Did you want to take a break, quick break?

6              MR. BRAFMAN:  Yes, your Honor.

7              THE COURT:  Ladies and gentlemen, let me give you a

8    ten-minute break right now because I want to organize some

9    things here.  Don't discuss the case.  Keep an open mind.  I'll

10   bring you back out in ten minutes.

11             (Jury excused)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You want the witness in the witness room

3    while we discuss this?

4          MS. McLEOD:  Yes, the witness can step down.

5          THE COURT:  You can step down.

6          THE WITNESS:  Your Honor, if I brought my water up

7    rather than have this water that's been sitting up there four

8    hours --

9          THE COURT:  No, she pours it every time you come, but

10   you can bring your water.

11         THE WITNESS:  Thank you.

12         MR. BRAFMAN:  Your Honor ——

13         THE COURT:  How did you want to proceed, Mr. Brafman?

14         MR. BRAFMAN:  Your Honor, we need a minute or two to

15   review the proposed language to the charge so we can decide

16   whether we're still requesting that your Honor give it now.

17         THE COURT:  OK.  I pulled out some seminal language

18   out of the final instruction if that would be useful, but why

19   don't you look that over first.

20         MR. BRAFMAN:  Yes, it would.

21         MS. McLEOD:  Your Honor, would you like us to take a

22   look at the language you were planning on using or ——

23         THE COURT:  If you want to.

24         MS. McLEOD:  Yeah.

25         THE COURT:  You want me to take a look at the language

1    you're planning?

2              MS. McLEOD:  A little column A, column B.

3              MR. KAPLAN:  Judge, you use general Sands language for

4    the charge?

5              THE COURT:  Yes.  Did you use that?  I'm sure it's

6    very similar.

7              Why don't you give them a copy.

8              (Counsel confer)

9              MR. BRAFMAN:  Your Honor, we withdraw ——

10             THE COURT:  On the record.

11             MR. BRAFMAN:  Your Honor, we withdraw ——

12             THE COURT:  Yes, could everyone be seated, please.

13             Go ahead, Mr. Brafman.

14             MR. BRAFMAN:  Your Honor, respectfully, we are going

15   to ask for this instruction as part of the charge at the end of

16   the trial, but we are withdrawing our request that the Court

17   give the charge now.

18             THE COURT:  I have a more fuller instruction in the

19   final proposed charge.

20             MR. BRAFMAN:  Yes.

21             THE COURT:  As a matter of fact, every word of what's

22   on that sheet is in the final charge.

23             MR. BRAFMAN:  We understand, your Honor.

24             THE COURT:  And my concern is that, quite frankly, at

25   this point there's no evidence in this case that there was

1    anything wrong with these other loans.

2              MR. BRAFMAN:  Right.

3              THE COURT:  But if you want it at a different point in

4    the trial, I'll consider it, but I intend to make sure that I

5    give ⸺ and I'm pretty much giving the standard charge from

6    Sands --

7              MR. BRAFMAN:  Yes, your Honor.

8              THE COURT:  -- jury instructions on that issue.

9              So are you prepared to cross-examine?

10             MR. BRAFMAN:  Yes, your Honor.

11             THE COURT:  OK.  All right.  Then let's get the

12   witness first and then let's bring back the jury.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Cross-examination, Mr. Brafman.

3        MR. BRAFMAN:  Yes, your Honor.

4   CROSS-EXAMINATION

5   BY MR. BRAFMAN:

6   Q.  Good afternoon, Mr. Rosenwasser.

7   A.  Good afternoon.

8   Q.  I want to talk to you briefly about some of the general

9   experience that you had at the bank, Park Avenue Bank in

10  particular.  OK?

11  A.  Yes.

12  Q.  I think you testified that it was not uncommon for lawyers,

13  accountants, or even members of the board to refer clients to

14  the bank to try and obtain a loan.  Is that correct?

15  A.  That is correct.

16  Q.  And in fact, it was generally accepted practice that

17  lawyers and accountants and other business members of the

18  community or even board members would come to you with

19  recommendations, correct?

20  A.  Correct.

21  Q.  And, in fact, you noted on all of the loan presentations

22  that these individuals were, in fact, clients of

23  Mr. Zilberberg?

24  A.  Correct.

25        MR. NESSIM:  Objection.

1    Q.  That was not kept a secret by you or by any other people

2    who managed to see these loan presentations, correct?

3    A.  Correct.

4    Q.  And generally speaking — let's focus for a minute on the

5    Sauber loan.  This was someone who you spoke with, is that

6    correct?

7    A.  Correct.

8    Q.  And this was someone — did you also meet with him?  Did

9    you also meet with him?

10   A.  To the best of my recollection, yes.

11   Q.  Did you and he discuss several matters that had really

12   nothing to do with the loan?  For example, did he tell you that

13   he was in the wine business?

14   A.  He did.

15   Q.  And you had interest in kosher wine, is that correct?

16   A.  I did.

17   Q.  And you and he had this discussion at the bank?

18   A.  I think it was on the telephone.

19   Q.  And he also — you saw on his loan application that he

20   owned property in Connecticut, is that correct?

21   A.  There was no application.

22   Q.  I'm sorry.  On the loan — in the loan presentation he

23   mentioned property in Connecticut, correct?

24   A.  I was told that he had property in Connecticut, yes.

25   Q.  And you discussed that with him as well because your son

1   was considering going to a day school, Hebrew school, in

2   Connecticut, correct?

3   A.   Correct.

4   Q.   And you wanted to talk to him about the community that he

5   would maybe be living in, correct?

6   A.   That is correct.

7   Q.   And you had these discussions with Mr. Sauber in person or

8   by telephone on more than one occasion?

9   A.   At least on one occasion.

10  Q.   I'm sorry?

11  A.   At least on one occasion.

12  Q.   Now, when you listed Mr. Sauber as a client of

13  Mr. Zilberberg, did you get that information from

14  Mr. Zilberberg, from Mr. Sauber, or from both?

15  A.   From Mr. Zilberberg.

16  Q.   I'm sorry.  Didn't you also get that information from

17  Mr. Sauber?

18  A.   I don't recall that I did.  The probability is that I

19  didn't because I wouldn't question him.

20  Q.   But do you remember testifying in an investigation being

21  conducted by the FDIC?

22  A.   Yes.

23  Q.   And that was at least ten years ago, correct?

24  A.   It was in 2012 or '13, correct.

25  Q.   And at that time you were under oath, is that correct?

1  A.  Correct.

2  Q.  And this was at least ten years earlier, so it was a lot

3  closer to the transaction we're discussing, correct?

4  A.  Correct.

5  Q.  All right.  Now, do you remember being asked these

6  questions and giving these answers?  See if it refreshes your

7  recollection, page 403.

8         MS. McLEOD:  Can you give us a second to review it?

9         MR. BRAFMAN:  Yes.

10         MR. NESSIM:  Your Honor, may we be heard at sidebar?

11         THE COURT:  Yes.

12         (Continued on next page)

1          (At sidebar)

2          THE COURT:  Yes, sir.

3          MR. NESSIM:  As I understand it, Mr. Brafman is trying

4    to impeach his testimony that he told Sauber —— or Sauber told

5    him that he was his attorney, and it's not inconsistent with

6    the testimony he gave the FDIC.  So I think it's improper

7    impeachment.  In full context, he's saying he's not sure.  He

8    said here he's not sure.  He said he likely didn't.  His --

9          THE COURT:  Refreshes his recollection.

10          MR. BRAFMAN:  Your Honor, in cross-examining I'm going

11   to refresh your recollection because I'll read to you from the

12   transcript, and it begins on page 403:

13          "This is based on what Mr. Zilberberg told you rather

14   than what the borrower told you?

15          "I really can't say that.  I don't know.

16          "But you do know that you spoke to Mr. Zilberberg

17   about it.  You just said a minute ago.

18          "Right.  Somebody told he was a client.  So it was

19   either Mr. Zilberberg or probably both of them."

20          THE COURT:  OK.  So I'm not sure what you're doing

21   with the testimony.

22          MR. BRAFMAN:  Well, I'm refreshing his recollection

23   that at the FDIC, when he was asked these questions, he said it

24   was probably both of them.  That's critical to this case, your

25   Honor.  So maybe it refreshes the recollection, maybe it

1    doesn't, but ——

2            THE COURT:  I don't know what his answer is going to

3    be, but I don't think that that's an improper question.

4            MR. NESSIM:  If it's to refresh, then that's one

5    thing.  But to have him read it and say, does that refresh your

6    recollection, I suppose that's fine.  But the idea that this is

7    inconsistent with what he's already testified to such that he

8    should be impeached on it, that's what we have a problem with.

9            THE COURT:  That's for the jury to determine whether

10   it impeaches.  Obviously, the logic of it is the same to you as

11   it is to the jury.  He's saying he didn't know, then --

12           MR. BRAFMAN:  He said maybe it's probably both of

13   them, so I think ——

14           THE COURT:  Well, that doesn't probably mean anything.

15           MR. BRAFMAN:  No, but I can use his prior testimony to

16   refresh his recollection that when he was under oath ten years

17   ago, he said on this issue it was probably both of them.

18           MR. NESSIM:  But ——

19           MS. McLEOD:  I think ——

20           MR. NESSIM:  He can refresh his memory as to what he

21   remembers right now that's one thing, but the idea that the

22   statement can come in is only if it comes in for impeachment.

23           THE COURT:  My position is this:  You can ask the

24   question, and if you think, based on the answers, that you want

25   to redirect him on this, then you can address it with him.

1          MS. McLEOD:  He ——

2          THE COURT:  I don't think this makes the evidence any

3    different or inconsistent with what he just said.  He said it

4    didn't happen, and he said before his recollection was somewhat

5    different.  And if his recollection was not —— if his

6    recollection now is it didn't happen, but his recollection ten

7    years ago is that it might have happened, those two, different

8    statements.

9          MS. McLEOD:  I agree.  I think the issue is that, and

10   this has happened before, there has been a lot of improper

11   refreshing of recollection.  The way —— the way Mr. Brafman

12   should refresh recollection is he shows something to the

13   witness, he does not identify the document, he puts it in front

14   of him, asks him to read it silently, withdraws the document

15   and asks, Does that refresh your recollection as to X?  And

16   instead he wants to ——

17         THE COURT:  One at a time.

18         MS. McLEOD:  —— read him the testimony into the

19   record, and that is something that could be done if it were a

20   proper impeachment, but that's not what's happening.

21         MR. BRAFMAN:  It is impeachment.  It's a government

22   witness.  He has just said he got the information from

23   Mr. Zilberberg.  If you continue reading here, your Honor,

24   says:  It was probably both of them, because when I talked to

25   Mr. Sauber, I'm sure I would have referred to his lawyer,

1    Mr. Zilberberg.  In that conversation I would have said,

2    Mr. Zilberberg wants me to do this and asked me to do this.

3            THE COURT:  Look, look, I understand the government's

4    position, and I agree with the government's position with

5    regard to other documents or testimony that's not this witness'

6    testimony.  But the bottom line is he can ask this witness

7    about anything that he said on a different occasion that's not

8    exactly the same way he said at trial.

9            So this is his own testimony.  So he could ask him is

10   that true or does he remember that or is that accurate or is

11   what he's saying today accurate.  He can ask him that.  It's

12   his testimony.

13           MS. McLEOD:  I don't disagree in principle, in

14   general, with what your Honor's saying.  I think the issue is,

15   (1) I'm still not sure if you are refreshing recollection or

16   you're impeaching.

17           MR. BRAFMAN:  I'm not.  I'm impeaching.  That is your

18   witness.

19           MS. McLEOD:  OK.  So then if someone is impeaching,

20   the way you impeach is you establish what the testimony is,

21   which he's done, and then if it's inconsistent, then you say:

22   Isn't it true on this date you had this testimony — you asked

23   this question and gave this answer, and our — the reason we

24   objected is because there is not an inconsistency.  So to

25   impeach him with the testimony is therefore improper.  That's

1    what the objection was.

2           THE COURT:  Well, I don't disagree with you that

3    that's a way to impeach the witness, but that's not the only

4    way to impeach a witness.  This is his own testimony.  There's

5    no reason he can't be asked:  When you were asked that question

6    on another date, did you give a different answer?  And the

7    semantics of it is not going to make this any more or less

8    powerful as impeachment.

9           Obviously, if he'd stuck with what he said today, then

10   it would be a prior consistent statement.  If it's somewhat

11   different, then it's a prior inconsistent statement.  If

12   Mr. Brafman wants to argue to the jury that somehow his

13   testimony has been impeached, then the jury's smart, and you

14   can argue back to them that that's not what they heard.  And if

15   you want to clean this up, you can clean it up.  The witness

16   knows what he said and what he meant.

17          If he wants to — my feeling is he's going to give us

18   an answer that is going to make this moot and not as of such

19   import as Mr. Brafman wants it to be.  But he has the right to

20   ask him about this witness' prior testimony to the extent that

21   this witness gave some testimony that's either different,

22   either slightly or greater different or — or is testimony that

23   he doesn't remember now, that he's not being able to give.

24          Go ahead and ask the question.

25          MR. BRAFMAN:  Thank you.

1              (In open court; jurors present)

2              MR. BRAFMAN:  Thank you, Judge.  May I proceed?

3              THE COURT:  Yes.

4    BY MR. BRAFMAN:

5    Q.  Mr. Rosenwasser, I think you said a minute ago —— I'm just

6    trying to put this context.  I think you said a minute ago that

7    you recall getting the information that Mr. Sauber was a client

8    of Mr. Zilberberg from Mr. Zilberberg, correct?

9    A.  Yes.

10   Q.  You recall testifying before the FDIC?

11   A.  Yes.

12   Q.  And this was approximately ten years ago?

13   A.  Correct.

14   Q.  And at that time you were under oath as well?

15   A.  Correct.

16   Q.  And you were trying to remember as best as you could?

17   A.  Correct.

18   Q.  Do you remember being asked this question and giving this

19   answer:

20   "Q.  This is based on what Mr. Zilberberg told you rather than

21   what the borrower told you from your best recollection?

22   "A.  I really can't say that.  I don't know.

23   "Q.  But you know that you spoke to Mr. Zilberberg about it.

24   You just said that a minute ago.

25   "A.  Right.  Somebody told me he's a client.  So it is either

1    Mr. Zilberberg or probably both of them.

2    "Q.  I'm sorry.  I didn't mean to interrupt.

3    "A.  It was probably both of them, because when I talked to

4    Mr. Sauber, I'm sure I would have referred to his lawyer,

5    Mr. Zilberberg, in that conversation, and I would have said

6    Mr. Zilberberg wants me to do this and asked me to do this and

7    can I get this and are you going to give me this?"

8           Do you remember being asked those questions?

9    A.  Yes.

10   Q.  And does it refresh your recollection that when you were

11   asked these questions ten years ago, at that time you said it

12   was probably both of them, and in substance you then said that

13   it was Mr. Sauber because I referred to Mr. Zilberberg as his

14   lawyer?

15   A.  I don't think, with all due respect, sir, that you're

16   interpreting my response.  If you can show me my response,

17   please, then I'll be glad to tell you what I meant by it.

18           MR. BRAFMAN:  Can I show it to the witness, your

19   Honor?

20           THE COURT:  Yes.

21           MS. McLEOD:  Why don't we pull it up.

22           MR. BRAFMAN:  We can pull it up.  It's page 403.

23           THE COURT:  I'm not sure he can read that.

24           Can you read that?

25           THE WITNESS:  Right now, not — oh, yeah, I can.  OK.

1   A.  OK.  So I'm rereading my answer.  It was probably both of

2   them; in other words, recalling that I spoke to both of them,

3   because when I talked to Mr. Sauber, I'm sure I would have

4   referred to his lawyer, Mr. Zilberberg, in that conversation.

5   In other words, at that time, ten years ago, I surmised that I

6   would have probably spoken to his —— or referred to his lawyer

7   as Mr. Zilberberg in that conversation, and I would have said

8   —— I would have said that it was still —— I'm talking ten years

9   ago as far as what I would have said three years before that.

10  OK.  And I would have said Mr. Zilberberg wants me to do this

11  and asked me to do this and can I please —— thank you —— can I

12  get this?  "Get this" means can I get these documents that I

13  requested and I require, and are you going to give me this?

14  Q.  OK.

15  A.  "This" meaning whatever documents I asked for.

16  Q.  Right.  At that time did Mr. Sauber try and correct you by

17  saying, in words or substance, Mr. Zilberberg is not my lawyer?

18  A.  Oh, no, no, that would never have happened.  That would not

19  have happened.

20  Q.  So he, essentially, in words or substance, authorized you

21  to speak to Mr. Zilberberg about this loan application,

22  correct?

23          MR. NESSIM:  Objection.

24          THE COURT:  Sustained as the form of the question.

25  Q.  Did you get —— did you understand from this conversation

1  that Mr. Sauber was a client of Mr. Zilberberg?

2          MR. NESSIM:  Objection.  Mischaracterizes the witness'

3  testimony.

4          THE COURT:  Overruled.

5          You can answer that.

6          THE WITNESS:  I can answer it?

7          THE COURT:  Yes.

8          THE WITNESS:  OK.  Thank you.

9  A.  Yes.

10  Q.  Thank you.

11          And in that conversation, you remember — I'm sorry.

12          And you do remember quite clearly speaking to

13  Mr. Sauber himself about personal items like his wine business

14  and the community in Connecticut, right?

15  A.  Those aren't necessarily personal.

16  Q.  But you had those ——

17  A.  The wine business is a business that he owned and that I

18  thought I can take some collateral on.  The building that he

19  owned in Connecticut was meaningful to me.  Meaningful to me

20  personally, but also meaningful to me in terms of does it

21  present collateral?  Does it mean that the man is a wealthy man

22  and has the wherewithal to pay me?

23  Q.  Part of the reason you recall this conversation is because

24  (a) you too were interested in the wine business, correct?

25  A.  No.  I had financed a major winery at a previous bank.

1    Q.  So you knew about the wine business from that financing?

2    A.  I did.

3    Q.  And that's one of the reasons you questioned him about his

4    wine business?

5    A.  Correct.

6    Q.  To see what kind of a business was it, was it producing any

7    income, and so forth, correct?

8    A.  Correct.

9    Q.  Because, as your job as a banker, you were trying to see if

10   there was any additional collateral or financial wherewithal

11   for him to be able to support the loan?

12   A.  Or more business that I could do with the guy.

13   Q.  And when you talked to him about the property he listed in

14   Waterbury, Connecticut, that was interesting to you for two

15   reasons:  One, if it was a property, that might provide

16   additional collateral, correct?

17   A.  Correct.

18   Q.  And it also was of interest to you because your son was

19   thinking about moving to Waterbury, Connecticut, because they

20   have a Hebrew school in Waterbury, Connecticut, right?

21   A.  That is correct.

22   Q.  And you knew Mr. Sauber is an orthodox man?

23   A.  I surmised that he was orthodox.

24          MR. BRAFMAN:  Give me just a minute, your Honor.

25   Q.  Now, what's an exhibit as —— Government Exhibit 208 is the

1  loan write-up that you created from information you got from

2  Herschel Sauber and Pauline Sauber, correct?

3  A.  Regarding the loan that was requested by the Saubers,

4  correct.

5  Q.  And this was the loan for $1.4 million, correct?

6  A.  Correct.

7  Q.  And you indicate on this loan presentation at the bottom,

8  if you will, looking at the line right before the government

9  exhibit sticker, you indicate Mr. Sauber is a client of Mendel

10  Zilberberg, and you identify Mr. Zilberberg as a member of the

11  board of Park Avenue Bank, correct?

12  A.  That is correct, sir.

13  Q.  And this document follows the loan wherever the write-up

14  goes, is that correct?

15  A.  I didn't understand your question.

16  Q.  Does this document stay with you, or does it go on to

17  whoever else is going to review this loan at the bank?

18  A.  Oh, for sure, it goes to the reviewer.  I don't know if I

19  wrote this or not.  I need to see the last page.  But whether I

20  wrote it or one of the people who worked on my team wrote it,

21  that's irrelevant.  I'm responsible for it.  And it was shown

22  to anybody who signed it, and it becomes an integral part of

23  the loan file.

24  Q.  So the fact that Mr. Sauber was a client of Mr. Zilberberg

25  was something that whoever reviewed this document would at

1    least be advised of, correct?

2    A.  Correct.

3    Q.  Now, this document also —— if you look at the third page

4    where it says other requirements —— I'm sorry, recommendation,

5    "reviewed without recommendation," and that's your signature,

6    correct?

7    A.  That is so.

8    Q.  OK.  Now, you could write reviewed with recommendation,

9    reviewed without recommendation, or reviewed against

10   recommending the loan, correct?

11   A.  No, I would never have written I'm not recommending it.

12   Q.  OK.

13   A.  Because any loan that I don't recommend ends up in a box

14   under my bed —— under my desk.

15   Q.  OK.

16   A.  Doesn't get done.

17   Q.  So this was your way of saying I'm not recommending it, but

18   if you want to look at it, go ahead?

19   A.  Correct.

20   Q.  All right.  And the people who ultimately signed on this

21   loan was Edward Beyer, who was the chief lending officer, and

22   that's his signature, correct?

23   A.  Yes.

24   Q.  And Charles Antonucci, who was the chief executive officer

25   and also president, and that's his signature as well, correct?

1   A.   That is correct.

2   Q.   And you understood that if you are overruled, meaning in

3   the pecking order at the bank, it could still be approved by

4   these two people who were above you in seniority, correct?

5   A.   Correct.

6   Q.   Can I ask you a question, sir?  Do you have personal

7   knowledge of what Mr. Zilberg or Mr. Sauber or anybody else

8   may have told Mr. Antonucci or Mr. Beyer before they approved

9   the loan?

10  A.   No.

11  Q.   Can you testify with any reasonable degree of certainty

12  whether or not Mr. Zilberg told them that this was a client,

13  and I'm going to get fees from the proceeds of this loan?

14  A.   I have no idea.

15  Q.   OK.   Thank you.

16        Now, ultimately, Mr. and Mrs. Sauber personally signed

17  the loan agreement, the promissory note, correct?

18  A.   Correct.

19        MR. BRAFMAN:  And if we could put up Exhibit 211,

20  which is in evidence.  And if we could go to the last page, if

21  we can.  Sorry, the page before the last page.

22  Q.   Do you see the last —— notice of final agreement?

23  A.   Yes.

24  Q.   And is that a bank form?

25  A.   Yes.

1    Q.  And this bank form is signed by Herschel Sauber and Pauline

2    Sauber.  Do you see that?

3    A.  That is correct.

4    Q.  And when they sign this form, they're assuming ultimate

5    responsibility for paying back this loan, correct?

6    A.  Yes.

7    Q.  They have guaranteed the payment?

8    A.  They're the borrowers.  That's much stronger than being a

9    guarantor.

10   Q.  So if they sign this, they're responsible for the loan?

11   A.  Absolutely.

12   Q.  Now, do you know whether this loan was ultimately

13   defaulted?

14   A.  I have no idea.

15   Q.  Thank you.

16          Now let's talk about Mr. Klein.  OK.

17   A.  Go ahead.

18   Q.  At the time he was applying for a loan, he was someone that

19   the bank was interested in as becoming a depositor at the bank,

20   correct?

21   A.  Correct.

22   Q.  You knew him to be a fairly wealthy individual?

23   A.  I didn't know him.  He was introduced to me.

24   Q.  When he was introduced to you, you learned a lot about him?

25   A.  I learned about him.

1    Q.  And did you ultimately, in your presentation, about

2    Mr. Klein say, in words or substance, that he would be required

3    to maintain a $25,000 balance in his account at the bank?

4    A.  Yes.

5    Q.  It was one of the things that Park Avenue Bank tried to

6    insist on was if you're going to become a borrower, you're

7    going to have to keep accounts here as well, correct?

8    A.  Correct.

9    Q.  And the way it worked was if the borrower ultimately was

10   approved, the money would go directly to that account, correct?

11   A.  Correct.

12   Q.  Now, if we could look at Government Exhibit 210.

13           Do you see it, sir?  Do you have it before you?

14           I want to do them in order, so if we can take that

15   down and put up Exhibit 203, please.  Sorry.

16           This is the initial loan presentation, correct?

17   A.  Correct.

18   Q.  And this is for $600,000?

19   A.  That is correct.

20   Q.  And on the bottom you indicate that he is a client of

21   Mr. Zilberberg, Park Avenue Bank board member, correct?

22   A.  Yes, sir.

23   Q.  And in the description on page 2, it reads as follows:

24           Abraham Klein is the president of Laser Master

25   International, a publicly traded paper products manufacturer

1    and commercial printing company.

2           During 2007, Mr. Klein invested in Caring Home Care

3    Company, a home health care company, with a partner (50/50 ——

4    50 percent/50 percent ownership).  It was discovered that the

5    partner was colluding to steal money from the business.

6    Mr. Klein sued the partner upon this discovery.  Mr. Zilberberg

7    successfully arbitrated the case.

8           Did you write that?

9    A.  Yes.

10   Q.  And did you know that from anyone other than Mr. Zilberberg

11   or Mr. Klein?

12   A.  No.

13   Q.  So who did you learn this from?  Both?

14   A.  Probably both.

15   Q.  OK.  Now, it writes:  "Mr. Zilberberg successfully

16   arbitrated the case.  As a result, the judge granted sole

17   ownership to Mr. Klein and a judgment of $2.1 million from the

18   partner.  The company was placed into receivership this past

19   week until such time that the New York State Department of

20   Health approves a change in control to Mr. Klein."

21          Do you see that?

22   A.  Yes.

23   Q.  And you understood that once a company is in receivership,

24   until the new owner is approved by the New York State

25   Department of Health, a financial institution is prohibited

1  from lending them any money directly, correct?

2  A.  That was my understanding, yes.

3  Q.  OK.  Now, the company requires working capital to support

4  its activities.  $10 million in annualized sales; 2 million in

5  pro forma projected net income.  However, a financial

6  institution will not be able to lend to the company while it is

7  in receivership per Mr. Zilberberg.  As such, a $600,000

8  personal loan will be provided to Mr. Klein to in turn lend it

9  to Caring Company until such time that the ownership transfer

10  is approved by the New York City Department of Health, and

11  thereafter a traditional borrowing baseline of credit will be

12  provided to Caring.

13          You wanted Caring as a client and Mr. Klein as a

14  depositor, correct?

15  A.  I'm sorry.  I did not hear the question.

16  Q.  You wanted Mr. Klein and, if possible, his company to be a

17  depositor at Park Avenue Bank?

18  A.  Depositor and a borrower, correct.

19  Q.  So this $600,000 loan was what you might call in your

20  industry a bridge loan, correct?

21  A.  Correct.

22  Q.  It was $600,000 until the sale or the judgment to Mr. Klein

23  could be approved by the New York State Department of Health,

24  and then Mr. Klein would have plenty of money to pay back this

25  loan, presumably?

1    A.  Correct.

2    Q.  Now, you also had an understanding that he was the

3    president of Laser Master, and Mrs. Klein was a housewife.  His

4    tax returns for that company reported joint adjusted gross

5    income of 136,000 against 138,000 the prior year, consisting of

6    W-2 wages.  Is that correct?

7    A.  Yes.

8    Q.  And you asked Mr. Klein to also submit a personal financial

9    statement, correct?

10   A.  Correct.

11   Q.  Now, this loan was ultimately recommended for $600,000,

12   correct?

13   A.  Yes.

14   Q.  And that recommendation was prepared by Matthew Solomon,

15   correct?

16   A.  Salmon.

17   Q.  I'm sorry?

18   A.  Salmon.

19   Q.  Sorry, Matthew Salmon.

20          And he is part of the team that you worked with?

21   A.  Correct.

22   Q.  And it was reviewed by W.M. Dray, D-r-a-y.  He is also part

23   of your team?

24   A.  Yes.  He was a credit officer.

25   Q.  And then it was also —— the loan officer was you, correct?

1    A.  Correct.

2    Q.  All right.  Now, this was ultimately sent to Edward Beyer

3    and Charles Antonucci for approval, is that correct?

4    A.  Yes.

5    Q.  Now, then if we could look at Exhibit 210.  Do you have

6    that?

7    A.  Yes.

8    Q.  And sometime later, the million-dollar unsecured line of

9    credit was asked for, an increase from $600,000?

10   A.  Yes.

11   Q.  And it's the same person we're talking about, Mr. Klein?

12   A.  Yes.

13   Q.  And he would guarantee or sign, and he would be the

14   borrower?

15   A.  He's the borrower, correct.

16   Q.  So if you look at the second page, top, it says:

17   "Mr. Klein is a client of Mendy Zilberberg, PAB board member.

18   On 5/12/09, the bank approved a $600,000 line to the borrower.

19   The relationship is satisfactory and interest is current."

20           Did you type that or a member of your team do it?

21   A.  I don't recall.  But even if a member of my team did it,

22   I'm responsible for it.

23   Q.  So you have no reason to doubt that information when it was

24   included in this write-up?

25   A.  Correct.

1   Q.  All right.  Now, if you look at the third —— I'm sorry.  Go

2   up.

3   A.  Once again, not only did I not have reason to doubt it, I

4   probably verified this.

5   Q.  OK.

6   A.  It says the relationship is satisfactory; meaning that he

7   to date has done everything that was required.  And the

8   interest is current also.  So I probably not only believed it,

9   I probably verified it.

10  Q.  By verifying it, it gave you additional reason to feel

11  secure in extending —— increasing the line of credit, correct?

12  A.  That is correct.

13  Q.  And if you look at this paragraph which starts with

14  "Mr. Zilberberg":  "Mr. Zilberberg successfully arbitrated the

15  case.  As a result, the judge granted sole ownership to

16  Mr. Klein and a judgment of 2.1 million from the partner.  The

17  company was placed in receivership until such time as the New

18  York State Department of Health approves a change in control to

19  Mr. Klein.  On 9/17/909, Mr. Klein will come before the Public

20  Health Council for approval to own this license, and on 10/1/09

21  it will come before the full council for approval."

22          And did you verify it or was this provided to you by

23  Mr. Klein or Mr. Zilberberg?

24  A.  I don't recall.

25  Q.  Now, did you also learn that the previous owner, the

1  partner who he bought into, was essentially colluding to steal

2  from the company?

3  A.  That's what I was told, yes.

4  Q.  When you were told that, did you understand that the

5  $400,000 increase from 600,000 to a million was because the

6  previous owner had not forwarded withholding taxes to the city

7  or state?

8  A.  Correct.

9  Q.  And then you understood that the $400,000 increase ⸺

10  A.  Just let me interrupt.  I'm sorry, sir.  State or federal.

11  Q.  I'm sorry, you're right.

12  A.  I'm sorry.

13  Q.  It's OK.  It's OK.  I stand corrected.

14          Now, if you look at page 3, which is the following

15  page, please, that is a borrower's financial discussion:  "As

16  mentioned above, Mr. Klein is president of Laser Master, and

17  Mrs. Klein is a housewife."

18          Next paragraph:  "Mr. and Mrs. Klein submitted a joint

19  personal financial statement on PAB form dated 8/31/2009, on

20  which they reported a net worth of $17.7 million comprised

21  primarily of real estate and the judgments related to the

22  Caring Company arbitration (9.15 million plus 9.5 million,

23  three times the company's earnings).  The liquidity was

24  190,000."

25          Now, with a net worth of 17.7 million, you believed

1    that this loan was fair and appropriate and the risk was not

2    substantial to the bank, correct?

3    A.  Correct.

4    Q.  So whatever formula you were using, he passed that formula,

5    right?

6    A.  Yes.

7    Q.  Now, if you look at the last page, there is a "prepared by

8    Matthew Salmon" and there's initials.  Do you recognize them as

9    his initials?

10   A.  Yes.  Yes, I do.

11   Q.  And reviewed by W.M. Dray, and there seems to be a

12   signature there?

13   A.  Right.

14   Q.  Now ⎯

15   A.  It was in absentia, but ⎯ in other words, he reviewed it,

16   but he didn't ⎯ this is not his signature.

17   Q.  Then you signed it as well, correct?

18   A.  Correct.

19              (Continued on next page)

20

21

22

23

24

25

1              (In open court; jury present)

2    Q.   So this was a loan that you were willing to support?

3    A.   Correct.

4    Q.   And this is also approved by Edward Beyer and Charles

5    Antonucci, correct?

6    A.   Correct.

7    Q.   Now, did you feel that it was either out of the ordinary or

8    inappropriate to provide documents to the lawyer who referred

9    the loan, or to get documents from the lawyer who referred the

10   loan?

11   A.   No.

12   Q.   That happened on regular occasions, correct?

13   A.   Fairly regular, yeah.

14   Q.   So if I, as a lawyer, came to you and said I want you to

15   lend money to this person, my client, you would have no

16   hesitation then communicating with me, correct?

17   A.   Correct.

18   Q.   And if the lawyer, me in that instance, sent you document

19   after document, you would not find that -- you would not find

20   that out of the ordinary, correct?

21   A.   That is correct.

22   Q.   Now I'd like you to look at Government Exhibit 212.

23              That is the write-up for Moses Trebitsh, correct?

24   A.   Correct.

25   Q.   Did you understand him to be the father-in-law of Ari

1  Fried?

2  A.  No.

3  Q.  He never told you that?

4  A.  No.

5  Q.  Didn't he tell you that he was borrowing the money because

6  he was going to lend it to Ari Fried's business?

7  A.  Not that I recall.

8  Q.  Okay.  But this $1.4 million loan was not ultimately

9  approved, correct?

10  A.  Correct.

11  Q.  Because it was basically too much money in your judgment

12  for a man who owned a fruit store?

13  A.  Among other things, yes.

14  Q.  But the fruit store was on 13th Avenue in Borough Park,

15  correct?

16  A.  Correct.

17  Q.  And that's one of the busiest, if you know -- do you know

18  Borough Park at all?

19  A.  Actually, a branch I had worked at for a brief period of

20  time, about four or five months when I first started at Park

21  Avenue Bank, this store was exactly across the street.  So I

22  used to buy lunch there, and I was familiar with the store.

23  Q.  Okay.  But you understood 13th Avenue in Borough Park to be

24  perhaps one of the most, if not the most busy shopping streets

25  in that community, correct?

1    A.  Correct.

2    Q.  And most of the stores were mom and pop owned stores, not

3    major supermarket chains, correct?

4    A.  Correct.

5    Q.  And did you come to know Mr. Trebitsh at all?

6    A.  Met him.

7    Q.  Okay.  I just want to get --

8          MR. BRAFMAN:  Can we pull up Exhibit 213, please?

9    A.  I mean, if I met him, it doesn't mean we only shook hands.

10   I mean, he took me through his store, the back, the front, and

11   everything that was going on, and what he intended to do, et

12   cetera, et cetera.

13   Q.  I'm going to get to that in a second.

14   A.  Sorry.

15   Q.  It's okay.  Now, the $1,400,000 loan was never funded,

16   correct?

17   A.  Correct.

18   Q.  And, in your opinion, and your recommendation was that, you

19   know, it's just too much debt service for someone who owns

20   essentially a fruit store, correct?

21   A.  Correct.

22   Q.  And then he came back to you, or he came back out for an

23   application for a $300,000 unsecured line of credit, correct?

24   A.  Requested.

25   Q.  And that ultimately was deemed by you to be more

1   reasonable, correct?

2   A.  Correct.

3   Q.  And he ultimately got that?

4   A.  Correct.

5   Q.  Now, in connection with the $1.4 million loan, you were

6   told by Mr. Zilberberg, even though he referred the loan to

7   you, you were told by him, if you don't like it, if you don't

8   want to do it, don't do it?

9   A.  I don't recall those words specifically associated with

10  this, but definitely that was the tone of --

11  Q.  Of the conversation?

12  A.  -- the conversation or of the relationship.  In other

13  words, we never -- I don't believe he would ever tell me,

14  Moshe, you better do this, otherwise you're out of a job

15  tomorrow.

16  Q.  And he would never have twisted your arm?

17  A.  Whereupon I would have told him to go to hell, but that's

18  besides the point.

19  Q.  I'm sorry?

20  A.  I would have told him to go to hell.

21  Q.  I understand that, but let's move beyond that, because you

22  agreed he never twisted your arm into doing a loan you didn't

23  feel comfortable with, correct?

24  A.  It would have never happened.

25  Q.  Now, in connection with this loan, this was approved,

1    correct?

2    A.   The $300,000, yes.

3    Q.   Okay.  Now, if you look at page 2 of this application, or

4    this write-up -- I'm sorry, page 3, this lists the assets that

5    Mr. Trebitsh provided to the bank, correct?

6    A.   Correct.

7    Q.   And you are aware of the value at the time, approximate

8    value of real estate in Borough Park?

9    A.   I had an idea.

10   Q.   Okay.  Now --

11   A.   By the way, when you say Mr. Trebitsh provided it, I'm not

12   sure if he himself went in or somebody else provided it on his

13   behalf.  I'm not sure.

14   Q.   Okay.

15   A.   I can't comment on that.

16   Q.   All right.  But with respect to this loan, in words or

17   substance, he told you that he wants to combine the two stores

18   and make them into one big store, correct?

19   A.   That is correct.

20   Q.   And you actually went to him for what in your industry is

21   called a site visit, where you actually go to the store and

22   look at what the plan is, correct?

23   A.   Correct.

24   Q.   And when you went to the store, did you see that it was

25   really two stores that he wanted to combine?

1   A.  There was -- there was definitely a passageway between the

2   two stores that he had put up, and it was very apparent that

3   the other store was going to be added to his existing store.

4   Q.  Okay.  So at the end of the day, this loan was funded,

5   correct?

6   A.  I believe so.

7   Q.  And you asked him to open an account at your bank, correct?

8   A.  Correct.

9   Q.  And the $300,000 went into that account, correct?

10  A.  I presume.

11  Q.  Okay.  Now, if we look at page 6 of this document, you were

12  listed as the loan officer, correct?

13  A.  Correct.

14  Q.  And Mr. Dray is listed as having reviewed the loan?

15  A.  Correct.

16  Q.  And Mr. Salmon is -- said it was prepared by him?

17  A.  Yes.

18  Q.  And they have initials next to their names?

19  A.  Correct.

20  Q.  And you signed this as well, correct?

21  A.  Correct.

22  Q.  Now, this was ultimately approved by two different people,

23  because Edward Beyer was no longer the chief lending officer at

24  this time, correct?

25  A.  I am not sure that that's correct.

1    Q.  Well, who signed it as the chairman and CEO?

2    A.  Mr. Glascoff.

3    Q.  I'm sorry?

4    A.  Mr. Glascoff.

5    Q.  And did he become the chairman and CEO, as he writes under

6    this signature?

7    A.  He was the chairman and CEO, yes.

8    Q.  And Chuck Price is listed as the president; is that

9    correct?

10   A.  That is correct.

11   Q.  And he was the president?

12   A.  Yes, he was.

13   Q.  And he approved the loan as well?

14   A.  They both approved the loan, that's correct.

15   Q.  Now, when you say that there were rumors circulating about

16   the bank, isn't it true that one of the rumors that was

17   circulating was that another bank was trying to buy the bank?

18   A.  Yes.

19   Q.  And there were actually people coming into the bank and

20   meeting with officers of the bank on a regular basis, correct?

21   A.  Yes, there were.

22   Q.  So was everybody there sort of skittish about whether or

23   not they were going to have a job if a new bank bought the

24   bank?

25   A.  Yes.

1  Q.  And would you agree that there was certain concern that if

2  the bank was bought by another bank, that there would be a lull

3  in the lending process?

4          MR. NESSIM:  Objection.

5          THE COURT:  Overruled.  He can answer.

6  Q.  Sir, you may answer.

7  A.  You need to repeat the question.

8  Q.  Okay.

9  A.  I'm sorry.

10  Q.  That's all right.

11          You remember testifying about Exhibit 403, which is an

12  email from Mr. Zilberberg to you --

13  A.  I'm sorry.  You were going to repeat the question or not?

14  Q.  I'm going to withdraw it for now, and then I will go back

15  to it.

16  A.  Okay.  Fine.  It's just I didn't hear.  My hearing's not

17  great.

18          MR. BRAFMAN:  Okay.  Government Exhibit 403, can we

19  put that up, please?  Can we scroll -- if we highlight the

20  bottom --

21  Q.  This is an email that the government asked you about just a

22  couple of minutes ago.  Do you recall?

23  A.  Yes, sir.

24  Q.  And it's from Mr. Zilberberg to you, and it says, "you will

25  have documents emailed within the next half hour from Stacey in

1    my office.  The only thing missing is the appraisal, which you

2    will have tomorrow a.m.  Please process ASAP.  And remember the

3    other matters we discussed Friday.  I remember the story of

4    Cinderella who had until 12:00 to do what had to be done and

5    afterward the pumpkin thing."

6          Do you understand what that means?

7    A.  Yes.

8    Q.  Okay.  Can you move up a little bit?

9          You then responded, "don't worry.  Charlie says he

10   will not stop lending."

11         Correct?

12   A.  Correct.

13   Q.  All right.  So Mr. Zilberberg was expressing concern, as

14   you understood it, that with all these rumors going around,

15   these loans may never close?

16   A.  They may never get approved.

17   Q.  Okay.  So he was expressing some sense of urgency, right?

18   A.  Correct.

19   Q.  All right.  Now, do you remember expressing the thought

20   that sort of at Park Avenue Bank everything was urgent?

21   A.  I can't say that.  I cannot say that, no.

22   Q.  Well, can you say it now?  Was everything at Park Avenue

23   Bank at that time somewhat urgent?

24   A.  I can't agree with that statement, no.

25   Q.  Okay.  Let me ask you if you remember --

1   A.  We liked to get things done.  We liked to get things done

2   quickly and with alacrity.  We liked to be on top of our game,

3   perhaps more so than at other times, but still we wanted to do

4   what we had to do, and in the proper way.

5   Q.  Now, when a loan was recommended by someone who was

6   familiar with the process, was it unusual for them to try and

7   process it as quickly as possible?

8   A.  No.  It was very common.

9   Q.  Now, when I use the word "urgent" -- do you remember being

10  asked this question.  I'm referring to page 388 and page 389.

11  "Did you feel any" --

12          MR. BRAFMAN:  You can put it up, please.

13  Q.  Question, on the bottom of page 388, "did you feel any

14  sense of urgency about reviewing and approving this loan?"

15          Answer, continuing to the -- "oh, everything in Park

16  Avenue was urgent.  It was never take your time, we've got

17  plenty of time.  Not at Park Avenue Bank."

18          Question, "but Mr. Zilberberg in these emails was

19  repeatedly asking you when this would fund, and are we on

20  track, and that sort of thing, right?"

21          Answer, "that's the way he was.  There's nobody who

22  brought me a piece of business who took a back seat and said,

23  okay, you handle it on your own.  Don't worry."  You said,

24  "doesn't happen."

25          Do you remember being asked those questions and giving

1    those answers?

2    A.  Yes, I do.

3            MR. BRAFMAN:  Okay.  You can take it down, please.

4            Your Honor, I may be done.  I just want to check with

5    my associates.

6            THE COURT:  Yes.

7            MR. BRAFMAN:  Your Honor, I think I'm done.

8            Thank you, Mr. Rosenwasser.

9            THE COURT:  Any further questions by the government?

10           MR. NESSIM:  Very briefly, your Honor.

11           MR. BRAFMAN:  Just give me a minute.

12   REDIRECT EXAMINATION

13   BY MR. NESSIM:

14   Q.  Mr. Rosenwasser, you had some questions on

15   cross-examination about whether Mr. Sauber or Mr. Zilberberg

16   made certain statements to you about the loan.

17           Do you remember those questions?

18   A.  Yes.

19   Q.  You testified on direct that all of the statements in the

20   loan presentations that you prepared and reviewed, you

21   understood all those statements to be accurate, right?

22   A.  Correct.

23   Q.  And that includes --

24           MR. NESSIM:  If you can just pull up Government

25   Exhibit 208, Mr. Carbone.

1    Q.  Like you understood, for example, it was accurate that the

2    borrower on this $1.4 million loan was Herschel Sauber, Pauline

3    Sauber?

4    A.  Yes.

5    Q.  And you understood it was accurate that they were going to

6    use this loan for working capital for their business

7    investments?

8    A.  Correct.

9          MR. NESSIM:  You can zoom out of that, please,

10   Mr. Carbone.

11   Q.  And just as another example, you understood it was accurate

12   that Mr. Sauber was a client of Mr. Zilberberg?

13   A.  Correct.

14         MR. NESSIM:  And, Mr. Carbone, let's go to page 2 for

15   a second.

16   Q.  And you understood, as another example, that it was

17   accurate that Mr. Sauber owned a three-family house in Borough

18   Park with a value of $2.5 million?

19   A.  Yeah.

20   Q.  You understood everything here was accurate as you reported

21   it to the bank?

22   A.  Yes.

23   Q.  And that's true across all of the loan presentations?

24   A.  Yes.

25   Q.  And some of this information you used for the loan

1  presentations came from Mr. Zilberberg and his employees,

2  right?

3  A.   The information came in -- yes, definitely, some

4  information came from Mr. Zilberberg's office, absolutely, yes.

5              MR. NESSIM:  You can take it down, please,

6  Mr. Carbone.

7              Nothing further.

8              THE COURT:  Anything further from the defense?

9              MR. BRAFMAN:  Nothing further, your Honor.

10             THE COURT:  Thank you, sir.  You can step down.

11             THE WITNESS:  Oh, great.

12             THE COURT:  The government can call its next witness.

13             MR. NESSIM:  Your Honor, the government calls Moses

14  Trebitsh.

15             THE COURT:  You can step up, sir, right into the box.

16  Thank you.

17             Stand there for a second.

18             THE DEPUTY CLERK:  Please raise your right hand.

19             (Witness sworn)

20             THE COURT:  You can be seated, sir.

21             Just get a little closer to the microphone, and point

22  it to your mouth.

23             Thank you.

24             You can inquire, Mr. Nessim.

25             MR. NESSIM:  Thank you, your Honor.

1    MOSES TREBITSH,

2          called as a witness by the government,

3          having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. NESSIM:

6    Q.  Good afternoon, Mr. Trebitsh.

7          In what neighborhood do you live?

8    A.  Brooklyn, in Borough Park.

9    Q.  And how far did you go in school?

10   A.  I didn't go to school.

11         THE COURT:  You have to speak much louder, and into

12   the mic.

13         THE WITNESS:  Okay.

14         THE COURT:  Shout it.

15   Q.  You said you didn't go to school?

16   A.  I didn't.

17   Q.  What do you do for work?

18   A.  I don't work already.

19   Q.  You are retired?

20   A.  Yes.

21   Q.  Prior to your retirement, what did you do for work?

22   A.  I had a fruit store.

23   Q.  What's the name of the fruit store?

24   A.  Aron's Fruit Store.

25   Q.  Are you still an owner of Aron's Fruit Store?

1    A.  Yes, I think so.

2    Q.  Where is it located?

3    A.  5208 13th Avenue.

4    Q.  Are you familiar with a person named Aron Fried?

5    A.  Yes.

6    Q.  How do you know him?

7    A.  My son-in-law.

8    Q.  Did there come a time when you applied for a loan in

9    approximately 2009?

10   A.  Yes.

11   Q.  From what bank?

12   A.  I don't remember the name of the bank.

13   Q.  Did you apply for the loan because someone asked you to

14   apply for it?

15   A.  No.  I wanted to help my son -- my son-in-law to go into

16   business.  I took out a loan.

17   Q.  So you took out the loan for your son-in-law?

18   A.  Yeah.  He should be able to open a business.

19   Q.  Was the money from the loan supposed to be for your

20   business or for your son-in-law's benefit?

21   A.  I guess it was supposed to go to me.

22   Q.  But were you supposed to keep the money or were you

23   supposed to give it to someone else?

24   A.  I don't remember.  I don't remember.  I can't remember.

25   Q.  Did you keep the money?

1    A.  No.

2    Q.  Who did you give the money to?

3    A.  To my son-in-law, Ari Fried.

4    Q.  In addition to your son-in-law -- or excuse me.  Withdrawn.

5            Are you familiar with someone named Mendel Zilberberg?

6    A.  Yes.

7    Q.  Was he involved in this loan?

8    A.  It went through him, I guess so.

9    Q.  And did you meet with him during the course of the loan

10   going through him?

11   A.  Yes, once.

12   Q.  And what did you do in that meeting?

13   A.  I don't remember exactly.

14   Q.  Did you fill out any paperwork during that meeting?

15   A.  I don't remember exactly what it was.

16   Q.  But did you meet with Mr. Zilberberg?

17   A.  Yes.

18   Q.  Once?

19   A.  In his office.

20   Q.  And was Mr. Fried there as well?

21   A.  I think so.

22   Q.  And you said the money went to Mr. Fried when you received

23   the money from the loan?

24   A.  Yes.

25   Q.  Just to be clear, the money from the loan, did all of it go

1  to Mr. Fried, or just a portion of it?

2  A.  I'm not sure.  I think it all.  I'm not sure.

3  Q.  Did you keep any of it?

4  A.  No.

5          MR. NESSIM:  Nothing further, your Honor.

6          MR. BRAFMAN:  I just have a couple of questions, sir.

7          THE COURT:  Yes.

8  CROSS-EXAMINATION

9  BY MR. BRAFMAN:

10 Q.  Mr. Trebitsh, I'm one of the lawyers who represents

11 Mr. Zilberberg.  I just want to ask you a couple of quick

12 questions.

13         When you say you don't remember, it's because you

14 really don't remember?  This happened a long time ago, correct?

15 A.  Yes.

16 Q.  Now, Ari Fried, who was your son-in-law at the time, was

17 running a health care business, Emanuel; is that correct?

18 A.  Yes, I think so.

19 Q.  And he wanted money to invest into that business, correct?

20 A.  I'm not sure exactly what it was then.  He needed it for

21 his business.  I don't know for which -- I don't remember which

22 one he needed it.

23 Q.  All right.  Is this the first time he asked you for money

24 for his business?

25 A.  Yeah.

1           MR. BRAFMAN:  I have nothing further, your Honor.

2           THE COURT:  Any further questions?

3           MR. NESSIM:  No, your Honor.

4           THE COURT:  Thank you, sir.  You can step down.

5           THE WITNESS:  Thank you very much.

6           THE COURT:  All right.  Ladies and gentlemen --

7           Go ahead.  Watch your step.

8           THE WITNESS:  Thank you.

9           THE COURT:  Ladies and gentlemen, we're going to

10   adjourn for the weekend.  We're going to hear some witnesses on

11   Monday.  We may finish the witnesses on Monday.  If we finish

12   the witnesses on Monday, on Tuesday we'll have the closing

13   arguments, the summations of the lawyers, I'll give you

14   instructions on the law, and I'll send you in to begin your

15   deliberations.

16           All right.  Now, depending exactly how many witnesses

17   we have, then I'll know Monday morning whether it's going to be

18   a full day, a little more than a day, or it may even be less

19   than a day on Monday, and we can be prepared for you on

20   Tuesday.  So at this point I'm shooting to give the case to you

21   Tuesday.  If we get delayed for any reason, obviously it could

22   spill over a day, but that's my best estimate.  So if we can,

23   hopefully, finish the witnesses on Monday, and give the case to

24   you for deliberation on Tuesday.

25           I will see you on Monday morning at 9:45.  Have a nice

1    weekend and relax.  I'll see you next week.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  So the government thinks you'll probably

3    take the morning to do your two witnesses?

4              MR. NESSIM:  I think we will probably rest in the

5    morning, but, you know --

6              THE COURT:  Sure.  We'll have the day flexible.

7              MR. NESSIM:  Right.

8              THE COURT:  What I'm going to try to do is give you a

9    rough draft of the charge, so you can have it over the weekend

10   and start going through this, so we can be prepared to move

11   efficiently into a charging conference as soon as we discharge

12   the jury and finish the witnesses, right after motions.  As I

13   indicated to them, hopefully, we can finish up all of the

14   witnesses on Monday, and give the case to the jury to begin

15   their deliberations on Tuesday.

16             All right.  Is there anything else we need to address?

17             MR. NESSIM:  No, sir.  Not on behalf of the

18   government.

19             THE COURT:  All right.  I think what I'll do is have

20   my law clerk -- we're making some changes right now.  I will

21   have my law clerk, probably within the hour, email it to you,

22   so you can go over the jury instructions.  All right?

23             MR. NESSIM:  Yes.  Thank you, your Honor.

24             THE COURT:  Have a nice weekend.  I'll see you Monday

25   morning, 9:45.

1                  (Adjourned until July 10, 2023, at 9:45 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination  of:                        Page

3    MORDECHAI FREUND

4    Direct By Mr. Nessim . . . . . . . . . . . . 315

5    Cross By Mr. Kaplan  . . . . . . . . . . . 352

6    Redirect By Mr. Nessim . . . . . . . . . . . 374

7    MOSHE ROSENWASSER

8    Direct By Mr. Nessim . . . . . . . . . . . . 381

9    Cross By Mr. Brafman . . . . . . . . . . . 450

10   Redirect By Mr. Nessim . . . . . . . . . . . 486

11    MOSES TREBITSH

12   Direct By Mr. Nessim . . . . . . . . . . . . 489

13   Cross By Mr. Brafman . . . . . . . . . . . 492

14                   GOVERNMENT EXHIBITS

15   Exhibit No.                         Received

16   1004   . . . . . . . . . . . . . . . . . . 317

17   602  . . . . . . . . . . . . . . . . . . 318

18   401  . . . . . . . . . . . . . . . . . . 320

19   402  . . . . . . . . . . . . . . . . . . 320

20   603  . . . . . . . . . . . . . . . . . . 321

21   604  . . . . . . . . . . . . . . . . . . 322

22   605  . . . . . . . . . . . . . . . . . . 324

23   412  . . . . . . . . . . . . . . . . . . 325

24   413  . . . . . . . . . . . . . . . . . . 327

25   436  . . . . . . . . . . . . . . . . . . 328

1    414    . . . . . . . . . . . . . . . . . . . 329

2    423    . . . . . . . . . . . . . . . . . . . 330

3    417    . . . . . . . . . . . . . . . . . . . 332

4    417    . . . . . . . . . . . . . . . . . . . 333

5    422    . . . . . . . . . . . . . . . . . . . 335

6    416    . . . . . . . . . . . . . . . . . . . 336

7    421    . . . . . . . . . . . . . . . . . . . 336

8    424    . . . . . . . . . . . . . . . . . . . 337

9    428    . . . . . . . . . . . . . . . . . . . 338

10   427    . . . . . . . . . . . . . . . . . . . 340

11   426    . . . . . . . . . . . . . . . . . . . 341

12   425    . . . . . . . . . . . . . . . . . . . 344

13   429    . . . . . . . . . . . . . . . . . . . 345

14   430    . . . . . . . . . . . . . . . . . . . 345

15   552    . . . . . . . . . . . . . . . . . . . 346

16   555    . . . . . . . . . . . . . . . . . . . 347

17   554    . . . . . . . . . . . . . . . . . . . 347

18   557    . . . . . . . . . . . . . . . . . . . 348

19   558    . . . . . . . . . . . . . . . . . . . 348

20   506    . . . . . . . . . . . . . . . . . . . 349

21   415, 419, and 420    . . . . . . . . . . . . 352

22   203, 210, 212, and 213    . . . . . . . . . . 399

23   502    . . . . . . . . . . . . . . . . . . . 402

24   504    . . . . . . . . . . . . . . . . . . . 405

25   404    . . . . . . . . . . . . . . . . . . . 408

499

1   405  . . . . . . . . . . . . . . . . . 410

2   406  . . . . . . . . . . . . . . . . . 411

3   403  . . . . . . . . . . . . . . . . . 412

4   551  . . . . . . . . . . . . . . . . . 414

5   407  . . . . . . . . . . . . . . . . . 415

6   505  . . . . . . . . . . . . . . . . . 418

7   408  . . . . . . . . . . . . . . . . . 426

8   409  . . . . . . . . . . . . . . . . . 428

9   410  . . . . . . . . . . . . . . . . . 429

10  411  . . . . . . . . . . . . . . . . . 431

11  553  . . . . . . . . . . . . . . . . . 437

12  556  . . . . . . . . . . . . . . . . . 437

13  559  . . . . . . . . . . . . . . . . . 442

14  560  . . . . . . . . . . . . . . . . . 443

15

16

17

18

19

20

21

22

23

24

25